Teresa Li (Bar No. 278779)
teresa@lawofficesofteresali.com
LAW OFFICES OF TERESA LI, PC
315 Montgomery Street, 9th Floor
San Francisco, California 94104
Telephone:   415.423.3377
Facsimile:   888.646.5493

Attorneys for Plaintiffs
RUBEN JUAREZ and ISELA HERNANDEZ

Daniel K. Balaban
Daniel@dbaslaw.com
BALABAN & SPIELBERGER, LLP
11999 San Vincente Boulevard, Suite 345
Los Angles, CA 90049
Telephone:   424.832.7677
Facsimile:   424.832.7702

Attorneys for Plaintiffs
RUBEN JUAREZ and ISELA HERNANDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN JUAREZ, an individual and ISELA HERNANDEZ, an individual<br><br>Plaintiffs,<br><br>v.<br><br>PRECISION VALVE & AUTOMATION, Inc., a corporation and DOES 1-20<br><br>Defendants. | Case No. 2:17-cv-03342<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**GENERAL NEGLIGENCE**<br>**STRICT LIABILITY**<br>**FAILURE TO WARN**<br>**LOSS OF CONSORTIUM**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs RUBEN JUAREZ and ISELA HERNANDEZ hereby file this Complaint for Relief and Demand for Jury Trial against Defendant PRECISION VALVE & AUTOMATION, INC., (a New York Corporation) and alleges as follows:

FIRST AMENDED COMPLAINT

**PARTIES AND JURISDICTION**

1. The Plaintiffs RUBEN JUAREZ and ISELA HERNANDEZ reside in Granada Hills, CA 91344, in the County of Los Angeles within the State of California. During all relevant time, Plaintiff ISELA HERNANDEZ is Plaintiff's RUBEN JUAREZ's lawful wife.

2. During all relevant time, the alleged injuries occurred in the County of Los Angeles within the State of California.

3. Defendant PRECISION VALVE & AUTOMATION, INC. ("PVA") is a New York Corporation and its principal place of business is 1 Mustang Drive, Cohoes, New York, 12047.

4. Defendant PVA designed, manufactured, and sold PVA 350, a benchtop dispensing / coating system that sprays chemicals to circuit boards.

5. Before 2012, PVA designed, manufactured, and sold at least a PVA 350 to one of Space Exploration Technologies Corp. ("Space X") California locations in Hawthorne, CA, a County of Los Angeles.

6. On information and belief, before the sales of the PVA 350, PVA had samples of the chemicals to be sprayed by the PVA 350. As a result, PVA knew or should have known the toxicity of the chemicals to be used by the PVA 350.

7. Plaintiffs are unaware of the true names and capacities of those Defendants sued herein as DOES 1-20, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of said Defendants, when the same have been ascertained, together with such other charging allegations as may be appropriate.

8. Plaintiffs are informed and believe, and thereupon allege, that each Defendant designated as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereafter referred to, and caused injuries and damages proximately thereby to plaintiffs, as hereinafter alleged, either

through said defendants' own negligent conduct, or through the conduct of their agents, servants or employees, or in some other manner as yet unknown.

9. Plaintiffs are informed and believe, and thereupon allege, that at all times mentioned herein, defendants and each of them, were the agents, servants, employees, independent contractors and/or joint venturers of their co-defendants and were, as such, acting within the scope, course and authority of said agency, employment, contract, and/or joint venture, or acting in the concert, and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection, hiring, training, control, and supervision of each and every other defendant as an agent, servant, employee, independent contractor and/or joint venture.

10. At some or all relevant herein, each Defendant was the agent of each other defendant, each Defendant was acting within the court and scope of that agency, each Defendant ratified the conduct of the other Defendants with actual and/or constructive knowledge of such conduct, and each Defendant was subject to and under the supervision of the other defendant.

**GENERAL ALLEGATIONS**

11. PVA 350 is a benchtop dispensing / coating system that sprays chemicals to circuit boards, manufactured, designed, supplied, installed, inspected, repaired, and sold by Defendant PVA. Once programmed, PVA can automatically spray chemicals without an attendant constantly on duty.

12. PVA 350 does not have an automatic shutoff and does not sound an alarm when the ventilation / exhaust is not in operation. In other words, PVA 350 is designed to continue to spray chemicals even when the ventilation / exhaust is not in operation. Furthermore, there is no warning anywhere about this.

13. On information and belief, to add the automatic shutoff, PVA only needs to include an airflow sensor or something similar.

14. On January 2012, Plaintiff RUBEN JUAREZ started working for Space X as a programmer for a PVA 350 that sprayed chemicals to circuit boards at Space X's Hawthorne, CA location. Plaintiff RUBEN JUAREZ worked there with the PVA 350 until May or June of 2014.

15. During Plaintiff RUBEN JUAREZ's time at Space X, Plaintiff RUBEN JUAREZ was in charge of programming the PVA 350 to spray Arathane® 5750A, Arathane® 5750B, Arathane® 5750A/B, and Humiseal®, Humiseal® thinner.

16. PVA trained Plaintiff RUBNE JUAREZ that in order to verify whether the equipment correctly sprayed the chemicals, Plaintiff RUBNE JUAREZ had to stick his head into the spraying chamber of the conformal coating machine to verify. He had to do this because the spray is usually transparent and is very fine with tiny thickness and therefore, a naked eye cannot identify whether or not certain part of the circuit board has been sprayed or the thickness of the spray. The only way to verify this is to use a black light and poke his head inside the PVA 350 to check. He could not take the circuit board out of the PVA 350 to verify this because it is wet and thus, any handling of the board would destroy the accuracy of the spray.

17. During Plaintiff RUBEN JUAREZ's time at Space X from 2012 to 2014, he had confirmation that the ventilation system to the PVA 350 was not in operation many times: he asked his co-worker why it always smelt so bad in the room, the co-worker told Mr. Juarez that he just realized that he had forgotten to turn on the ventilation system.

18. When the exhaust fan was not in operation, Plaintiff RUBEN JUAREZ unknowingly breathed in the chemicals during the verification process because his head was directly emerged inside the PVA 350 with the toxic chemicals floating inside it.

19. In addition, when the exhaust fan was not in operation, the chemicals leaked out of the PVA 350. Plaintiff RUBEN JUAREZ on average spent about 60% of his days standing right next to the PVA 350.

20. The MSDS of Arathane® 5750A shows that it contains chemicals toluene, diphenylmethane 4, 4'-diisocyanate, MDI Homopolymer, methylenediphenyldiisocryanate ("MDI"), and triethyl phosphate. It further provides that the chronic health effects from the exposure to the chemicals "can cause target organ damage" that include "upper respiratory tract," "the nervous system . . . brain, central nervous system (CNS)."

21. The MSDS of Arathane® 5750B shows that it contains chemicals toluene, hydroxylated polybutadiene, methyl ethyl ketone, 1, 1'-phenyliminodipropan-2-ol. It further provides that the chronic health effects of exposure to the chemicals "can cause target organ damage" including "the nervous system . . . brain, gastrointestinal tract, central nervous system (CNS)." Over-exposure will aggravate the medical conditions.

22. The MSDS of Humiseal® shows that it contains chemicals toluene, acetone, xylene, ethyl benzene, methyl ethyl ketone, dimethyl ether, heptane, ethyl 3 ethoxy propionate, and oil mod. Polyurethane. It further provides that inhalation of the chemicals can "[c]ause irritation of nasal passages and throat" and "stupor (central nervous system depression)." "Significant exposure to these chemicals may adversely affect people with chronic disease of the respiratory system" and "central nervous system." And an inhalation may "cause mild nausea/dizziness."

23. The MSDS of Humiseal® thinner 521 EU that it contains chemicals xylene. It further provides "[s]ignificant exposure to these chemicals may adversely affect people with chronic disease of the respiratory system [and] central nervous system." Inhalation may cause nausea/dizziness.

24. The scientific community has generally accepted the effects of

prolonged exposure to these chemicals. For example, Center of Disease Control's ("CDC") publishes that "[s]ymptoms of toluene poisoning include CNC effects (headache, dizziness, ataxia, drowsiness, euphoria . . . . respiratory depression, nausea . . . electrolyte imbalances)." United States Department of Labor Occupational Safety and Health Administration notes that symptoms of toluene exposure include "weakness, exhaustion, confusion, euphoria, dizziness, headache . . . anxiety, muscle fatigue, insomnia" and that "long term and repeated workplace exposure to toluene affect the central nervous system." Environmental Protection Agency ("EPA") also notes that chronic effect of toluene exposure can cause "CNS depression," leading to drowsiness, headache, dizziness, and neurobehavioral effects.

25. Similarly, symptoms from exposure to MDI include "headache, sore throat . . . chest tightness." A study of 203 school children who were exposed to MDI shows that 70.9% reported headache, and 62.6% reported nausea. The effects of chronic exposure of MDI include "headache, nausea and muscle aches. "There are also case reports of neurological effects" of "headaches, forgetfulness, mood alterations, irritability, and difficulty concentrating." "[T]here was evidence of emotional distress in the form of depression, anxiety, and altered mentation."

26. On information and belief, before a benchtop dispensing system is designed and manufactured by PVA, Space X sends samples of its toxic chemicals to PVA for customization. So, PVA knew or should have known the exact type of chemicals used by its PVA 350 and the dangerous health consequences from exposure to these chemicals if the exhaust/ventilation is not in operation.

27. Plaintiff RUBEN JUAREZ, a previously healthy man, who rarely went to see doctors, after six months into the job, on June 27, 2012, went to urgent care for palpitations and presyncope (lightheadedness, muscular weakness, blurred vision, and feeling faint). He also complained about shortness of breath. All of

6
FIRST AMENDED COMPLAINT

these symptoms are well documented as chronic exposure to these toxic chemicals by the scientific community.

28. From June of 2012 to present, Plaintiff RUBEN JUAREZ has had over 9 hospitalizations for symptoms associated with toluene, MDI, and other toxic chemical exposure. In addition, he has had at least 21 visits to urgent care /emergency room for symptoms associated with the toxic chemical exposure.

29. His current medications include Oxycodne, Norco, Topamax, Depakote, and Ondansetron for migraine, Wellbutrin and Xanax for depression, Flonase and Allegra-D for respiratory issues, Deltasone for chest tightness, and Protonix for stomach problems causing from the drug cocktail.

30. His current conditions include severe headache, nausea, short of breath, dizziness, memory loss, out of balance, respiratory issues, and stomach pain from the medications. He also has suicidal thoughts once a week: sometimes his migraines are so severe that he hopes that he just does not wake up the next day. He also has sleeping problems.

31. Due to the continuing medical treatment, hospitalization, and urgent care visits, Plaintiff has not worked since May or June of 2014.

32. Plaintiff RUBEN JUAREZ lives with his 12-year-old daughter and his wife Plaintiff ISELA HERNANDEZ.

33. During the entire time, none of the treating physicians suspected that chemical exposures could have been the cause of his symptoms, due to the fact that none knew that Plaintiff RUBEN JUAREZ was working with chemicals. His medical records list his employment as "computer programmer."

34. Up until May of 2015, Plaintiff RUBEN JUAREZ thought that his injury was caused by lead solder wire and cleaning solution to clean electronic parts operated by other Space X employees near Plaintiff's work station. The solder wire and the cleaning solution had nothing to do with the PVA 350—they were not even

housed in the same location as the PVA 350. It was not until May of 2015, when Plaintiff Juarez saw the MSDS sheets from Space X that he first saw that the solder wire was actually lead-free and the detergent was only alcohol and that he first suspected that the PVA 350 might have caused his injuries. Therefore, despite diligent investigation of the circumstances of the injury, Plaintiff RUBEN JUAREZ could not have reasonably discovered facts supporting the cause of action against PVA within the application statute of limitations period.

### FIRST CAUSE OF ACTION

### NEGLIGENCE

### (Against all Defendants)

35. Plaintiffs refer to paragraph 1-34 above and incorporate them into this cause of action as though fully set forth herein.

36. Defendants designed, manufactured, supplied, installed, inspected, and repaired the PVA 350.

37. First, Defendants were negligent in designing, manufacturing, supplying, installing, inspecting, and repairing the PVA 350. In particular, Defendants failed to use the amount of care in designing, manufacturing, inspecting, installing, and repairing the PVA 350 that a reasonably careful designer, manufacturer, supplier, installer, repairer would use in similar circumstances to avoid exposing Plaintiff RUBEN JUAREZ, a programmer of the PVA 350, to a foreseeable risk of harm. Furthermore, Defendants' design violated Cal-OSHA, which requires that "When spray is automatically applied without an attendant constantly on duty, the operating control of spray apparatus shall be so arranged that spray cannot be applied unless exhaust fans are in operation." (Title 8 of Cal. Code of Regulations, § 5153.)

38. Second, Defendants knew or reasonably should have known that the PVA 350 was dangerous or was likely to be dangerous when used or misused in a

reasonably foreseeable manner. Defendants failed to adequately warn of the danger.

39. Third, Defendants became aware of this defect after the PVA 350 was sold and Defendants failed to recall/retrofit or warn of the danger of the PVA 350. A reasonable manufacturer/distributor/seller under the same or similar circumstances would have recalled, retrofitted the product.

40. Plaintiffs were harmed.

41. Defendants' negligence was a substantial factor in causing Plaintiffs' harm.

## SECOND CAUSE OF ACTION
## STRICT PRODUCT LIABILITY
### (Against all Defendants)

42. Plaintiffs refer to paragraph 1-41 above and incorporate them into this cause of action as though fully set forth herein.

43. The PVA 350 contains a design defect that it does not stop spraying toxic chemicals or sound any alarm when the ventilation / exhaust is not in operation. It continues to spray toxic chemicals even when the ventilation / exhaust is not in operation without sounding any alarm about it. It also requires the operator to put his head into the machine to check the spray.

44. The PVA 350 also did not have warning of the potential safety hazard when the ventilation / exhaust is not in operation.

45. The PVA 350 did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

46. Plaintiffs were harmed.

47. The PVA's failure to perform safely was a substantial factor in causing Plaintiffs' harm.

## THIRD CAUSE OF ACTION

## LOSS OF CONSORTIUM

### (Against all Defendants)

48. Plaintiffs refer to paragraph 1-47 above and incorporate them into this cause of action as though fully set forth herein.

49. Defendants' wrongful conduct, acts and omissions, were a substantial factor in causing Plaintiff ISELA HERNANDEZ to sustain loss of love, care, companionship, comfort, assistance, protection, society, moral support from Plaintiff RUBEN JUAREZ, in an amount according to proof.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, each of them, as follows:

1. For general and noneconomic damages according to proof;
2. For special and economic damages according to proof;
3. For costs of suit;
4. For attorneys' fees as allowed by law;
5. Pre-judgment interest; and
6. For such further relief as the Court deems just and proper.

Dated: April 24, 2018             LAW OFFICES OF TERESA LI, PC

Teresa Li
Attorneys for Plaintiffs
RUBEN JUAREZ and ISELA HERNANDEZ

BALABAN & SPIELBERGER, LLP

| | |
|---|---|
| DATED: April 24, 2018 | /s/*Daniel K. Balaban*<br>Daniel K. Balaban, Esq.,<br>Attorneys for Plaintiffs<br>RUBEN JUAREZ and ISELA HERNANDEZ |