# EXHIBIT 21

196

1   Teresa Li (Bar No. 278779)
    teresa@lawofficesofteresali.com
2   LAW OFFICES OF TERESA LI P.C.
    315 Montgomery Street, 9th Floor
3   San Francisco, California 94104
    Telephone:   415.423.3377
4   Facsimile:    888.646.5493

5   Attorneys for Plaintiffs
    RUBEN JUAREZ AND ISELA
6   HERNANDEZ

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11   RUBEN JUAREZ, an individual and     Case No. CV-03342-ODW(GJSX)
    ISELA HERNANDEZ, an individual,
12

13             Plaintiff,           **PLAINTIFF ISELA HERNANDEZ'S**
                                 **RESPONSE TO DEFENDANT'S REQUEST**
14       v.                      **FOR PRODUCTION OF DOCUMENTS AND**
                                 **ELECTRONICALLY STORED**
15   PRECISION VALVE & AUTOMATION,   **INFORMATION (ESI), SET ONE (1)**
    Inc., a corporation and DOES 1-20,
16
            Defendants.
17

18

19   **PROPOUNDING PARTY: DEFENDANT, PRECISION VALVE & AUTOMATION**

20   **RESPONDING PARTY:**   **PLAINTIFF, ISELA HERNANDEZ**

21   **SET NUMBER:**        **ONE**

22       Pursuant to Federal Rules of Civil Procedure Rule 34, Plaintiff ISELA HERNANDEZ

23   hereby responds to Defendant PRECISION VALVE & AUTOMATION, INC.'s request for

24   production of documents and electronically stored information, set one (1).

25       **RESPONSES TO PRODUCTION OF DOCUMENTS AND ELECTRONICALLY**

26                       **STORED INFORMATION**

27   **REQUEST FOR PRODUCTION NO. 1:**

28       All DOCUMENTS which support or in any way relate to YOUR allegations against

197

1   DEFENDANT in this case.

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

3          The request is overly broad, unduly burdensome, and oppressive.  It also seeks

4   information that protected by the attorney-client privilege and the attorney work product doctrine.

5   It also seeks a premature disclosure of expert opinions.   Without waiving the objections and

6   subject thereto, Plaintiff responds: plaintiff has complied.

7   **REQUEST FOR PRODUCTION NO. 2:**

8          All DOCUMENTS which support or in any way relate to YOUR cause of action for Loss

9   of Consortium (Third Cause of Action) in the COMPLAINT.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

11         The request is overly broad, unduly burdensome, and oppressive.  It also seeks

12  information that protected by the attorney-client privilege and the attorney work product doctrine.

13  It also seeks a premature disclosure of expert opinions.   Without waiving the objections and

14  subject thereto, Plaintiff responds: plaintiff has complied.

15  **REQUEST FOR PRODUCTION NO. 3:**

16         All DOCUMENTS which support or in any way relate to YOUR claim that Defendant's

17  wrongful conduct, acts and/or omissions "were a substantial factor in causing Plaintiff ISELA

18  HERNANDEZ to sustain loss of love, care companionship, comfort, assistance, protection,

19  society, moral support from Plaintiff RUBEN JUAREZ" as alleged in the COMPLAINT.

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

21         The request is overly broad, unduly burdensome, and oppressive.  It also seeks

22  information that protected by the attorney-client privilege and the attorney work product doctrine.

23  It also seeks a premature disclosure of expert opinions.   Without waiving the objections and

24  subject thereto, Plaintiff responds: plaintiff has complied.

25  **REQUEST FOR PRODUCTION NO. 4:**

26         All DOCUMENTS which document or relate to INJURIES which YOU allege were

27  caused, or were in any way contributed to, by Defendant's wrongful conduct, acts and/or

28  omissions, as alleged in YOUR COMPLAINT.

2

198

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

The request is overly broad, unduly burdensome, and oppressive.  It also seeks information that protected by the attorney-client privilege and the attorney work product doctrine. It also seeks a premature disclosure of expert opinions.   Without waiving the objections and subject thereto, Plaintiff responds: plaintiff has complied.

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS which document or relate to anything YOU did to determine what caused Isela Hernandez's injuries which are alleged in the COMPLAINT.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

The request is overly broad, unduly burdensome, and oppressive.  It also seeks information that protected by the attorney-client privilege and the attorney work product doctrine. It also seeks a premature disclosure of expert opinions.   It is vague and ambiguous and unintelligible.  Without waiving the objections and subject thereto, Plaintiff responds: plaintiff has complied.

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS which establish or in any way relate to whether plaintiffs' lawsuit is barred by the two-year statute of limitations found in Code of Civil Procedure section 335.1.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

The request is overly broad, unduly burdensome, and oppressive.  It also seeks information that protected by the attorney-client privilege and the attorney work product doctrine. It also seeks a premature disclosure of expert opinions.   Without waiving the objections and subject thereto, Plaintiff responds: plaintiff has complied.

**REQUEST FOR PRODUCTION NO. 7:**

YOUR most up-to-date resume and/or curriculum vitae.

///

///

///

///

3

199

1   **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

2          The request is overly broad, unduly burdensome, and oppressive.  It is not relevant to the

3   case.  It violates Plaintiff's right of privacy.  Plaintiff will not comply.

4

5

6

Dated: September 7, 2017                           LAW OFFICES OF TERESA LI, P.C.

7

8

9                                                  Teresa Li
                                                   Attorney for Plaintiffs
10                                                 RUBEN JUAREZ AND ISELA
                                                   HERNANDEZ
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF
DOCUMENTS AND ELECTRONICALLY STORED INFORMATION, SET ONE (1)

**PROOF OF SERVICE**

State of California, County of San Francisco

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is 315 Montgomery Street, 9th Floor, San Francisco, CA 94104.

On the date listed below, I served the following documents: in the manner and/or manners described below to each of the parties herein and addressed as stated below:

- **PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES, SET ONE (1)**
- **PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (ESI), SET ONE (1)**
- **PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES, SET ONE (1)**
- **PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (ESI), SET ONE (1)**

Shahrad Milanfar
smilanfar@bkscal.com
Alex P. Catalona
acatalona@bkscal.com
BECHERER KANNETT & SCHWEITZER
1255 Powell Street
Emeryville, CA 94608

_____ United States Postal Service, U.S. Mal, with First Class postage prepaid and deposited in a sealed envelope at San Francisco, CA.  I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

_____ Facsimile Transmission

_____ Hand delivery by Courier: same day delivery

__X__ Other: E-Mail. pdf attachment

201

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on <u>September 8, 2017</u>, at San Francisco, California.  .

| | |
|---|---|
| <u>   Teresa Li   </u> | |
| Type or Print Name | Signature |

# EXHIBIT 22

1   Shahrad Milanfar (SBN 201126)
    smilanfar@bkscal.com
2   Alex P. Catalona (SBN 200901)
    acatalona@bkscal.com
3   BECHERER KANNETT & SCHWEITZER
    1255 Powell Street
4   Emeryville, CA 94608
    Telephone: (510) 658-3600
5   Facsimile: (510) 658-1151

6   Attorneys for Defendant
    PRECISION VALVE & AUTOMATION, INC.
7

8               UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
9

10  RUBEN JUAREZ, an individual and ISELA        Case No.:  CV17-03342-ODW(GJSX)
    HERNANDEZ, an individual,
11                                               **DEFENDANT PRECISION VALVE &**
                          Plaintiffs,            **AUTOMATION, INC.'S REQUESTS**
12                                               **FOR PRODUCTION OF DOCUMENTS**
    vs.                                          **AND ELECTRONICALLY STORED**
13                                               **INFORMATION (ESI) TO PLAINTIFF**
    PRECISION VALVE & AUTOMATION, Inc., a        **RUBEN JUAREZ, SET NO. TWO**
14  corporation and DOES 1-20,
15                        Defendants.
16

17  PROPOUNDING PARTIES:          Defendant PRECISION VALVE &
                                  AUTOMATION, INC.
18
    RESPONDING PARTY:             Plaintiff RUBEN JUAREZ
19
    SET NO:                       TWO
20

21      Defendant PRECISION VALVE & AUTOMATION, INC. requests that the responding

22  party, plaintiff RUBEN HERNANDEZ, respond to the following requests for production of

23  documents and electronically stored information (ESI) (hereinafter "Requests For Production"),

24  under oath, within thirty (30) days, pursuant to Federal Rule of Civil Procedure 34.

    **DEFINITIONS APPLICABLE TO ALL REQUESTS FOR PRODUCTION**
25
        1.      The terms "DOCUMENT" and "DOCUMENTS" mean any "writing", "recording"
26
    and/or "photograph" as defined in Rule 1001 of the Federal Rules of Evidence including but not
27
    limited to the original, copy or electronic version of anything handwritten, typewritten, printed,
28

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

204

photostatic, photographic, computer, magnetic impulse, mechanical, electronic, or electronically

recorded, or any other form of data compilation; this also includes but is not limited to any

Electronically Stored Information ("ESI"), emails, texts, deposition transcripts, articles, notes,

letters, correspondence, memos, communications of any kind, etc.

    2.    The terms "YOU" and "YOUR" mean and refer to plaintiff RUBEN JUAREZ and

anyone acting on his behalf, including, but not limited to, attorneys, investigators, insurers, and

any other agents.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 18:

    All DOCUMENTS which in any way relate to any disability claim made by YOU from

2012 to the present.


Dated: October 31, 2017             BECHERER KANNETT & SCHWEITZER


By: _____
               Alex P. Catalona
               Attorney for Defendant
               PRECISION VALVE & AUTOMATION, INC.

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

205

1  Shahrad Milanfar (SBN 201126)
   smilanfar@bkscal.com
2  Alex P. Catalona (SBN 200901)
   acatalona@bkscal.com
3  BECHERER KANNETT & SCHWEITZER
   1255 Powell Street
4  Emeryville, CA 94608
   Telephone: (510) 658-3600
5  Facsimile: (510) 658-1151

6  Attorneys for Defendant
   PRECISION VALVE & AUTOMATION, INC.
7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10 RUBEN JUAREZ an individual and ISELA      )  CASE NO. 2:17-cv-03342 ODW (GJSx)
   HERNANDEZ, an individual,                 )
11                                           )  [Los Angeles County Superior Court
                   Plaintiffs,               )  Case No. BC650229]
12                                           )
13 v.                                        )  **CERTIFICATE OF SERVICE**
                                             )
   PRECISION VALVE & AUTOMATION,             )
14 INC., a corporation and DOES 1-20,        )
                                             )
15                 Defendants.               )
                                             )
16 _____)

17        I, Jerry M. Dumlao, declare that I am employed in the County of Alameda, State of
   California; I am over the age of eighteen (18) years and not a party to the within entitled action;
18 my business address is 1255 Powell Street, Emeryville, California 94608.

19        On **October 31, 2017,** I caused to be served the foregoing:

20        **DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S REQUEST FOR
          PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED**
21        **INFORMATION (ESI) TO PLAINTIFF RUBEN JUAREZ, SET NO. TWO**

22        In said action by placing a true copy thereof enclosed in a sealed envelope and served in
23 the manner and/or manners described below to each of the parties herein and addressed as
   follows:
24

25 *Attorneys for Plaintiff*                    Teresa Li, Esq.
                                                LAW OFFICES OF TERESA LI, PC
26                                              6701 Koll Center Parkway, Suite 250
                                                Pleasanton, CA 94566
27                                              Telephone: (415) 423-3377
                                                Facsimile: (888) 646-5493
28

                                  -1-
                        CERTIFICATE OF SERVICE

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

206

1

Email: teresa@lawofficesofteresali.com

2 ⊠ (By Mail) I deposited such envelope with postage thereon fully prepaid to be placed in the United States Mail at Emeryville, California. I am familiar with the mail
3 collection practices of Becherer Kannett & Schweitzer Attorneys and pursuant to those practices the envelope would be deposited with the United States Postal Service the
4 same day.

5 ☐ (Electronic Filing) I am familiar with the United States District Court, Eastern District of California's practice for collecting and processing electronic filings. Under
6 that practice, documents are electronically filed with the court. The CM/ECF system
7 will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document.
8

9 Executed on October 31, 2017

10

11

12 Jerry M. Dumlao

13

14

15

16

17

18

19

20

21

22

23

Becherer 24
Kannett &
Schweitzer
25

1255
Powell St.
Emeryville, CA 26
94608
510-658-3600
27

28

-2-

DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S
NOTICE OF REMOVAL (28 U.S.C. § 1441(a))

207

# EXHIBIT 23

1   Teresa Li (Bar No. 278779)
    teresa@lawofficesofteresali.com
2   LAW OFFICES OF TERESA LI P.C.
    6701 Koll Center Parkway, Suite 250
3   Pleasanton, California 94566
    Telephone:     415.423.3377
4   Facsimile:     888.646.5493

5   Attorneys for Plaintiffs
    RUBEN JUAREZ AND ISELA
6   HERNANDEZ

7

8                        UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11  RUBEN JUAREZ, an individual and        Case No. CV-03342-ODW(GJSX)
    ISELA HERNANDEZ, an individual,
12                                          **PLAINTIFF RUBEN JUAREZ'S RESPONSE**
                    Plaintiff,              **TO DEFENDANT'S REQUEST FOR**
13                                          **PRODUCTION OF DOCUMENTS AND**
    v.                                      **ELECTRONICALLY STORED**
14                                          **INFORMATION (ESI), SET TWO (2)**
    PRECISION VALVE & AUTOMATION,
15  Inc., a corporation and DOES 1-20,

16                  Defendants.

17

18  **PROPOUNDING PARTY: DEFENDANT, PRECISION VALVE & AUTOMATION**

19  **RESPONDING PARTY:    PLAINTIFF, RUBEN JUAREZ**

20  **SET NUMBER:          TWO**

21      Pursuant to Federal Rules of Civil Procedure Rule 34, Plaintiff RUBEN JUAREZ hereby

22  responds to Defendant PRECISION VALVE & AUTOMATION, INC.'s request for production

23  of documents and electronically stored information, set two (2).

24
            **RESPONSES TO PRODUCTION OF DOCUMENTS AND**
25          **ELECTRONICALLY STORED INFORMATION**

26  **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18**

27      All DOCUMENTS which in any way relate to any disability claim made by you from

28
                                      1
    PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF
    DOCUMENTS AND ELECTRONICALLY STORED INFORMATION, SET TWO (2)

1   2012 to the present.

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

3        The request is overly broad, unduly burdensome, and oppressive. It also seeks

4   information that protected by the attorney-client privilege and the attorney work product doctrine.

5   It also seeks a premature disclosure of expert opinions. Without waiving the objections and

6   subject thereto, Plaintiff responds: plaintiff has no responsive documents in his possession.

7   Dated: December 5, 2017                    LAW OFFICES OF TERESA LI, P.C.

8

9

10                                             Teresa Li
                                               Attorney for Plaintiffs
11                                             RUBEN JUAREZ AND ISELA
                                               HERNANDEZ
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                               2

210

1          **PROOF OF SERVICE**

2    RE: Juarez v. PVA

3          I am employed in the County of Alameda, State of California. I am over the age of 18

4    years and not a party to the within action. My business address is 6701 Koll Center Parkway,

5    Suite 250, Pleasanton, CA 94566.

6          On December 6, 2017, I served a copy of the following document:

7          **PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST**

8          **FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED**

9          **INFORMATION (ESI), SET TWO (2)**

10   on the below listed parties in this action as follows:

11   Shahrad Milanfar
     Alex P. Catalona
12   BECHERER KANNETT & SCHWEITZER
     1255 Powell Street
13   Emeryville, CA 94608

14

     __XXX__      **BY MAIL:** I placed such envelope on the above date with postage fully prepaid,
15              for deposit in the U.S Postal Service at my place of business in Pleasanton,
                California, following the ordinary business practices of my place of business. I
16              am readily familiar with the business practice at my place of business for
                collection and processing of correspondence for mail with the U.S. Postal Service.
17              Under the practice, such correspondence is deposited with the U.S. Postal Service
                the same day it is collected and processed in the ordinary course of business.
18

                **BY FAX:** I caused such document to be transmitted by facsimile transmission to
19              a facsimile machine maintained by the person on whom it is served at the
                facsimile number as last given by that person on any document which he or she
20              has filed in the case. I caused such by sending a true copy from Teresa Li's
                facsimile number, and that transmission reported as complete and without error to
21              the following facsimile number: _____.

22              **BY PERSONAL SERVICE:** I caused such document to be delivered by hand to
                the above listed party.
23

24         I declare under penalty of perjury under the laws of the State of California that the

25   foregoing is true and correct and that this document was executed at Pleasanton, California on

26   December 6, 2017.

27                                    _____
                                      JODI ALTIZER
28

211

# EXHIBIT 24

1   Shahrad Milanfar (SBN 201126)
    smilanfar@bkscal.com
2   Alex P. Catalona (SBN 200901)
    acatalona@bkscal.com
3   BECHERER KANNETT & SCHWEITZER
    1255 Powell Street
4   Emeryville, CA 94608
    Telephone: (510) 658-3600
5   Facsimile: (510) 658-1151

6   Attorneys for Defendant
    PRECISION VALVE & AUTOMATION, INC.
7

8                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
9

10  RUBEN JUAREZ, an individual and ISELA       Case No.:  CV17-03342-ODW(GJSX)
    HERNANDEZ, an individual,
11                                              **DEFENDANT PRECISION VALVE &**
                      Plaintiffs,               **AUTOMATION, INC.'S REQUESTS**
12                                              **FOR PRODUCTION OF DOCUMENTS**
    vs.                                         **AND ELECTRONICALLY STORED**
13                                              **INFORMATION (ESI) TO PLAINTIFF**
    PRECISION VALVE & AUTOMATION, Inc., a       **ISELA HERNANDEZ, SET NO. TWO**
14  corporation and DOES 1-20,
15                    Defendants.

16
    PROPOUNDING PARTIES:          Defendant PRECISION VALVE &
17                                AUTOMATION, INC.

18  RESPONDING PARTY:             Plaintiff ISELA HERNANDEZ

19  SET NO:                       TWO

20
            Defendant PRECISION VALVE & AUTOMATION, INC. requests that the responding
21
    party, plaintiff ISELA HERNANDEZ, respond to the following requests for production of
22
    documents and electronically stored information (ESI) (hereinafter "Requests For Production"),
23
    under oath, within thirty (30) days, pursuant to Federal Rule of Civil Procedure 34.
24
          **DEFINITIONS APPLICABLE TO ALL REQUESTS FOR PRODUCTION**
25
            1.      The terms "DOCUMENT" and "DOCUMENTS" mean any "writing", "recording"
26
    and/or "photograph" as defined in Rule 1001 of the Federal Rules of Evidence including but not
27
    limited to the original, copy or electronic version of anything handwritten, typewritten, printed,
28

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

-1-

213

1  photostatic, photographic, computer, magnetic impulse, mechanical, electronic, or electronically

2  recorded, or any other form of data compilation; this also includes but is not limited to any

3  Electronically Stored Information ("ESI"), emails, texts, deposition transcripts, articles, notes,

4  letters, correspondence, memos, communications of any kind, etc.

5  ## REQUESTS FOR PRODUCTION

6  **REQUEST FOR PRODUCTION NO. 8:**

7  All DOCUMENTS which establish or in any way relate to whether plaintiffs' lawsuit is

8  barred by the two-year statute of limitations found in California Code of Civil Procedure section

9  340.8.

10

11  Dated: April 3, 2018                    BECHERER KANNETT & SCHWEITZER

12

13                                   By: _____
                                         Alex P. Catalona

14                                       Attorney for Defendant
                                         PRECISION VALVE & AUTOMATION, INC.

15

16

17

18

19

20

21

Becherer
Kannett &
Schweitzer

22

23

2200
Powell St
Suite 805
Emeryville, CA
94608
510-638-3600

24

25

26

27

28
                                                -2-
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S REQUESTS FOR PRODUCTION OF
DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (ESI) TO PLAINTIFF ISELA
HERNANDEZ, SET NO. TWO

214

1  Shahrad Milanfar (SBN 201126)
   smilanfar@bkscal.com
2  Alex P. Catalona (SBN 200901)
   acatalona@bkscal.com
3  BECHERER KANNETT & SCHWEITZER
   1255 Powell Street
4  Emeryville, CA 94608
   Telephone: (510) 658-3600
5  Facsimile: (510) 658-1151

6  Attorneys for Defendant
   PRECISION VALVE & AUTOMATION, INC.
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10 RUBEN JUAREZ an individual and ISELA    ) CASE NO. 2:17-cv-03342 ODW (GJSx)
   HERNANDEZ, an individual,               )
11                                          ) [Los Angeles County Superior Court
               Plaintiffs,                  ) Case No. BC650229]
12                                          )
   v.                                       ) **CERTIFICATE OF SERVICE**
13                                          )
   PRECISION VALVE & AUTOMATION,            )
14 INC., a corporation and DOES 1-20,       )
                                            )
15             Defendants.                   )
                                            )
16 _____ )

17      I, Jerry M. Dumlao, declare that I am employed in the County of Alameda, State of
   California; I am over the age of eighteen (18) years and not a party to the within entitled action;
18 my business address is 1255 Powell Street, Emeryville, California 94608.

19      On **April 3, 2018**, I caused to be served the foregoing:

20 DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S REQUEST FOR
   PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED
21 INFORMATION (ESI) TO PLAINTIFF ISELA HERNANDEZ, SET NO. TWO

22      In said action by placing a true copy thereof enclosed in a sealed envelope and served in
   the manner and/or manners described below to each of the parties herein and addressed as
23 follows:
24
   *Attorneys for Plaintiff*                    Teresa Li, Esq.
25                                               LAW OFFICES OF TERESA LI, PC
                                                 6701 Koll Center Parkway, Suite 250
26                                               Pleasanton, CA  94566
                                                 Telephone: (415) 423-3377
27                                               Facsimile: (888) 646-5493
28

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

-1-
CERTIFICATE OF SERVICE

215

1    Email: teresa@lawofficesofteresali.com

2    ☐ (By Mail) I deposited such envelope with postage thereon fully prepaid to be placed
     in the United States Mail at Emeryville, California. I am familiar with the mail
3    collection practices of Becherer Kannett & Schweitzer Attorneys and pursuant to those
     practices the envelope would be deposited with the United States Postal Service the
4    same day.

5    ☒ (By Personal Delivery) I caused such envelope to be delivered by hand to the office
     of the addressee(s).
6

7    ☐ (Via Facsimile) I caused said document(s) to be transmitted to the facsimile
     number(s) of the addressee(s) designated.
8

9    ☐ (Electronic Filing) I am familiar with the United States District Court, Eastern
     District of California's practice for collecting and processing electronic filings. Under
10   that practice, documents are electronically filed with the court. The CM/ECF system
     will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge,
11   and any registered users in the case. The NEF will constitute service of the document.

12

13   Executed on March 2, 2018.

14

15                                                    Jerry M. Dumlao

16

17

18

19

20

21

22

23

Becherer
Kannett &    24
Schweitzer
             25
1235
Powell St.
Emeryville, CA  26
94608
510-658-3600   27

28
                              -2-
     DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S
     NOTICE OF REMOVAL (28 U.S.C. § 1441(a))

216

# EXHIBIT 25

217

1   Teresa Li (Bar No. 278779)
    teresa@lawofficesofteresali.com
2   LAW OFFICES OF TERESA LI P.C.
    315 Montgomery Street, 9th Floor
3   San Francisco, California 94104
    Telephone: 415.423.3377
4   Facsimile: 888.646.5493

5   Attorneys for Plaintiffs
    RUBEN JUAREZ AND ISELA
6   HERNANDEZ

7   Daniel K. Balaban
    Daniel@dbaslaw.com
8   BALABAN & SPIELBERGER, LLP
    11999 San Vincente Boulevard
9   Suite 345
    Los Angles, CA 90049
10  Telephone: 424.832.7677
    Facsimile: 424.832.7702
11
    Attorneys for Plaintiffs
12  RUBEN JUAREZ and ISELA HERNANDEZ

13

14              UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16

17  RUBEN JUAREZ, an individual and    Case No.  CV-03342-ODW(GJSX)
    ISELA HERNANDEZ, an
18  individual,

19              Plaintiff,             **PLAINTIFF ISELA HERNANDEZ'S
                                       RESPONSE TO DEFENDANT'S**
20      v.                             **REQUEST FOR PRODUCTION OF
                                       DOCUMENTS AND**
21  PRECISION VALVE &                  **ELECTRONICALLY STORED
    AUTOMATION, Inc., a corporation    INFORMATION (ESI), SET TWO (2)**
22  and DOES 1-20,

23              Defendants.

24

25  **PROPOUNDING PARTY:**    **DEFENDANT, PRECISION VALVE &**
26                            **AUTOMATION**
27  **RESPONDING PARTY:**     **PLAINTIFF, ISELA HERNANDEZ**
28

218

1 | **SET NUMBER:**                    **TWO**

2 |        Pursuant to Federal Rules of Civil Procedure Rule 34, Plaintiff ISELA

3 | HERNANDEZ hereby responds to Defendant PRECISION VALVE &

4 | AUTOMATION, INC.'s request for production of documents and electronically

5 | stored information, set two (2).

6 |        **RESPONSES TO PRODUCTION OF DOCUMENTS AND**

7 |        **ELECTRONICALLY STORED INFORMATION**

8 | **REQUEST FOR PRODUCTION NO. 8:**

9 |        All DOCUMENTS which establish or in any way relate to whether

10 | Plaintiffs' lawsuit is barred by the two-year statute of limitations found in

11 | California Code of Civil Procedure section 340.8.

12 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

13 |        Plaintiff has complied.

14 |

15 | Dated:        May 8, 2018                LAW OFFICES OF TERESA LI, P.C.

16 |

17 |                                         Teresa Li
                                            Attorney for Plaintiffs

18 |                                         RUBEN JUAREZ AND ISELA
                                            HERNANDEZ

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

2

PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF
DOCUMENTS AND ELECTRONICALLY STORED INFORMATION, SET TWO (2)

219

**PROOF OF SERVICE**

RE: *Juarez v. PVA*

     I am employed in the County of Alameda, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 6701 Koll Center Parkway, Suite 250, Pleasanton, CA 94566.

     On May 8, 2018, I served a copy of the following document: **PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES, SET TWO (2); PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (ESI), SET THREE (3); PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES, SET TWO (2); PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (ESI), SET TWO (2)** on the below listed parties in this action as follows:

Alex P. Catalona
BECHERER KANNETT & SCHWEITZER
1255 Powell Street
Emeryville, CA 94608

  X        **BY MAIL:** I placed such envelope on the above date with postage fully prepaid, for deposit in the U.S Postal Service at my place of business in Pleasanton, California, following the ordinary business practices of my place of business.  I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mail with the U.S. Postal Service. Under the practice, such correspondence is deposited with the U.S. Postal Service the same day it is collected and processed in the ordinary course of business.

          **BY FAX:** I caused such document to be transmitted by facsimile transmission to a facsimile machine maintained by the person on whom it is served at the facsimile number as last given by that person on any document which he or she has filed in the case.  I caused such by sending a true copy from Teresa Li's facsimile number, and that transmission reported as complete and without error to the following facsimile number: _____.

          **BY PERSONAL SERVICE:** I caused such document to be delivered by hand to the above listed party.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this document was executed at Pleasanton, California on

220

1   May 8, 2018.

2                                    Teresa Li

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                                                      RECEIVED

18                                                  MAY 14 2018

19                                                   BY BKS

20

21

22

23

24

25

26

27

28

221

# EXHIBIT 26

1  Shahrad Milanfar (SBN 201126)
   smilanfar@bkscal.com
2  Alex P. Catalona (SBN 200901)
   acatalona@bkscal.com
3  BECHERER KANNETT & SCHWEITZER
   1255 Powell Street
4  Emeryville, CA 94608
   Telephone: (510) 658-3600
5  Facsimile: (510) 658-1151

6  Attorneys for Defendant
   PRECISION VALVE & AUTOMATION, INC.
7

8              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
9

10 RUBEN JUAREZ, an individual and ISELA       Case No.:  CV17-03342-ODW(GJSX)
   HERNANDEZ, an individual,
11                                             **DEFENDANT PRECISION VALVE &**
                    Plaintiffs,                **AUTOMATION, INC.'S REQUESTS**
12                                             **FOR PRODUCTION OF DOCUMENTS**
   vs.                                         **AND ELECTRONICALLY STORED**
13                                             **INFORMATION (ESI) TO PLAINTIFF**
   PRECISION VALVE & AUTOMATION, Inc., a       **RUBEN JUAREZ, SET NO. THREE**
14 corporation and DOES 1-20,
15                  Defendants.
16
17 PROPOUNDING PARTIES:          Defendant PRECISION VALVE &
                                 AUTOMATION, INC.
18
   RESPONDING PARTY:             Plaintiff RUBEN JUAREZ
19
   SET NO:                       THREE
20
21     Defendant PRECISION VALVE & AUTOMATION, INC. requests that the responding

22 party, plaintiff RUBEN HERNANDEZ, respond to the following requests for production of

23 documents and electronically stored information (ESI) (hereinafter "Requests For Production"),

24 under oath, within thirty (30) days, pursuant to Federal Rule of Civil Procedure 34.

   **DEFINITIONS APPLICABLE TO ALL REQUESTS FOR PRODUCTION**
25
26     1.     The terms "DOCUMENT" and "DOCUMENTS" mean any "writing", "recording"

27 and/or "photograph" as defined in Rule 1001 of the Federal Rules of Evidence including but not

28 limited to the original, copy or electronic version of anything handwritten, typewritten, printed,

-1-

Becherer
Kannett &
Schweitzer
———
1255
Powell St.
Emeryville, CA
94608
510-658-3600

223

1  photostatic, photographic, computer, magnetic impulse, mechanical, electronic, or electronically

2  recorded, or any other form of data compilation; this also includes but is not limited to any

3  Electronically Stored Information ("ESI"), emails, texts, deposition transcripts, articles, notes,

4  letters, correspondence, memos, communications of any kind, etc.

5  **REQUEST FOR PRODUCTION**

6  **REQUEST FOR PRODUCTION NO. 19:**

7       All DOCUMENTS which establish or in any way relate to whether plaintiffs' lawsuit is

8  barred by the two-year statute of limitations found in California Code of Civil Procedure section

9  340.8.

10

11

12  Dated: April 3, 2018                    BECHERER KANNETT & SCHWEITZER

13

14                                   By: _____

                                            Alex P. Catalona

15                                          Attorney for Defendant
                                            PRECISION VALVE & AUTOMATION, INC.

16

17

18

19

20

21

22  Becherer
    Kannett &
23  Schweitzer

24  2200
    Powell St
    Suite 905
25  Emeryville, CA
    94608
    510-658-3600

26

27

28
                                            -2-
_____

**224**

1   Shahrad Milanfar (SBN 201126)
    smilanfar@bkscal.com
2   Alex P. Catalona (SBN 200901)
    acatalona@bkscal.com
3   BECHERER KANNETT & SCHWEITZER
    1255 Powell Street
4   Emeryville, CA 94608
    Telephone: (510) 658-3600
5   Facsimile: (510) 658-1151

6   Attorneys for Defendant
    PRECISION VALVE & AUTOMATION, INC.
7

8                           UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10  RUBEN JUAREZ an individual and ISELA          )   CASE NO. 2:17-cv-03342 ODW (GJSx)
    HERNANDEZ, an individual,                     )
11                                                )   [Los Angeles County Superior Court
                      Plaintiffs,                 )   Case No. BC650229]
12                                                )
    v.                                            )   **CERTIFICATE OF SERVICE**
13                                                )
    PRECISION VALVE & AUTOMATION,                 )
14  INC., a corporation and DOES 1-20,            )
                                                  )
15                    Defendants.                 )
                                                  )
16

17      I, Jerry M. Dumlao, declare that I am employed in the County of Alameda, State of
    California; I am over the age of eighteen (18) years and not a party to the within entitled action;
18  my business address is 1255 Powell Street, Emeryville, California 94608.

19      On **April 3, 2018**, I caused to be served the foregoing:

20      DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S REQUEST FOR
        PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED
21      INFORMATION (ESI) TO PLAINTIFF RUBEN JUAREZ, SET NO. TWO

22
        In said action by placing a true copy thereof enclosed in a sealed envelope and served in
23  the manner and/or manners described below to each of the parties herein and addressed as
    follows:
24

25  *Attorneys for Plaintiff*                     Teresa Li, Esq.
                                                  LAW OFFICES OF TERESA LI, PC
26                                                6701 Koll Center Parkway, Suite 250
                                                  Pleasanton, CA 94566
27                                                Telephone: (415) 423-3377
                                                  Facsimile: (888) 646-5493
28

Becherer
Kannett &
Schweitzer

1255
Powell St.
Emeryville, CA
94608
510-658-3600

-1-

225

Email: teresa@lawofficesofteresali.com

☐ (By Mail) I deposited such envelope with postage thereon fully prepaid to be placed in the United States Mail at Emeryville, California. I am familiar with the mail collection practices of Becherer Kannett & Schweitzer Attorneys and pursuant to those practices the envelope would be deposited with the United States Postal Service the same day.

☒ (By Personal Delivery) I caused such envelope to be delivered by hand to the office of the addressee(s).

☐ (Via Facsimile) I caused said document(s) to be transmitted to the facsimile number(s) of the addressee(s) designated.

☐ (Electronic Filing) I am familiar with the United States District Court, Eastern District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document.

Executed on March 2, 2018.

Jerry M. Dumlao

Becherer
Kannett &
Schweitzer

1255
Powell St
Emeryville, CA
94608
510-658-3600

-2-

226

# EXHIBIT 27

1   Teresa Li (Bar No. 278779)
    teresa@lawofficesofteresali.com
2   LAW OFFICES OF TERESA LI P.C.
    6701 Koll Center Parkway, Suite 250
3   Pleasanton, California 94566
    Telephone: 415.423.3377
4   Facsimile: 888.646.5493

5   Attorneys for Plaintiffs
    RUBEN JUAREZ AND ISELA
6   HERNANDEZ

7   Daniel K. Balaban
    Daniel@dbaslaw.com
8   BALABAN & SPIELBERGER, LLP
    11999 San Vincente Boulevard
9   Suite 345
    Los Angles, CA 90049
10  Telephone: 424.832.7677
    Facsimile: 424.832.7702
11
    Attorneys for Plaintiffs
12  RUBEN JUAREZ and ISELA
    HERNANDEZ
13

14

15

16              UNITED STATES DISTRICT COURT

17           CENTRAL DISTRICT OF CALIFORNIA

18
    RUBEN JUAREZ, an individual and    Case No. CV-03342-ODW(GJSX)
19  ISELA HERNANDEZ, an
    individual,                        **PLAINTIFF RUBEN JUAREZ'S
20                                      RESPONSE TO DEFENDANT'S
                Plaintiff,              REQUEST FOR PRODUCTION OF
21                                      DOCUMENTS AND
    v.                                  ELECTRONICALLY STORED
22                                      INFORMATION (ESI), SET THREE (3)
    PRECISION VALVE &
23  AUTOMATION, Inc., a corporation
    and DOES 1-20,
24
                Defendants.
25

26

27  **PROPOUNDING PARTY:    DEFENDANT, PRECISION VALVE &

28  AUTOMATION**

                              1

228

1   **RESPONDING PARTY:      PLAINTIFF, RUBEN JUAREZ**

2   **SET NUMBER:        THREE**

3        Pursuant to Federal Rules of Civil Procedure Rule 34, Plaintiff RUBEN

4   JUAREZ hereby responds to Defendant PRECISION VALVE & AUTOMATION,

5   INC.'s request for production of documents and electronically stored information,

6   set two (2).

### RESPONSES TO PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION

9   **REQUEST FOR PRODUCTION OF DOCUMENTS NO. 18**

10       All DOCUMENTS which establish or in any way relate to whether plaintiffs'

11  lawsuit is barred by the two-year statute of limitations found in California Code of

12  Civil Procedure section 340.8.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

14       Plaintiff has complied.

15  Dated:      May 8, 2018                LAW OFFICES OF TERESA LI, P.C.

Teresa Li
Attorney for Plaintiffs
RUBEN JUAREZ AND ISELA
HERNANDEZ

2

PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION, SET THREE (3)

229

1

**PROOF OF SERVICE**

2

RE: *Juarez v. PVA*

3

      I am employed in the County of Alameda, State of California.  I am over the age of 18

4

years and not a party to the within action.  My business address is 6701 Koll Center Parkway,

5

Suite 250, Pleasanton, CA 94566.

6

      On May 8, 2018, I served a copy of the following document: **PLAINTIFF RUBEN**

7

**JUAREZ'S RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES,**

8

**SET TWO (2); PLAINTIFF RUBEN JUAREZ'S RESPONSE TO DEFENDANT'S**

9

**REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY**

10

**STORED INFORMATION (ESI), SET THREE (3); PLAINTIFF ISELA HERNANDEZ'S**

11

**RESPONSE TO DEFENDANT'S REQUEST FOR INTERROGATORIES, SET TWO (2);**

12

**PLAINTIFF ISELA HERNANDEZ'S RESPONSE TO DEFENDANT'S REQUEST FOR**

13

**PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED**

14

**INFORMATION (ESI), SET TWO (2)** on the below listed parties in this action as follows:

15

Alex P. Catalona
BECHERER KANNETT & SCHWEITZER

16

1255 Powell Street
Emeryville, CA 94608

17

18

  X         **BY MAIL:** I placed such envelope on the above date with postage fully prepaid,

19

for deposit in the U.S Postal Service at my place of business in Pleasanton, California, following the ordinary business practices of my place of business.  I

20

am readily familiar with the business practice at my place of business for collection and processing of correspondence for mail with the U.S. Postal Service.

21

Under the practice, such correspondence is deposited with the U.S. Postal Service the same day it is collected and processed in the ordinary course of business.

22

         **BY FAX:** I caused such document to be transmitted by facsimile transmission to

23

a facsimile machine maintained by the person on whom it is served at the facsimile number as last given by that person on any document which he or she

24

has filed in the case.  I caused such by sending a true copy from Teresa Li's facsimile number, and that transmission reported as complete and without error to

25

the following facsimile number: _____.

26

         **BY PERSONAL SERVICE:** I caused such document to be delivered by hand to the above listed party.

27

28

      I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct and that this document was executed at Pleasanton, California on

**230**

May 8, 2018.

Teresa Li

RECEIVED
MAY 1 4 2018
BY BKS

231

# EXHIBIT 28

**Plaintiffs' Privilege Log**

**Case: Juarez v. PVA**
**Created: 10-31-2017**

| Content of the Document Withheld | Author | Privilege |
|---|---|---|
| Notes from speaking with the clients and witnesses | Teresa Li, Esq. | Attorney-client privilege and attorney work product |

233

# EXHIBIT 29

**Catalona, Alex**

| | |
|---|---|
| **From:** | Teresa Li <teresa@lawofficesofteresali.com> |
| **Sent:** | Sunday, June 24, 2018 9:35 AM |
| **To:** | Catalona, Alex |
| **Cc:** | Teresa Li; Dumlao, Jerry; Daniel Balaban |
| **Subject:** | Re: Ruben Juarez, et al. v. Precision Valve & Automation, et al. |

The same as last year. No amendment.

Teresa
Teresa Li, Esq.
Law Offices of Teresa Li, PC
East Bay Office:
6701 Koll Center Parkway, Suite 250
Pleasanton, CA 94566
Phone: (888) 635-3259
Fax:     (888) 646-5493
Email: Teresa@LawOfficesOfTeresaLi.com
www.lawofficesofteresali.com

San Francisco Satellite Office:
315 Montgomery Street, 9th Floor
San Francisco, CA 94104
Phone: (415) 423-3377
Fax: (415) 423-3402

CONFIDENTIALITY NOTICE:     This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.

> On Jun 23, 2018, at 1:27 PM, Catalona, Alex <acatalona@bkscal.com> wrote:
>
> Teresa, your most recent discovery responses again include objections based on the attorney client privilege and work product doctrine. Will you be amending your privilege log previously served in October of last year? Or, does that document cover all of the documents that are the subject of your objections based on the attorney client privilege and work product doctrine?

**From:** Teresa Li [mailto:teresa@lawofficesofteresali.com]
**Sent:** Thursday, May 03, 2018 5:11 PM
**To:** Dumlao, Jerry <jdumlao@bkscal.com>
**Cc:** Teresa Li <teresa@lawofficesofteresali.com>; Catalona, Alex <acatalona@bkscal.com>; Daniel Balaban <daniel@dbaslaw.com>
**Subject:** Re: Ruben Juarez, et al. v. Precision Valve & Automation, et al.

235

Jerry,

Thanks.  As per our filing, please include my co-counsel Dan Balaban in the loop on all filing and service.  He is cc-ed.  Thanks,

Teresa

Teresa Li, Esq.
Law Offices of Teresa Li, PC
East Bay Office:
6701 Koll Center Parkway, Suite 250
Pleasanton, CA 94566
Phone: (888) 635-3259
Fax:    (888) 646-5493
Email: Teresa@LawOfficesOfTeresaLi.com
www.lawofficesofteresali.com

San Francisco Satellite Office:
315 Montgomery Street, 9th Floor
San Francisco, CA 94104
Phone: (415) 423-3377
Fax: (415) 423-3402

CONFIDENTIALITY NOTICE:    This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.


On May 3, 2018, at 2:30 PM, Dumlao, Jerry <jdumlao@bkscal.com> wrote:

Dear Ms. Li,

Attached please find a letter from Alex Catalona to you of this date.  If you are unable to open the attachment, please let me know at your earliest opportunity.

If you have any questions, please feel free to contact Mr. Catalona.

Best regards,
Jerry Dumlao

Jerry M. Dumlao
Legal Assistant to Alex P. Catalona
Becherer Kannett & Schweitzer
1255 Powell Street
Emeryville, CA 94608
Tel:  (510) 597-3348

236

Southern California:  85 North Raymond Avenue | Pasadena, CA 91103
Email:  jdumlao@bkscal.com | www.bkscal.com

CONFIDENTIALITY NOTICE:
This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not a named recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer. Thank you.

🖨 Thank you for considering the environment before printing this e-mail.

<Letter to T. Li re link to add'l doc production.pdf>

237

# EXHIBIT 30

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    RUBEN JUAREZ, an individual and    ) CASE NO.
     ISELA HERNANDEZ, an individual,    ) CV17-03342-ODW(GJSX)
5                                        )
                           Plaintiffs,   )
6                                        )
                   vs.                   )
7                                        )
                                         )
8                                        )
     PRECISION VALVE & AUTOMATION,       )
9    INC., a corporation and DOES 1-20, )
                                         )
10                         Defendants.   )
     _____)

11

12

13

14             VIDEO-RECORDED DEPOSITION OF

15                      RUBEN JUAREZ

16                       VOLUME 1

17                  Burbank, California

18              Thursday, March 8, 2018

19

20

21

22

23   Reported By:

24   Elizabeth Schmidt

25   CSR No. 13598

Page 2

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    RUBEN JUAREZ, an individual and    ) CASE NO.

     ISELA HERNANDEZ, an individual,    ) CV17-03342-ODW(GJSX)

5                                        )

                            Plaintiffs,  )

6                                        )

                    vs.                  )

7                                        )

                                         )

8                                        )

     PRECISION VALVE & AUTOMATION,       )

9    INC., a corporation and DOES 1-20, )

                                         )

10                         Defendants.   )

     _____)

11

12

13

14

15          Deposition of RUBEN JUAREZ, Volume I, taken on

16   behalf of Defendant, at 2500 North Hollywood Way,

17   Room P125E, Burbank, California, beginning at 9:03 A.M.

18   and ending at 2:19 P.M., on March 8, 2018, before

19   Elizabeth Schmidt, Certified Shorthand Reporter

20   No. 13598.

21

22

23

24

25

240

```
 1    APPEARANCES:
 2            For Plaintiff:
 3                    LAW OFFICES OF TERESA LI, PC
                      BY:  TERESA LI, ESQ.
 4                    6701 Koll Center Parkway
                      Suite 250
 5                    Pleasanton, California 94566
                      (415)423-3377
 6                    teresa@lawofficesofteresali.com
 7
 8            For Defendant:
 9                    BECHERER KANNETT & SCHWEITZER
                      BY:  ALEX P. CATALONA, ESQ.
10                    1255 Powell Street
                      Emeryville, California 94608
11                    (510)658-3600
                      acatalona@bkscal.com
12
13
14
15    ALSO PRESENT:  JULIO PENA, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                                    I N D E X

2       WITNESS

3       RUBEN JUAREZ

4               Examination by:                        Page

5               Mr. Catalona                           7

6

7

8

9                                E X H I B I T S

10

11      Exhibit          Description                   Page

12      Exhibit 1 - handwritten statement             19

13      Exhibit 2 - deposition notice                 20

14      Exhibit 3 - photographs                       24

15      Exhibit 4 - photographs                       67

16      Exhibit 5 - PVA product overview              70

17      Exhibit 6 - PVA350 specifications             70

18      Exhibit 7 - PVA650 specifications             70

19      Exhibit 8 - Arathane 5750 B(LV) MSDS          110

20      Exhibit 9 - Kester 285 MSDS                   110

21      Exhibit 10 - Arathane 5750-A/B(LV) MSDS       110

22      Exhibit 11 - isopropyl alcohol MSDS           110

23      Exhibit 12 - HumiSeal 1A33 aerosol MSDS       110

24      Exhibit 13 - HumiSeal 285 MSDS                110

25      Exhibit 14 - HumiSeal thinner 521EU MSDS      110

242

Page 5

1                        EXHIBITS, CONTINUED

2

3      Exhibit            Description                    Page

4      Exhibit 15 - Arathane 5750 A MSDS              110

5      Exhibit 16 - 3/30/15 deposition transcript     117

6      Exhibit 17 - 5/20/15 deposition transcript     117

7      Exhibit 18 - handwritten note on note card     149

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

243

Page 6

1          Burbank, California

2        Thursday, March 8, 2018

3            9:03 A.M.

4             *   *   *

5          THE VIDEOGRAPHER:   Good morning.   We're on          09:03:43

6   the record at 9:02 A.M. on March 8, 2018.   Please note

7   that microphones are sensitive and might pick up

8   whispers, private conversations, and cellular

9   interference.   Audio and video recording will continue

10  to take place unless all parties agree to go off the          09:04:00

11  record.

12          This is the video-recorded deposition of

13  Ruben Juarez taken by counsel for Defendant in the

14  matter of Juarez vs. Precision Valve & Automation,

15  Incorporated.   This deposition is being held at          09:04:15

16  Los Angeles Marriott Burbank located in Burbank,

17  California.   My name is Julio Pena from Veritext, and

18  I am the videographer.   The court reporter is

19  Elizabeth Schmidt from Veritext.   I am not related to

20  any party in this action, nor am I financially          09:04:33

21  interested in the outcome.

22          If there are any objections to proceeding,

23  please state them at the time of your appearance,

24  beginning with the noticing attorney.   Your

25  appearance, please.          09:04:43

Page 7

1          MR. CATALONA:  This is Alex Catalona for

2    Defendant Precision Valve & Automation.

3          MS. LI:  Teresa Li appearing on behalf of

4    Plaintiffs Ruben Juarez and Isela Juarez.

5          THE WITNESS:  Isela Hernandez.                    09:05:05

6          THE VIDEOGRAPHER:  Will the court reporter

7    please swear in the witness.

8          MS. LI:  It's Isela Hernandez.  I'm sorry.

9    I made a mistake.

10                     RUBEN JUAREZ,

11       having first been duly sworn, testified as follows:

12                     EXAMINATION

13   BY MR. CATALONA:

14       Q    Good morning, Mr. Juarez.  My name is Alex

15   Catalona.  I'll be asking you most of the questions     09:05:30

16   here today.  I represent Precision Valve & Automation,

17   Inc.  Could you please state your name and date of

18   birth.

19       A    My name is Ruben Hernandez Juarez.  My date

20   of birth date is           1970.                        09:05:43

21       Q    And where were you born?

22       A    Mexico City.

23       Q    What medications did you take this morning?

24       A    I took -- bear with me because my memory

25   doesn't work that well.  Prozac.  I took Ritalin.  I    09:06:05

Page 33

1       Q    And when you started, who were your

2   coworkers?

3       A    I can tell you SpaceX have a high rate of

4   turnover.  So personnel comes in and out all the time.

5       Q    Okay.  But do you remember the names of any          09:48:38

6   people you worked with when you started?

7       A    I remember my manager.

8       Q    What was his name?

9       A    John Pena.

10      Q    Do you remember the name of anyone else?            09:48:51

11      A    I remember the name of I believe he was a

12   supervisor.  Gregory Maxwell.

13      Q    Why don't we just talk about your entire

14   time at SpaceX.  Other than John Pena and Gregory

15   Maxwell, please give me the names of anyone else you        09:49:17

16   worked with regularly.

17      A    By nature I'm bad with names.  Okay?  With

18   all these memory problems, it has make it more

19   difficult for me to remember every single person or

20   some individuals.  I know their physical -- physically      09:49:41

21   how do they look like, but I might not know their

22   name.

23      Q    I understand that.  I have a lot to cover;

24   so I'm going to ask very specific questions.  If you

25   could try to answer the questions.  I'm just asking         09:49:58

Page 35

1      Q    So Gregory Maxwell was a supervisor over

2  John Pena?

3      A    No.  John Pena was the director of avionics.

4  Gregory Maxwell was some kind of supervisor position.

5  I don't know exactly what his position was because I          09:51:25

6  wasn't working for him.

7      Q    Did you report to John Pena directly the

8  entire time you worked for SpaceX?

9      A    Let me think about that one.  I did my

10  reports mostly with John Pena, but at one point -- it        09:51:55

11  is hard for me to explain the dynamics because SpaceX

12  is an evolving company.  So one day, you're one

13  position; the next day, another director comes over

14  and you're a different position.  So for the most

15  part, I know in my paper when I sign my original paper       09:52:24

16  when I was hired, I was to report directly to John

17  Pena.

18      Q    Okay.  Did you report to anyone else

19  directly after that?

20      A    I think for this period of time, I think I          09:52:41

21  reported to -- not reported to; more like let him know

22  what I was working on -- to Gregory Maxwell.

23      Q    Okay.  So those two are the only people you

24  remember that supervised you.

25      A    They were -- yeah.  Again, Gregory Maxwell          09:53:00

Page 36

1    was not my supervisor.  He was somebody who I would

2    just tell him what project I was working on.  John

3    Pena was the one who gave me the projects to work on,

4    and then Gregory Maxwell will ask me how you doing on

5    this project or what are you doing here, could you          09:53:19

6    help us here, and he would ask me for input.

7        Q    Right.  Was there anyone else that did any

8    of that?

9        A    Not that I can remember, no.

10       Q    And you stopped working at SpaceX at the end       09:53:30

11   of March 2014?

12       A    I think if that's what it says it is, the

13   paper says.  I don't remember the exact date or month.

14   I know it was 2014.

15       Q    You don't remember the month?                      09:53:53

16       A    No.

17       Q    Did you work in one room at SpaceX or at

18   different locations?

19       A    At first was one room, then thereafter, the

20   production area was moved to a different room.             09:54:18

21       Q    So you worked in one room for a while, and

22   then later you worked in another room; right?

23       A    Correct.

24       Q    And your job was either in the first room

25   you worked in or in the second room.                       09:54:31

248

Page 37

1        A     Both.

2        Q     Is that correct?

3        A     Yes.  They moved production from one room --

4   they were standing.

5        Q     Right.  I totally get that.  So the work          09:54:45

6   that you did in the first room, was it the same work

7   that you did in the second room, it just changed

8   locations?

9        A     Correct.

10       Q     Okay.  And were the same types of machines        09:54:56

11  and equipment in both of those rooms?

12       A     No.

13       Q     How did it change?

14       A     We add more equipment.

15       Q     Okay.  So the second room had more               09:55:05

16  equipment.

17       A     Yes.

18       Q     And did the second room have the same kinds

19  of equipment that was in the first room but it added

20  some additional equipment?                                   09:55:14

21       A     They added some additional equipment to the

22  room.

23       Q     Okay.  And other than going to lunch -- did

24  you go to lunch in a different room, or did you eat

25  lunch in the room that you were assigned to?                 09:55:30

Page 38

1          MS. LI:  All the time?  Every day?

2    BY MR. CATALONA:

3      Q    In general.

4          MS. LI:  Overly broad.

5          THE WITNESS:  I don't understand your                09:55:42

6    question.

7    BY MR. CATALONA:

8      Q    In general, did you eat lunch in the room

9    where you were working, or was there a lunch room

10   somewhere else?                                             09:55:49

11     A    Oh, there was a lunch room in the second

12   floor or first floor.  I don't remember exactly.  I

13   don't remember the layout, but it was a lunch area.

14     Q    Okay.  Other than possibly going to a lunch

15   room, during your day did you go anywhere else at          09:56:00

16   SpaceX other than the room where you were working?

17     A    I had a work station outside the room on the

18   second room, not the first room.

19     Q    Was the work station connected to the second

20   room?                                                      09:56:15

21     A    No.

22     Q    And what did you do in the work station?

23     A    Review documents, design tool fixtures.

24     Q    Okay.  So when you worked at SpaceX, other

25   than the first room and the second room and the work       09:56:39

Page 39

1    station outside the second room, did you do any kind

2    of work in any other locations at SpaceX?

3        A    No.  I delivered parts to the tool

4    manufacturer.  But I didn't work in it.  I just

5    delivered the parts.  That was it.                    09:57:04

6        Q    Okay.  Let's talk about the first room

7    first.  How many months did you work in the first

8    room, or years?

9        A    I don't remember.

10       Q    Was it more than a year?                      09:57:16

11       A    I don't remember.

12       Q    Do you know about when you moved from the

13   first room to the second room?

14       A    I don't remember.

15       Q    And how many people worked in the first room  09:57:25

16   with you?

17       A    I never counted people that worked there.  I

18   was just more focusing on the machine itself and

19   trying to get the programming done rather than -- I

20   don't know.  I didn't count.  Because that was not    09:57:47

21   my...

22       Q    Did Francisco work in the first room?

23       A    Yes.

24       Q    And Jose?

25       A    He worked in adjacent room.                   09:57:58

Page 41

1    You don't know if other people at SpaceX did the same

2    work that you were doing.

3          MS. LI:  Overly broad and vague and

4    ambiguous.

5    BY MR. CATALONA:                                    09:59:11

6        Q    Or you do know.  Either you know or you

7    don't; right?

8          MS. LI:  Same objections.

9          THE WITNESS:  Can you reword your question

10   because I don't understand what you're trying to say.   09:59:21

11   BY MR. CATALONA:

12       Q    I just want to know if anyone else at SpaceX

13   did the kind of work you did.

14       A    I was hired to work on the machine

15   programming it.                                     09:59:31

16       Q    Did anyone else do that?

17       A    No.

18       Q    Okay.  That's all I was asking.  What

19   machinery was in the first room?

20       A    An oven, convection oven, PVA350, a couple   09:59:45

21   benches, and a PCBA rack.

22       Q    PCVA rack?

23       A    Right.  Correct.

24       Q    What equipment was in the second room?

25   Wait.  Before you tell me that, was all the equipment   10:00:25

Page 42

1    that you just listed that was in the first room, was

2    all of that in the second room?

3      A   Yes.

4      Q   Okay.  So then what equipment in addition to

5    what you listed was in the second room?          10:00:36

6      A   That I can remember?

7      Q   Yes.

8      A   I purchase a inspection station.

9      Q   Anything else?

10      A   I also purchased a air filtration system.   10:00:52

11      Q   Okay.  Anything else?

12      A   And I don't know -- don't remember anything

13    else.

14      Q   And were there these -- you talked about

15    these baths that you put parts in.  Was that in the   10:01:14

16    first --

17      A   No.  No.  That had nothing to do with the

18    PVA350.

19      Q   I know.  But was it in the room?

20      A   No.                               10:01:28

21      Q   Where were the baths at?

22      A   They were outside the room next to my

23    computer station.

24      Q   So you worked at a computer station outside

25    the room?                                   10:01:38

Page 46

1      A    They were next to it, but that was nothing

2   to do with the PVA350.

3      Q    Right.

4      A    There's a separate --

5      Q    Sure.                                    10:05:25

6      A    -- completely separate -- two different

7   items.

8      Q    Sure.  But you worked with those items.

9      A    I didn't work with those items.  I didn't --

10  the wash area was installed next to my work station.   10:05:36

11  I did not work on the wash area.  Does that make

12  sense?

13     Q    Okay.  You did not work on the wash area,

14  but other people were washing parts in that area;

15  right?                                           10:05:54

16     A    Correct.

17     Q    Okay.  And that was 12 inches from your work

18  station?

19     A    Guesstimate more or less, yeah.

20     Q    Yes?  Okay.  How was the air filtration    10:06:03

21  system used on the production floor?

22     A    Which filtration system are we talking

23  about?

24     Q    The one that you purchased.

25     A    The one that I purchased was for the        10:06:30

Page 47

1    conformal coating area.

2        Q    Was it inside the conformal coating area?

3        A    Correct.

4        Q    Did you ever meet Elon Musk?

5        A    I don't understand your question.          10:06:58

6        Q    Did you ever meet Elon Musk?

7        A    As in seeing it on the company?  As in

8    shaking his hand?  Can you be more specific.

9        Q    Did you ever meet him at any time?

10       A    When you say "meet," you're saying --     10:07:14

11       Q    To say hi, shake his hand, anything.

12       A    No.

13       Q    You never spoke to him?

14       A    No.  I saw him in the production, but I

15   never shake his hand or say, "Hi, buddy, how you    10:07:26

16   doing?"  Nothing like that.

17       Q    Did he ever provide any instruction

18   regarding how you were supposed to do your job?

19           MS. LI:  Who?  I'm sorry.  Vague and

20   ambiguous as to "he."  Who?                         10:07:44

21           MR. CATALONA:  Who we're talking about.

22   Elon Musk.

23           MS. LI:  Oh.  I'm sorry.

24           MR. CATALONA:  It's pretty obvious.

25   ///                                                 10:07:53

Page 56

1     Q     Yes.

2     A     I'm not a chemistry.  I don't know what the

3  chemics have in it.  How do I can come up with why?  I

4  don't know that.  I'm not educated in that area.  It's

5  not my area of expertise.                          10:22:13

6     Q     What was your job title at SpaceX?

7     A     Equipment specialist.

8     Q     So back to my last question, you were saying

9  that you don't know why you didn't sue the chemical

10 companies because chemistry is not your area of        10:22:42

11 expertise?

12    A     Correct.

13    Q     Is there any other reason why you didn't sue

14 them?

15    A     I'm not a lawyer.  I don't know what it       10:22:51

16 takes to -- I'm not a doctor.  I'm not a lawyer.  I

17 don't know what it takes.  I don't know how that

18 works.

19    Q     Okay.  Did your job title ever change?

20    A     Yes.  They changed it to technician.          10:23:05

21    Q     Anything else?

22    A     Not that I know.

23    Q     Did your job duties change at SpaceX?

24    A     No.  Just the title changed.

25    Q     Okay.  What was the typical day for you at    10:23:18

256

Page 57

1    SpaceX?

2         A    There was no typical day.

3         Q    It was always different?

4         A    For the most part.

5         Q    Did you work five days a week, Monday        10:23:35

6    through Friday?

7         A    No.

8         Q    How many days a week?

9         A    It varied.  It varied.

10        Q    Did you ever do any work at home as part of   10:23:45

11   your work for SpaceX?

12        A    What do you mean, did I --

13        Q    Was all the work that you did when you were

14   employed by SpaceX physically at the SpaceX campus?

15        A    Yes.                                          10:24:05

16        Q    So you can't take your work home with you;

17   right?

18        A    I cannot take the equipment with me home,

19   no.

20        Q    Okay.  How many hours per day did you work   10:24:12

21   outside of the conformal coating area?

22        A    Again, I estimate I work about 60 percent of

23   my time in the conformal coating area.  So the other

24   40 percent would have been doing some other task.

25        Q    When you worked in the conformal coating     10:24:46

Page 58

1    area, did you set up the machine and hit go and then

2    it ran and you didn't have to be in the conformal

3    coating area while it was doing what it was doing?

4         A    No.  My job was to program the machine, not

5    to run the machine.  To program the machine so the          10:25:03

6    operators can run the machine.

7         Q    Oh, so you were never an operator?

8         A    No.  I was not an operator.

9         Q    And the operators actually worked inside the

10   room?                                                        10:25:16

11        A    The operators worked inside the room.

12        Q    So you didn't have to work inside the room

13   since you were not a operator?

14        A    Most of the time, it would take up to eight

15   to ten hours to develop a program.  So you have to be        10:25:27

16   there to do the work inside the room, inside the

17   machine itself.  The way the machine is built, by

18   nature it has flaws.  You cannot program the machine

19   on offline programming such as other CNC machines,

20   pick and place machines, or other where you can do          10:25:48

21   most of your programming offline or what they call

22   offline or at your work station and bring the machine

23   or transfer machine over to the -- the program over to

24   the machine and fine-tune it there.

25            The problem with the PVA350, it doesn't have        10:26:04

Page 59

```
 1   a platform or a software to aid you to allow you to do
 2   your rough work at your computer and transfer it over
 3   to the machine and then fine-tune it.  Here, you're
 4   dependent on a human factor.
 5        Q    What's the dimension of the conformal          10:26:21
 6   coating room?
 7             MS. LI:  Which one?
 8   BY MR. CATALONA:
 9        Q    The conformal coating room that was inside
10   the first room and the conformal coating room that was   10:26:29
11   inside the second room.  Or were they different?
12             MS. LI:  Compound.  Go ahead.
13             THE WITNESS:  Okay.  Let's make something
14   clear.  We're talking about the first-floor room?  The
15   first-floor room, it would have been 12 by 18            10:26:47
16   footprint.  That's an estimate.
17   BY MR. CATALONA:
18        Q    Okay.  The first-floor room was 12 feet by
19   18 feet.
20        A    The conformal coating room.                    10:27:01
21        Q    Oh, the conformal coating room was 12 feet
22   by 18 feet.
23        A    Yes.  It was a small room.  It was
24   encapsulated inside another room which was a little
25   bit bigger room.  Would have been probably -- I don't    10:27:12
```

Page 60

1    know.  I don't want to say something that I don't

2    know.

3         Q    So the conformal coating room was 12 feet by

4    18 feet.

5         A    Guesstimate.                              10:27:25

6         Q    And how big was the conformal coating room

7    in the production --

8              MS. LI:  Floor.

9    BY MR. CATALONA:

10        Q    -- floor, which is also the second room?   10:27:35

11        A    Bit bigger.  I don't want to give you a

12   wrong number; so I don't want to guesstimate.

13        Q    About how much bigger was it than 12 feet by

14   18 feet?

15        A    It was bigger.                             10:27:51

16        Q    Twice as big or less than twice as big?

17        A    It was big.

18        Q    What equipment was in the conformal coating

19   room in the first room that you worked in?

20        A    We already --                             10:28:06

21        Q    Okay.  So all the equipment that you already

22   talked about was actually inside the conformal coating

23   room?

24        A    The first one.  And then when we moved to

25   the second floor to expand our production         10:28:17

260

Page 61

1  capabilities, we add some equipment, that station that

2  I told you about it and the filtration system that I

3  told you about it and the PCB rack that I told you

4  about.

5      Q    Okay.  Okay.  So all the equipment that        10:28:28

6  we've already talked about, that was inside the

7  conformal coating room.  It wasn't outside the

8  conformal coating room; right?

9      A    It was inside the conformal coating room.

10     Q    And that's true for both of the conformal      10:28:43

11  coating rooms that you talked about, the one on the

12  first room and then the one on the production floor.

13  All the equipment was inside the conformal coating

14  room.

15     A    Let me see if I follow your question.  On      10:28:58

16  the first floor, we have the conformal coating

17  machine, we have some equipment; and then when we move

18  to the second floor, we have whatever we had on the

19  first floor plus some other equipment that I just

20  described we purchased.                                 10:29:12

21     Q    Right.  And what were the types of things

22  you had to do inside the conformal coating room in

23  either location where it was?

24     A    Programming.

25     Q    Okay.  Anything else?                          10:29:46

Page 62

1    A    That was the main part of my job to get a

2  board, set up the board inside the machine, make sure

3  the pattern is correct, that the coating is correct,

4  do a dry run, do a wet run, make sure to put my head

5  inside there and check the thickness of the layer,          10:30:08

6  clean it up, rerun it again until I got the desired

7  thickness and width.  Because it varies.  The spray

8  valve has an adjustment that it can change the width

9  and the thickness of the conformal coating.  So you

10  have to fine-tune it.                                        10:30:31

11       And then in order for you to fine-tune it,

12  the machine has to switch to bypass the door so you

13  can access.  There is no other way to program the

14  machine, unfortunately.  You have to eyeball it.  And

15  you have to stick your head in there and look inside        10:30:48

16  and make sure that your spraying head is parallel with

17  the board and see where the board starts and where it

18  ends and then do the same thing to the board.

19       Then you will run a dry run, which that only

20  goes through movements.  And then you go through a wet       10:31:07

21  run, and the machine starts to spray.  Then what you

22  do is you get a wet gauge to make sure what the

23  thickness of the film is to verify that you have been

24  accurate.  We're talking about 1.5 thousandths of an

25  inch.  So it was very thin mist of material.                10:31:30

Page 63

1      Q    What you just described was what you did

2    60 percent of the time as part of your job; right?

3      A    That along with the designing some fixtures

4    for the machine and so forth, yes.  But I was the main

5    support for that machine.                              10:31:51

6      Q    And that was sort of your job as far as the

7    conformal coating work that you did; right?

8      A    It became my job.

9      Q    When did it become your job?

10     A    When I start working there, they saw me that   10:32:04

11    I --

12     Q    So immediately after you started working

13    there, that was your job.

14     A    Yes.  The reason I was --

15     Q    I didn't ask a question.  I need to cover a   10:32:16

16    lot of ground.  I know you want to explain things, but

17    we'll get to everything.  Okay?

18     A    I understand, but I just don't want to be

19    misunderstood.  The reason they hired me was to be a

20    equipment specialist looking forward to purchase a new 10:32:31

21    assembly line for SMT.

22     Q    That's fine.  I didn't ask that.  I will ask

23    the questions, and we'll go through this

24    systematically.  I want to cover a lot of ground.

25    Okay?                                                 10:32:47

Page 64

1        How many hours per day did you work with

2    chemicals?

3        A    What do you mean by "chemicals"?

4        Q    The chemicals that you asked for MSDS sheets

5    for.                                              10:33:02

6        A    The chemicals that I ask -- well, the time

7    that I spent on the conformal coating.

8        Q    How many hours per day was that?

9        A    60 percent of my time.

10       Q    How many hours did you work in a day?    10:33:16

11       A    It would vary.

12       Q    Did you sometimes work less than five days a

13   week?

14       A    When I start to get sick, I start to miss

15   work, yes.                                        10:33:26

16       Q    Let's talk about before you started to get

17   sick.  What was the normal amount of time you worked?

18       A    There was no normal amount of time.

19       Q    Was it three to five days?  What was the

20   range?                                            10:33:39

21       A    Again, there is no -- you know when your

22   start time is; you don't know when your end time is.

23   At least for me, that was the case.  There would have

24   been some days we work 12 hours, 14 hours; there would

25   have been some days I worked only 8 hours.        10:33:54

Page 67

1        Q    What were those chemicals?

2             MS. LI:  Vague and ambiguous as to time.

3   Are you asking him now or back then?

4             MR. CATALONA:  He just said he learned what

5   they were.                                          10:36:22

6   BY MR. CATALONA:

7        Q    I just want to know what you learned.

8        A    Alcohol.

9        Q    Okay.  And those chemicals were used for

10  cleaning electronic parts?                          10:36:33

11       A    Cleaning electronic devices, boards,

12  subassemblies, assemblies.

13            (Reporter clarification.)

14            THE WITNESS:  Subassemblies and assemblies.

15  Electronic assemblies and subassemblies.

16  BY MR. CATALONA:

17       Q    And the thinners were used, too, to clean

18  the parts; right?

19       A    No.

20       Q    I'll mark this as Exhibit 4.              10:36:59

21       (Exhibit 4 was marked for identification.)

22  BY MR. CATALONA:

23       Q    Is this a picture of the PVA350?

24       A    Yes.

25            MS. LI:  Objection.  Vague and ambiguous as  10:37:11

Page 70

1    different, this is different.  I cannot go into my

2    head.

3        Q    Just tell me.  I mean, if you can't do it,

4    that's fine.

5        A    No, I don't --

6            MS. LI:  He already said that he can't do

7    it.

8    BY MR. CATALONA:

9        Q    If you can't do it, that's fine.  What I'm

10   trying to -- "I don't know" is a perfectly acceptable        10:39:45

11   answer.

12       A    I don't know.

13       Q    I'm asking you looking at the picture, can

14   you tell me anything in that picture that's different

15   from the one you used?                                       10:39:53

16           MS. LI:  Objection.  Asked and answered and

17   harassing the client.  And lacks foundation.

18           THE WITNESS:  I don't know.

19   BY MR. CATALONA:

20       Q    Okay.  That's fine.  The one that you used,        10:40:07

21   were there lights inside of the machine?

22       A    No.

23       (Exhibit 5, Exhibit 6, and Exhibit 7 were

24       marked for identification.)

25   ///

Page 73

1          You've got to wait for my objection.

2          THE WITNESS:  I'm sorry.

3     BY MR. CATALONA:

4          Q     Did you ever use any other products from PVA

5     at SpaceX besides the PVA350?                          10:43:08

6          MS. LI:  Objection.  Vague and ambiguous as

7     to any other product with PVA.  You're talking about

8     any components?  Or are you talking about conformal

9     coating?  What are you talking about?

10    BY MR. CATALONA:                                       10:43:23

11         Q     Did you work with any other PVA products at

12    SpaceX besides the PVA350?

13         MS. LI:  Same objections.  Vague and

14    ambiguous as to "products."

15         THE WITNESS:  I'm not quite sure what you're      10:43:35

16    referring to.  When you say "PVA," PVA has a lot of

17    different equipment.

18    BY MR. CATALONA:

19         Q     Okay.  Did you work with any other equipment

20    at SpaceX that was from PVA other than the PVA350?     10:43:45

21         A     Not that I know.

22         Q     Okay.  Did you work with any other machines

23    from PVA at SpaceX besides the PVA350?

24         A     Not that I know.

25         Q     What is the PVA350?                         10:44:06

Page 113

1        Q     Which of these chemicals on these MSDS

2   sheets did you use in connection with the PVA350?

3        A     The HumiSeal, Arathane, that's it.

4        Q     HumiSeal and Arathane and that's it?  Is

5   that what you said?                                    11:46:35

6        A     The brand?  HumiSeal.  And from what I can

7   see, the Huntsman Arathane.

8        Q     Okay.  HumiSeal and Arathane.  Is that it?

9        A     Let me look at this.  Be patient with me,

10  please.  My thinking process is not like yours.        11:46:58

11            So alcohol is not part of the 350.  The

12  solder wire is not part of the 350.  The lead-free

13  flux cored solder is not part of the 350.  So that

14  leaves us with the other four MSDS.

15       Q     So the Arathane 5750 B(LV) is part of the    11:47:41

16  PVA350?

17       A     57 A/B.  Part A and part B.

18       Q     There's also one that is Arathane 5750 B.

19  Is that for the PVA350?

20       A     Which one are you referring to?  These two?  11:48:02

21  Part A and part B?

22       Q     This one.

23       A     As far as I know, these are the same, part A

24  and part B.  These two are the same.  These two are

25  the same.                                              11:48:20

268

Page 114

1      Q     Okay.  So Exhibit 8 is -- wait.  Strike

2    that.

3            Exhibit 15 is Arathane 5750 A and Exhibit 8

4    is 5750 B and Exhibit 10 is Arathane 5750 A/B, and

5    your testimony is that these are all the same.          11:48:40

6      A     As far as I remember, we only used one

7    Arathane.  A/B.

8      Q     Oh, okay.  The only Arathane you used was

9    A/B; correct?

10     A     As far as I remember, there was only one      11:48:54

11   Arathane, A/B, part A and part B.  That's it.

12     Q     And were there two parts to that, or was it

13   one substance that was called Arathane 5750 A/B?

14     A     No.  They were separate chemicals that when

15   you mixed, they would start to cure rather quickly.    11:49:13

16     Q     And the two chemicals you mixed were part A

17   and part B.

18     A     Correct.

19     Q     Great.  Thank you very much.  That's very

20   helpful.                                                11:49:23

21     A     This is a different one.  You didn't give me

22   this.  You just hand it to me.

23     Q     This is the HumiSeal thinner 521EU.  Did you

24   also use that with the PVA350?

25     A     I remember it was a HumiSeal thinner.  I       11:49:44

1    one.

2              MS. LI:  Volume I; right?

3              MR. CATALONA:  Yeah.

4              MS. LI:  Is my copy the correct copy?

5              MR. CATALONA:  You have Volume I?          11:53:27

6              MS. LI:  Yeah.

7              MR. CATALONA:  Yes.  That's right.

8         (Exhibit 16 and Exhibit 17 were marked for

9         identification.)

10   BY MR. CATALONA:                                      11:53:32

11        Q    Okay.  So the first one that you talked

12   about -- and you can look at this or not; it's on

13   page 49 -- was thinner 527.  Do you remember talking

14   about thinner 527?

15        A    Page 49?                                    11:53:46

16        Q    Yes.

17        A    What paragraph number or what line number?

18        Q    Line 22 and 23.

19        A    Okay.

20        Q    Line 23, it says thinner 527, but the MSDS  11:54:23

21   sheet says thinner 521.  Do you think it's thinner 527

22   or 521, or do you remember?

23        A    As I stated earlier, I know it was a

24   thinner, but I don't remember what number of thinner

25   was it.                                               11:54:41

270

Page 149

1      Q    Okay.

2      A    A lot of people are not -- like you.  You

3   just made a mistake.  You say it's in microns.  The

4   person who wrote this, it should have been .00015.  So

5   it's missing zeros.  It's wrong.                    01:54:25

6      Q    How many zeros is it missing?

7      A    So -- let me see.  So this would be

8   1 thousandth of an inch.  This would be one five

9   ten-thousandths of an inch.

10     Q    Okay.  This is in inches?              01:54:51

11     A    Yes.

12     Q    Can I write "inches" on it?

13     A    If you want to.

14          MR. CATALONA:  I'm writing "inches" on this,

15   and I'm going to mark this as Exhibit 18.  He just     01:54:55

16   wrote .0015 on a Marriott piece of paper, which is

17   Exhibit 18.

18          (Exhibit 18 was marked for identification.)

19   BY MR. CATALONA:

20     Q    So your answer at the deposition was       01:55:13

21   approximately 5 thousandths of an inch.

22     A    Where do you see 5?

23     Q    In line 18.  But it's actually

24   1.5 thousandths of an inch.

25     A    Well, if you look at No. 21, it says:      01:55:44

Page 150

1          "ANSWER:  .001, which is

2          1 thousandth of an inch."

3          A lot of people not very well with math.  So

4    if you're talking to some people that are not, they're

5    not work with numbers all the time.  It's hard for          01:56:05

6    them to explain.  The 5 thousandths that I was trying

7    to explain to them, it is cellophane paper.  That is

8    about 5 thousandths of an inch.  That's where the

9    5 thousandths came from.

10         Q    Okay.  I just want to know how thick the         01:56:23

11   material was in the PVA350.  So it wasn't

12   5 thousandths of an inch.  It was 1.5 thousandths of

13   an inch; correct?

14         A    1 thousandth 5 ten-thousandths of an inch.

15   See.  You're confused now.                                  01:56:46

16         Q    Yeah.  I think you just said 1 thousand 5 --

17         A    1 thousand ten-thousandths of an inch.

18   5 ten-thousandths of an inch.

19         Q    Okay.  That makes sense.  5 ten-thousandths

20   of an inch.                                                 01:57:08

21         A    Yes.

22         Q    Okay.  So that's extremely small; correct?

23         A    Very small.

24         Q    And you maybe can't even see that without a

25   microscope?                                                 01:57:19

Page 153

1    ambiguous.  It's a very simple question.

2              MS. LI:  No.  It's overly broad and assumes

3    many different scenarios.

4    BY MR. CATALONA:

5         Q    Would you ever stick your head in the          02:01:01

6    machine when the machine was actually operating?

7         A    Yes.

8         Q    Okay.  And you mean the machine was actually

9    spraying material, you would stick your head in?

10        A    Yes.  That's what they told me at PVA.          02:01:16

11        Q    Okay.  Why would you do that?

12        A    That's what I was taught.

13        Q    What's the purpose?

14        A    The material is a clear material.

15        Q    It's a what?                                    02:01:29

16        A    It's a clear material.  If you're going to

17   spray it on this surface, you wouldn't be able to see

18   it.  Okay?

19        Q    And why couldn't you see it?  I'm going to

20   show you Exhibit 4 again.  It looks like you can see      02:01:50

21   everything in the PVA350 on Exhibit 4.  Why can't you

22   see it through the glass window?

23             MS. LI:  Objection.  Lacks foundation.

24   Exhibit 4 doesn't show the spray.

25             THE WITNESS:  Why can't you see it?  Because     02:02:05

Page 154

1    you have to use a blacklight to see it.

2              MS. LI:  He's talking about the spray.

3              MR. CATALONA:  I'm not done yet.  Please.

4    BY MR. CATALONA:

5         Q    And why can't you use a blacklight through          02:02:17

6    the glass window?

7         A    You're asking something that doesn't make

8    sense.

9         Q    Well, tell me why.

10        A    Because you never work on this machine.  You         02:02:28

11   don't seem to understand how this machine works nor

12   how to inspect boards.

13        Q    Correct.  So tell me why.

14        A    I'm telling you why.  Because you wouldn't

15   be able to see it without using a blacklight.             02:02:45

16        Q    Why can't you flash the blacklight through

17   that glass window?

18        A    Because sometimes you don't want to

19   overspray.  And when you do overspray, we're talking

20   about thousandths of an inch.  We're not talking about       02:02:55

21   2 meters, 3 meters, 4 meters.

22        Q    Why not turn the machine off and stop the

23   spraying before sticking your head in?

24        A    That's what I was taught to do.

25        Q    There's got to be a reason.  I mean, how did       02:03:16

274

Page 155

1   it help your job to have the machine spraying when you

2   stuck your head inside of it?

3       A    Let me take a little bit of water.  I don't

4   want to give you a training of how program the

5   machine.  I was hoping that you would learn it from          02:03:53

6   PVA.  But this is not -- this is more complicated than

7   what you make it seem like.  You're asking me why did

8   you need to put your head in there.  Well, that's the

9   nature of the beast.  That's the nature of the beast.

10      Q    That's not what I asked.                            02:04:13

11          MS. LI:  Let him finish.

12          THE WITNESS:  What did you ask, then?

13  BY MR. CATALONA:

14      Q    I said why don't you turn it off before

15  sticking your head in?                                       02:04:22

16      A    And that's the nature of the breast.  This

17  machine by nature has flaws.

18      Q    You mean you can't turn it off?

19      A    I didn't say you can't turn it off.

20      Q    Okay.                                               02:04:35

21      A    I say by nature, this machine, the design is

22  not well done.  There is no good engineering in this

23  machine.

24          Let me give you an example, Mr. Catalona.

25  Let me give you an example.  I have experience doing         02:04:49

275

Page 165

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4  RUBEN JUAREZ, an individual and    ) CASE NO.

   ISELA HERNANDEZ, an individual,    ) CV17-03342-ODW(GJSX)

5                                      )

                     Plaintiffs,       )

6                                      )

                vs.                    )

7                                      )

                                       )

8                                      )

   PRECISION VALVE & AUTOMATION,       )

9  INC., a corporation and DOES 1-20, )

                                       )

10                   Defendants.       )

   _____)

11

12

13

14          VIDEO-RECORDED DEPOSITION OF

15                  RUBEN JUAREZ

16                   VOLUME II

17              Burbank, California

18           Thursday, March 15, 2018

19

20

21  Reported By:

22  Elizabeth Schmidt

23  CSR No. 13598

24

25  PAGES 165 - 343

Page 166

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    RUBEN JUAREZ, an individual and    ) CASE NO.
     ISELA HERNANDEZ, an individual,    ) CV17-03342-ODW(GJSX)
5                                        )
                        Plaintiffs,      )
6                                        )
                    vs.                  )
7                                        )
                                         )
8                                        )
     PRECISION VALVE & AUTOMATION,       )
9    INC., a corporation and DOES 1-20, )
                                         )
10                      Defendants.      )
     _____)

11

12

13

14

15         Deposition of RUBEN JUAREZ, Volume II, taken on

16   behalf of Defendant, at 2500 North Hollywood Way,

17   Room P125E, Burbank, California, beginning at 9:02 A.M.

18   and ending at 1:05 P.M., on March 15, 2018, before

19   Elizabeth Schmidt, Certified Shorthand Reporter

20   No. 13598.

21

22

23

24

25

277

Page 167

1    APPEARANCES:

2              For Plaintiff:

3                        LAW OFFICES OF TERESA LI, PC
                         BY:  TERESA LI, ESQ.

4                        6701 Koll Center Parkway
                         Suite 250

5                        Pleasanton, California 94566
                         (415)423-3377

6                        teresa@lawofficesofteresali.com

7

8              For Defendant:

9                        BECHERER KANNETT & SCHWEITZER
                         BY:  ALEX P. CATALONA, ESQ.

10                       1255 Powell Street
                         Emeryville, California 94608

11                       (510)658-3600
                         acatalona@bkscal.com

12

13

14

15   ALSO PRESENT:  JULIAN SHINE, videographer

16

17

18

19

20

21

22

23

24

25

278

Page 168

1                          I N D E X
2    WITNESS
3    RUBEN JUAREZ
4            Examination by:                        Page
5            Mr. Catalona                           171
6
7
8
9                        E X H I B I T S
10
11   Exhibit          Description                    Page
12   Exhibit 19 - stipulated protective order        170
13   Exhibit 20 - Avionics SOP AV1200-1A Rev. G3     177
14   Exhibit 21 - Avionics SOP AV1200-1A Rev. C      177
15   Exhibit 22 - Avionics SOP AV1200-1A Rev. D1     177
16   Exhibit 23 - PVA installation and service       198
                  manual
17
     Exhibit 24 - expense report, Bates Juarez 00976  228
18
     Exhibit 25 - expense report, Bates Juarez 01451  232
19
     Exhibit 26 - 3/12/15 e-mail chain               234
20
     Exhibit 27 - employment application             243
21
     Exhibit 28 - 12/29/11 letter                    245
22
     Exhibit 29 - Dr. Alyesh medical record          246
23
     Exhibit 30 - Dr. Schenkel medical record        247
24
     Exhibit 31 - list of medications                249
25

279

Page 169

1                         EXHIBITS, CONTINUED

2     Exhibit          Description                      Page

3     Exhibit 32 - workers' compensation claim form      252

4     Exhibit 33 - Dr. Brautbar medical record           254

5     Exhibit 34 - patient questionnaire                 254

6     Exhibit 35 - history of injury/exposure on the job254

7     Exhibit 36 - patient questionnaire                 254

8     Exhibit 37 - 10/28/14 e-mail                       296

9     Exhibit 38 - Hamlin Psyche Center medical record   314

10    Exhibit 39 - Dr. Regev medical record              329

11    Exhibit 40 - Dr. Andiman medical record            331

12

13

14                     QUESTIONS MARKED

15                  Page              Line

16                  188               18

17                  189               18

18                  198                3

19                  340               22

20

21

22

23

24

25

280

Page 170

1          Burbank, California

2        Thursday, March 15, 2018

3            9:02 A.M.

4             *  *  *

5      (Exhibit 19 was marked for identification prior

6      to going on the record.)

7          THE VIDEOGRAPHER:  We are on the record at

8    9:01 A.M. on March 15, 2018.  Please note that

9    microphones are sensitive and may pick up whispering,

10   private conversations, and cellular interference.          09:02:50

11   Audio and video recording will continue to take place

12   unless all parties agree to go off the record.

13        This is the video-recorded deposition of

14   Ruben Juarez, Volume II, in the matter of Ruben Juarez

15   et al vs. Precision Valve & Automation, Incorporated,       09:03:07

16   et al, filed in the United States District Court,

17   Central District of California, case

18   No. CV17-03342-ODW.

19        This deposition is being held at 2500 North

20   Hollywood Way, Burbank, California.  My name is Julian      09:03:29

21   Shine.  I am the videographer.  Our court reporter is

22   Elizabeth Schmidt.  We're here from Veritext Legal

23   Solutions.  I am not authorized to administer an oath.

24   I am not related to any party in this action, nor am I

25   financially interested in the outcome in any way.           09:03:44

Page 172

1       A    I don't remember.

2       Q    Ten years ago?  20 years ago?

3       A    I can't tell you exactly what date.

4       Q    What estimate?

5       A    I cannot estimate the date.                    09:04:58

6       Q    Can you estimate the decade?

7       A    Decade.  No.

8       Q    Okay.  Is your wife and your daughter an

9   American citizen?

10      A    They are.                                       09:05:16

11      Q    Do you know when they became an American

12  citizen?

13      A    My wife, no.

14      Q    Daughter?  Was she born in this country?

15      A    When she was born.                              09:05:24

16      Q    Okay.

17           Did SpaceX give you any written instructions

18  for how to do your job?

19      A    Did SpaceX -- when?

20      Q    At any time.                                    09:05:35

21      A    Not that I can remember.

22      Q    What are SOPs?

23      A    SOP.  No idea.

24      Q    What are standard operating procedures?

25      A    I have no idea.                                 09:05:54

Page 176

1        A    I am trying to answer your question.

2        Q    No, you're not.  You're wasting time --

3        A    I can't --

4             (Simultaneous crosstalk.)

5    BY MR. CATALONA:

6        Q    Sir.  I just asked about written

7    instructions.  We have very limited time.  You need to

8    answer the question.  Okay?

9        A    I am trying to give you --

10       Q    No, you're not.                          09:09:10

11       A    Well, you want me to answer something that I

12   don't remember.  I'm trying to backtrack my memory,

13   sir.

14       Q    I don't want you to backtrack your memory.

15       A    If I don't backtrack my memory, how can I    09:09:22

16   remember something back then?  We're talking about

17   four years ago.  Do you understand that?  Or more than

18   that.  Do you understand that, Mr. Catalona?

19       Q    Don't ask me questions, sir.  I'm here to

20   ask you questions, and you're here --              09:09:35

21       A    And I am trying.

22       Q    -- to answer those questions.

23       A    I am trying, sir.

24       Q    Just -- okay.  I withdraw the question.

25   Okay?  We have limited time.  I can't waste time.  So  09:09:43

Page 177

1    if there were any written instructions by SpaceX, tell

2    me what they gave you in writing.

3         A    In writing?

4         Q    Yes.

5         A    That I can remember, nothing.                    09:09:59

6         Q    Thank you.

7              Now, these were documents that were produced

8    by SpaceX in this case.  This is Exhibit 21.  And this

9    is --

10             MS. LI:  What do you mean, these are             09:10:13

11   documents produced by SpaceX?

12             MR. CATALONA:  And this is Exhibit 22.

13             MS. LI:  Are these from the subpoena?

14             MR. CATALONA:  Yes.  And this is Exhibit 20.

15   This is a document produced by PVA.                        09:10:23

16         (Exhibit 20, Exhibit 21, and Exhibit 22 were

17          marked for identification.)

18   BY MR. CATALONA:

19        Q    So I'm showing you Exhibits 21 -- strike

20   that.

21             I'm showing you Exhibit 20, 21, and 22.

22   Have you ever seen those documents before?

23             MS. LI:  Can I get a copy of this?

24   BY MR. CATALONA:

25        Q    Okay.  We've been on the record while you're    09:11:58

Page 177

1   if there were any written instructions by SpaceX, tell

2   me what they gave you in writing.

3       A    In writing?

4       Q    Yes.

5       A    That I can remember, nothing.                          09:09:59

6       Q    Thank you.

7            Now, these were documents that were produced

8   by SpaceX in this case.  This is Exhibit 21.  And this

9   is --

10           MS. LI:  What do you mean, these are             09:10:13

11  documents produced by SpaceX?

12           MR. CATALONA:  And this is Exhibit 22.

13           MS. LI:  Are these from the subpoena?

14           MR. CATALONA:  Yes.  And this is Exhibit 20.

15  This is a document produced by PVA.                          09:10:23

16       (Exhibit 20, Exhibit 21, and Exhibit 22 were

17        marked for identification.)

18  BY MR. CATALONA:

19       Q    So I'm showing you Exhibits 21 -- strike

20  that.

21           I'm showing you Exhibit 20, 21, and 22.

22  Have you ever seen those documents before?

23           MS. LI:  Can I get a copy of this?

24  BY MR. CATALONA:

25       Q    Okay.  We've been on the record while you're     09:11:58

Page 178

1    looking at documents for approximately 60 seconds.

2    Have you ever seen those documents before?

3         A    Not that I can remember, no.

4         Q    And we're going to depose your coworkers at

5    SpaceX.                                                    09:12:14

6         A    That's fine.

7         Q    And will they say that you've never seen

8    those documents before?

9         A    Probably.

10            MS. LI:  Objection.  Calls for speculation.      09:12:22

11   BY MR. CATALONA:

12        Q    So SpaceX never gave you any training that

13   included documents?

14        A    I tried to answer that question in the

15   beginning, and you're not listening.  You're just         09:12:33

16   trying to get upset.  And I want you to understand

17   what happened.  And you just keep asking me the same

18   question over and over.  When I was first hired, I was

19   hired to program SMT equipment.

20        Q    Got it.

21        A    Does that make sense?

22        Q    I heard that.  I heard that.

23            MS. LI:  Let him finish.

24   BY MR. CATALONA:

25        Q    That's fine.                                    09:12:56

Page 190

1          MR. CATALONA:  Mark that question.  We'll

2     have to --

3     BY MR. CATALONA:

4          Q    Are you going to answer that question?

5          A    I'm sorry.  You're arguing too much.  I          09:23:38

6     forget which question do you --

7          Q    The instruction is:

8                "Use gloves, eye protection, and

9                face mask in well-ventilated

10               areas per the MSDS."                             09:23:48

11          Did you do that?

12          MS. LI:  Same objections.

13          THE WITNESS:  It's been quite some time; so

14     I don't remember which one I did or which one I didn't

15     do.                                                        09:24:14

16     BY MR. CATALONA:

17          Q    Did you do that one?

18          A    Which one, sir?

19          Q    The one I just asked you.

20          A    There's a lot of them.  There's gloves,         09:24:18

21     eyewear, face mask, well-ventilated area, MSDS.

22          Q    Did you wear gloves?

23          A    Sometimes.

24          Q    Did you wear eye protection?

25          A    I used glasses.                                 09:24:28

Page 191

1    Q    Did you wear face mask?

2    A    No.

3    Q    Did you have a well-ventilated area that you

4    were working in to do conformal coating?

5    A    That is kind of individualized because for        09:24:41

6    whatever -- well-ventilated area for you is not good

7    for me.  So I don't know what they mean by that.

8    Q    You don't know if you did that or not?

9    Answer the question.

10    MS. LI:  Objection.  Calls for speculation,          09:25:02

11    lacks foundation.

12    THE WITNESS:  I already told you the

13    well-ventilated area, that it's good for you, it might

14    not be well-ventilated for me.

15    BY MR. CATALONA:                                       09:25:14

16    Q    Did you follow the MSDS?

17    A    I was never provided MSDS.

18    Q    Do you agree that this document instructs

19    you to use gloves, eye protection, and face mask in a

20    well-ventilated area per the MSDS?                     09:25:26

21    A    That's what it says.

22    Q    Okay.  And SpaceX had the MSDS sheets on the

23    job; correct?

24    MS. LI:  Objection.  Vague and ambiguous as

25    to "on the job" and vague and ambiguous as to time.    09:25:41

288

Page 192

1          Go ahead.

2          THE WITNESS:  What do you mean, "on the

3   job"?

4   BY MR. CATALONA:

5      Q    At SpaceX.                                    09:25:48

6      A    On the job.  What do you mean by that, "on

7   the job"?

8      Q    They were there.

9      A    There where?

10     Q    At SpaceX.                                    09:25:53

11     A    Don't yell at me.  Hang on.  Where at SpaceX

12  do you mean?

13     Q    Where you worked.  Are you going to refuse

14  to answer that question?

15     A    No.  I'm trying to remember whether there    09:26:05

16  were or whether there weren't.

17     Q    And what do you remember?

18     A    I don't remember seeing them.

19     Q    Were they there and you just didn't see

20  them?                                                09:26:20

21     A    I'm not going to speculate something that I

22  don't know.

23     Q    Did you ever ask to see the MSDS sheets?

24         MS. LI:  Vague and ambiguous as to time.

25         Go ahead.                                      09:26:32

Page 194

1       A    While I was working, you mean?

2       Q    Yes.

3       A    Because I asked them afterwards.

4       Q    Well, I didn't ask that.  You're refusing to

5    answer the question.  Did you ever ask for the MSDS          09:27:22

6    sheets at SpaceX?  Yes or no.

7       A    I don't remember.

8            MS. LI:  Can we take a break?

9            MR. CATALONA:  No.

10           MS. LI:  I'm going to take a break.              09:27:37

11           MR. CATALONA:  We're not going off the

12   record.

13           MS. LI:  Then you can keep the record on and

14   we're going to take a break.

15           MR. CATALONA:  Okay.  We're off the record.     09:27:45

16           THE VIDEOGRAPHER:  We're off the record at

17   9:26 A.M.

18           (A recess was taken.)

19           THE VIDEOGRAPHER:  We are back on the record

20   at 9:28 A.M.                                            09:29:56

21   BY MR. CATALONA:

22      Q    Okay.  We're still on page 1139.  And in

23   Section 6.1.1, do you see that it specifies HumiSeal

24   1A33 conformal coating, HumiSeal 521 thinner, and

25   HumiSeal 1063 stripper; correct?                        09:30:15

Page 198

1    arrived at SpaceX?  Do you know?

2        A    Again, I don't know.

3        Q    Okay.  Now, even though it says to follow

4    the PVA manual, you never did follow the PVA manual;

5    right?                                                09:34:25

6            MS. LI:  Objection.  Argumentative.

7            Do not answer.

8            MR. CATALONA:  You're instructing him not to

9    answer that question?

10           MS. LI:  Yeah.                                09:34:31

11           MR. CATALONA:  We'll mark that question, as

12   well.

13           MS. LI:  Mark it.

14           THE WITNESS:  Are we done with this?

15   BY MR. CATALONA:                                      09:34:53

16       Q    Yes.  For now.

17            This is Exhibit 23.

18            (Exhibit 23 was marked for identification.)

19   BY MR. CATALONA:

20       Q    Have you ever seen that before?             09:34:56

21           MS. LI:  Can I have a copy of Exhibit 23?

22           MR. CATALONA:  Wait.  Wait a second.  This

23   is Exhibit 23, and you can look at this.  I'm only

24   going to ask him parts in there.  That's why I'm

25   giving you that.                                      09:35:29

Page 199

1          MS. LI:  It's minus, like, a third of what

2     he has.

3          MR. CATALONA:  Like I said, I'm only going

4     to ask questions about that portion.  So, you know,

5     you can look at the actual exhibit on a break if you          09:35:40

6     want.

7     BY MR. CATALONA:

8          Q    Back to the questioning.  This is the PVA350

9     manual.  Actually, it refers to other models than the

10    350.  Have you ever seen this document before?          09:35:59

11         A    Not that I can remember.

12         Q    Was it available at SpaceX?

13         MS. LI:  Calls for speculation, asked and

14    answered.

15         Go ahead.          09:36:10

16         THE WITNESS:  I never seen it.

17    BY MR. CATALONA:

18         Q    Do you know if it was available or not?

19         A    You're asking me for speculate.

20         MS. LI:  Calls for speculation.          09:36:19

21    BY MR. CATALONA:

22         Q    I don't want you to speculate.  If you don't

23    know --

24         A    You're asking me --

25         Q    -- just say "I don't know."          09:36:22

292

Page 200

1      A    I did say I don't know.  You keep asking me

2  the same question.  Do you know if it was available.

3  I said I don't know.

4      Q    Did you ever ask to look at that manual?

5         MS. LI:  Asked and answered.                    09:36:34

6         Go ahead.

7         THE WITNESS:  No.

8  BY MR. CATALONA:

9      Q    Did you ever look at its provisions about

10  safety?                                               09:36:39

11         MS. LI:  Assumes facts not in evidence.

12         THE WITNESS:  If I never look at it, how can

13  I...

14  BY MR. CATALONA:

15      Q    How can you what?                            09:36:49

16      A    How can I look at something that I haven't

17  read.

18      Q    Okay.  Turn to page 40, please.  This page

19  is entitled operation and maintenance manual.  Did you

20  ever look at that page?                               09:37:06

21         MS. LI:  Argumentative.

22  BY MR. CATALONA:

23      Q    Sir, please turn to page 40.

24      A    I'm trying to read -- this is a big book.  I

25  never seen it before.  So you're asking me to look at  09:37:30

293

Page 206

1    equipment manufacturer?

2       A    No.

3             MS. LI:  Same objections.

4    BY MR. CATALONA:

5       Q    Okay.  Do you see the next sentence, it          09:44:16

6    says:

7                   "Using the workcell in other ways

8                   than is described in this

9                   documentation supplied with the

10                  equipment may result in injury or       09:44:27

11                  damage of the equipment."

12            Do you see that?

13      A    Yes.

14      Q    What does that mean?

15            MS. LI:  Lacks foundation, calls for           09:44:46

16    speculation.

17            Go ahead.

18            THE WITNESS:  Maybe just the equipment and

19    other ways it's not built for.

20    BY MR. CATALONA:                                       09:45:06

21      Q    Could result in injury; right?

22      A    That's what it says.

23      Q    And one of the examples that it gives is

24    removing door interlocks or bypassing safety devices.

25    Do you see that?                                       09:45:18

Page 207

1      A    Yes.

2      Q    Turn to page 62.  This is the operating

3  safety section.  Do you see that?

4      A    Yes.

5      Q    And it lists notices and warnings; right?          09:45:37

6      A    Yes.

7      Q    The first it lists is, quote:

8                  "Safety glasses, gloves, and

9                  long-sleeved clothing are

10                 necessary precautions when             09:45:52

11                 working with automated industrial

12                 equipment."

13          Do you see that?

14     A    Yes.

15     Q    Second it states:                                09:46:02

16                 "Read and understand all

17                 operating manuals before using

18                 this equipment."

19          Do you see that?

20     A    Yes.                                            09:46:09

21     Q    What does that mean?

22          MS. LI:  Same objection.  Calls for

23  speculation, lacks foundation.

24          Go ahead.

25          THE WITNESS:  I guess to read the operation     09:46:16

Page 208

1    manual before using the machine.

2    BY MR. CATALONA:

3        Q    Third it states:

4             "Do not disable the safety

5             features of this machine."                      09:46:26

6        Do you see that?

7        A    Yes.

8        Q    What does that mean?

9             MS. LI:  Same objection.  The document

10   speaks for itself.                                       09:46:34

11            THE WITNESS:  Do not tamper with the

12   machine, I guess.

13   BY MR. CATALONA:

14       Q    And don't disable the safety features;

15   right?                                                   09:46:45

16       A    That's what it says there.

17       Q    The next section is called safety devices

18   and guarding.  Do you see that?

19       A    Which number?  Oh.  You're moving on to the

20   next -- okay.                                            09:46:58

21       Q    Yes.  The next section is called safety

22   devices and guarding.  Do you see that?

23       A    Yes, sir.

24       Q    Do you see where it says in bold:

25            "Note:  The safety features                     09:47:07

Page 209

1          should never" -- in all caps --

2          "be bypassed, disabled, or

3          tampered with.  Precision Valve &

4          Automation, Inc., is not

5          responsible for any damages

6          incurred, mechanical or human,

7          because of alteration or

8          destruction of any safety

9          features."

10         Do you see that?                          09:47:31

11    A    That's what it says.

12    Q    What does that mean?

13         MS. LI:  Same objection.  Calls for

14    speculation and lacks foundation.  Calls for a legal

15    opinion.                                        09:47:39

16         Go ahead.

17         THE WITNESS:  I'm not sure what -- I guess

18    it's a legal term.

19    BY MR. CATALONA:

20    Q    Well, what do you think it means?         09:47:50

21         MS. LI:  Same objections.  Asked and

22    answered.

23    BY MR. CATALONA:

24    Q    Tell me.

25         MS. LI:  Same objections.  Asked and      09:47:57

Page 210

1   answered.

2           THE WITNESS:  Can you re-word that question.

3   Because this is a legal terms.  I'm not a legal

4   expert.

5   BY MR. CATALONA:                                    09:48:10

6       Q    I just read what it says.  I asked you what

7   it meant.

8           MS. LI:  Same objection.  Lacks foundation,

9   calls for speculation, calls for a legal opinion,

10  asked and answered.  You're harassing the witness and  09:48:20

11  also wasting time asking him to read hundreds and

12  hundreds of pages of documents --

13          MR. CATALONA:  You're --

14          MS. LI:  -- he hasn't read before --

15          MR. CATALONA:  You're being improper.         09:48:29

16          MS. LI:  Let me finish.

17          MR. CATALONA:  You're being --

18          MS. LI:  He has not read before and

19  simultaneously claiming that he's running out of time.

20          So just for the record, let's see how long     09:48:35

21  this counsel is going to spend asking the witness to

22  read something that he's never read before line by

23  line and then complaining that he doesn't have enough

24  time.

25          MR. CATALONA:  Your behavior is improper       09:48:47

Page 211

1    once again.  Please state an objection and do not

2    coach the witness.  Do not interfere with the process.

3    BY MR. CATALONA:

4        Q    What does that mean?

5            MS. LI:  Same objections.  Go ahead.          09:48:58

6            THE WITNESS:  It's a legal term.  I don't

7    know what it in legality means.

8    BY MR. CATALONA:

9        Q    You do not know what "safety features should

10   never be bypassed" means?                             09:49:11

11           MS. LI:  Same objections.

12           THE WITNESS:  Where are you reading that

13   from, Mr. Catalona?

14   BY MR. CATALONA:

15       Q    The first sentence.                          09:49:25

16       A    But this is contrary to what they teach you.

17       Q    I didn't ask that.  I just asked you if you

18   knew what that meant.

19           MS. LI:  Same objections.  Let's move on.

20   He already answered that.                             09:49:43

21           I'll instruct you not to answer.

22           MR. CATALONA:  He said it was a legal term.

23   That's not an answer.

24           MS. LI:  That's an answer.  Let's move on.

25   He didn't write the sentence.  You're asking what he   09:49:54

Page 212

1    meant?  A sentence that he didn't write and he never

2    read it before?

3             MR. CATALONA:  You're being improper again,

4    Teresa.

5             MS. LI:  Let's move on.                    09:50:01

6    BY MR. CATALONA:

7        Q    What does this mean, "the safety features

8    should never be bypassed"?

9             MS. LI:  Same objections.  Asked and

10   answered, harassing the witness.                    09:50:10

11            THE WITNESS:  I already told you I don't

12   know.

13   BY MR. CATALONA:

14       Q    Thank you.  That's the first time you told

15   me that.                                            09:50:15

16            MS. LI:  That's not the first time he told

17   you that.

18   BY MR. CATALONA:

19       Q    We're going to move on now.  Okay.  Did

20   anyone use compressed air around you at SpaceX?     09:50:29

21       A    Which line?

22       Q    Oh.  You can give me that, sir.  I'm

23   probably not going to ask questions about that again

24   for a while.  Yeah.  Did anyone use compressed air

25   around you at SpaceX?                               09:50:49

300

Page 243

BY MR. CATALONA:

1

2      Q    Other than what your attorney told you, do

3 you have any information regarding why you waited

4 until February 28, 2017, to file your lawsuit in this

5 case?  Answer the question.                          10:28:55

6      A    Can you re-word the question again.  I'm

7 trying to think about.

8      Q    Other than what she told you.  I'm not

9 asking about that.  Okay?  Other than that, do you

10 have any information to tell me that would explain why   10:29:21

11 you waited until February 28, 2017, to file your

12 lawsuit in this case?

13      A    I don't know.

14      Q    Okay.  I've marked as exhibit -- strike

15 that.

16         I've marked a document as Exhibit 27.

17         (Exhibit 27 was marked for identification.)

18 BY MR. CATALONA:

19      Q    What is this document?

20      A    Employment application.                     10:30:01

21      Q    For you; right?

22      A    Yes.

23      Q    Is everything in this document, Exhibit 27,

24 true and accurate as far as you know?

25      A    To my best of my recollection, yes.          10:30:13

Page 244

1      Q     Did you personally fill out all of the

2   information in it?

3      A     My wife helped me with some thing.  My wife

4   helped me with some.

5      Q     Did she physically type it out?          10:30:34

6      A     No.  She was helping me remembering because

7   sometimes it's hard to remember everything.

8      Q     Were you the only person that physically

9   filled out the employment application?

10     A     I don't remember.  This has been long time   10:30:50

11  ago, Mr. Catalona.

12     Q     Okay.  Do you remember anyone else who did

13  anything to help you with this employment application

14  other than your wife?

15     A     Not that I can remember, no.             10:31:02

16     Q     Did you create this on or about November 27,

17  2011?

18     A     That's what it says.

19     Q     Turn to page 313.

20     A     Where do you see the pages?               10:31:30

21     Q     At the very bottom.

22     A     305.

23     Q     I said 313.

24     A     Oh.  Yes.

25     Q     What was your job with EMI Electronics?    10:31:44

Page 245

1        A    Manufacture process engineer.

2        Q    Do you see the reference to PVA equipment in

3    that job description?

4        A    Yes.

5        Q    It also says:                                    10:32:05

6             "Output conformal coating

7             programs per customer request."

8             Do you see that?

9        A    Correct.

10       Q    What PVA equipment did you use?              10:32:13

11       A    If I remember correct, 650.

12       Q    The PVA650?

13       A    Yes.

14       Q    What work did you do with conformal coating?

15       A    Not that much.                              10:32:28

16       Q    Well, tell me what you did.

17       A    I just went for training, and that was

18   pretty much it.  That was -- from the time I got the

19   training to the time I left the company was about a

20   month or so.                                         10:32:44

21       Q    And you already told us about that training;

22   right?

23       A    Yes, sir.

24       Q    Okay.  Let's put that away.

25            (Exhibit 28 was marked for identification.)

303

Page 246

1    BY MR. CATALONA:

2        Q    I've handed you Exhibit 28.

3        A    Yes.

4        Q    This is the document that offered you the

5    job at SpaceX; right?                              10:33:18

6        A    That's what it says.

7        Q    On page 322, that is your signature; right?

8        A    Yes, sir.

9        Q    Okay.  Please give me that back.

10        (Exhibit 29 was marked for identification.)

11   BY MR. CATALONA:

12       Q    This is a history and physical dated

13   March 14, 2013.  Do you see that it says that you had

14   coil embolization for nonruptured ACA aneurysm?

15       A    Where does it say that, Mr. Catalona?  Which    10:34:14

16   paragraph?

17       Q    The first paragraph.

18       A    Oh, yeah.

19       Q    It indicates that that procedure was done in

20   January 2013.  Do you see that?                    10:34:31

21       A    Yes, sir.

22       Q    When do you remember having that done?

23       A    What done?

24       Q    The procedure.

25       A    The --                                    10:34:43

Page 247

1      Q    What we just talked about.

2      A    The coil?

3      Q    Yes.

4      A    Sometime in January '13.

5      Q    And is that also called a craniotomy?          10:34:54

6      A    I don't know what it is called.  Craniotomy,

7   I don't even know what the term means.

8      Q    Okay.  Have any of your doctors ever talked

9   to you about having a craniotomy?

10     A    That's the first time I heard that term.      10:35:27

11  What is a craniotomy?

12     Q    That's an operation having to do with your

13  cranium.

14     A    No.

15     Q    Okay.  This is Exhibit 30.                     10:35:43

16         (Exhibit 30 was marked for identification.)

17  BY MR. CATALONA:

18     Q    And I'd like you to turn to the second page

19  of this, the second page of this document.  Who is

20  Dr. Steven Schenkel?                                   10:36:00

21     A    He's a psychiatric.

22     Q    And he's one of your doctors?

23     A    Yes.

24     Q    And do you see the first line of the chief

25  complaint?                                             10:36:19

Page 251

1   my question again, my answer?

2       Q    Just answer the question.

3       A    I said to clear my airways.

4       Q    That wasn't the question.  I said did anyone

5   tell you why you were -- okay.  Let me ask a different          10:40:34

6   question.  Has anyone ever told you the cause of any

7   breathing problems you have?

8       A    I just told you the toxicologist said that

9   part of my breathing problem was due to chemical

10  exposure.                                                       10:41:03

11      Q    And did he specify what chemicals?

12      A    No.  Not that I know.  I didn't read his

13  report.

14      Q    So on March 27, 2014, you left your job at

15  SpaceX.  Correct?                                              10:41:18

16      A    I don't know exact the day, the exact date,

17  sir.

18      Q    Was it at the end of March 2014?

19      A    I don't remember.  I know it was in 2014,

20  but I don't remember the month or the date.                    10:41:30

21      Q    Why did you leave?

22      A    As stated in my prior -- in my opening

23  statement, after trying for two times to return to

24  work and having to end up in the hospital, I could no

25  longer continue to work, and SpaceX did not allow me          10:41:53

1    to return to work.  I tried to set up an appointment

2    with Mr. Lynch at SpaceX.  I was begging him.  I'm

3    trying to return to work.

4          I sent several e-mails to human resources.

5    I send a ADA, Americans with Disabilities Act, with          10:42:17

6    some restrictions for me to return to work, and where

7    I was unsuccessful trying to -- all what I wanted was

8    to return to work to be able to provide for my family.

9    That's all what I did.  So as far as the date and

10   time, what my last day of work was with SpaceX, I            10:42:39

11   don't remember.

12       Q    Okay.  I just put in front of you

13   Exhibit 32.

14          (Exhibit 32 was marked for identification.)

15   BY MR. CATALONA:

16       Q    Is that your workers' compensation claim?

17       A    Yeah.

18       Q    Is that your signature on line 8?

19       A    Yes.

20       Q    Did you type this form?                             10:43:09

21       A    No.

22          MS. LI:  Okay?

23          MR. CATALONA:  Okay.  Let's go off the

24   record.

25          THE VIDEOGRAPHER:  We are off the record at           10:43:23

Page 253

1    10:42 A.M.

2            (A recess was taken.)

3            THE VIDEOGRAPHER:  We are back on the record

4    at 10:48 A.M.

5    BY MR. CATALONA:                                      10:50:01

6        Q    Why did you wait until September of 2014 to

7    file your claim?

8        A    Which claim, sir?

9        Q    The one that's right in front of you.

10       A    I don't know when that was filed.           10:50:13

11       Q    It was filed September 24, 2014.

12       A    Where does it say that?

13           MS. LI:  Calls for attorney-client

14    privilege, work product.

15           If you can answer without what you were told  10:50:25

16    by your workers' comp attorney, go ahead.

17           THE WITNESS:  No.

18    BY MR. CATALONA:

19       Q    You need to answer out loud, sir.

20       A    No.                                          10:50:38

21       Q    No, you don't know why you and your attorney

22    waited until September 23, 2014, to file this claim;

23    is that true?

24           MS. LI:  Same objections.

25           THE WITNESS:  Correct.                        10:50:49

Page 255

1        A    I think that's the toxicologist.

2        Q    He's a toxicologist you saw for your

3    workers' comp case?

4        A    Yes, sir.

5        Q    Please look at all four exhibits.  Is that      10:53:24

6    your writing and is that your signature at the bottom

7    of the exhibits, or maybe sometimes it's at the top,

8    sometimes at the very beginning?

9        A    Some of these are not my handwriting.

10       Q    Okay.  Which one or ones are not your          10:54:14

11   handwriting?

12       A    Exhibit 34.  It's not my handwriting.

13   Exhibit 33, it is my handwriting.

14       Q    Okay.  How about Exhibit 35?

15       A    It doesn't appear to be my handwriting.        10:55:02

16       Q    On Exhibit 35, why don't you turn to

17   page 53.  It's the third page or the second page.

18       A    Yes.

19       Q    Under history of injury, exposure on the

20   job, can you read any of that writing?                   10:55:36

21       A    No.

22       Q    Is any of that writing your handwriting?

23       A    No.

24       Q    Let's go to the next exhibit.  Let's go to

25   Exhibit 36.  That's your handwriting?                    10:55:54

309

Page 256

1     A    It sure looks like.

2     Q    Okay.  Turn to page 72, please.

3     A    There's no page 72.  It goes from 70 to 78.

4     Q    Let's see.  Huh.

5          Turn to page 72 in that document.  It              10:57:07

6     appears the one you had was out of order.  Do you see

7     page 72?  Okay.  Do you see on the bottom it says:

8               "For environmental exposures,

9               describe the dates of your

10              exposure."                                     10:57:26

11         Do you see that?

12    A    No.

13    Q    Do you see it right there?

14    A    Oh, yeah.

15    Q    Okay.  What did you write in response to          10:57:33

16    that question?

17    A    I work with chemicals at all times.  Times

18    that I was in charge of replacing fume filters, repair

19    the conformal coating equipment, also order parts for

20    the equipment.  My employer bypass switch on the        10:57:58

21    equipment.

22    Q    Okay.  I'm just going to read it again just

23    to make sure we're clear.  It says:

24              "I worked with chemicals all the

25              time.  I was in charge of                      10:58:15

Veritext Legal Solutions
866 299-5127

310

Page 257

```
 1              replacing fume filter and repair

 2              the conformal coat equipment,

 3              also order parts for the

 4              equipment.  My employer bypassed

 5              the safety switch on the              10:58:28

 6              equipment."

 7         Is that what it says?

 8    A    That's what it reads, yes.

 9    Q    Is that what it says?

10    A    Yes.                                       10:58:35

11    Q    Okay.  Thank you.  On page 76 -- ah, yes.

12 Turn to page 76.  Do you see where it asked you to

13 name and describe any and all chemicals which you were

14 exposed to?

15    A    Part 3?                                    10:59:26

16    Q    Yes.  No.  Yeah.  Part 3.  Exactly.  Strike

17 that.

18         On page 76 -- can you turn to page 76.

19    A    Yes, sir.  Let me see what this -- it

20 doesn't have the date.  This document is not dated.    10:59:46

21    Q    Okay.  On page 76, it asks you to name and

22 describe any and all chemicals which you were exposed

23 to.  Can you please turn to page 76.

24    A    Yes.  But can we first be on the record

25 which is the date of this document?                 11:00:11
```

Page 258

1           MS. LI:  It's on the last page.

2    BY MR. CATALONA:

3       Q    It says on the last page.  All of these are

4    the same date.

5           MS. LI:  Your last page is different from my      11:00:24

6    last page.

7           MR. CATALONA:  That's just a printout.

8           THE WITNESS:  Yes.

9    BY MR. CATALONA:

10      Q    Okay.  So it says -- okay.  Go back to         11:00:34

11   page 76.  Do you see where it asks you to name and

12   describe any and all chemicals you were exposed to?

13      A    Yes, sir.

14      Q    What did you write in response to that

15   question?                                               11:00:50

16      A    Isopropyl alcohol, solder wire, Arathane,

17   HumiSeal, and HumiSeal.

18      Q    And HumiSeal thinner 521.

19      A    Yes.

20      Q    And these are the chemicals from the MSDS       11:01:01

21   sheets that we already talked about?

22      A    I believe so, yes.

23      Q    It says you were exposed to these chemicals

24   from breathing, working with hands, repairing

25   equipment and filters; right?                           11:01:19

Page 259

1     A    That's what it says.

2     Q    And that's what you wrote?

3     A    Yes.

4     Q    Okay.  You wrote that you were exposed to

5  these chemicals four to five hours per day?                11:01:31

6     A    That's what it says, yes.

7     Q    Turn to the next page.  You stated that you

8  inhaled these chemicals; right?

9     A    Correct.

10    Q    You stated that when you inhaled the             11:01:49

11  chemicals, you were tired, got a headache, and became

12  dizzy; right?

13    A    Where?  Which paragraph, sir?

14    Q    The very top.

15        MS. LI:  It doesn't say when you inhale,          11:02:06

16  would you.  It says:

17            "If yes, did you feel sick, and

18            if so, describe what you felt."

19        MR. CATALONA:  Okay.  If that's how you want

20  him to answer it.                                         11:02:17

21        MS. LI:  That's what it says.  You just

22  re-worded it.

23  BY MR. CATALONA:

24    Q    First it says:

25            "Did you inhale these chemicals?"

Page 260

1          And you circled "yes"; correct?

2     A    Yes.

3     Q    Then it says:

4               "If yes, would you feel sick, and

5               if so, describe what you felt."          11:02:32

6          And you wrote "tired, headache, dizzy";

7     correct?

8     A    Correct.

9     Q    Okay.  Down near the bottom it says --

10    strike that.

11         Near the bottom, it asks:

12              "Did you develop headaches at the

13              time of exposure (i.e. immediate,

14              severe, hours while exposed)?"

15         Answer, "yes."  Do you see that?          11:03:28

16    A    Did you develop headaches at the time of

17    exposure.  Yes.

18    Q    It asks -- strike that.

19         At the top, the second section of this

20    document, it asked:          11:04:00

21              "Did you have skin contact with

22              these chemicals?"

23         And you circled "yes"; correct?

24    A    Yes.

25    Q    Then it says:          11:04:09

314

Page 261

```
 1                 "How often, how many hours per

 2                 day, days per week?"

 3           And you stated:

 4                 "Four to five every day."

 5      A    Correct.                              11:04:19

 6      Q    Then it says:

 7                 "If yes, did you experience any

 8                 reaction, symptoms, and if so,

 9                 describe, i.e., smell, burning of

10                 the eyes, cough, et cetera."      11:04:39

11           And your answer was:

12                 "Nausea, dizziness, burning of

13                 the eyes."

14           Correct?

15      A    Correct.                              11:04:50

16      Q    Please turn the page.  Do you see the part

17  about ventilation?

18      A    Yes.

19      Q    The question is "How was the ventilation,"

20  and your choices were excellent, good, average, poor,   11:05:19

21  or none, and you circled the word "poor."  Do you see

22  that?

23      A    Yes.

24      Q    You stated that you were not given any

25  personal protective devices; correct?              11:05:36
```

Page 268

1          Your aneurysm surgery was in January 2013?

2      A    Correct.

3      Q    And you had headaches before that; correct?

4      A    I had symptoms.  Not just headaches.

5      Q    Not just headaches, but you had really bad          11:12:58

6   headaches before that.

7      A    Not just headaches.

8      Q    Not just headaches, but you did have

9   headaches.

10     A    I went through different physicians --          11:13:06

11     Q    Sure.

12     A    -- and they did a bunch of tests where

13   they --

14     Q    Right.

15     A    -- they thought my balance was off.          11:13:13

16     Q    Right.

17     A    They thought I got double vision.

18     Q    Right.  I totally get that.  I'm just trying

19   to find out the timing here.  So in other words,

20   you're saying that you started having headaches, and          11:13:24

21   your aneurysm, all of that stuff predated any of your

22   exposure to chemicals.

23     A    How can that -- it just doesn't -- you're

24   not making any sense.  If my work started in 2012 and

25   my symptoms started occurring in mid-2012, how can          11:13:45

316

Page 270

1    what is the second floor or the mezzanine or whatever

2    they want to call it, then that's when they installed.

3    What date and what time was that installed, I don't

4    know.  But when I first start working there, the bath

5    wash area was not next to me, and it was really small          11:15:18

6    compared to the second wash.  Does that make sense?

7        Q    You started working at SpaceX in

8    January 2012.

9        A    That's what the record shows, yes.

10       Q    And when did you start being exposed to          11:15:34

11   toxic chemicals at SpaceX?  How soon after you started

12   working there?

13       A    Okay.  There's a period.

14       Q    Yeah.

15       A    And you probably don't know or you might         11:15:49

16   know when you start working in a company, there's an

17   introduction period.

18       Q    Sure.  I get it.

19       A    I would say within a week or two or few days

20   thereafter I start working there.                          11:16:03

21       Q    Okay.

22       A    Because you have to become familiar with the

23   product.

24       Q    Sure.  So after a couple of weeks or maybe

25   even a month?                                              11:16:12

317

Page 271

```
 1      A    No.  It wouldn't be a month.

 2      Q    It would be a month?

 3      A    It wouldn't be a month.

 4      Q    Oh, it wouldn't be a month.  So after two or

 5  three weeks tops?                                  11:16:22

 6      A    I think two weeks most.

 7      Q    Okay.  You started working at SpaceX in

 8  January 2012.  After two weeks at most, you started

 9  being exposed to toxic chemicals; correct?

10      A    I start to work in the PVA machine, yes.    11:16:35

11      Q    And then you developed your aneurysm and

12  headaches by January of 2013.  So that was afterwards;

13  right?

14      A    But you're putting together in the same

15  basket aneurysm with the headaches.  You put it in the  11:16:57

16  same basket.  Do you see that?  You put in the --

17      Q    Yeah, I am.

18      A    Well, it doesn't.

19      Q    Okay.  Then I'll break it up.  I'll break it

20  up, then.  So your headaches started in the summer of   11:17:09

21  2012.

22      A    Sometime in the middle of 2012, yes.

23      Q    And then your aneurysm surgery was January

24  of 2013.

25      A    Correct.                                      11:17:24
```

318

Page 293

1      Q    Okay.  What does an SMT programmer do?

2      A    Program SMT machines.

3      Q    And are you saying the PVA350 is not a SMT

4   machine?

5      A    Oh, gosh.

6      Q    Just yes or no is fine.

7      A    Because you don't seem to get it.  You don't

8   get it, Mr. Catalona.

9      Q    I'm trying to create a record.

10     A    And I'm trying to make the record straight      11:47:01

11  that one has -- they are two separate entities.

12     Q    That's fine.  Okay?  That's fine.

13     A    But I keep telling you that, and you say --

14     Q    You talked about --

15     A    -- you're telling me it's not or you're       11:47:14

16  telling -- no.

17     Q    What kind of machine does an SMT programmer

18  program?

19     A    See, you're not making sense.  What kind of

20  machine an SMT machine programs?                        11:47:24

21     Q    No.  That's not what I said.

22         THE WITNESS:  Can you repeat, please, the

23  question.  That's what I just said.

24         (Record read.)

25         THE WITNESS:  Oh.  Program.  My bad.  He        11:47:38

Page 294

1   programs SMT machines.

2   BY MR. CATALONA:

3       Q    And what -- strike that.

4            Explain what is an SMT machine.

5       A    It's a pick-and-place machine.  That means          11:47:50

6   self-explanatory, picks one part, places one part,

7   picks one part, places one part.

8       Q    Thank you.

9       A    Well, I'm --

10      Q    That's a really good explanation.  You            11:48:04

11  haven't explained that yet.  So that is important so

12  we have that on the record.  Thank you.  Okay.

13      A    So what that has to do with conformal

14  coating?  Nothing.

15      Q    Were there any SMT machines in any of the         11:48:20

16  spaces where you worked at SpaceX?

17      A    Again, define "space."  I moved all over the

18  place.

19      Q    Okay.  The first space would be the large

20  room that the conformal coating room was in.  Were     11:48:36

21  there any SMT machines in that area?

22      A    Are you going to let me explain to you now,

23  or are you going to keep cutting me off, Mr. Catalona?

24  Because I've been trying to explain to you this from

25  the beginning.  I really do.  I'm trying to be as much

Page 295

1    as honest as possible for you to understand, but you

2    keep making faces and making.

3            I was -- again, I was hired as an SMT

4    programmer.  At the time of my employment, the SMT

5    line was just a drawing, an idea to start building our        11:49:06

6    own boards in-house.  So in the meantime, I was told

7    to work on the PVA machine.

8        Q    Okay.  Okay.  I think the answer is no.

9    There were no SMT machines.  That's all I wanted to

10   know.                                                          11:49:31

11       A    Thereafter, there was a purchase of a

12   complete line for SMT that I helped to develop

13   programs and processes.  Okay?  But they had

14   nothing to do -- the two technologies are completely

15   separate, Mr. Catalona.                                       11:49:47

16       Q    When did they start having SMT machines at

17   SpaceX?

18       A    I don't remember that.  I don't know the

19   date.

20       Q    How many months had you worked there when           11:49:57

21   that happened?

22       A    I don't know that.

23       Q    More than a year?

24       A    I don't remember.  If I say I don't

25   remember, that means I don't remember.                        11:50:05

Page 296

1        Q    Okay.  I'm going to hand you Exhibit 37.

2             (Exhibit 37 was marked for identification.)

3             THE WITNESS:  Are we done with this?

4    BY MR. CATALONA:

5        Q    Sure.  Sure.                              11:50:13

6        A    See how nice you look like when you calm

7    down?  You're not supposed to scream at me.  I'm not

8    your enemy.  I don't even know you.

9        Q    Okay.  This is an e-mail dated 9/6/14.  Did

10   you send this e-mail?  Please turn to the first page.   11:50:38

11       A    Yes.  What about it?

12       Q    Okay.  Do you see that it attaches a

13   document entitled letter to SpaceX?  On the first

14   page.

15       A    Yes.                                       11:50:58

16       Q    Okay.  Please turn to the following pages.

17   Is that the document that was attached to your e-mail

18   to Mike Lynch?

19       A    I don't remember.  I cannot tell you.

20       Q    Let me just tell you SpaceX produced this,   11:51:11

21   and that is the attachment to that e-mail.

22       A    Okay.  If they say it is.

23       Q    You have no reason to dispute that; right?

24       A    Unless -- I don't know.  Like I said, I

25   don't know.                                         11:51:29

322

Page 297

```
 1      Q    Well, turn to the last page.  At the very

 2   end, it says, "Regards, Ruben Juarez."  Do you

 3   remember that?

 4      A    It could be, yeah.

 5      Q    Okay.  Okay.  So let's go back to the first      11:51:43

 6   page.  Why did you send that document to SpaceX?

 7      A    I don't remember.

 8      Q    The red parts in the document are e-mails

 9   that you cut and pasted into that document; right?

10      A    I don't remember, Mr. Catalona.              11:52:06

11      Q    Is this your writing when you write this:

12                "Hi Mike, I would like to know my

13                current status at SpaceX."

14           Did you write that?

15      A    I don't remember.  Like I said, I've been to    11:52:22

16   many doctors and many medications.  Probably one of

17   them is memory problems.

18      Q    Okay.  So you don't remember this, but you

19   can't say whether or not you sent this letter?

20           MS. LI:  Asked and answered, harassing the      11:52:37

21   client.

22           THE WITNESS:  I already told you I don't

23   remember.

24   BY MR. CATALONA:

25      Q    You wrote:
```

323

Page 300

1    saying they missed my files, they didn't have the

2    files, and so forth and so on.  I would love to.  I

3    was -- the only thing how do I know to do,

4    Mr. Catalona, to work.

5         Q    Did you --

6         A    And I was vehemently trying to return to

7    work.  And as a result of that, I end up in the

8    hospital.  So I was trying to.  I was -- all what I

9    was asking was to be able to return to work even

10   part-time.                                    11:55:26

11        Q    Okay.  Now, please turn to the last page and

12   look at the e-mail that you -- strike that.

13             Please turn to the last page and look at the

14   very end, the black portion of this letter to SpaceX,

15   which is the attachment to this exhibit, Exhibit 37.  11:55:59

16   Do you see where it says, quote:

17             "No job in this word [sic] is

18             worth me going" --

19        A    Where were you reading, Mr. Catalona?  Can

20   you point that out to me, please.            11:56:21

21        Q    Sure.  In the last paragraph of this

22   document, which is Exhibit 37.  Do you see where it

23   says:

24             "No job in this word [sic] is

25             worth me going to the ER room         11:56:36

Page 301

1          every week due to toxic work

2          environment."

3      A    Yes.

4      Q    What did you mean by that?

5      A    As I stated, they were -- I start working as          11:56:48

6  a programmer.  We have that clear.  Thereafter, they

7  were telling me that I was not a programmer.  They

8  were telling me that I was a technician, which I

9  never -- why would I go from manufacturing engineer to

10  a technician?  It doesn't make sense.                          11:57:17

11          So it's probably here somewhere, and what I

12  say to Gregory Maxwell, that oh, no, I'm not a

13  technician.  You try to treat me as a technician.

14  That, I remember.  Let me see.

15          "Maxwell, you can put it any way                       11:57:38

16          you like.  I know what I told

17          you.  I was hired as an equipment

18          specialist.  After a few months,

19          I inform manager that SpaceX were

20          going to remove all the                                11:57:49

21          specialists but not to worry,

22          that all would remain the same

23          for me.  I was getting ready to

24          do the programming for all the

25          SMT machines; so the title did                         11:57:56

Page 303

1    Mr. Maxwell, he offered me a lead position prior to my

2    last hospitalization because they thought I was such a

3    good employee.

4        Q    And you --

5        A    And I was trying to return to work,            11:59:18

6    Mr. Catalona.  I was doing everything possible.  Even

7    asking my doctors to allow me to return to work even

8    as a part-time.  And as you can see here, it says

9    something about part-time, and they denied me.  They

10   said no, there's no part-times.  We don't have          11:59:37

11   part-times here.

12            And under ADA, American with Disabilities

13   Act, if you're part of a contract for the government,

14   you should be able to be have some kind of

15   accommodation for you to return to work.  So no, I'm    11:59:48

16   not a freeloader.  I was trying to provide for my

17   family.  Okay?

18            That's what I was referring to a toxic work

19   environment.  I didn't want to come back for them to

20   harass me and telling me oh, no, whatever, you're just  12:00:02

21   a technician.  That's what I was trying to avoid.  I'm

22   going to return to work, but I want to go back to work

23   as what we discussed at the beginning, SMT programmer

24   and work with the PVA machine.  Work as a programmer

25   at all.  That was my title.  A programmer in all        12:00:22

326

Page 304

1    machines.  Okay?

2       Q     Okay.  So you went to the emergency room

3    because you were in a toxic work environment.

4       A     No, I didn't go for -- I say I don't want to

5    end up -- see, right now our interaction is not          12:00:46

6    friendly.  It's not even cordial.  Okay?  I didn't

7    want them to do.  When I said not a job on this earth

8    is worth for me to end up in the work environment, it

9    is because I didn't want to be arguing with them about

10   oh, no, you're a programmer, no, you're a technician.     12:01:08

11   I didn't want that.  I want them to say okay, you're

12   going to return to work, Ruben, doing the same thing

13   that you were doing.

14      Q     Okay.  Did you go to the emergency room due

15   to working in a toxic work environment?                   12:01:20

16      A     Again, toxic as a --

17      Q     However you want to define it.

18      A     No.  You're asking the question, not me.

19      Q     So you can't answer that question?

20      A     Yes.  I can answer you.                          12:01:35

21      Q     Okay.  Good.

22      A     Please narrow down what you mean by "toxic."

23   Do you mean human interaction?

24      Q     I mean what you said in the last paragraph

25   of your letter.                                           12:01:47

327

Page 311

1    asking you about Dr. Andiman or any forms or anything.

2    What I'm asking you about was at the time that you

3    were going through these problems, you had a

4    disability, and the disability had to do with your

5    migraines.  That was causing you to miss a lot of          12:09:33

6    work; right?

7         A    When?

8         Q    When you were missing a lot of work at

9    SpaceX.

10        A    There is different periods, Mr. Catalona.        12:09:44

11        Q    Okay.  Right around the time that you

12   finally left SpaceX in March of 2014, you left because

13   of your disability, which was your migraines.

14        A    Yes.  I left due to having not only migraine

15   but other symptoms.                                        12:10:05

16        Q    Right.  Exactly.  And that was putting you

17   in the emergency room.

18        A    That was hospitalizing me, yes.

19        Q    And --

20        A    But this had nothing to do with it.  This       12:10:19

21   is -- you're trying to put together, everything

22   together.  You don't seem to have a timeline.  This is

23   after I left.  This is the third time I was trying to

24   return to work.  Does that make sense now?  I tried to

25   return to work twice, and both times I end up in the      12:10:38

Page 312

1    hospitalized.

2         Q    Because of your migraines and other

3    symptoms.

4         A    You have to ask that doctors.  I don't know

5    why.  I didn't felt good, I went to the hospital, and          12:10:51

6    then you have to read the medical reports, whatever

7    they may be.  Okay?  This is the third time that I was

8    trying to return to work, and you tell me why didn't

9    you return to work.  And I keep telling you I don't

10   know.  You have to ask that to SpaceX.  I provide             12:11:10

11   SpaceX with my ADA, they told me they lost it.

12        Then I think a manager from SpaceX HR

13   department said don't worry about it, we'll have a

14   conversation.  And then I waited a couple weeks and

15   she never called me.  I called back, and they said           12:11:31

16   she's no longer working with us.

17        Q    Okay.  Let's go to this here.  This is the

18   third page of Exhibit 37.  There's a big paragraph

19   that you wrote in red.  It begins "Maxwell."  And in

20   the middle of the paragraph, you said:                        12:12:02

21             "It is very easy.  Just tell HR

22             that you don't need a sick

23             person, and that is the end.

24             Don't have to worry anymore about

25             me getting to work or calling in            12:12:15

Page 313

1        late due to my disability."

2            When you said "a sick person," you were

3    referring to yourself; right?

4        A    Yes.

5        Q    And what did you mean by "a sick person"?          12:12:27

6        A    A person who has health problems.

7        Q    And your health problems were your migraines

8    and your aneurysm and --

9        A    Not aneurysm.

10       Q    -- symptoms.  Okay.  Your migraines and your      12:12:44

11   symptoms.

12       A    The aneurysm was ruled out.  I -- you can

13   laugh or whatever you want, Mr. Catalona.

14       Q    I'm not laughing.

15       A    Well, you're making gestures that you're,        12:12:50

16   like --

17       Q    No, I'm not, sir.

18       A    -- smiling.  Okay.  But anyway, it may not

19   be relevant for you, but it is for me.  So if you read

20   Dr. Michael Alexander records where he said that my      12:13:02

21   aneurysm is stable.  It has nothing to do with it.

22   And my migraines started before the aneurysm.  And the

23   aneurysm, he then conveys saying that in several

24   visits that I had with neurosurgeon Michael Alexander,

25   who is the director of neurology, neurosurgery, at       12:13:26

Page 314

1    Cedars-Sinai, that my aneurysm is not related to my

2    neurological conditions.

3        Q    Okay.  So when you said you were a sick

4    person, you were talking about your neurological

5    conditions.                                    12:13:43

6        A    Neurological problems, yes.

7        Q    And when you were talking about your

8    disability, you were talking about your neurological

9    problems; right?

10       A    Limitations.                          12:13:49

11       Q    Okay.  Let's turn to Exhibit 38.  You can

12   give me that.

13       A    Are we done with this?

14       Q    Yes.

15          (Exhibit 38 was marked for identification.)

16   BY MR. CATALONA:

17       Q    Do you remember seeing Dr. Windman?  This is

18   a report from Gayle Windman, Ph.D., treating

19   psychologist's report.

20       A    No.  I don't remember.  This is the first  12:14:16

21   time I see this document.

22       Q    Do you remember that she was hired to

23   evaluate you for your workers' compensation case?

24       A    Like I say, I don't remember.

25       Q    Okay.  So you don't remember this document.  12:14:29

Page 315

1   Do you remember seeing a psychologist for your

2   workers' compensation case?

3       A   Yes, sir.

4       Q   How many times did you see your

5   psychologist?                                    12:14:43

6       A   I don't count.

7       Q   Do you remember her taking an exhaustive

8   history of you?

9       A   No.  I don't remember.

10      Q   Okay.  Turn to page 3 of this document.  Do   12:14:52

11  you see the portion of this page that is called

12  history of the work injury?

13      A   Yes, sir.

14      Q   Okay.  Do you see the section entitled --

15  strike that.

16          Look at the fifth paragraph.

17      A   Uh-huh.

18      Q   It says:

19          "A few months after he began

20          working at SpaceX, Mr. Juarez          12:15:34

21          developed symptoms of migraine

22          headaches, dizziness, difficulty

23          walking, and sinus symptoms due

24          to exposure to electronic

25          materials such as tin and lead,        12:15:46

332

Page 316

1              chemical coatings such as

2              Arathane and HumiSeal, and

3              cleaning substances such as

4              thinners and isopropyl alcohol.

5              He reported this issue to his

6              supervisor to no avail."

7         Do you see that?

8    A    Yes.

9    Q    So what did you tell Mr. Pena about this?

10   It says, "He reported this issue to his supervisor to        12:16:06

11   no avail."

12   A    I don't know what she referring to.  I

13   didn't wrote this document.

14   Q    Well, what did you report to your supervisor

15   about this?                                                   12:16:24

16   A    I don't know what he's referring to, whoever

17   wrote this document.

18   Q    Did you report to your supervisor anything

19   about this?

20   A    Not that I can remember, no.                            12:16:36

21   Q    There's other documents, I believe, that say

22   that you went out and purchased your own air

23   filtration system.

24   A    Which document?  Can you show me.

25   Q    Well, you already talked about that at your            12:17:03

Page 318

1                   to exposure to electronic

2                   materials such as tin and lead,

3                   chemical coatings such as

4                   Arathane and HumiSeal, and

5                   cleaning substances such as

6                   thinners and isopropyl alcohol.

7                   He reported this issue to his

8                   supervisor to no avail."

9          Can you think of what supervisor she is

10   referring to?                                        12:18:58

11      A    I didn't wrote this.

12          MS. LI:  Lacks foundation, calls for

13   speculation.

14          Go ahead.

15          THE WITNESS:  I didn't wrote this document.    12:19:03

16   So I cannot tell you what she was referring to.

17   BY MR. CATALONA:

18      Q    Okay.  Let me put it this way.  Did any of

19   your supervisors ever do anything to limit the

20   exposure to electronic materials such as tin and lead,    12:19:38

21   chemical coatings such as Arathane and HumiSeal, and

22   cleaning substances such as thinners and isopropyl

23   alcohol?

24      A    Did any of my supervisors.

25      Q    Yeah.  Did they ever do anything to fix       12:19:54

Page 319

```
 1   those problems?

 2        A    Let me think about that.  I only had one

 3   supervisor.

 4        Q    Did he ever do anything to fix those

 5   problems?                                          12:20:12

 6        A    He was mainly in his office.  He didn't --

 7   he wasn't that much on the production area.  Not that

 8   I know.  You have to ask them.

 9        Q    So did he do anything to fix any of those

10   problems?                                          12:20:27

11        A    I said not that I know.  You have to ask

12   them.

13        Q    Okay.  Are you talking about Mr. Pena?

14        A    Well, there were several.

15        Q    Did Mr. Pena ever do anything to help the  12:20:41

16   work environment at SpaceX?

17        A    You're trying to make me think about what he

18   did or he didn't do.  I don't follow him.  Like I

19   said, when you work in a high-paced environment, you

20   worry about what you do, not what everybody else does.  12:21:00

21        Q    Yeah.  If you don't know, that's fine.

22        A    I already told you I don't know.

23        Q    But you didn't say that.  So --

24             MS. LI:  He said, "Not that I'm aware of."

25   He did say that twice.                             12:21:10
```

Page 328

1          He reported this issue to his

2          supervisor to no avail."

3          One of the things you said in that paragraph

4    was "cleaning substances such as thinners and

5    isopropyl alcohol."  And what thinners were cleaning          12:33:12

6    substances?

7          A    We went over this before, Mr. Catalona.

8    There was only one thinner.

9          Q    Oh.

10         A    I didn't -- again, this is the first time I          12:33:26

11   see this report.  I don't know whether this report was

12   output -- this is an interview, or I don't know if it

13   was just an output that the person who wrote it based

14   it on my medical report, typed it out.  So I don't

15   know if this was actual interview or what it is.  I          12:33:44

16   never seen this document.

17         Q    So wait.  The thinner that we're talking

18   about was HumiSeal 521 thinner?

19         A    Yeah.  Whatever it was.

20         Q    Okay.  On the first page of this document,          12:34:04

21   Exhibit 38, it states:

22               "Gentlepersons, Mr. Ruben Juarez,

23               a 46-year-old equipment

24               specialist for Space Exploration

25               Technology/SpaceX completed          12:34:22

Page 329

1          psychological evaluation and

2          testing on 3/31/16 at the Van

3          Nuys Hamlin Street office."

4      Do you remember doing that?

5      A    It was more like a multiple choice test.          12:34:34

6      Q    Turn to the last page.

7      A    Yes.

8      Q    It says Gayle K. Windman, Ph.D.  Does that

9  ring any bells with you?

10     A    No.  I'm not good with names.  So even if          12:35:34

11  you just tell me names, I'm not good with names.

12     Q    Okay.  Let's go off the record.

13         THE VIDEOGRAPHER:  We are off the record at

14  12:34 P.M.

15         (A recess was taken.)                               12:42:19

16         THE VIDEOGRAPHER:  We are back on the record

17  at 12:41 P.M.

18  BY MR. CATALONA:

19     Q    Okay.  This is Exhibit 39.

20         (Exhibit 39 was marked for identification.)

21  BY MR. CATALONA:

22     Q    This is a medical record from Isaac Regev,

23  M.D.  Do you remember who that guy is?

24     A    No, sir.

25     Q    Turn to page 17.  And look at the paragraph        12:42:45

Page 331

1    sent by workers' compensation.

2         Q    That sounds right.

3         A    And at the time I consulted him, I believe

4    that I was under the impression that alcohol was the

5    cause -- the bath wash that we talked about on the          12:44:53

6    second conformal coating room 2 -- you labeled it like

7    that, Mr. Catalona?

8         Q    Yes.

9         A    Conformal coating No. 2, I was under the

10   impression that the wash area installed right next to       12:45:14

11   me, I thought there were some chemicals used there.

12   But after we find out they were just alcohol, not

13   chemicals but just alcohol and lead-free solder used

14   in that area, then that cleared that up.

15        Q    Okay.  But at this time, you knew -- strike        12:45:42

16   that.

17             At this time, you suspected that toxic

18   exposure was the cause; right?

19        A    Yeah.  I guess so, yeah.

20        Q    Okay.                                              12:45:54

21        A    Trying to look at what the date is.

22        Q    It's right on the front page.

23             I'm going to give you this exhibit.

24        (Exhibit 40 was marked for identification.)

25             THE WITNESS:  This, Mr. Catalona, I was not        12:46:04

1         MR. CATALONA:  Okay.  We're back on the

2    record.  I just wanted to make a brief record about

3    Exhibit 19, which is the stipulated protective order

4    that is an order from the court which pertains to

5    Exhibits 20, 21, and 22.  These are confidential

6    documents produced pursuant to the protective order.

7    There are procedures in the protective order regarding

8    these documents.  And they are marked confidential.

9    And that means the court reporter and the court

10   reporting firm should not produce these documents,

11   Exhibits 20, 21, and 22, to any third party to this

12   litigation unless there is a signed acknowledgment and

13   agreement to be bound, which is page 16 of Exhibit 19.

14   That's it.

15

16            (The deposition concluded at 1:05 P.M.)

17

18

19

20

21

22

23

24

25