# EXHIBIT 31

Jobvite - Candidate Form 

## Employment Application

**Submitted:** Sunday, November 27, 2011 7:31 PM
**By:** Ruben Juarez
**For:** Manufacturing Equipment Specialist (SMT)
**Req ID:** 430

# SpaceX Employment Application

Thank you for your interest in employment with SpaceX. Your skills, abilities, experience, and education will be considered in a non-discriminatory manner for vacancies in the specific job you indicate. Selections will be made on the basis of job-related qualifications. The information herein is regarded as confidential and is, together with all attached documentation, the property of SpaceX. Please complete this form fully, accurately, and honestly to show your qualifications for the specific job you seek.

All fields marked with an asterisk "*" are required to submit this application. Any fields without an asterisk "*" are not required at this time, but are available for you to share your background information if you decide.

When you have completed the form and reviewed the "Reference Authorization" and "Acknowledgements" sections please click the Submit button at the end of this page.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## I. Personal Information

Please provide a complete profile of your contact information so that we may be able to reach you accordingly.

| | |
|---|---|
| Legal First Name | Ruben |
| Legal Middle Name | Hernandez |
| Legal Last Name | Juarez |
| Email Address | rubjua70@yahoo.com |
| Primary Phone # | 818 832 0213 |
| Secondary Phone # | 818 294 6356 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Current Address

Please provide your current address.


Granada Hills, CA

### Permanent Address

If your permanent address is different from current address, please use this section to note the distinction.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## II. Application Information

This section pertains to necessary information we need to process your application.

Are you legally authorized to   I am authorized to work in the United States for any employer.
work in the United States?

https://hire.jobvite.com/Hiring/ViewPrintableCandidateForm.aspx?z=0LAXhfwj[1/26/2012 5:31:34 PM]



EXHIBIT 27
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

341

Jobvite - Candidate Form

Please note that if you are hired you will have to present evidence of your right to work in the United States no later than the first day of your employment.

| | |
|---|---|
| Are you at least 18 years old? | **Yes** |
| Are you willing to relocate? | **No** |
| Are you able to perform the job functions | **Yes** |
| Can you perform the essential functions of this job with or without reasonable accommodation? | **Yes** |
| Are you willing to work overtime if necessary? | **Yes** |
| When are you available to begin work at SpaceX? | **12/19/2011** |
| What is your desired salary? | **65,000 Yr** |
| Do you have any friends or relatives currently working at SpaceX? | **No** |
| If yes, state name(s) and relationship: | |

Having a friend or relative who works for SpaceX will not disqualify you from employment, but SpaceX will not place you in a direct or indirect supervisory or reporting relationship to a friend or relative.

| | |
|---|---|
| Have you ever been convicted of a misdemeanor or felony? | **Yes** |
| If yes, state the nature of the felony(s) or misdemeanor(s), when, and where convicted and disposition of the case. | **DUI on 2003 Los Angeles CA Community service,AA meetings, Pay a fine.** |

## III. Educational Background

Please list any universities, colleges, or schools you have attended in descending order.

### School #1

| | |
|---|---|
| School Name | **Los Angeles Valley College** |
| Country/Region | **Los Angeles CA** |
| Major | **Electronics** |
| Degree Type | **Associate Degree** |
| GPA (Overall) | **3.25 - 3.50** |
| GPA (Major) | **N/A** |
| Status | **Currently Attending** |
| Start Date | **1/1/2007** |
| End Date | |

### School #2

Jobvite - Candidate Form

School Name

Country/Region

Major

Degree Type

GPA (Overall)

GPA (Major)

Status

Start Date

End Date

........................................................................................................................

## School #3

School Name

Country/Region

Major

Degree Type

GPA (Overall)

GPA (Major)

Status

Start Date

End Date

| | |
|---|---|
| SAT Score | N/A |
| ACT Score | N/A |
| GRE Score | N/A |
| Other Training/Skills | Solder Wave Maintenance and Process<br>Vitronics Soltec Inc. Stratham, NH |
| | Through Hole Equipment, Maintenances<br>and Troubleshooting VCD, Radial<br>Universal Instruments (in-house training) |
| | Root Cause Analysis<br>CSUN, Los Angeles CA |
| | Wire Bonder Programming<br>Kulicke & Soffa, Fort Washington, PA |
| | Lead Former: CF8, CF10<br>GPD Global, Grand Jct., CO |
| | AutoCAD<br>US CAD, Los Angeles, CA |
| | Circuit Cam (Equipment programming) San Jose, CA |
| | Fuji Equipment Programming software:<br>MC16, F4G, Fuji Cam, Fuji Flexa<br>Fuji America, Vernon Hills, IL |

Jobvite - Candidate Form

Fuji Equipment Maintenance and Troubleshooting:
CP4, CP6, CP7, IP1, IP2, QP242, QP341
Fuji America, Vernon Hills, IL

SMT Programming
MYDATA, Rowley, MA

SMT Basic Operation

MYDATA, Rowley, MA

Master Cam
Los Angeles Valley College, Los Angeles, CA

Operation of Conventional Lathe and Milling machine
Los Angeles Valley College, Los Angeles, CA

# IV. Employment Background

Please list most recent jobs first and account for all periods of time within the last ten years, including periods of unemployment and the reasons thereof.

May we contact your present   No
employer?

If yes, initial here:

...............................................................................................................................

## Company #1

| | |
|---|---|
| Company Name | EMI |
| Job Title | Manufacturing Engineer |
| Years | 1 |
| Start Date | 5/31/2010 |
| End Date | |
| Direct Supervisor | Andrew Lechuga |
| Supervisor Title | M.E Manager |
| Company Phone | 714 979 2228 |
| Starting Pay Rate | 57,000 Yr |
| Final Pay Rate | 65,000 Yr |
| Reason for Leaving | Still Currently Working |
| Explanation of Leaving | |
| Is it OK for us to contact this company? | No |

## Company #2

| | |
|---|---|
| Company Name | Moore Industries |
| Job Title | Manufacturing Engineer |
| Years | 2 |
| Start Date | 5/1/2007 |



344

Jobvite - Candidate Form

| | |
|---|---|
| End Date | 5/15/2009 |
| Direct Supervisor | Lisa Last name not available |
| Supervisor Title | Production Scheduler |
| Company Phone | 818 874 7111 |
| Starting Pay Rate | 54,000 |
| Final Pay Rate | 57,000 |
| Reason for Leaving | Laid Off |
| Explanation of Leaving | Company reorganization |
| Is it OK for us to contact this company? | No |

## Company #3

| | |
|---|---|
| Company Name | Magnetek/ JMR electronics |
| Job Title | SMT manager |
| Years | 1 |
| Start Date | 1/2/2006 |
| End Date | 1/1/2007 |
| Direct Supervisor | Ernie Escobar |
| Supervisor Title | General Manager |
| Company Phone | 800 288 8178 |
| Starting Pay Rate | 75,000 |
| Final Pay Rate | 75,000 |
| Reason for Leaving | Other |
| Explanation of Leaving | Company division was sold to Power-One |
| Is it OK for us to contact this company? | Yes |

## Company #4

| | |
|---|---|
| Company Name | ISI |
| Job Title | Manufacturing Engineer/SMT manager |
| Years | 4 |
| Start Date | 6/3/2002 |
| End Date | 12/30/2005 |
| Direct Supervisor | John Crawford |
| Supervisor Title | Operation Manager |
| Company Phone | 805 482 2870 |
| Starting Pay Rate | 45,000 |
| Final Pay Rate | 65,000 |
| Reason for Leaving | Other |

https://hire.jobvite.com/Hiring/ViewPrintableCandidateForm.aspx?z=0LAXhfwj[1/26/2012 5:31:34 PM]

Jobvite - Candidate Form

| | |
|---|---|
| Explanation of Leaving | **New Job** |
| Is it OK for us to contact this company? | **Yes** |

# V. Reference Check

Please list at least two former managers or persons whom you delivered work to. Also, please list a phone number and/or email address for each person.

## Reference #1

| | |
|---|---|
| Name | **John Crawford** |
| Relationship | **Former Manager** |
| Job Title | **Operation Manager** |
| Company | **ISI** |
| Phone | **(805) 482-2870** |
| Email | **N/A** |

## Reference #2

| | |
|---|---|
| Name | **Scott Alyn** |
| Relationship | **Former manager** |
| Job Title | **President and Founder** |
| Company | **Electronics Source Company** |
| Phone | **818-988-7696** |
| Email | **s.alyn@electronic-source.com** |

## Reference #3

| | |
|---|---|
| Name | **Lee. R. Mannheimer** |
| Relationship | **Client** |
| Job Title | **Company President** |
| Company | **CTL Inc.** |
| Phone | **805 490-0621** |
| Email | **N/A** |

# VI. Reference And Background Check Authorization

I hereby authorize SpaceX and its agents to independently research my background, character, past employment and education. I hereby authorize every person, business, employer, governmental agency, court, financial institution, police department, motor vehicle department, licensing agency, school, and any other association or institution having control of any documents, records and other information pertaining to me, to furnish to SpaceX or its designated agents any such information, records, or any other pertinent data, and to permit SpaceX or any of its agents to inspect and make copies of such documents, records, and other information.

https://hire.jobvite.com/Hiring/ViewPrintableCandidateForm.aspx?z=0LAXhfwj[1/26/2012 5:31:34 PM]

Jobvite - Candidate Form

I further understand that if information from a credit report (pursuant to the Fair Credit Reporting Act – FCRA) is used for employment purposes, SpaceX will obtain prior authorization from me, and that the information in the report will not be used in violation of any federal or state laws.

I understand that you may contact my previous employers and I authorize those employers to disclose to you all records pertinent to my employment with them. In addition to authorizing the release of any information regarding my employment, to the extent permitted by law, I hereby fully waive any rights or claims I have, or may have, against my former employers, their agents, employees, and representatives, as well as other individuals who release information to you, and release them from any and all liability, claims, or damages that may directly or indirectly result from the use, disclosure, or release of such information by any person or party, whether such information is favorable or unfavorable to me.

I release SpaceX and its agents from any and all liability, claims or lawsuits relating to SpaceX's investigation and/or use of the information obtained from any and all of the above-referenced sources. I agree to defend, indemnify and hold harmless SpaceX and its agents from any and all claims or lawsuits that may result from SpaceX's investigation or actions taken as a result of its research.

If you understand and agree to the Reference And Background Check Authorization terms listed above, please check the "I authorize the reference and background checks" box below.

**I authorize the reference and background checks**

## VII. Acknowledgements

I understand that if I am hired, I will be required to provide documents which will verify my identity and eligibility to work in the United States, in compliance with the Immigration Reform and Control Act of 1986.

I understand that failure to reveal any prior employment I have had within the past 10 years or the providing of any false or misleading information that is incorrect, incomplete, or untrue, may be grounds for refusal to hire or immediate termination of employment if SpaceX hires me, regardless of when SpaceX discovers the correct information.

I understand that if I am hired, I agree to sign the SpaceX Proprietary Information and Inventions Assignment Agreement. I also understand that if I am hired and before I begin working at SpaceX, I will not improperly use or disclose any proprietary or confidential information of any present or past employers. I understand that all SpaceX employees are "at will" employees. This means that if SpaceX hires me I may resign my employment at any time, for any or no reason. Similarly, SpaceX may terminate my employment at any time, with or without notice, for any or no reason. SpaceX also reserves the right to determine and change at any time my job duties, title, level and responsibilities, reporting relationships, compensation and benefits, as well as its personnel policies and procedures for any reason or for no particular reason or cause. No promise or representation contrary to the foregoing is binding on SpaceX unless made in writing and signed by the CEO of SpaceX and me. I certify that the information provided in this application is accurate.

If you understand and agree to the Acknowledgments listed above, please check the "I understand and agree" box below.

**I understand and agree**

## VII. Non-Disclosure Agreement

This Employment Application Nondisclosure Agreement ("Agreement") is entered into by and between the individual identified below ("Applicant") and Space Exploration Technologies, a Delaware corporation, for itself or any of its subsidiaries, affiliates, employees, agents or contractors (collectively, "SpaceX"), effective as of the date set forth under Applicant's signature below.

In consideration of SpaceX's agreeing to consider Applicant for employment and/or disclosing to Applicant information regarding SpaceX's operations and business, Applicant and SpaceX hereby agree as follows:

1. Confidentiality Obligations.

(a) Information Disclosed by SpaceX. Subject to the limitations in Section 2 below, Applicant will keep in strict confidence all information (whether of a technical, business or other nature) disclosed to Applicant by SpaceX. The restrictions in this Section 1(a) will apply to information disclosed verbally, in writing or otherwise. Disclosure of any information by SpaceX does not grant Applicant any license under any patent, copyright, trade secret or other intellectual property right of SpaceX.

(b) Prior or Current Obligations. Applicant will not use or disclose to SpaceX any inventions, trade secrets, confidential or proprietary information or material belonging to any other party (including all current and former employers). Applicant will not breach any agreement to keep such inventions, trade secrets, confidential or non-public proprietary information or material in confidence. Applicant will not induce SpaceX to use any inventions, confidential or non-public proprietary

Jobvite - Candidate Form

 

information or material belonging to any other party.

2. Limitation on Confidentiality Obligations. The restrictions in Section 1 above do not apply to any information that: (a) was known to Applicant without restriction before receipt from SpaceX as demonstrated by files in existence at the time of disclosure; (b) is rightfully received by Applicant from a source other than SpaceX without a duty of confidentiality; (c) is or becomes publically available other than through a breach of this Agreement; or (d) is independently developed by Applicant without reference to information disclosed by SpaceX and such independent development can be shown by documentary evidence. Applicant may disclose confidential information when compelled to do so by law if it provides reasonable prior notice to SpaceX, unless a court orders that SpaceX not be given notice.

3. Evaluation of Potential Employment. Applicant may share the fact that he / she interviewed with SpaceX and visited SpaceX's facilities and the terms of any written offer of employment by SpaceX, if such offer is extended.

4. Copies; Return of Materials. Applicant will not copy or reverse engineer all or any part of any information covered by the restrictions in Section 1 above, and will promptly return all materials containing or summarizing any such information to SpaceX upon conclusion of Applicant's discussions with SpaceX, or in any event upon SpaceX's request.

5. Voluntary Assistance to SpaceX. Applicant is under no obligation to give SpaceX any ideas, suggestions, comments or other feedback related to SpaceX's business or operations. If Applicant shares any ideas, suggestions, comments, or other feedback with SpaceX during or after the application Page 2 of 2 process, Applicant agrees that SpaceX will own such idea, suggestion, comment or feedback. Applicant hereby assigns all of his/her right, title, and interest in such idea, suggestion, comment, or feedback to SpaceX, and agrees that SpaceX will be free to use and implement same, without restriction or obligation of any kind. This Agreement does not create any agency or partnership relationship and imposes no obligation to proceed with any business transaction between Applicant and SpaceX.

6. Termination. Either party may terminate this Agreement with thirty days prior written notice, but this agreement's provisions will survive and continue in effect as to confidential information that is disclosed before termination for so long as such information remains confidential or proprietary.

7. Jurisdiction. This Agreement will be governed by the laws of the state of California, excluding its conflict-of-laws principles. Exclusive jurisdiction over and venue of any suit related to this Agreement shall be in the state and federal courts of Los Angeles County, California. Failure to enforce any provisions of this Agreement will not constitute a waiver. The prevailing party in any suit related to this Agreement will be entitled to recover reasonable attorneys' fees incurred in connection with such suit. Applicant agrees that any breach or threatened breach of this Agreement will cause irreparable harm to SpaceX for which there will be no adequate remedy at law and that in such event, SpaceX will be entitled, without limitation, to injunctive relief (including specific performance) without the necessity of proving harm.

8. Miscellaneous. This Agreement is not assignable or transferable by either party without the prior written consent of the other party; subject to that limitation, this Agreement will inure to the benefit of and be binding upon the parties and their respective successors and assigns. This agreement is the parties' entire agreement on the subject matter hereof, superseding any prior or contemporaneous agreements with respect thereto, and may not be amended except in writing signed by SpaceX and Applicant.

If you understand and agree to the Non-Disclosure Agreement listed above, please check the "I have read and agree to the NDA" box below.

**I have read and agree to the NDA**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

By clicking the "Submit" button below, I certify that all information in this application is accurate, complete and true to the best of my knowledge.

Jobvite - View Application

# Resume for Ruben Juarez

Position: Manufacturing Equipment Specialist (SMT)
Address: United States
Phone: (818) 832-0213
Cell
Phone:  (818) 294-6356
Email: rubjua70@yahoo.com

Ruben Juarez

Granada Hills, California
(818) 294-6356 cell
(818) 832-0213 Home
E-mail rubjua70@yahoo.com

SUMMARY: Goal oriented, hands on individual with over 20 years experience in different areas of electronic manufacturing.

Strengths
Able to work well individually or as part of a team.
Capable to learn tasks and grasp new concepts quickly.
Proficient in communicate concepts to others effectively.
Able to work in a fast-paced environment.

WORK EXPERIENCE

I Manufacturing Process Engineer
EMI Electronics
Santa Ana, CA
(2008-Present)
Responsibilities include: output programs from CAD files and/or Gerber files for router equipment, laser marker/PVA equipment for new/existing clients.
Develop process for solder wave equipment including lead and lead free products, design pallets/tooling to be used during wave soldering. Develop work
instructions (travelers/flow charts) for new/current products, in charge of modifying travelers/work instructions (ECO's) to comply with IPC and J-STD
workmanship standards. Conduct kickoff meetings for NPI. Conduct evaluation test for new material (solder paste, solder wire, solder mask). Out put
conformal coating programs per customer request. Develop pallet/board layout via CAD software/cam350.feed back customer for NPI (DFM). Responsible for
several counts from bare board to box build.

II Manufacturing Process Engineer
JMR Electronics.
Chatsworth, CA
(2002-2008)
Task include: output programs from CAD files and/or Gerber files for Fuji, MYDATA pick and place equipment and CS400 through-hole equipment. Up-date
product revision, order new stencil for (DEK) screen printer. Supervise first articles for NPI, create flow charts to optimize production floor. Assist electrical
design department on pallet size and/or board orientation. In charge of ordering equipment spares parts and Update maintenances logbooks. Establish IPC-
A-610 training program for electro mechanical assemblers. Monitor re-flow profiles via KIC software. Balance production lines to optimize equipment
utilization. Troubleshoot solder problems via SPC. over see all preventive maintenances to minimize down time in production lines, schedule Non-emergency
repairs, equipment modification and up-grades, keep records of maintenance to comply with ISO audits, ensure all employees wear safety equipment,
developed PWI (Process work instructions).perform root cause analysis.

III. Maintenance supervisor
Electronic Source
Van Nuys, California
(1997 –2002)
functions included: responsible for maintenance and janitorial department, over see all preventive maintenances to reduce down time in production lines, work
with production to set-up production lines and to optimize equipment utilization, schedule Non-emergency repairs, equipment modification and up-grades,
order consumable pars, keep records of maintenance to comply with ISO audits, schedule toxic waste collections, make sure all employees wear safety
equipment, implemented lock-out tag out program to prevent accidents, developed MWI (maintenance work instructions) according to manufacture's
recommendations to ensure equipment repeatability and reliability.

349

Jobvite - View Application

IV. Maintenance technician
Harman Electronics
Northridge, California
(1988 –1997)
Duties included: SET-UP variety of picks and place equipment, through hole and testing, troubleshooting to a board level, keep all mechanical and pneumatic screws drivers to a specified torque, performed preventive maintenance, and routine checks, used performed root caused analysis to prevent down time and bottlenecks, and upgrade equipment.

Education

Currently pursuing a B.S. in Electronics

College
Los Angeles Valley College.
AS Electronics

Los Angeles Valley College.
2 year diploma in Biomedical Equipment Technician

College
North Valley Occupational Center (2yrs)
Power Plant (Aircraft Mechanic)

High School (GED)
San Fernando, CA

Training

Fuji Equipment Programming software: MC16, F4G, Fuji cam, Fuji flexa.
Fuji America, Vernon Hills, IL

Fuji Equipment maintenances and troubleshooting: CP4, CP6, CP7, IP1, IP2, QP242, QP341.
Fuji America, Vernon Hills, IL

Solder Wave maintenance and process.
Vitronics Soltec Inc. Stratham, NH

Through Hole equipment, maintenances and troubleshooting VCD, Radial.
Universal Instruments (in-house training)

Lead former: CF8, CF10.
GPD Global, Grand Jct., CO.

AutoCAD.
US CAD, Los Angeles, CA.

Circuit Cam (Equipment programming)
San Jose, CA.

Root cause analysis.
CSUN, Los Angeles CA.

Wire bonder programming.
Kulicke & Soffa, Fort Washington, PA.

Thermal profile.
KIC (In-house Training)

SMT programming.
MYDATA Rowley, MA.

SMT basic operation.
MYDATA Rowley, MA.

Master Cam

https://hire.jobvite.com/Hiring/ViewPrintableApplication.aspx?a=pq3dtfwT[1/26/2012 5:29:24 PM]

350

Jobvite - View Application

LAVC Los Angeles CA.

Operation of Conventional Lathe and Milling machine.
LAVC Los Angeles CA

# EXHIBIT 32



Thursday, December 29, 2011

Ruben Juarez

Granada Hills, CA ███████

Dear Ruben:

On behalf of SpaceX (the "Company"), I am pleased to offer you the position of Manufacturing Equipment Specialist, reporting directly to John Pena, Production Manager, Avionics Clean Room and overall to Juan Lopez, Director of Avionics Production.

This offer is contingent upon the following:

- The satisfactory completion of an investigation of your background

- You signing and returning all documents specified in the packet prior to starting employment

- Upon your first day of employment you providing proof of the legal right to work in the United States and documents that establish both identity and employment eligibility. Failure to provide this on day one will delay your start date. Please refer to the I-9 form's "Lists of Acceptable Documents" page in the offer packet for a list of acceptable documents. All documents submitted must be original documents except in the case of birth certificates for which certified copies will be acceptable.

You will be paid an hourly wage of $30.00/hour. As a non-exempt employee, you will be eligible for overtime pay. Your salary will be payable on a bi-weekly basis pursuant to the Company's regular payroll policy. You will be entitled to three weeks of paid vacation per annum, in accordance with the Company's standard vacation policy. The Company will provide you with the opportunity to participate in the standard benefits plans currently available to other similarly situated employees, subject to any eligibility requirements imposed by such plans.



1 Rocket Road   Hawthorne CA 90250
phone 310.363.6000   fax 310.363.6001

EXHIBIT 28
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

In connection with the commencement of your employment, the Company's Board of Directors will grant you an option to purchase 3,120 shares of the Company's Common Stock with an exercise price per share to be equal to the fair market value of a share of the Company's Common Stock on the date of grant (the next Board of Director's meeting addressing option grants subsequent to your start date) as determined by the Company's Board of Directors. These option shares will vest at the rate of 20% of the shares on the twelve (12) month anniversary of your Vesting Commencement Date (as defined in the Stock Option Agreement, which date will be your Start Date, as defined below) and the remaining shares will vest monthly thereafter at the rate of 1/60th of the total number of shares per month; subject to your full-time employment with the Company.

Vesting of the options will, of course, depend on your continued full-time employment with the Company. The options will be incentive stock options to the maximum extent allowed by the tax code and will be subject to the terms of the Company's 2002 Stock Plan and the Stock Option Agreement between you and the Company. Capitalized terms not defined in this letter will have the meaning as defined in the Company's 2002 Stock Plan and form of Stock Option Agreement.

Your employment with the Company will be on an "at will" basis, meaning that either you or the Company may terminate your employment at any time for any reason or no reason, without further obligation or liability.

I am delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me. Please indicate the date on which you expect to begin work in the space provided below (the "Start Date"). Your employment will be subject to you entering into the Company's standard Confidential Information Agreement entered into by employees. This letter sets forth the terms of your employment with the Company and supersedes any prior representations or agreements, whether written or oral. This letter may not be modified or amended except by a written agreement, signed by the Company and by you.



354

Yours faithfully,

Space Exploration Technologies Corp.

By: _____

Elon Musk
Chairman & CEO

ACCEPTED AND AGREED:

_____
Signature

Ruben Juarez
Print Name

12/30/11
Date

_____

Anticipated Start Date: 1/16/12

**SPACEX**

355

# EXHIBIT 33

State of California
Department of Industrial Relations
DIVISION OF WORKERS' COMPENSATION

Estado de California
Departamento de Relaciones Industriales
DIVISION DE COMPENSACIÓN AL TRABAJADOR



WORKERS' COMPENSATION CLAIM FORM (DWC 1)

PETITION DEL EMPLEADO PARA DE COMPENSACIÓN DEL TRABAJADOR (DWC 1)

**Employee:** Complete the "Employee" section and give the form to your employer. Keep a copy and mark it "Employee's Temporary Receipt" until you receive the signed and dated copy from your employer. You may call the Division of Workers' Compensation and hear recorded information at (800) 736-7401. An explanation of workers' compensation benefits is included as the cover sheet of this form.

You should also have received a pamphlet from your employer describing workers' compensation benefits and the procedures to obtain them.

*Empleado:* Complete la sección "Empleado" y entregue la forma a su empleador. Quédese con la copia designada "Recibo Temporal del Empleado" hasta que Ud. reciba la copia firmada y fechada de su empleador. Ud. puede llamar a la División de Compensación al Trabajador al (800) 736-7401 para oír información grabada. En la hoja cubierta de esta forma esta la explicación de los beneficios de compensación al trabajador.

Ud. también debería haber recibido de su empleador un folleto describiendo los benficios de compensación al trabajador lesionado y los procedimientos para obtenerlos.

Any person who makes or causes to be made any knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying workers' compensation benefits or payments is guilty of a felony.

Toda aquella persona que a propósito haga o cause que se produzca cualquier declaración o representación material falsa o fraudulenta con el fin de obtener o negar beneficios o pagos de compensación a trabajadores lesionados es culpable de un crimen mayor "felonia".

**Employee—complete this section and see note above**   *Empleado—complete esta sección y note la notación arriba.*

1. Name. *Nombre.* RUBEN JUAREZ                Today's Date. *Fecha de Hoy.* 09/24/2014
2. Home Address. *Dirección Residencial.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3. City. *Ciudad.* GRANADA HILLS          State. *Estado.* CA          Zip. *Código Postal.* ▮▮▮▮
4. Date of Injury. *Fecha de la lesión (accidente).* CT: MAR 27 2013 — MAR 27 2014
5. Address and description of where injury happened. *Dirección/lugar dónde ocurrió el accidente.* COMPANY PREMISES; DUE TO REPETITIVE AND CONTINUOUS EXPOSURE TO ELECTRONIC PARTS CLEANING & LEAD SO
6. Describe injury and part of body affected. *Describa la lesión y parte del cuerpo afectada.* HEADACHES,ANEURYSM
7. Social Security Number. *Número de Seguro Social del Empleado.* ▮▮▮▮0743
8. Signature of employee. *Firma del empleado.* _____

**Employer—complete this section and see note below.** *Empleador—complete esta sección y note la notación abajo.*

9. Name of employer. *Nombre del empleador.* SPACE EXPLORATION TECHNOLOGY/SPACEX
10. Address. *Dirección.* 1 ROCKET ROAD, HAWTHORNE, CA 90250
11. Date employer first knew of injury. *Fecha en que el empleado supo por primera vez de la lesión o accidente.* 09/27/2014
12. Date claim form was provided to employee. *Fecha en que se le entregó al empleado la petición.* 09/24/2014
13. Date employer received claim form. *Fecha en que el empleado devolvió la petición al empleador.* 09/27/2014
14. Name and address of insurance carrier or adjusting agency. *Nombre y dirección de la compañía de seguros o agencia administradora de seguros.* Chubb Ins. 233 S. Wacker Drive #4700 Chicago IL 60606
15. Insurance Policy Number. *El número de la póliza de Seguro.* #7173 6529
16. Signature of employer representative. *Firma del representante del empleador.* _____
17. Title. *Título.* Benefits Analyst     18. Telephone. *Teléfono.* (310) 2403-3300

**Employer:** You are required to date this form and provide copies to your insurer or claims administrator and to the employee, dependent or representative who filed the claim within one working day of receipt of the form from the employee.

SIGNING THIS FORM IS NOT AN ADMISSION OF LIABILITY

*Empleador:* Se requiere que Ud. feche esta forma y que provéa copias a su compañía de seguros, administrador de reclamos, o dependiente/representante de reclamos y al empleado que hayan presentado esta petición dentro del plazo de un día hábil desde el momento de haber recibido la forma del empleado.

EL FIRMAR ESTA FORMA NO SIGNIFICA ADMISION DE RESPONSABILIDAD

☐ Employer copy/*Copia del Empleador*   ☐ Employee copy/*Copia del Empleado*   ☐ Claims Administrator/*Administrador de Reclamos*   ☐ Temporary Receipt/*Recibo del Empleado*

6/10 Rev.

EXHIBIT 32
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

Juarez v PVA SPX 1199

357

# EXHIBIT 34

PVA-0003

PVA1



PVA-0004

PVA1



360

PVA-0002

PVA



# EXHIBIT 35



**CEDARS-SINAI MEDICAL CENTER.**

HERNANDEZJUAREZ, Ruben
MRN: 200548127
DOB: ▉/1970, Sex: M
Adm: 3/14/2013, D/C: 3/21/2013

## H&P Notes

H&P signed by Alyesh, Michael, MD at 3/17/2013 3:37 PM

| Author: Alyesh, Michael, MD | Service: (none) | Author Type: Physician |
|---|---|---|
| Filed: 3/17/2013 3:37 PM | Date of Service: 3/15/2013 12:53 PM | Status: Signed |
| Editor: Alyesh, Michael, MD (Physician) | | |

CEDARS-SINAI MEDICAL CENTER

PATIENT:    JUAREZ, RUBEN
MED REC:    200548127
DICTATOR:   MICHAEL ALYESH, MD

HISTORY AND PHYSICAL EXAMINATION
DATE OF ADMISSION: 03/14/2013

HISTORY OF PRESENT ILLNESS: This is a 43-year-old male, known to me from his last admission back in January, after the patient had coil embolization for nonruptured ACA aneurysm. The patient came a few days after that complaining of persistent headache. It was unclear if this headache was related to the aneurysm or not, but the patient had been on steroid medication. It was ultimately determined that this was not likely the cause of his aneurysm, and that it was secondary to some other cause. The patient at that time also was found to have evidence of a prior CVA, but it was unclear if this was a new CVA or if this has been there in the past. The patient has no focal deficits, but nevertheless, those findings were not felt to be related to the headaches he was having at that time. The patient was treated with pain medications, and his headache significantly improved. The patient had been fine up until now, and then 5 days ago, the patient said he started feeling his headache come back. He was scheduled to see his neurologist yesterday; however, he felt that his headache was going on too long and that he wanted to come to the emergency room to be further evaluated. The patient says that he also has nausea and dizziness. He also says that he has no focal deficits this time as he had last time that had resolved. He denies any vomiting. Denies any fevers or chills. Denies any chest pain or heart palpitations, but his major complaints are diffuse headache and dizziness. The patient was diagnosed with a sinus infection 2 weeks prior to admission, but feels like he is better from this.

REVIEW OF SYSTEMS:
Other, a otherwise 10-point review of systems is negative.

PAST MEDICAL HISTORY: As mentioned above.

EXHIBIT 29
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

This report was printed by the Health Information Dept, please call (310) 423-3313 with any questions. Page 10

363



**CEDARS-SINAI MEDICAL CENTER.**

HERNANDEZJUAREZ, Ruben
MRN: 200548127
DOB: ███1970, Sex: M
Adm: 3/14/2013, D/C: 3/21/2013

## H&P Notes (continued)

**H&P signed by Alyesh, Michael, MD at 3/17/2013  3:37 PM  (continued)**

MEDICATIONS:
1. Augmentin 875 mg by mouth twice a day.
2. Aspirin 81 mg daily.
3. Flonase nasal spray.
4. Norco.
5. Pravachol 40 mg daily.
6. Lyrica 100 mg daily.
7. Topamax 50 mg daily.

PAST SURGICAL HISTORY:  As mentioned above.

ALLERGIES:  No known drug allergies.

SOCIAL HISTORY:  No smoking, alcohol, or drugs.

FAMILY HISTORY:  Noncontributory.

PHYSICAL EXAMINATION:
VITAL SIGNS:  Blood pressure 105/60, heart rate of 67, temperature of 97, respiratory rate of 18, saturating 97% on room air.
HEART:  Regular rate and rhythm.  No rubs, murmurs, or gallops.
LUNGS:  Clear to auscultation bilaterally.
ABDOMEN:  Soft, nontender, nondistended.  Positive bowel sounds.
NEUROLOGIC:  He is alert and oriented times 3.  Extraocular muscles are intact.  Sclerae anicteric.  There is no clubbing, cyanosis, or edema.
There are no focal deficits known.  The patient has 5/5 in all extremities.  Sensation intact throughout.  Cranial nerves II-XII intact.

RESULTS OF SIGNIFICANCE:  Sodium of 149.  Otherwise CT of brain without contrast shows no evidence for hemorrhage or mass affect.

ASSESSMENT AND PLAN:
1. Recurrent headache, nausea and dizziness, secondary to unknown cause.  I believe that this patient likely is having migraine headaches.  However, I will order neurology consult for further evaluation, in light of this patient's prior history of coiled aneurysm, as well as infarcts seen in the brain.  Note, I believe these infarcts were caused from the angiogram the patient had in diagnosing his aneurysm, and were likely iatrogenic in nature from plaque break off during the procedure.  However, I will have to double check on this.  Cardiology has been consulted for

364



**CEDARS-SINAI MEDICAL CENTER.**

HERNANDEZJUAREZ, Ruben
MRN: 200548127
DCB: 1/9/1970, Sex: M
Adm: 3/14/2013, D/C: 3/21/2013

**H&P Notes (continued)**

H&P signed by Alyesh, Michael, MD at 3/17/2013  3:37 PM  (continued)

assistance, as this patient's dizziness and lightheadedness with
nausea may be cardiac in nature.  The patient will receive a workup
for this.  In the meantime, I will continue the patient on pain
medication to control his headache.  We will continue Lyrica and
Topamax.  Will also wait for further recommendations from neurology
in terms of pain control for possible migraine headache.  I do not
think that the patient will require a repeat lumbar puncture to
assess, as he had this last time, and no evidence or findings of
his headache could be found.  I also do not think we will need a
repeat magnetic resonance imaging, but I will defer this to
neurology.

2. Hypernatremia, likely secondary to poor oral intake.  Will continue
to monitor for now.


MICHAEL ALYESH, MD

MA/MEDQ/555187944   D:  03/15/2013   T:  03/15/2013   JOB#:  804573

**H&P signed by Alyesh, Michael, MD at 3/15/2013 11:47 AM**

Author: Alyesh, Michael, MD          Service: Internal Medicine          Author Type: Physician
Filed: 3/15/2013 11:47 AM            Date of Service: 3/15/2013 11:45 AM     Status: Signed
Editor: Alyesh, Michael, MD (Physician)

H & P dictated #804573
**Electronically signed by:**
Michael Alyesh, M.D.
Internal Medicine Hospitalist
3/15/2013
11:46 AM
Phone number: 310-553-5203


******* END OF ENCOUNTER *******

Printed by 28026 at 11/30/17  8:15 AM

365



**CEDARS-SINAI MEDICAL CENTER.**

HERNANDEZJUAREZ, Ruben
MRN: 200548127
DOB: ████/1970, Sex: M
Adm: 5/23/2013, D/C: 5/23/2013

H&P Notes

No notes of this type exist for this encounter.

******* END OF ENCOUNTER *******

Printed by 28026 at 11/30/17  8:15 AM

This report was printed by the Health Information Dept, please call (310) 423-3313 with any questions. Page 13

366

# EXHIBIT 36

*Isaac Regev, M.D.*

A PROFESSIONAL CORPORATION

NEUROLOGY / ELECTRODIAGNOSTICS

6404 WILSHIRE BLVD. ☐
SUITE 1121
LOS ANGELES, CA 90048
TELEPHONE: (323) 653-4544
FAX: (323) 653-4500
(ALL CORRESPONDENCE)

18740 VENTURA BLVD. ☐
SUITE 206
TARZANA, CA 91356
TELEPHONE: (818) 386-0472
FAX: (818) 386-0967

February 3, 2015

RE: JUAREZ, Ruben
DOI: CT
DOE: 2/3/15
OUR FILE: 27660
EMP: Space Exploration Technology

The patient is a 45 year old right handed male who is seen for neurological consultation on 2/3/15.

### HISTORY OF THE INJURY

The patient relates that he worked for the above named employer from 01/2012 to the present as an equipment specialist. He worked about sixty hours per week. He relates that almost from the beginning he noted frequent headaches at work which he felt was associated with exposure to various chemicals used in the facility for cleaning part. He also feels he was subject to lead exposure. He was not provided with any protective devices and his headaches were worse at work. Eventually he also started having dizziness and saw several physicians as well as a neurologist at Cedars Sinai and after work up was told he had an aneurysm in the "Circle of Willis". He was referred for coiling procedure which was done 01/2013. The patient says he hoped that his headaches would go away after this procedure.

### PATIENTS CURRENT COMPLAINTS

The patient relates of headaches which are moderate to intense. They are almost constant and described as a pressure type feeling. A few times he had to go to an ER where he was given Morphine and Dilaudid. He denies any other specific symptoms associated with the headaches although he is dizzy at times.

### WORK HISTORY

As described. On TTD,

### PAST MEDICAL HISTORY

Right elbow and right wrist surgery with transposition of the right ulnar nerve. The right wrist injury is of unknown nature. Both injuries were work related. He is also known to have narcolepsy.

368

RE: JUAREZ, Ruben
February 3, 2015
Page 2

Family History: Non-contributory

Social History: Married

Habits: Does not smoke, abuse alcohol or use drugs

Medications: Depakote, Topamax, Wellbutrin, Notriptityline, baby
Aspirin, Omeprazole, Ritalin, Norco, Percocet

Allergies to Medications: None

## PHYSICAL EXAMINATION

General Appearance: Well-nourished, well-developed

Head: Normocephalic, atraumatic, carotid upstroke +2 bilaterally

Vital Signs: Blood Pressure 120/80, Pulse 74 no orthostatic changes

## NEUROLOGICAL EXAMINATION

Mental Status: Alert and oriented to time, place and person.
Fluent speech.

Cranial Nerves:

II.         Visual fields are intact to confrontation.  Benign
            fundi without edema.  Full visual fields.

III, IV, VI  Full extraocular movements.  No nystagmus.
            Pupils are equal, round and reactive to light and
            accomodation.

V           Normal facial sensation.  Normal mastication.

VII         Normal facial movements.  No facial weakness.

VIII        Hearing is grossly normal.

IX, X       Normal gag reflex with good swallowing.  Normal
            uvula and soft palate motion.

XI          Good strength of sternocleidomastoid/trapezii
            muscles.

XII         Midline tongue without atrophy or fasciculations.

Motor Examination: Normal strength.  Normal muscle tone.

000074                                              369

RE: JUAREZ, Ruben
February 3, 2015
Page 3

<u>Sensory Examination:</u> Light touch and pinprick sensations are intact. Vibratory and joint position senses are normal.

<u>Deep Tendon Reflexes:</u>

|                   | R   | L   |          | R   | L   |
|-------------------|-----|-----|----------|-----|-----|
| Biceps            | +2  | +2  | Patellar | +2  | +2  |
| Triceps           | +2  | +2  | Achilles | +2  | +2  |
| Brachioradialis   | +2  | +2  |          |     |     |

Plantar response downgoing.

<u>Coordination:</u> Finger-to-nose, heel-to-shin and rapid alternating movements are all performed normally.

<u>Gait and Station:</u> Normal gait. No ataxia. Romberg is negative.

DIAGNOSIS

1. CHRONIC HEADACHES, RULE OUT TOXIC ENCEPHALOPATHY

2. STATUS POST INTRACRANIAL ANEURYSM COILING, FURTHER COMMENTS AFTER RECORDS REVIEW

DISCUSSION

The patient is evaluated for headaches. The history is somewhat complex and I do not have any medical records. The patient relates of frequent headaches at work and he believed they were associated with chemicals used to clean electrical parts. He also believes he was exposed to lead. The patient did not have any protective devices. In 2013 the patient was found to have an aneurysm in the "Circle of Willis" and had a coiling procedure at Cedars Sinai. He hoped his headaches would improve after the procedure but they did not. The patient says the neurosurgeon told him he does not believe the headaches are connected to his aneurysm.

The patient believes his headaches were related to toxic exposure but unfortunately we do not have records in this regard. I suggest the patient be seen by a toxicologist with the MSDS and working environment analysis. Further comments can be made thereafter.

The patient was given a special diet for headaches sufferers. He is already using Norco and Percocet for his headaches.

In compliance with recent Worker's Compensation legislation (Labor Code Section 4628 (j) and 5703 (a) (2) and Insurance Code Section 556) I declare under penalty of perjury that I have not violated Labor Code Section 139.3 and that the information contained in this

RE: JUAREZ, Ruben
February 3, 2015
Page 4

report and its attachments, if any, is true and correct to the best
of my knowledge and belief, except as to information that I have
indicated I received from others.  As to that information, I
declare under penalty of perjury that the information accurately
describes the information provided to me and, except as noted
herein, that I believe it to be true.  Furthermore, this evaluation
is in compliance with the guidelines established by the Industrial
Medical Council or Administrative Director pursuant to paragraph
(5) of subdivision (J) of Labor Code Section 139.2 or 5307.6.

Date of Report: 2/3/15

Signed this _____day of February 2015, at Los Angeles,
California.

                         Isaac Regev, M.D.

IR/rmw

*Isaac Regev, M.D.*

A PROFESSIONAL CORPORATION
NEUROLOGY / ELECTRODIAGNOSTICS

6404 WILSHIRE BLVD. ☐
SUITE 1121
LOS ANGELES, CA 90048
TELEPHONE: (323) 653-4544
FAX: (323) 653-4500
(ALL CORRESPONDENCE)

18740 VENTURA BLVD. ☐
SUITE 206
TARZANA, CA 91356
TELEPHONE: (818) 386-0472
FAX: (818) 386-0967

February 28, 2015

RE: JUAREZ, Ruben
DOI: CT
OUR FILE: 27660
EMP: Space Exploration Technology

I asked for medical records on the above named patient. I received some records from Cedars Sinai and the following is the review.

The patient was seen in the ER on 9/20/14. He is seen for palpitations. He has history of migraine headaches, ACA, aneurysm status post coiling and general anxiety. The patient appears very anxious in the ER. He is placed on tele without any ectopy. He receives morphine for headaches.

The records are basically in accordance with my clinical impressions. I did not have too many details about the past aneurysm which I learned was in the distribution of the ACA where he had coiling. My diagnosis of headaches is also compatible with these records.

In compliance with recent Worker's Compensation legislation (Labor Code Section 4628 (j) and 5703 (a) (2) and Insurance Code Section 556) I declare under penalty of perjury that I have not violated Labor Code Section 139.3 and that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true. Furthermore, this evaluation is in compliance with the guidelines established by the Industrial Medical Council or Administrative Director pursuant to paragraph (5) of subdivision (J) of Labor Code Section 139.2 or 5307.6.

Date of Report: 2/28/15
Signed this _____ day of February 2015, at Los Angeles, California.

                    Isaac Regev, M.D.

IR/rmw

## COMPEX LEGAL SERVICES

### CERTIFICATION

**(Pursuant to F.R.E. 803(6), 902(11), and 28 U.S.C. § 1746)**

I hereby certify and declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct to the best of my knowledge and belief. I am over the age of 18 and the duly authorized custodian of records for

**ISAAC REGEV, MD**
**6404 WILSHIRE BLVD., SUITE 1121, LOS ANGELES, CA 90048**

I have the authority to certify that the records made available to COMPEX LEGAL SERVICES for reproducing are all of the records under my custody and control which are all of the records under the custody and control of HAMLIN PSYCHE CENTER, described and called for in the SUBPOENA/Authorization served with this declaration in the matter related to said individual or thing pertaining to:

**RECORDS OF: JUAREZ, RUBEN**
**AKA: RUBEN, HERNANDEZ JUAREZ**
**DATE OF BIRTH:** ████ 1970
**SOCIAL SECURITY #:** ████ 0743

| HOW ORIGINAL RECORDS WERE PREPARED | |
|---|---|
| ☐ HANDWRITTEN NOTES | ☐ TYPED/DATA ENTERED |
| ☐ TRANSCRIBED | ☐ OTHER _____ |

| TYPE OF RECORDS PRODUCED | | | |
|---|---|---|---|
| ☒ MEDICAL | ☒ BILLING | ☐ FILMS | ☐ INSURANCE |
| ☐ EMPLOYMENT | ☐ PAYROLL | ☐ SCHOLASTIC | |
| ☐ OTHER | | | |

Said records were made at or near the time of the statements, acts, events, conditions, opinions, diagnoses, etc., that are reported in those records, by a person with knowledge of and a business duty to record those matters. Said records were kept in the course of a regularly conducted activity of the business, and made as a regular practice and custom of the business. I have delivered all of the records requested with the following exceptions:

_Cindy Rodriguez_
CUSTODIAN OF RECORDS NAME (PLEASE PRINT)

_Cindy Rodriguez_
SIGNATURE OF CUSTODIAN OF RECORDS

6/29/18   LA, CA
DATE, AND CITY AND STATE

I AM THE ATTORNEY'S REPRESENTATIVE AND I STATE THAT I MADE TRUE AND CORRECT COPIES OF ALL THE ORIGINAL RECORDS DELIEVERD TO ME BY THE CUSTODIAN OF RECORDS OF THE ABOVE LOCATION.

I DECLARE UNDER PENALTY OF PERJURY & UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

6/29/18  Los Angeles, CA
DATE, AND CITY AND STATE

_signature_
SIGNATURE

_felix fernandez_
PRINT NAME

PURSUANT TO CAL. BUS. AND PROF. CODE § 22463, I WILL MAINTAIN THE INTEGRITY AND CONFIDENTIALITY OF ANY AND ALL INFORMATION OBTAINED, AND DISTRIBUTE THE RECORDS COPIED BY COMPEX LEGAL SERVICES TO THE AUTHORIZED PERSON OR ENTITIES.

373

# COMPEX LEGAL SERVICES

## AFFIDAVIT - (Pursuant to Cal Evidence Code 1561)

I12177-H

I hereby declare under penalty of perjury that the following statements are true to the best of my knowledge and belief. I am over the age of 18 and the duly authorized custodian of records for:

**ISAAC REGEV, MD**

**6404 WILSHIRE BOULEVARD, SUITE 1121, LOS ANGELES, CA 90048**

and have the authority to certify that the records made available to COMPEX LEGAL SERVICES for reproducing are all of the records under my custody and control, described and called for in the SUBPOENA/Authorization served with this declaration in the matter relating to said individual or thing pertaining to:

RECORDS OF:  JUAREZ, RUBEN

AKA: RUBEN HERNANDEZ JUAREZ

DATE OF BIRTH: ▮▮/70

SOCIAL SECURITY #: ▮▮▮-0743

| HOW ORIGINAL RECORDS WERE PREPARED | |
|---|---|
| ☐ HANDWRITTEN NOTES | ☐ TYPED/DATA ENTERED |
| ☐ TRANSCRIBED | ☐ OTHER _____ |

| TYPE OF RECORDS PRODUCED | | | |
|---|---|---|---|
| ☑ MEDICAL | ☑ BILLING | ☐ FILMS | ☐ INSURANCE |
| ☐ EMPLOYMENT | ☐ PAYROLL | ☐ SCHOLASTIC | |
| ☐ OTHER _____ | | | |

Said records were prepared by personnel of the business in the ordinary course of business at or near the time of the act, condition, or event. I have delivered all of the records/items requested with the following exception(s):

_NO FILMS_

_Cindy N._

CUSTODIAN NAME (PLEASE PRINT)                 DEPARTMENT

_Cindy Reyes_                                  8 / 18 / 17

SIGNATURE OF CUSTODIAN                         DATE

I AM THE ATTORNEY'S REPRESENTATIVE AND I STATE THAT I MADE TRUE COPIES OF ALL THE ORIGINAL RECORDS DELIVERED TO ME BY THE CUSTODIAN OF RECORDS OF THE ABOVE LOCATION.

I DECLARE UNDER PENALTY OF PERJURY & UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

8/18/17                      _signature_                  FELIX T.

DATE                         SIGNATURE                    PRINT NAME

PURSUANT TO BUSINESS & PROFESSIONS CODE SECTION 22462, I WILL MAINTAIN THE INTEGRITY & CONFIDENTIALITY OF ANY AND ALL INFORMATION OBTAINED, AND DISTRIBUTE THE RECORDS COPIED BY COMPEX LEGAL SERVICES TO THE AUTHORIZED PERSON OR ENTITIES.

SHAREDDEGLFORM.DOC

# EXHIBIT 37

FROM·                    (WED)MAR 11 2015 14:           14:06/No. 7521853158 P  2

*Isaac Regev, M.D.*

A PROFESSIONAL CORPORATION

NEUROLOGY / ELECTRODIAGNOSTICS

6404 WILSHIRE BLVD.
SUITE 1121
LOS ANGELES, CA 90048
TELEPHONE: (323) 653-4544
FAX: (323) 653-4500
(ALL CORRESPONDENCE)

18740 VENTURA BLVD.
SUITE 206
TARZANA, CA 91356
TELEPHONE: (818) 386-0472
FAX: (818) 386-0987

February 3, 2015

RE: JUAREZ, Ruben
DOI: CT
DOE: 2/3/15
OUR FILE: 27660
EMP: Space Exploration Technology

The patient is a 45 year old right handed male who is seen for
neurological consultation on 2/3/15.

### HISTORY OF THE INJURY

The patient relates that he worked for the above named employer
from 01/2012 to the present as an equipment specialist. He worked
about sixty hours per week. He relates that almost from the
beginning he noted frequent headaches at work which he felt was
associated with exposure to various chemicals used in the facility
for cleaning part. He also feels he was subject to lead exposure.
He was not provided with any protective devices and his headaches
were worse at work. Eventually he also started having dizziness
and saw several physicians as well as a neurologist at Cedars Sinai
and·after work up was told he had an aneurysm in the "Circle of
Willis". He was referred for coiling procedure which was done
01/2013. The patient says he hoped that his headaches would go
away after this procedure.

### PATIENTS CURRENT COMPLAINTS

The patient relates of headaches which are moderate to intense.
They are almost constant and described as a pressure type feeling.
A few times he had to go to an ER where he was given Morphine and
Dilaudid. He denies any other specific symptoms associated with
the headaches although he is dizzy at times.

### WORK HISTORY

As described. On TTD,

### PAST MEDICAL HISTORY

Right elbow and right wrist surgery with transposition of the right
ulnar nerve. The right wrist injury is of unknown nature. Both
injuries were work related. He is also known to have narcolepsy.



EXHIBIT 39
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

RE: JUAREZ, Ruben
February 3, 2015
Page 2

<u>Family History:</u> Non-contributory

<u>Social History:</u> Married

<u>Habits:</u> Does not smoke, abuse alcohol or use drugs

<u>Medications:</u> Depakote, Topamax, Wellbutrin, Notriptityline, baby Aspirin, Omeprazole, Ritalin, Norco, Percocet

<u>Allergies to Medications:</u> None

## PHYSICAL EXAMINATION

<u>General Appearance:</u> Well-nourished, well-developed

<u>Head:</u> Normocephalic, atraumatic, carotid upstroke +2 bilaterally

<u>Vital Signs:</u> Blood Pressure 120/80, Pulse 74 no orthostatic changes

## NEUROLOGICAL EXAMINATION

<u>Mental Status:</u> Alert and oriented to time, place and person. Fluent speech.

<u>Cranial Nerves:</u>

| | |
|---|---|
| II. | Visual fields are intact to confrontation. Benign fundi without edema. Full visual fields. |
| III, IV, VI | Full extraocular movements. No nystagmus. Pupils are equal, round and reactive to light and accomodation. |
| V | Normal facial sensation. Normal mastication. |
| VII | Normal facial movements. No facial weakness. |
| VIII | Hearing is grossly normal. |
| IX, X | Normal gag reflex with good swallowing. Normal uvula and soft palate motion. |
| XI | Good strength of sternocleidomastoid/trapezii muscles. |
| XII | Midline tongue without atrophy or fasciculations. |

<u>Motor Examination:</u> Normal strength. Normal muscle tone.

 
RE: JUAREZ, Ruben
February 3, 2015
Page 3

<u>Sensory Examination:</u> Light touch and pinprick sensations are intact.  Vibratory and joint position senses are normal.

<u>Deep Tendon Reflexes:</u>

|              | R   | L   |          | R   | L   |
|--------------|-----|-----|----------|-----|-----|
| Biceps       | +2  | +2  | Patellar | +2  | +2  |
| Triceps      | +2  | +2  | Achilles | +2  | +2  |
| Brachioradialis | +2 | +2 |          |     |     |

Plantar response downgoing.

<u>Coordination:</u> Finger-to-nose, heel-to-shin and rapid alternating movements are all performed normally.

<u>Gait and Station:</u> Normal gait.  No ataxia.  Romberg is negative.

DIAGNOSIS

1.   CHRONIC HEADACHES, RULE OUT TOXIC ENCEPHALOPATHY

2.   STATUS POST INTRACRANIAL ANEURYSM COILING, FURTHER COMMENTS AFTER RECORDS REVIEW

DISCUSSION

The patient is evaluated for headaches.  The history is somewhat complex and I do not have any medical records.  The patient relates of frequent headaches at work and he believed they were associated with chemicals used to clean electrical parts.  He also believes he was exposed to lead.  The patient did not have any protective devices.  In 2013 the patient was found to have an aneurysm in the "Circle of Willis" and had a coiling procedure at Cedars Sinai.  He hoped his headaches would improve after the procedure but they did not.  The patient says the neurosurgeon told him he does not believe the headaches are connected to his aneurysm.

The patient believes his headaches were related to toxic exposure but unfortunately we do not have records in this regard.  I suggest the patient be seen by a toxicologist with the MSDS and working environment analysis. Further comments can be made thereafter.

The patient was given a special diet for headaches sufferers.  He is already using Norco and Percocet for his headaches.

In compliance with recent Worker's Compensation legislation (Labor Code Section 4628 (j) and 5703 (a) (2) and Insurance Code Section 556) I declare under penalty of perjury that I have not violated Labor Code Section 139.3 and that the information contained in this



RE: JUAREZ, Ruben
February 3, 2015
Page 4

report and its attachments, if any, is true and correct to the best
of my knowledge and belief, except as to information that I have
indicated I received from others.  As to that information, I
declare under penalty of perjury that the information accurately
describes the information provided to me and, except as noted
herein, that I believe it to be true.  Furthermore, this evaluation
is in compliance with the guidelines established by the Industrial
Medical Council or Administrative Director pursuant to paragraph
(5) of subdivision (J) of Labor Code Section 139.2 or 5307.6.

Date of Report: 2/3/15

Signed this _____ day of February 2015, at Los Angeles,
California.

Isaac Regev, M.D.

IR/rmw

# EXHIBIT 38

**LIST ALL EMPLOYERS/JOBS THAT YOU HAVE HAD. JOB DESCRIPTION, AND DURATION [From what date to what date]:**

(Including military, summer jobs, moonlighting jobs, part-time jobs, full-time jobs).

| Employer | Job Description | Dates |
|---|---|---|
| 1) Space Exploration | Equipmen spcielist | 1/12 — to present |
| 2) Express Manufacturing | Manufacturing Eng. | 10/10 — 1/12 |
| 3) Moore Industries | Manufacturing Eng. | 9/2007 — 3/2009 |
| 4) | | |
| 5) | | |

**LIST ALL INJURIES TO ALL BODY PARTS REGARDLESS OF WHETHER IT IS INDUSTRIAL OR NON-INDUSTRIAL:**

(i.e., car accident with injury, fall injury, injury with other employers).

| Injury | Date | Employer | Body part |
|---|---|---|---|
| 1) Elbow | 9/15/2008 | Moore Industris | elbow |
| 2) Wrist | '90 | Harman International | |
| 3) | | | |
| 4) | | | |
| 5) | | | |

EXHIBIT 36
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

Page 1 of 18

I.  Do you have recollection of any notices posted regarding Workers' Compensation in
    any of the rooms of the employer's office?

    (Circle)

    YES    Location: _____

           What did the notice say? _____

    NO     I did not notice.

II. Did you notify your employer in writing (yourself or your attorney) via claim form
    with regard to your illness/injury?

    (Circle)

    YES    How and when? _____

    NO

III. Did your employer provide you with a list of all physicians on the medical provider
     list?

    (Circle)

    YES    _____

    NO

0073

382

◯                    ◯

## PATIENT HISTORY FORM

*You __must__ complete this questionnaire in detail in order to be seen by the doctor.*
*Favor de completar el questionario en detalle, antes de que el doctor lo examine.*

Patient Name: Ruben Juarez     Age: 45     Date: 3/25/15

### PART 1 – JOB DESCRIPTION:

Employer: Space Exploration     Length of Employment: 8 y r s

Occupation & Job Duties: (How many hours per day per each duty, and how many days per week.)

4 hours computer work
4 hours working with differet
Che mi cals on Conformel east
Doom, and wash areas

Hours per week:_____ Days per week:_____ Overtime per week:_____

Are you still working for the above company:   (Yes)   No

If NO, when was your last day of employment:_____

Were you fired:     Yes   No     Why:_____
Did you quit:     Yes   (No)     Why:_____
Were you laid-off   Yes   (No)   Why:_____
Were you put on disability:   (Yes)   No   Why: Medical

and by Who: Doctor Ronel Andiman

Have you worked since that time:   Yes   (No)

If YES, where, when and what type of work_____

0075

383

## PART II – HISTORY OF INJURY

What part of your body or what internal diseases are involved in the illness/injury (describe what happened to you, detailing when and what you were doing at that time):

I have migraine and Hed aches
During the day I look many
days off due to migraines
and dizziness.

Give a detailed explanation of your job duties which you feel are responsible for your problem. If you suffered stress on the job, give examples of what occurred including dates and years. If you were exposed to chemicals, dust, fumes, or other hazardous materials at work describe in detail then go on to Part III (for exposure cases only).

I was

FOR ENVIRONMENTAL EXPOSURES:

DESCRIBE THE DATE(S) OF YOUR EXPOSURE:

I worked with chemicals all the
time Iwas incharge of replacing
Fume filter and repair the conformel
Coat Equipment also order parts.
For the equipment. my employer bypass
the safety switch on the equipment

0072

384

Did you notify or complain to anybody at work:       Yes       No

If YES, who and what was done: ___No thing___

Did you employer send you to a doctor:       Yes       No

If YES, list the names, dates seen, and diagnosis given:

Name: _____   Dates: _____   Diagnosis: _____

Did you seek medical care on your own:       Yes       No

| Name: | Dates: | Diagnosis: |
|---|---|---|
| Racey medical | 1/7/13 | brain anrury sem. |
| Ronal Andrson | 6/13 | Migreines |
| Racey medica | 9/12 | Hed ackes |

## PART III – EXPOSURE TO HAZARDOUS MATERIALS (WORK AND/OR ENVIRONMENTAL)

*(NOTE: If you were not exposed to any hazardous materials skip this section.)*

Name and describe any and all chemicals which you were exposed to:

Isopropyl alcohol, 63/37%bSolder wire
Arathane 5750, Humiseal thinner521
Humiseal 1A33

How were you exposed to these chemicals: (Breathing, ingestion, etc)

Breathing, working with Aonds.
Repairing equipment and Filters

How often were you exposed? (How many hours per day, days per week.)

4 to 5 Hours per day

Page 5 of 18

Did you inhale these chemicals:  (Yes)    No

If YES, would you feel sick and if so describe what you felt: _____

tired, Head acke, Dizzie

Did you have skin contact with these chemicals:  (Yes)   No

How often, how many hours per day, days per week: _____

4 - 5  every  day

If YES, did you experience any reaction (symptoms) and if so describe: (i.e. smell, burning of the eyes, cough, etc) nausea, Dizzines, burning OF eyes

_____

_____

_____

If you did experience a smell, describe the smell: (i.e. pungent, like smoke, like rotten eggs, etc: _

_____

_____

_____

_____

Did you develop headaches at the time of exposure (i.e. immediate, severe, hours while exposed?) Y e S

_____

_____

Did you experience shortness of breath (i.e. immediate, severe, hours while exposed?) _____

Yes  I best ask a coworker to go out with me for a walk

Page 6 of 18

0071

386

Did you experience chest pain (i.e. immediate, severe, hours while exposed?) _____

_____ N·O _____

Did you have this type of experience of symptoms before (prior to) the described exposure?
(Describe if YES): _____ N O _____

_____

## FOR WORK AND/OR ENVIRONMENTAL
How was the ventilation:    Excellent    Good    Average    (Poor)    None

Ventilation was provided by: ____ Do·t   Know _____

Were you provided with any personal protective devices:    Yes    (No)

If YES, what : _____ Paper/Cloth Mask    _____ Gloves – What Kind _____

_____ Respirator with Cartridge - How often were cartridges changed _____

Were you given any training on how to use the equipment:    Yes    (No)

Were you given any safety training:    Yes    (No)

Were you told that the chemicals are dangerous/hazardous:    Yes    (No)

What is the size of your work area: aʇ Fırst 20" X 10'    after 30'X 15'

How many people work in that same area:   1 — 3 _____

## PART IV – CURRENT MEDICAL HISTORY
List all doctors who are currently treating/caring for you and what are they treating you for:

| Name | Reason |
|------|--------|
| Donal Andiman | neurology |
| Steven Schenkel | psychritric |
| Marshak | M D |

387

Are you currently certified for disability by any doctor?   (Yes)   No

IF YES, what is the name of the doctor and the diagnosis: _____

Ronald    Andeman

**MEDICATIONS:**
List all medications which are you currently taking:

| Name | Dosage | Prescribing Doctor |
|---|---|---|
| Topamax | 100 | Andiman |
| Depakot | 500 | Andiman |
| Wellbutin | 300 | Schenkel |
| Pamelor | 50 | Andiman |
| Xanax | .5 | Schenkel |
| Aspirin 81 | 81 | Andiman |

List any diagnostic studies that have been performed or treatment given to you in regards to your injury/illness, and results if known:

Grcand  Med d

_____

_____

_____

_____

**PART V – PAST MEDICAL HISTORY (For Environmental and/or Industrial Exposures)**

Have you had any previous injuries to any parts of the body involved in this claim?  If yes, describe in detail:

_____

_____

_____

Have you had any other work-related injuries? If yes, describe in detail:

yes    elbow

_____

_____

Have you ever been hospitalized? If yes, give hospital name, dates and reason (name of illness):

| Date | Hospital | Reason (Name of Illness) |
|---|---|---|
| 6/14 | Srders | Migraines |

Page 8 of 18

0070

388

_____   _____   _____
_____   _____   _____

Have you ever had an operation (surgery)?  If yes, where, when and name of operation performed:

Date                    Hospital                Reason
1|8|13                 Sedars                 brain aneurysca
_____   _____   _____
_____   _____   _____

Have you ever had any car accidents?  If yes, described in detail:
_____ Dont remember _____
_____
_____

If yes, what body parts were injured: _____

Have you had any major adult illness?  Please circle those that apply and indicate when diagnosis was first made (date and year):

Diabetes mellitus_____        High blood pressure_____

Arthritis_____                Thyroid disease_____

Tuberculosis_____             Hepatitis/Jaundice_____

Heart disease_____            Kidney disease_____

Asthma_____                   Lung disease_____

Stomach ulcer_____            Cancer_____

Other (describe):_____
_____
_____

Do you have any allergies?  If yes, please list including allergies to foods, medications, dust, pollens, hay fever, etc.. none _____
_____
_____
_____

Page 9 of 18

0078

Are you currently using any herbal medications? If Yes, what and for how long?_____

_____ ν Ο _____

_____

Are you currently using any over-the-counter vitamins or health food additives? If yes, what and for how long?___ Vilawing  Ε _____

_____

In regard to you exposure to toxic chemicals, have you seen a health care professional? If yes, when____ Ν Ο _____

_____

If yes, are you still seeing a health care professional in regards to your exposure?_____

_____

## PART VI – SOCIAL HISTORY:

Do you currently smoke?                    Yes   No
If yes, what do you smoke _____, how long have you smoked _____.
and how much do you smoke per day _____ or per week?

If no, have you smoked in the past?        Yes   No

If yes, when did you stop ___1/13____, what did you smoke  Cigarrels ___, how long did you smoke __10+ years_. and how much did you smoke 1 packof 20 per ?
                                                                    month

Do you currently drink alcohol?            Yes   No
If yes, how much do you drink _____ and how often_____?

If no, have you ever drank heavily in the past?   Yes   No
Do you have a history of illicit drug abuse?      Yes   No
If yes, what type of drug_____, for how long_____, and
when was the last time _____?

0069

390

## PART VII – FAMILY HISTORY

| Relation | Age | State of Health | If Dead, Cause of Death |
|----------|-----|-----------------|-------------------------|
| Father | 76 | | Natural |
| Mother | 74 | | Natural |
| Brothers | 50 | Good | |
| | 57 | Good | |
| Sisters | 60 | Good | |
| | 47 | Good | |

## PART VIII – ENVIRONMENTAL HISTORY

Do you have any hobbies, if yes describe in detail: _____

Do you have any pets, if yes, what kind and for how long? _____

2 dogs   5 + years

Do you currently or in the past live with anyone who is a smoker, who and for how many years? _____

NO

Do you use any household cleaning products, how often and what? _____

NO

Do you use fertilizers, how often? NO

Page 11 of 18

Do you use insecticides, how often? ____ NO ____

Do you pump your own gasoline, how often? ____ 1 per week ____

Do you use solvents/paints/glues at home, if yes how often? ____ NO ____

Do you reside near a chemical plant and/or toxic dump, if yes what is the name and type of plant, and how far away? ____ NO ____

Did you ever reside near a chemical plant, toxic dump, major highway, or gasoline station? If yes, when, for how many years, and what distant? ____ NO ____

Have you been exposed to any chemicals or hazardous materials outside of work, if yes, describe in detail? ____ NO ____

## PART IX – ADDITIONAL INFORMATION

Please describe any additional information which you feel is relevant to your case that has not been covered by this questionnaire.

____ 1 Get botex intrctraus every 3 months ____

## PART X – PRESENT SYMPTOMS

Please indicate which symptoms you have including the frequency (daily, once a week, once a month, intermittent, constant) and the intensity (mild, moderate, severe) – if applicable.

**General**

| | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Fatigue | Yes | No | every day | severe | _____ |
| Loss of Weight | Yes | No | How Much _____ | | _____ |
| Weight Gain | Yes | No | How Much 2016 | | _____ |

**Internal**

| | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Shortness of Breath | Yes | No | 1 week | mild | _____ |
| Palpitations | Yes | No | every other day | moderate | _____ |
| Stomach Pain | Yes | No | every day | moderate | _____ |
| Diarrhea | Yes | No | | | _____ |
| Asthma | Yes | No | | | _____ |
| Cough | Yes | No | | | _____ |
| Chest pain | Yes | No | | | _____ |
| Stroke | Yes | No | | mild | _____ |
| Heart Attack | Yes | No | | | _____ |
| High Blood Pressure | Yes | No | For How Long _____ | | _____ |
| History of Exposure to Fumes | Yes | No | What _____ | | When _____ |
| History of Exposure to Dust | Yes | No | What _____ | | When _____ |

**Musculoskeletal**

| | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Neck Pain | Yes | No | every day | severe | _____ |
| Back Pain | Yes | No | every day | severe | _____ |
| Elbow Pain | Yes | No | | | _____ |
| Shoulder Pain | Yes | No | 1 week | mild | _____ |
| Diffuse Muscle Pain | Yes | No | | | _____ |

**Ear, Nose & Throat**

| | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Loss of Balance | Yes | No | 1-2 week | severe | _____ |
| Dizziness (Vertigo) | Yes | No | 1 week | mild | _____ |
| Voice Changes | Yes | No | | | _____ |
| Throat Irritation | Yes | No | | | _____ |
| Nose Bleeds | Yes | No | 1 week | mild | _____ |
| Nasal Congestion | Yes | No | 1-2 week | severe | _____ |
| Noises in Ears | Yes | No | every other day | mild | _____ |
| Hearing Loss | Yes | No | Which Ear both | For How Long _____ | |

**Toxic**

| | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Loss of Memory | Yes | No | often | mild | _____ |
| Tingling Sensation in Hands/Legs | Yes | No | | | _____ |
| Recent Cancer | Yes | No | Type _____ | When Diagnosed _____ | |
| History of Exposure to Asbestos | Yes | No | When _____ | | |
| History of Exposure to Radiation | Yes | No | When _____ | | |
| History of Exposure to Toxic Chemicals | Yes | No | What _____ | | When _____ |

| Skin & Allergies | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Skin Rashes | Yes | No | | | |
| Skin Itching | Yes | No | | | |
| Psoriasis | Yes | No | | | |
| Eczema | Yes | No | | | |
| Skin Cancer | Yes | No | When _____ | | |
| Recent Allergies | Yes | No | Describe _____ | | |

| Neurology | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Headaches | Yes | No | 1-4 per week | severe | |
| Dizziness | Yes | No | 1-3 per week | severe | |
| Blurred Vision | Yes | No | 1-5 per month | mild | |
| Numbness of Hands/Legs | Yes | No | | | |

| Ophthalmology | | | How Often | Intensity | Date of Onset |
|---|---|---|---|---|---|
| Eye Irritation | Yes | No | every day | mild | |

**Psychiatric/Psychological/Stress**

| | | | | | |
|---|---|---|---|---|---|
| Insomnia | Yes | No | Crying Spells | Yes | No |
| Irritability | Yes | No | Suicide Thoughts | Yes | No |
| Depression | Yes | No | Loss of Appetite | Yes | No |
| Loss of Memory | Yes | No | | | |

Page 14 of 18

## ADDITIONAL QUESTIONS

1. Did any doctor tell you that your problem was work-related?  Y  (N)
   If YES, Who _____   When_____

2. Have you had any problems with your stomach in the last 10 years?  Y  (N)

   If YES, Describe:_____

3. Have you had any problems with lung disease and/or asthma in the last 10 years?  Y  (N)

   If YES, Describe:_____

4. Any surgeries?  (Y)  N
   If YES, Describe:  elbow, brain, wrist

5. Any previous work comp claims?  (Y)  N
   If YES, Describe:  elbow surgery

   What were the results:  on going

6. Any other previous accidents?   Y  (N)

   If YES, Describe:_____

## HOME ENVIRONMENT

1. Please provide us with some information about your present home:
   _____ Apartment  X  House _____ Duplex _____ Coop

2. Age of building  50+

3. Type of heating:  X  forced hot air _____ water/steam _____ gas _____ oil

4. How many are in your household?  3

5. Are there smokers in your apartment/household?     YES  (NO)

6. Are there pets in your apartment/household?     YES  (NO)
   If yes, please specify:_____

7. Do you use pesticides or anti/roach control chemicals at home?  YES  (NO)

0081  395



8.   Do you use a humidifer at home?          YES   NO

9.   Do you have wall to wall carpeting in your home?          YES   NO

10.  Have there been any water leaks in your home/apartment?          YES   NO

11.  Have you noticed visible stains on the walls?     YES   NO

12.  Visible stains on ceiling tiles?     YES   NO

13.  Does your home/apartment have a musty odor?  YES   NO

14.  Have you noticed mold or mildew?          YES   NO
     If yes, explain _____

     _____

15.  Have you made any air quality or environmental survey done in your
     home/apartment?          YES   NO
     If yes, what were the results?: _____

0066

396

## ACTIVITIES OF DAILY LIVING COMMONLY MEASURED IN ACTIVITIES OF DAILY LIVING (ADL) AND INSTRUMENTAL ACTIVITIES OF DAILY LIVING (IADL) SCALES*

Do you have difficulties with activities of daily living:

| ACTIVITY | EXAMPLE | NO | MODERATE | SEVERE |
|----------|---------|----|----------|--------|
| Self care Personal Hygiene | Urinating, defecating, brushing teeth, combing hair, bathing, dressing oneself, eating | ✓ | | |
| Communication | Writing, typing, seeing, hearing, speaking | | ✓ | |
| Physical Activity | Standing, sitting, reclining, walking, climbing stairs | | ✓ | |
| Sensory Function | Hearing, seeing, tactile feeling, tasting, smelling | ✓ | | |
| Nonspecialized Hand activities | Grasping, lifting, tactile discrimination | | | |
| Travel | Riding, driving, flying | | ✓ | |
| Sexual Function | Orgasm, ejaculation, lubrication, erection | | ✓ | |
| Sleep | Restful, nocturnal sleep pattern | | | ✓ |

*Adopted with changes from the American Medical Association Fifth Edition, 2004.

## THE EPWORTH SLEEPINESS SCALE

Name: Ruben Suarez

Today's date: 3/25/15          Your age (years): 45

Your sex (male = M; female = F): M

How likely are you to doze off or fall asleep in the following situations, in contrast to feeling just tired? This refers to your usual way of life in recent times. Even if you have not done some of these things recently try to work out how they would have affected you. Use the following scale to choose the *most appropriate number* for each situation:

- 0 = would *never* doze
- 1 = *slight* chance of dozing
- 2 = *moderate* chance of dozing
- 3 = *high* chance of dozing

| Situation | Chance of dozing |
|---|---|
| Sitting and reading | 3 |
| Watching TV | 3 |
| Sitting, inactive in a public place (e.g., a theater or meeting) | 3 |
| As a passenger in a car for an hour without a break | 3 |
| Lying down to rest in the afternoon when circumstances permit | 3 |
| Sitting and talking to someone | 3 |
| Sitting quietly after a lunch without alcohol | 3 |
| In a car, while stopped for a few minutes in traffic | 3 |

Thank you for your cooperation.

0065

398

# EXHIBIT 39

# HAMLIN PSYCHE CENTER

| **Thomas A. Curtis, M.D.** | **William W. Kaiser, Ph.D.** |
|---|---|
| Medical Director | Director of Clinical Services |

Lorna Punzalan, Office Manager, ext. 218
Italo Vilogron, Treatment Coordinator, ext. 220

| 14531 Hamlin Street<br>Van Nuys, CA 91411 | www.hamlinpsychecenter.com<br>Van Nuys: (818) 780-4409<br>Long Beach: (562) 513-3684<br>Fax (818) 780-4472 | 4300 Long Beach Blvd., #240<br>Long Beach, CA 90807 |
|---|---|---|

Chubb Group of Insurance Companies
P.O. BOX 42065
Phoenix, AZ 85080

Gary Kaplan, Esq.
3600 Wilshire Blvd., Ste. 2100
Los Angeles, CA 90010

Isaac Regev, M.D.
6404 Wilshire Blvd., Ste. 1121
Los Angeles, CA 90048

| | |
|---|---|
| Re: | Ruben Juarez |
| WCAB #: | ADJ9801824 |
| Claim #: | 076914050057 |
| Employer: | Space Exploration Technology/Spacex |
| SSN: | ███0743 |
| DOB: | ███1970 |
| DOI: | CT 3/27/2013-3/27/2014 |
| DOE: | 3/31/16 |

**REQUEST FOR AUTHORIZATION**

## TREATING PSYCHOLOGIST'S INITIAL REPORT WITH PSYCHOLOGICAL TEST RESULTS

Gentlepersons:

Mr. Ruben Juarez, a 46-year-old equipment specialist for Space Exploration Technology/Spacex, completed psychological evaluation and testing on 3/31/16 at the Van Nuys Hamlin Street office.

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 2

---

# INTRODUCTION

On 9/24/14, Mr. Juarez submitted an Employee's Claim for Workers' Compensation Benefits citing a cumulative trauma date of injury from 3/27/13 to 3/27/14 involving his head/headaches and brain/aneurysm due to repetitive and continuous exposure to lead, electronic parts and cleaning substances.

There was a letter dated 11/27/15 from Ariet Agazaryan, a UR triage supervisor from Chubb Group of Insurance Companies indicating to Mr. Juarez that, "We are disputing the liability for the above treatment requested because the injury is being disputed or the liability for the claimed body parts are being disputed: Entirety of the claim."

There was a letter dated 9/26/15 submitted by the primary treating physician, Dr. Isaac Regev, designating Dr. Thomas Curtis as treating physician in this case.

Dr. Curtis designated Gayle K. Windman, Ph.D., as the evaluating psychologist for this report.

This report would comprise the applicant's initial comprehensive psychological evaluation.

It should be kept in mind that this initial treating psychological evaluation could not attest to what should be a more inclusive and detailed history of injury within the investigative reports, records, depositions and other materials of discovery, and afforded by and compensated for within the comparatively unlimited time frames of the medical-legal evaluations of PQME or AME psyche physicians.

It would be requested that the adjuster either promptly authorize the requested psychological treatment plan or submit this request to Utilization Review.

As well, since this office can now provide only limited psychological treatment on a lien basis, it would be requested that the parties seek panel QME or AME psychological/psychiatric consultation as soon as possible so that we can proceed promptly within the parameters of the recommended psychological treatment.

Would the defendant please provide copies of all reports, records, witness statements, depositions and all other discovery documents in this matter. This request would be ongoing for new documents.

---

## IDENTIFYING DATA

Mr. Juarez achieved an Associate's degree. He is married. He lives in Granada Hills with his wife, Isela (age 45), and his daughter, Marisol (age 12).

## HISTORY OF THE WORK INJURY

Mr. Juarez began his employment at Space Exploration Technology/Spacex in about 1/12. His last day of work there was in about 3/14.

Mr. Juarez was placed on disability on 3/28/14 by Dr. Ronald Andiman.

As an equipment specialist, Mr. Juarez's job duties included programming and maintaining equipment, designing tools and fixtures, and being responsible for production prototypes and production support.

Mr. Juarez received above average written work performance evaluations. There were other indications of positive work performance including being recognized as the top performer. He was promoted in 2013. He worked there for about two years.

A few months after he began working at Spacex, Mr. Juarez developed symptoms of migraine headaches, dizziness, difficulty walking and sinus symptoms due to exposure to electronic materials such as tin and lead; chemical coatings such as Arathane and HumiSeal; and cleaning substances such as thinners and isopropyl alcohol. He reported this issue to his supervisor to no avail.

Mr. Juarez consulted with several doctors until he was sent to get a CT scan, which revealed he had a brain aneurysm. He underwent emergency brain surgery in Cedars-Sinai. He was discharged after three days.

A few days later, Mr. Juarez had a stroke with worsened migraine headaches. Due to his worsening condition, Mr. Juarez had anxiety attacks. He was hopeless and felt like damaged equipment that could not be used.

Mr. Juarez tried to return to work; however, his supervisor said that he could not return to work due to his illness. Mr. Juarez contacted HR and submitted ADA forms. Mr. Juarez was told he would be called back, but he never received a call from them.

In 2014, Mr. Juarez consulted with a neurologist, Ronald Andiman, who diagnosed migraine headache. He also consulted with a psychiatrist, Dr. Steven Schenkel, who prescribed psychotropic medications including Wellbutrin, Xanax, Valium, Zoloft and Ambien.

In 2015, Mr. Juarez came under the care of the primary treating neurologist, Dr. Isaac Regev.

Mr. Juarez remained symptomatic. His emotional condition will be further described in other sections of this report to follow.

## APPLICANT'S REPORT OF EMOTIONAL SYMPTOMS

As a result of the events of injury at work, Mr. Juarez developed symptoms of mental disorder including depression, anxiety, irritability and insomnia.

There have been significant alterations in Mr. Juarez's previously active lifestyle such that the quality of his life became deteriorated. He developed difficulty engaging in his usual activities like before such as basic self-care and housekeeping.

Mr. Juarez reported persisting symptoms of depression including changes in appetite and weight, sleep disturbance, decreased energy, difficulty thinking, and feelings of emptiness and inadequacy.

Mr. Juarez has experienced recurring periods of anxiety with symptoms including recurrent panic attacks, excessive worry, difficulty controlling his worry, feelings of restlessness, feeling "keyed up" and on edge, difficulty concentrating, irritability, muscle tension, abdominal distress and feeling pressured.

There have also been unprovoked crying episodes that have occurred multiple times weekly.

Mr. Juarez has experienced stress-intensified medical symptoms with worsened headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and possible stress-aggravated high blood pressure.

Due to his mental disorder, Mr. Juarez has experienced impairment in his daily activities including bodily functions, personal hygiene, eating properly, sleeping and functioning sexually. Because of his nervousness, there has been increased urinary frequency. There have been problems with stress-related constipation and diarrhea.

Due to stress-related overeating and depressive inactivity, Mr. Juarez has developed a gain of weight of about 20 to 25 pounds.

Mr. Juarez has also experienced a depressively decreased interest in his basic self-care activities including brushing his teeth, bathing regularly and dressing appropriately without prompting from others. In addition, there has been decreased motivation and

Ruben Juarez vs. Space Exploration Technology/Spacex
- Page 5

ability to perform normal housekeeping activities including making the bed, cooking a meal and vacuuming the house.

Mr. Juarez has developed decreased sexual interest due to depression, anxiety, emotional withdrawal, irritability and anger.

Mr. Juarez has developed difficulty staying asleep and falling asleep due to depression, anxiety, worry and nightmares. Mr. Juarez uses Ambien, Valium and Sonata to fall asleep. Because of his insomnia, Mr. Juarez has experienced excessive daytime sleepiness, morning headaches, trouble concentrating and a change in his personality. Mr. Juarez's insomnia has persisted.

Due to his emotional distress, Mr. Juarez has had difficulty interacting appropriately with others including family members, friends and neighbors. Mr. Juarez has become emotionally withdrawn.

Due to his mental disorder, Mr. Juarez has developed attitudes that have impaired his ability to socialize including defensiveness, mistrustfulness and fearfulness. Mr. Juarez has become irritable and impatient with people. There have been problems with becoming short-tempered and being prone to inappropriate angry outbursts.

Mr. Juarez has experienced difficulty tolerating prolonged contact with people because of his depression, anxiety, irritability and quickness to anger. There has been insufficient emotional control such that Mr. Juarez yells at others.

Because of Mr. Juarez's emotional disturbances, there has been difficulty paying attention, concentrating and remembering things. Mr. Juarez has experienced problems with distractibility, slowed thinking, mental blocking and loss of his train of thought.

Because of his cognitive impairment, Mr. Juarez has had difficulty communicating his thoughts. Mr. Juarez's cognitive functioning has become impaired such that there has been difficulty in his ability to read a magazine or book and follow the plot of a movie or TV show. Mr. Juarez also has problems remembering telephone numbers, appointments, birthdays, directions, what people tell him and where he left things around the house.

Due to Mr. Juarez's depression and anxiety, there has been psychological fatigue and energy depletion.

## PERSONAL AND FAMILY HISTORY

Mr. Juarez was the youngest of six children. He was born and raised in Mexico City. He moved to Southern California in about 1986.

Mr. Juarez described the relationship he had with his parents, Juan and Aurora, as mostly positive. There appeared to be no problems with the relationship he had with his parents that would be related to his current emotional distress. Mr. Juarez could not recall the years his parents died. In any event, each death was followed by a normal grief reaction that became resolved.

Mr. Juarez described his childhood as happy and normal. He reported no significant childhood problems with peer relations, school behavior, school performance or adolescent turmoil.

Mr. Juarez has been married to Isela since about 1996. In the aftermath of Mr. Juarez's recent work-related problems, the relationship has deteriorated to the point of separation. The problems in Mr. Juarez's relationship appeared to have arisen primarily from his current work-related disability situation. There have been problems in the relationship related to his physical pain and disability, depression, irritability, diminished sexual desire and fatigue. Mr. Juarez indicated that, were it not for the troubles originating from work, he would not have undergone the relationship problems in his personal life.

## WORK HISTORY

Mr. Juarez was employed by Space Exploration Technology/Spacex as an equipment specialist for approximately two years, from about 1/12 to about 3/14.

Prior to that, Mr. Juarez worked for Express Manufacturing from 2010 to 2012. The reason given for leaving this job was to get a new job. Mr. Juarez's work performance was rated above average.

Before that, Mr. Juarez worked for Moore Industries from 2007 to 2009, when he was laid off due to a work injury there. Mr. Juarez's work performance was rated above average.

Prior to that, Mr. Juarez worked for Magnatek from 2004 to 2007. The reason given for leaving this job was to get a new job. Mr. Juarez's work performance was rated above average.

## PRIOR WORK INJURIES

In 2008, Mr. Juarez injured his elbow while working for Moore Industries. There was psychological component to the injury. He consulted with a mental health specialist. He recovered.

## PSYCHOLOGICAL HISTORY

In regard to his mental health history, Mr. Juarez reported no previous episodes of comparable emotional upset or confusion. He has never undergone psychiatric hospitalization. There have been no suicide attempts. He has never previously been prescribed any psychotropic medication.

## PERSONAL HABITS

In regard to his personal habits, Mr. Juarez stated that he is a non-smoker. He no longer drinks. There was a history of conviction for alcohol-related charges including a DUI in 2004. He paid a fine and performed community service. Mr. Juarez denied the use of any illegal drugs or the abuse of any legal ones.

## MEDICAL HISTORY

Relevant to serious medical illnesses, surgeries or hospitalizations, Mr. Juarez was diagnosed with CVA or stroke in 2013 and migraine headaches in 2014.

In regard to medication usage, Mr. Juarez has recently taken Depakote, Topamax, Pamelor, Aspirin, Bactrim, Pantoprazole, Carafet, Valium, Xanax, Wellbutrin, Prozac and Ritalin.

## INJURY AND LEGAL HISTORY

In the early 2000s, Mr. Juarez injured his shoulders and back in a vehicular accident. He received settlement of approximately $2,000. As well, in 2015, Mr. Juarez injured his back in another vehicular accident. He recovered from both accidents. There was no psychological component to these injuries.

Additionally, there have been no past convictions of any felonies.

## MENTAL STATUS EXAMINATION

Mr. Juarez presented in interview as a 46-year-old male who was casually dressed.

Mr. Juarez initially presented as defensive and guarded due to his natural personality temperament and due to and depression and anxiety. This was particularly evident when he described how he developed migraine headaches and memory impairment and feels like a burden to his family. Once rapport had been established, Mr. Juarez became more open.

Mr. Juarez's manner of communication was depressed, particularly when revealing how he cannot do things he used to enjoy like playing with his daughter and watching his daughter's basketball games.

Mr. Juarez's thought processes were noted to be anxious when describing how he cannot tolerate loud noises and prefers to be alone in a quiet place.

Mr. Juarez was preoccupied with worries about his career future and his economic future. He has fears of continued intractable pain and permanent work impairment.

There did not appear to be a loss of contact with reality in the form of visual or auditory hallucinations. There was no evidence of frank paranoia or delusions of persecution. There appeared to be an absence of frank schizophrenia or other psychosis.

Mr. Juarez was not able to retain the recollection of three simple items. Mr. Juarez was oriented to the day of the week and date. Mr. Juarez's recall of past serial U.S. presidents was adequate. His ability to perform simple calculation -- the subtraction of serial sevens from 100 -- appeared to be unimpaired.

Mr. Juarez demonstrated diminished cognitive functioning in the clinical interview situation. He was noted to be revealing of defects in concentration, attention and memory. He developed memory impairment due to stroke. He forgets telephone numbers, appointments, birthdays, directions, what people tell him and where he left things around the house. He cannot focus on watching television or reading. It appeared most likely that Mr. Juarez's cognitive deficits were caused by emotionally reactive confusion, overwhelmed psychological coping mechanisms and brain dysfunction.

Mr. Juarez's motivation to recover appeared impaired by aspects of depression including hopelessness. There were not any discernible indications of malingering for secondary gain. Mr. Juarez did not reveal fiscal incentives. Overall, Mr. Juarez and his account of his injuries were deemed to be of average credibility.

Relevant to his need for treatment, Mr. Juarez's capacity for psychological insight and good psychological judgment was observed to be essentially unimpaired. He was interested in receiving psychotherapy.

## PSYCHOLOGICAL TEST RESULTS

Overall, Mr. Juarez's psychological test results were massively abnormal.

The Beck Depression Inventory score of 47 placed Mr. Juarez in the severe range of subjective depression, according to Beck scoring criteria.

There was the administration of the Beck Anxiety Inventory (BAI). This test consists of descriptive statements of anxiety which are endorsed on a 4-point scale. The BAI measures the severity of self-reported anxiety in adult outpatients over the age of 17 years. In this case, the total score of 39 indicated a severe level of anxiety according to Beck scoring criteria.

The Beck Scale for Suicidal Ideation (BSS) not only serves as a screening device to detect suicidal ideation, it also measures the severity of suicidal potential and risk. The ratings for 19 items are calculated such that the total BSS score can range from 0 to 38, from normal to maximal risk. Within this range, the score generated by Mr. Juarez was 7. This indicates a need for emotional treatment to reduce or remove suicidal ideation.

There was the administration of the Insomnia Severity Index (ISI) which measures the severity of self-reported insomnia. This test consists of rating descriptive statements of the patient's current sleep patterns which are endorsed on a 5-point scale. In this case, the total score of 27 indicated severe insomnia according to ISI scoring criteria.

The NSQ (Neuroticism Scale Questionnaire) scores revealed abnormal anxiety and depression. There was also an indication of a need for emotional treatment.

The score of 10 Sten on the Total Scale of the NSQ revealed a definite need for psychotherapy. This score placed him at approximately the 98th percentile for "total neuroticism," according to NSQ scoring criteria.

The Anxiety Scale score of 10 Sten placed Mr. Juarez at approximately the 98th percentile for anxiety in our population. This means that according to NSQ scoring criteria, about 2% or fewer of all people's score fall within the same range of anxiety as did Mr. Juarez.

The score on the Depression Scale, at 9 Sten, placed Mr. Juarez at approximately the 95th percentile for depression in our population. According to NSQ scoring criteria, about 5% of all people's score fall in this range or worse.

The NSQ indicated further abnormalities. The E scale was abnormally elevated to a Sten of 10. This test result reflected excessive gentleness, submissiveness and vulnerability to mental distress and disorder. This score indicated a greater sensitivity than average to the development of mental distress and disorder.

The MMPI-2 (Minnesota Multiphasic Personality Inventory-2) revealed indications of overwhelmed emotional coping mechanisms and mental dysfunction.

The L, F, K scores on the MMPI-2 (8, 24, 12 raw; 70, 110, 43 T) indicated a technically invalid profile. The F-K Index of 12 was beyond the acceptable score of 11. The F Scale was elevated at or above 90 T.

It should be noted that T scores on the MMPI-2 at or above 65 on the clinical scales are generally considered significant and abnormal.

The exact T scores for clinical scales 1 through 0 were as follows: 108, 104, 104, 77, 60, 75, 102, 118, 49 and 82.

Such MMPI-2 validity scores could reflect intense confusion, a random answering pattern due to factors including cognitive/perceptual dysfunctioning, an overwhelming of psychological coping mechanisms, a lack of cooperation, and/or an exaggeration of symptoms as a cry for help and/or as a purposeful manipulation for secondary gain (malingering). In this particular case, the most likely cause for invalidity would be a combination of factors of actual intense emotional symptomatology, overwhelmed coping mechanisms, impaired motivation and the inhibitory effects of depression, frustration, irritability, anger, fatigue and, most importantly, of personal or cultural variations of high symptom reporting tendencies. There may also be high symptom reporting due to inflation caused by anger and litigation contentiousness. At any rate, the MMPI-2 was invalid and beyond the scope of the standard principles of profile interpretation.

It should also be kept in mind relevant to the concept of invalidity that the MMPI-2 validity measurements do not indicate whether the patient does or does not have a mental disorder. Since a patient with mental disorder could underreport or overreport psychopathology, the measurements of defensiveness/denial and increased frequency of symptom reporting should be applied only to the issue of whether the statistical standards of interpretation can be applied to the clinical scale score and profile. Thus, measurements of the extent of symptom reporting and/or consistency apply only to the reliability of standard interpretation. This must be clarified because it should not be interpreted that the patient or his mental disorder is invalid, only that the standard interpretation should be considered invalid.

In summary, the psychological test results revealed an overwhelming of Mr. Juarez's coping mechanisms and mental dysfunction. In this particular case, the most likely cause for invalidity would be a combination of factors of actual intense emotional symptomatology, overwhelmed coping mechanisms, impaired motivation and the inhibitory effects of depression, frustration, irritability, anger and fatigue.

## DIAGNOSES AS PER DSM-5

According to DSM-5 criteria, to qualify for a diagnosis of Major Depressive Disorder, there must be symptoms including depression that has lasted for more than two weeks plus five (5) or more of the following criteria: (1) changes in weight and appetite, (2) decreased interest and motivation, (3) insomnia, (4) decreased energy, (5) difficulty thinking, (6) feelings of inadequacy, and (7) recurrent thoughts of death. In this case,

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 11

Mr. Juarez has developed depression that has lasted for more than two weeks with changes in weight and appetite, decreased interest and motivation, insomnia, decreased energy, difficulty thinking and feelings of inadequacy that have impaired his social and occupational functioning. Furthermore, Mr. Juarez's depressive symptoms are not attributable to the effects of a substance or any other medical condition. Therefore, Mr. Juarez qualifies for Major Depressive Disorder.

According to DSM-5 criteria, Mr. Juarez qualified for a diagnosis of Psychological Factors Affecting Medical Condition because there was the presence of the following medical symptoms—headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and high blood pressure—and because these medical symptoms have been exacerbated by his mental disorder. As well, these symptoms are not better accounted for by another mental disorder.

Therefore, on a psychodiagnostic basis, the most appropriate categories of mental disorder as applied to Mr. Juarez would be as follows:

| | |
|---|---|
| F32.9 | Major Depressive Disorder, Single Episode, Unspecified |
| F54 | Psychological Factors Affecting Medical Condition (stress-intensified headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and possible stress-aggravated high blood pressure) |

## SUMMARY

Upon examination, Mr. Juarez exhibited abnormal behavior with emotional withdrawal, depressive facial expressions and tearfulness when describing the chemical exposure related medical symptoms he developed during the course of his employment at Spacex.

A few months after working at Spacex, Mr. Juarez developed symptoms of migraine headaches, dizziness, difficulty walking and sinus symptoms due to exposures to electronic materials, chemical coatings and cleaning substances there. He reported this issue to his supervisor to no avail. Mr. Juarez underwent a CT scan, which revealed he had a brain aneurysm. He underwent emergency brain surgery in Cedars-Sinai. He was discharged after three days. A few days later, Mr. Juarez had a stroke with worsened migraine headaches. Due to his worsening condition, Mr. Juarez had anxiety attacks. He was hopeless and felt like damaged equipment that could not be used.

Juarez, Ruben
Page 11

410

Mr. Juarez tried to return to work; however, his supervisor said that he could not return to work due to his illness.  Mr. Juarez contacted HR and submitted ADA forms.  Mr. Juarez was told he would be called back, but he never received a call from them.

Mr. Juarez was provided with treatment including medication management for his brain condition under the care of the primary treating physician, Dr. Isaac Regev.  For the continuing emotional complications, Mr. Juarez was referred to this office.

Upon examination, Mr. Juarez was found to be too beset by stress-aggravated medical symptoms and too depressed, anxious and overwhelmed to work.  Mr. Juarez needed to work through the emotional symptoms in the further passage of time and supportive psychotherapy prior to attempting to return to any job.

Mr. Juarez was found to be temporarily totally disabled on a combined physical and psychological basis.

Mr. Juarez was observed to become emotionally unstable and disturbed at the contemplation of an immediate return to work.  If he attempted to return to work, his emotional condition would deteriorate into worsened emotional dysfunction.

The events of injury arising from work were predominantly causative of injury to the psyche.  It would be estimated that about 85% would be industrially-caused by the events described above with about 15% caused by the past and personal life events and other factors described below.

There would be past and personal life events and other factors to address in a comprehensive psychological evaluation.  For instance, there have been legal matters to consider.  In 2004, Mr. Juarez was charged with DUI.  He paid a fine and performed community service.  There have been no further problems with alcohol or the law.  He felt he has had learned his lesson.  There has been a prior work injury to consider.  In 2008, Mr. Juarez injured his elbow while working for Moore Industries.  There was psychological component to the injury.  He consulted with a mental health specialist. He recovered.  There have also been non-industrial accidents to consider.  In the early 2000s, Mr. Juarez injured his shoulders and back in a vehicular accident.  He received settlement of approximately $2,000.  As well, in 2015, Mr. Juarez injured his back in another vehicular accident.   He recovered from both injuries without emotional residuals.  There have also been medical conditions to consider.  In 2013, Mr. Juarez was diagnosed with CVA or stroke; in 2014, migraine headaches.  These medical conditions may become considered in part as work injury stress-aggravated compensable consequences.  In any event, there have been indications of emotional complications of these medical conditions in and of themselves, but not to the point of mental disorder or emotional impairment.  Such factors will all be addressed in more detail relevant to the issue of apportionment to be considered when Mr. Juarez's psychological condition becomes permanent and stationary.  All of the records should

411

be reviewed prior to a final opinion in this area. However, at present, there would appear to be a basis for 15% causation to the prior work injury and the non-industrial components of his medical conditions.

At present, it would not be possible to estimate, on a psychological basis, a return-to-work date for regular or modified work. As well, it cannot yet be determined, on a psychological basis, whether Mr. Juarez will eventually be emotionally able to engage in the occupation he performed at the time of the injury.

In addition, it would not yet be possible to estimate the residuals of permanent emotional impairment, if any.

These estimations will be provided as soon as possible, presumably when Mr. Juarez's psychological condition becomes closer to reaching permanent and stationary status.

<u>Mr. Juarez was found to be in need of emotional treatment.</u>

It should be noted that the California Medical Treatment Utilization Schedule Chronic Pain Treatment Guidelines Page 23 on Behavioral Interventions (CA MTUS Reg. 9792.24.2) indicates that Cognitive Behavioral Therapy (CBT) is "Recommended. The identification and reinforcement of coping skills is often more useful in the treatment of pain than ongoing medication or therapy, which could lead to psychological or physical dependence."

According to the Chronic Pain Guidelines, the following would be recommended:

> *- Initial trial of 3-4 psychotherapy visits over 2 weeks.*
> *- With evidence of objective functional improvement, a total of up to 6-10 visits over 5-6 weeks (individual sessions).*

<u>According to the guidelines, therefore, there would be a request for authorization of four (4) cognitive behavior psychotherapy (CBT) sessions in the next few weeks.</u>

The medical necessity and clinical rationale for such treatment would be set forth as follows: Without such treatment, the depression, anxiety, sleep problems, stress-intensified medical symptoms and the related functional impairment could worsen rather than improve as expected.

Overall, an attempt will be made to provide only the amount of emotional treatment essential to improving and maintaining emotional and cognitive functioning.

There will be the provision of CBT to help offset Mr. Juarez's symptoms of anxiety, panic, emotional withdrawal, isolation and depression.

There will also be the provision of psychotropic medication evaluation and management. Prescriptions will be provided as needed through the medical staff at this office.

Adjustments in medication will be provided according to the individual patient's needs. The frequency of medication management contacts should usually be no more than once every three weeks at the beginning, and when optimal, no more than every three to four months after that.

It should also be recalled that, according to the ODG that there is a risk of weaning patients off of psychotropic medications and that medications "should not be stopped abruptly if used for psychiatric conditions...[weaning] may take as long as 3 to 6 months."

*It has been concluded that the combination of psychotropic medication and psychotherapy, particularly in the form of integrated treatment provided within a setting, was more efficacious in leading to a better quality of life and potential increased productivity in the workplace (Langlieb AM, Kahn JP. How much does quality mental health care profit employers? J Occup Env Med. 2005; 47(11):1099-1109.)*

*Cognitive behavioral therapy for depression is recommended based on meta-analyses that compare its use with pharmaceuticals. Cognitive behavioral therapy fared as well as antidepressant medication with severely depressed outpatients in four major comparisons. Effects may be longer lasting (80% relapse rate with antidepressants versus 25% with psychotherapy) (Paykel, 2006) (Bockting, 2006) (DeRubeis, 1999) (Goldapple, 2004). It also fared well in a meta-analysis comparing 78 clinical trials from 1977 – 1996 (Gloaguen, 1998). In another study, it was found that combined therapy (antidepressants plus psychotherapy) was found to be more effective than psychotherapy alone (Thase, 1997). A recent high quality study concluded that a substantial number of adequately treated patients did not respond to antidepressant therapy (Corey-Lisle, 2004). A recent meta-analysis concluded that psychological treatment combined with antidepressant therapy is associated with a higher improvement rate that drug treatment alone. In longer therapies, the addition of psychotherapy helps to keep patients in treatment (Pampallona, 2003). For panic disorder, cognitive behavioral therapy is more effective and more cost-effective than medication (Royal Australian, 2001). The gold standard for the evidence-based treatment of MDD is a combination of medication (antidepressants) and psychotherapy. The primary forms of psychotherapy that have been most studied through research are: Cognitive Behavioral Therapy and Interpersonal Therapy (Warren, 2005).*

*In the interim, it should be kept in mind that Evidence-Based Mental Health concluded that in patients with depression, group psychotherapy is effective for relieving symptoms and that nine (9) studies showed that group psychotherapy and individual psychotherapy did not differ in effectiveness. (Evid. Based Mental Health 2001; 4:82 doi: 10.1136/ebmh.4.3.82..."Review: group psychotherapy is effective for depression (2001) Clinical Psychological: Science and Practice 8, 98. McDermut W, Miller IW, Brown RA.. The efficacy of group psychotherapy for depression: a meta-analysis and review of the empirical research..Spring:..—116 [CrossRef] [Web of Science])*

*As well, there is an abundance of evidence in the literature documenting the effectiveness of individual and group psychotherapy in chronic pain patients. Therefore, Mr. Juarez will be provided with CBT also to help in addressing his pain problems.*

*The effectiveness of individual and group psychotherapy in chronic pain patients has been firmly established (Gamsa A. Braha RF, Catchlove RF. The use of structured group therapy sessions in the treatment of chronic pain patients. Pain. 1985; 22(1):91-6.; Spence SH. Cognitive-behaviour therapy in the treatment of chronic, occupational pain of the upper limbs: a 2 yr follow-up. Behav Res Ther. 1991; 29(5):503-9.; Basler HD. Group treatment for pain and discomfort. Patient Educ Couns. 1993; 20(2-3):167-75.; Li EJ, Li-Tsung CW, Lam CS, Hui KY, Chan CC. The effect of a "training on work readiness" program for workers with musculoskeletal injuries: a randomized control trial (RCT) study. J Occup Rehabil. 2006; 16(4):529-41.; Thorn BE, Kuhajda MC. Group cognitive therapy for chronic pain. J Clin Psychol. 2006; 62(11):1355-66.)*

*The appropriateness and importance of the use of individual and group psychotherapy in chronic pain patients has also been firmly established in further research. (See Gamsa A, Braha RE, Catchlove RF. The use of structured group therapy sessions in the treatment of chronic pain patients. Pain. 1985; 22(1):91-6.; Spence SH. Cognitive-behaviour therapy in the treatment of chronic, occupational pain of the upper limbs: a 2 yr follow-up. Behav Res Ther. 1991; 29(5):503-9.; Basler HD. Group treatment for pain and discomfort. Patient Educ Couns. 1993; 20(2-3):167-75.; Li EJ, Li-Tsang CW, Lam CS, Hui KY, Chan CC. The effect of a "training on work readiness" program for workers with musculoskeletal injuries: a randomized control trial (RCT) study. J Occup Rehabil. 2006; 16(4):529-41.; Thorn BE, Kuhajda MC. Group cognitive therapy for chronic pain. J Clin Psychol. 2006; 62(11):1355-66.)*

*Cognitive behavioral rehabilitation programs have been demonstrated to be an effective means of reducing psychological distress, of changing cognition, and of improving the function of patients with chronic low back pain (Rose MJ, Reilly JP, Pennie B, Bowen-Jones K, Stanley IM, Slade PD. Chronic low back pain rehabilitation programs: a study of the optimum duration of treatment and a comparison of group and individual therapy. Spine. 1997; 22(19):2246-51; discussion 2252-3.) It has also been shown that psychological interventions in combination with physiotherapy can be effective in treating fibromyalgia patients, especially if applied early (Keel PJ, Bodoky C, Gerhard U, Müller W. Comparison of integrated group therapy and group relaxation training for fibromyalgia. Clin J Pain. 1998; 14(3):232-8.)*

*Experimental subjects suffering from chronic pain and treated in a multi-modality based setting including the provision of psychotherapy reported less pain, better control over pain, more pleasurable activities and feelings, less avoidance and less catastrophizing. In addition, disability was reduced in terms of social roles, physical functions and mental performance. (Basler HD, Jäkle C, Kröner-Herwig B. Incorporation of cognitive-behavioral treatment into the medical care of chronic low back patients: a controlled randomized study in German pain treatment centers. Patient Educ Couns. 1997; 31(2):113-24.) In the rehabilitation setting, the provision of psychotherapy stable anxiety levels despite increased patient effort implied improved pain tolerance. (Singh G, Willen SN, Boswell MV, Janata JW, Chelimsky TC. The value of interdisciplinary pain management in complex regional pain syndrome type I: a prospective outcome study. Pain Physician. 2004; 7(2):203-9.) Treatment with psychotherapy has also shown to cause a decrease in the degree to which pain interferes with activity, increasing the ability to cope with pain, and allowing a decreased use of some medications and other physical treatments (Puder RS. Age analysis of cognitive-behavioral group therapy for chronic pain outpatients. Psychol Aging. 1988; 3(2):204-7.)*

Would the claims administrator please fax to this office a letter of authorization for the aforementioned psychological treatment to be initiated as soon as possible.

It would be hereby requested that the defendant authorize the aforementioned course of emotional treatment at my office.

It should be noted further that Labor Code 5402(b) immediately went into effect with the passage of the Workers' Compensation reform bill on 4/19/04. Labor Code 5402(c) requires the employer to authorize all appropriate medical care up to $10,000 until the liability for the claimed injury is accepted or rejected. As of 6/1/04, Labor Code 5814 mandates a 25% penalty on the amount of payment unreasonably delayed (10% if self-imposed). Accordingly, it would be requested that the defendant please provide immediate payment.

Would the claims adjuster please provide copies of all medical records, personnel records, investigative reports or any other relevant discovery materials. These data are essential to evaluating complex matters of causation and apportionment. It would also be appreciated if the claims adjuster would provide notification of any scheduled psyche Agreed Medical Examinations, defense QME examinations or panel QME examinations,

and/or any reluctance to make reimbursement for a comprehensive permanent and stationary evaluation from this office. Would the adjuster please advise this office if the applicant is not an employee, was the initial aggressor, did not timely report the injury, filed a fraudulent claim or was otherwise not legally eligible for benefits. Would the adjuster please also submit any information relevant to any important upcoming court dates, in particular any expedited hearings or Mandatory Settlement Conferences; and please provide notification of any psyche physician's depositions.

If there are any valid objections such that there would not be the authorization for the requested treatment at this office, could the adjuster please report the basis for such denial within seven days.

For further information on treatment details, please request a brief narrative report. Otherwise, there will be further reports to follow as necessary.

Thank you for your consideration in this matter.

## AFFIDAVIT OF COMPLIANCE

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, I believe it to be true.

In the preparation of this report, I was assisted by Thomas A. Curtis, M.D., who edited the first draft and provided the psychological test interpretations.

It should be noted that, aside from the clerical preparation of this report, any reviews deemed necessary and appropriate to identify and determine the relevant psychological issues in this matter and to determine the diagnoses, conclusions and recommendations contained in this report, have been performed by me.

I declare under penalty of perjury that I have not violated the provisions of California Labor Code Section 139.3.

I also declare under penalty of perjury that the attached billing for services is true and correct to the best of my knowledge.

The opportunity to provide this evaluation has been appreciated.

If there are any questions, please feel free to contact me.

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 17

Signed on _____ 4/13/16 _____ in Los Angeles County, California.

Signature: _____

Gayle K. Windman, Ph.D. (PSY 19944)

416

## COMPEX LEGAL SERVICES

### CERTIFICATION
(Pursuant to F.R.E. 803(6), 902(11), AND 28 U.S.C. § 1746)

I hereby certify and declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct to the best of my knowledge and belief. I am over the age of 18 and the duly authorized custodian of records for

**HAMLIN PSYCHE CENTER
14531 HAMLIN STREET, VAN NUYS, CA 91411.**

I have the authority to certify that the records made available to COMPEX LEGAL SERVICES for reproducing are all of the records under my custody and control which are all of the records under the custody and control of HAMLIN PSYCHE CENTER, described and called for in the SUBPOENA/Authorization served with this declaration in the matter related to said individual or thing pertaining to:

**RECORDS OF: JUAREZ, RUBEN
    AKA: RUBEN, HERNANDEZ JUAREZ
    DATE OF BIRTH** ████/1970
    **SOCIAL SECURITY #** ████0743

| HOW ORIGINAL RECORDS WERE PREPARED | |
|---|---|
| ☒ HANDWRITTEN NOTES | ☒ TYPED/DATA ENTERED |
| ☐ TRANSCRIBED | ☐ OTHER _____ |

| TYPE OF RECORDS PRODUCED | | | |
|---|---|---|---|
| ☒ MEDICAL | ☒ BILLING | ☐ FILMS | ☐ INSURANCE |
| ☐ EMPLOYMENT | ☐ PAYROLL | ☐ SCHOLASTIC | |
| ☐ OTHER _____ | | | |

Said records were made at or near the time of the statements, acts, events, conditions, opinions, diagnoses, etc., that are reported in those records, by a person with knowledge of and a business duty to record those matters. Said records were kept in the course of a regularly conducted activity of the business, and made as a regular practice and custom of the business. I have delivered all of the records requested with the following exceptions:

_____

Yuliana Rios
CUSTODIAN OF RECORDS NAME (PLEASE PRINT)

S.S.D Disability / Medical Records Dept.
DEPARTMENT

_____
SIGNATURE OF CUSTODIAN OF RECORDS

6-25-18  Van Nuys, CA
DATE, AND CITY AND STATE

I AM THE ATTORNEY'S REPRESENTATIVE AND I STATE THAT I MADE TRUE AND CORRECT COPIES OF ALL THE ORIGINAL RECORDS DELIVERED TO ME BY THE CUSTODIAN OF RECORDS OF THE ABOVE LOCATION.

I DECLARE UNDER PENALTY OF PERJURY & UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

6/25/18 Van Nuys, CA
DATE, AND CITY AND STATE

_____
SIGNATURE

Anthony Hernandez
PRINT NAME

PURSUANT TO CAL. BUS. AND PROF. CODE § 22462, I WILL MAINTAIN THE INTEGRITY AND CONFIDENTIALITY OF ANY AND ALL INFORMATION OBTAINED, AND DISTRIBUTE THE RECORDS COPIED BY COMPEX LEGAL SERVICES TO THE AUTHORIZED PERSON OR ENTITIES.

417

# COMPEX LEGAL SERVICES

## AFFIDAVIT - (Pursuant to Cal Evidence Code 1561)

I12177-I

I hereby declare under penalty of perjury that the following statements are true to the best of my knowledge and belief. I am over the age of 18 and the duly authorized custodian of records for:

**HAMLIN PSYCH CENTER**
**14531 HAMLIN STREET, VAN NUYS, CA 91411**

and have the authority to certify that the records made available to COMPEX LEGAL SERVICES for reproducing are all of the records under my custody and control, described and called for in the SUBPOENA/Authorization served with this declaration in the matter relating to said individual or thing pertaining to:

**RECORDS OF: JUAREZ, RUBEN**
**AKA: RUBEN HERNANDEZ JUAREZ**
**DATE OF BIRTH:** ▆▆/70
**SOCIAL SECURITY #:** ▆▆ 0743

| HOW ORIGINAL RECORDS WERE PREPARED | |
|---|---|
| ☑ HANDWRITTEN NOTES | ☑ TYPED/DATA ENTERED |
| ☐ TRANSCRIBED | ☐ OTHER _____ |

| TYPE OF RECORDS PRODUCED | | | |
|---|---|---|---|
| ☑ MEDICAL | ☑ BILLING | ☐ FILMS | ☐ INSURANCE |
| ☐ EMPLOYMENT | ☐ PAYROLL | ☐ SCHOLASTIC | |
| ☐ OTHER _____ | | | |

Said records were prepared by personnel of the business in the ordinary course of business at or near the time of the act, condition, or event. I have delivered all of the records/items requested with the following exception(s):

_____

_____

_____

_Jackie V._
CUSTODIAN NAME (PLEASE PRINT)

_Front Desk_
DEPARTMENT

_(signature)_
SIGNATURE OF CUSTODIAN

_9/15/17_
DATE

I AM THE ATTORNEY'S REPRESENTATIVE AND I STATE THAT I MADE TRUE COPIES OF ALL THE ORIGINAL RECORDS DELIVERED TO ME BY THE CUSTODIAN OF RECORDS OF THE ABOVE LOCATION.

I DECLARE UNDER PENALTY OF PERJURY & UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

_9/15/17_
DATE

_(signature)_
SIGNATURE

_A. Hernandez_
PRINT NAME

PURSUANT TO BUSINESS & PROFESSIONS CODE SECTION 22462, I WILL MAINTAIN THE INTEGRITY & CONFIDENTIALITY OF ANY AND ALL INFORMATION OBTAINED, AND DISTRIBUTE THE RECORDS COPIED BY COMPEX LEGAL SERVICES TO THE AUTHORIZED PERSON OR ENTITIES.

418

# EXHIBIT 40

○                    ○

# HAMLIN PSYCHE CENTER

## Thomas A. Curtis, M.D.
### Medical Director

## William W. Kaiser, Ph.D.
### Director of Clinical Services

Lorna Punzalan, Office Manager, ext. 218
Italo Vilogron, Treatment Coordinator, ext. 220

---

| 14531 Hamlin Street<br>Van Nuys, CA  91411 | www.hamlinpsychecenter.com<br>Van Nuys: (818) 780-4409<br>Long Beach: (562) 513-3684<br>Fax (818) 780-4472 | 4300 Long Beach Blvd., #240<br>Long Beach, CA  90807 |

---

Chubb Group of Insurance Companies
P.O. BOX 42065
Phoenix, AZ 85080

Gary Kaplan, Esq.
3600 Wilshire Blvd., Ste. 2100
Los Angeles, CA 90010

Isaac Regev, M.D.
6404 Wilshire Blvd., Ste. 1121
Los Angeles, CA  90048

Re:          Ruben Juarez
WCAB #:      ADJ9801824
Claim #:     076914050057
Employer:    Space Exploration Technology/Spacex
SSN:         ▇▇▇-0743
DOB:         ▇▇▇1970
DOI:         CT 3/27/2013-3/27/2014
DOE:         3/31/16

### REQUEST FOR AUTHORIZATION

## TREATING PSYCHOLOGIST'S INITIAL REPORT WITH PSYCHOLOGICAL TEST RESULTS

Gentlepersons:

Mr. Ruben Juarez, a 46-year-old equipment specialist for Space Exploration Technology/Spacex, completed psychological evaluation and testing on 3/31/16 at the Van Nuys Hamlin Street office.

EXHIBIT 38
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

420



**Ruben Juarez vs. Space Exploration Technology/Spacex**
**Page 2**

# INTRODUCTION

On 9/24/14, Mr. Juarez submitted an Employee's Claim for Workers' Compensation Benefits citing a cumulative trauma date of injury from 3/27/13 to 3/27/14 involving his head/headaches and brain/aneurysm due to repetitive and continuous exposure to lead, electronic parts and cleaning substances.

There was a letter dated 11/27/15 from Ariet Agazaryan, a UR triage supervisor from Chubb Group of Insurance Companies indicating to Mr. Juarez that, "We are disputing the liability for the above treatment requested because the injury is being disputed or the liability for the claimed body parts are being disputed: Entirety of the claim."

There was a letter dated 9/26/15 submitted by the primary treating physician, Dr. Isaac Regev, designating Dr. Thomas Curtis as treating physician in this case.

Dr. Curtis designated Gayle K. Windman, Ph.D., as the evaluating psychologist for this report.

This report would comprise the applicant's initial comprehensive psychological evaluation.

It should be kept in mind that this initial treating psychological evaluation could not attest to what should be a more inclusive and detailed history of injury within the investigative reports, records, depositions and other materials of discovery, and afforded by and compensated for within the comparatively unlimited time frames of the medical-legal evaluations of PQME or AME psyche physicians.

It would be requested that the adjuster either promptly authorize the requested psychological treatment plan or submit this request to Utilization Review.

As well, since this office can now provide only limited psychological treatment on a lien basis, it would be requested that the parties seek panel QME or AME psychological/psychiatric consultation as soon as possible so that we can proceed promptly within the parameters of the recommended psychological treatment.

Would the defendant please provide copies of all reports, records, witness statements, depositions and all other discovery documents in this matter. This request would be ongoing for new documents.

421

## IDENTIFYING DATA

Mr. Juarez achieved an Associate's degree. He is married. He lives in Granada Hills with his wife, Isela (age 45), and his daughter, Marisol (age 12).

## HISTORY OF THE WORK INJURY

Mr. Juarez began his employment at Space Exploration Technology/Spacex in about 1/12. His last day of work there was in about 3/14.

Mr. Juarez was placed on disability on 3/28/14 by Dr. Ronald Andiman.

As an equipment specialist, Mr. Juarez's job duties included programming and maintaining equipment, designing tools and fixtures, and being responsible for production prototypes and production support.

Mr. Juarez received above average written work performance evaluations. There were other indications of positive work performance including being recognized as the top performer. He was promoted in 2013. He worked there for about two years.

A few months after he began working at Spacex, Mr. Juarez developed symptoms of migraine headaches, dizziness, difficulty walking and sinus symptoms due to exposure to electronic materials such as tin and lead; chemical coatings such as Arathane and HumiSeal; and cleaning substances such as thinners and isopropyl alcohol. He reported this issue to his supervisor to no avail.

Mr. Juarez consulted with several doctors until he was sent to get a CT scan, which revealed he had a brain aneurysm. He underwent emergency brain surgery in Cedars-Sinai. He was discharged after three days.

A few days later, Mr. Juarez had a stroke with worsened migraine headaches. Due to his worsening condition, Mr. Juarez had anxiety attacks. He was hopeless and felt like damaged equipment that could not be used.

Mr. Juarez tried to return to work; however, his supervisor said that he could not return to work due to his illness. Mr. Juarez contacted HR and submitted ADA forms. Mr. Juarez was told he would be called back, but he never received a call from them.

In 2014, Mr. Juarez consulted with a neurologist, Ronald Andiman, who diagnosed migraine headache. He also consulted with a psychiatrist, Dr. Steven Schenkel, who prescribed psychotropic medications including Wellbutrin, Xanax, Valium, Zoloft and Ambien.



Ruben Juarez vs. Space Exploration Technology/Spacex
Page 4

In 2015, Mr. Juarez came under the care of the primary treating neurologist, Dr. Isaac Regev.

Mr. Juarez remained symptomatic. His emotional condition will be further described in other sections of this report to follow.

## APPLICANT'S REPORT OF EMOTIONAL SYMPTOMS

As a result of the events of injury at work, Mr. Juarez developed symptoms of mental disorder including depression, anxiety, irritability and insomnia.

There have been significant alterations in Mr. Juarez's previously active lifestyle such that the quality of his life became deteriorated. He developed difficulty engaging in his usual activities like before such as basic self-care and housekeeping.

Mr. Juarez reported persisting symptoms of depression including changes in appetite and weight, sleep disturbance, decreased energy, difficulty thinking, and feelings of emptiness and inadequacy.

Mr. Juarez has experienced recurring periods of anxiety with symptoms including recurrent panic attacks, excessive worry, difficulty controlling his worry, feelings of restlessness, feeling "keyed up" and on edge, difficulty concentrating, irritability, muscle tension, abdominal distress and feeling pressured.

There have also been unprovoked crying episodes that have occurred multiple times weekly.

Mr. Juarez has experienced stress-intensified medical symptoms with worsened headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and possible stress-aggravated high blood pressure.

Due to his mental disorder, Mr. Juarez has experienced impairment in his daily activities including bodily functions, personal hygiene, eating properly, sleeping and functioning sexually. Because of his nervousness, there has been increased urinary frequency. There have been problems with stress-related constipation and diarrhea.

Due to stress-related overeating and depressive inactivity, Mr. Juarez has developed a gain of weight of about 20 to 25 pounds.

Mr. Juarez has also experienced a depressively decreased interest in his basic self-care activities including brushing his teeth, bathing regularly and dressing appropriately without prompting from others. In addition, there has been decreased motivation and



Ruben Juarez vs. Space Exploration Technology/Spacex
Page 5

ability to perform normal housekeeping activities including making the bed, cooking a meal and vacuuming the house.

Mr. Juarez has developed decreased sexual interest due to depression, anxiety, emotional withdrawal, irritability and anger.

Mr. Juarez has developed difficulty staying asleep and falling asleep due to depression, anxiety, worry and nightmares. Mr. Juarez uses Ambien, Valium and Sonata to fall asleep. Because of his insomnia, Mr. Juarez has experienced excessive daytime sleepiness, morning headaches, trouble concentrating and a change in his personality. Mr. Juarez's insomnia has persisted.

Due to his emotional distress, Mr. Juarez has had difficulty interacting appropriately with others including family members, friends and neighbors. Mr. Juarez has become emotionally withdrawn.

Due to his mental disorder, Mr. Juarez has developed attitudes that have impaired his ability to socialize including defensiveness, mistrustfulness and fearfulness. Mr. Juarez has become irritable and impatient with people. There have been problems with becoming short-tempered and being prone to inappropriate angry outbursts.

Mr. Juarez has experienced difficulty tolerating prolonged contact with people because of his depression, anxiety, irritability and quickness to anger. There has been insufficient emotional control such that Mr. Juarez yells at others.

Because of Mr. Juarez's emotional disturbances, there has been difficulty paying attention, concentrating and remembering things. Mr. Juarez has experienced problems with distractibility, slowed thinking, mental blocking and loss of his train of thought.

Because of his cognitive impairment, Mr. Juarez has had difficulty communicating his thoughts. Mr. Juarez's cognitive functioning has become impaired such that there has been difficulty in his ability to read a magazine or book and follow the plot of a movie or TV show. Mr. Juarez also has problems remembering telephone numbers, appointments, birthdays, directions, what people tell him and where he left things around the house.

Due to Mr. Juarez's depression and anxiety, there has been psychological fatigue and energy depletion.

## PERSONAL AND FAMILY HISTORY

Mr. Juarez was the youngest of six children. He was born and raised in Mexico City. He moved to Southern California in about 1986.

424

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 6

---

Mr. Juarez described the relationship he had with his parents, Juan and Aurora, as mostly positive. There appeared to be no problems with the relationship he had with his parents that would be related to his current emotional distress. Mr. Juarez could not recall the years his parents died. In any event, each death was followed by a normal grief reaction that became resolved.

Mr. Juarez described his childhood as happy and normal. He reported no significant childhood problems with peer relations, school behavior, school performance or adolescent turmoil.

Mr. Juarez has been married to Isela since about 1996. In the aftermath of Mr. Juarez's recent work-related problems, the relationship has deteriorated to the point of separation. The problems in Mr. Juarez's relationship appeared to have arisen primarily from his current work-related disability situation. There have been problems in the relationship related to his physical pain and disability, depression, irritability, diminished sexual desire and fatigue. Mr. Juarez indicated that, were it not for the troubles originating from work, he would not have undergone the relationship problems in his personal life.

## WORK HISTORY

Mr. Juarez was employed by Space Exploration Technology/Spacex as an equipment specialist for approximately two years, from about 1/12 to about 3/14.

Prior to that, Mr. Juarez worked for Express Manufacturing from 2010 to 2012. The reason given for leaving this job was to get a new job. Mr. Juarez's work performance was rated above average.

Before that, Mr. Juarez worked for Moore Industries from 2007 to 2009, when he was laid off due to a work injury there. Mr. Juarez's work performance was rated above average.

Prior to that, Mr. Juarez worked for Magnatek from 2004 to 2007. The reason given for leaving this job was to get a new job. Mr. Juarez's work performance was rated above average.

## PRIOR WORK INJURIES

In 2008, Mr. Juarez injured his elbow while working for Moore Industries. There was psychological component to the injury. He consulted with a mental health specialist. He recovered.

425

## PSYCHOLOGICAL HISTORY

In regard to his mental health history, Mr. Juarez reported no previous episodes of comparable emotional upset or confusion. He has never undergone psychiatric hospitalization. There have been no suicide attempts. He has never previously been prescribed any psychotropic medication.

## PERSONAL HABITS

In regard to his personal habits, Mr. Juarez stated that he is a non-smoker. He no longer drinks. There was a history of conviction for alcohol-related charges including a DUI in 2004. He paid a fine and performed community service. Mr. Juarez denied the use of any illegal drugs or the abuse of any legal ones.

## MEDICAL HISTORY

Relevant to serious medical illnesses, surgeries or hospitalizations, Mr. Juarez was diagnosed with CVA or stroke in 2013 and migraine headaches in 2014.

In regard to medication usage, Mr. Juarez has recently taken Depakote, Topamax, Pamelor, Aspirin, Bactrim, Pantoprazole, Carafet, Valium, Xanax, Wellbutrin, Prozac and Ritalin.

## INJURY AND LEGAL HISTORY

In the early 2000s, Mr. Juarez injured his shoulders and back in a vehicular accident. He received settlement of approximately $2,000. As well, in 2015, Mr. Juarez injured his back in another vehicular accident. He recovered from both accidents. There was no psychological component to these injuries.

Additionally, there have been no past convictions of any felonies.

## MENTAL STATUS EXAMINATION

Mr. Juarez presented in interview as a 46-year-old male who was casually dressed.

Mr. Juarez initially presented as defensive and guarded due to his natural personality temperament and due to and depression and anxiety. This was particularly evident when he described how he developed migraine headaches and memory impairment and feels like a burden to his family. Once rapport had been established, Mr. Juarez became more open.



Ruben Juarez vs. Space Exploration Technology/Spacex
Page 8

Mr. Juarez's manner of communication was depressed, particularly when revealing how he cannot do things he used to enjoy like playing with his daughter and watching his daughter's basketball games.

Mr. Juarez's thought processes were noted to be anxious when describing how he cannot tolerate loud noises and prefers to be alone in a quiet place.

Mr. Juarez was preoccupied with worries about his career future and his economic future. He has fears of continued intractable pain and permanent work impairment.

There did not appear to be a loss of contact with reality in the form of visual or auditory hallucinations. There was no evidence of frank paranoia or delusions of persecution. There appeared to be an absence of frank schizophrenia or other psychosis.

Mr. Juarez was not able to retain the recollection of three simple items. Mr. Juarez was oriented to the day of the week and date. Mr. Juarez's recall of past serial U.S. presidents was adequate. His ability to perform simple calculation -- the subtraction of serial sevens from 100 -- appeared to be unimpaired.

Mr. Juarez demonstrated diminished cognitive functioning in the clinical interview situation. He was noted to be revealing of defects in concentration, attention and memory. He developed memory impairment due to stroke. He forgets telephone numbers, appointments, birthdays, directions, what people tell him and where he left things around the house. He cannot focus on watching television or reading. It appeared most likely that Mr. Juarez's cognitive deficits were caused by emotionally reactive confusion, overwhelmed psychological coping mechanisms and brain dysfunction.

Mr. Juarez's motivation to recover appeared impaired by aspects of depression including hopelessness. There were not any discernible indications of malingering for secondary gain. Mr. Juarez did not reveal fiscal incentives. Overall, Mr. Juarez and his account of his injuries were deemed to be of average credibility.

Relevant to his need for treatment, Mr. Juarez's capacity for psychological insight and good psychological judgment was observed to be essentially unimpaired. He was interested in receiving psychotherapy.

## PSYCHOLOGICAL TEST RESULTS

Overall, Mr. Juarez's psychological test results were massively abnormal.

The Beck Depression Inventory score of 47 placed Mr. Juarez in the severe range of subjective depression, according to Beck scoring criteria.

There was the administration of the Beck Anxiety Inventory (BAI). This test consists of descriptive statements of anxiety which are endorsed on a 4-point scale. The BAI measures the severity of self-reported anxiety in adult outpatients over the age of 17 years. In this case, the total score of 39 indicated a severe level of anxiety according to Beck scoring criteria.

The Beck Scale for Suicidal Ideation (BSS) not only serves as a screening device to detect suicidal ideation, it also measures the severity of suicidal potential and risk. The ratings for 19 items are calculated such that the total BSS score can range from 0 to 38, from normal to maximal risk. Within this range, the score generated by Mr. Juarez was 7. This indicates a need for emotional treatment to reduce or remove suicidal ideation.

There was the administration of the Insomnia Severity Index (ISI) which measures the severity of self-reported insomnia. This test consists of rating descriptive statements of the patient's current sleep patterns which are endorsed on a 5-point scale. In this case, the total score of 27 indicated severe insomnia according to ISI scoring criteria.

The NSQ (Neuroticism Scale Questionnaire) scores revealed abnormal anxiety and depression. There was also an indication of a need for emotional treatment.

The score of 10 Sten on the Total Scale of the NSQ revealed a definite need for psychotherapy. This score placed him at approximately the 98th percentile for "total neuroticism," according to NSQ scoring criteria.

The Anxiety Scale score of 10 Sten placed Mr. Juarez at approximately the 98th percentile for anxiety in our population. This means that according to NSQ scoring criteria, about 2% or fewer of all people's score fall within the same range of anxiety as did Mr. Juarez.

The score on the Depression Scale, at 9 Sten, placed Mr. Juarez at approximately the 95th percentile for depression in our population. According to NSQ scoring criteria, about 5% of all people's score fall in this range or worse.

The NSQ indicated further abnormalities. The E scale was abnormally elevated to a Sten of 10. This test result reflected excessive gentleness, submissiveness and vulnerability to mental distress and disorder. This score indicated a greater sensitivity than average to the development of mental distress and disorder.

The MMPI-2 (Minnesota Multiphasic Personality Inventory-2) revealed indications of overwhelmed emotional coping mechanisms and mental dysfunction.

The L, F, K scores on the MMPI-2 (8, 24, 12 raw; 70, 110, 43 T) indicated a technically invalid profile. The F-K Index of 12 was beyond the acceptable score of 11. The F Scale was elevated at or above 90 T.

428

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 10

It should be noted that T scores on the MMPI-2 at or above 65 on the clinical scales are generally considered significant and abnormal.

The exact T scores for clinical scales 1 through 0 were as follows: 108, 104, 104, 77, 60, 75, 102, 118, 49 and 82.

Such MMPI-2 validity scores could reflect intense confusion, a random answering pattern due to factors including cognitive/perceptual dysfunctioning, an overwhelming of psychological coping mechanisms, a lack of cooperation, and/or an exaggeration of symptoms as a cry for help and/or as a purposeful manipulation for secondary gain (malingering). In this particular case, the most likely cause for invalidity would be a combination of factors of actual intense emotional symptomatology, overwhelmed coping mechanisms, impaired motivation and the inhibitory effects of depression, frustration, irritability, anger, fatigue and, most importantly, of personal or cultural variations of high symptom reporting tendencies. There may also be high symptom reporting due to inflation caused by anger and litigation contentiousness. At any rate, the MMPI-2 was invalid and beyond the scope of the standard principles of profile interpretation.

It should also be kept in mind relevant to the concept of invalidity that the MMPI-2 validity measurements do not indicate whether the patient does or does not have a mental disorder. Since a patient with mental disorder could underreport or overreport psychopathology, the measurements of defensiveness/denial and increased frequency of symptom reporting should be applied only to the issue of whether the statistical standards of interpretation can be applied to the clinical scale score and profile. Thus, measurements of the extent of symptom reporting and/or consistency apply only to the reliability of standard interpretation. This must be clarified because it should not be interpreted that the patient or his mental disorder is invalid, only that the standard interpretation should be considered invalid.

In summary, the psychological test results revealed an overwhelming of Mr. Juarez's coping mechanisms and mental dysfunction. In this particular case, the most likely cause for invalidity would be a combination of factors of actual intense emotional symptomatology, overwhelmed coping mechanisms, impaired motivation and the inhibitory effects of depression, frustration, irritability, anger and fatigue.

## DIAGNOSES AS PER DSM-5

According to DSM-5 criteria, to qualify for a diagnosis of Major Depressive Disorder, there must be symptoms including depression that has lasted for more than two weeks plus five (5) or more of the following criteria: (1) changes in weight and appetite, (2) decreased interest and motivation, (3) insomnia, (4) decreased energy, (5) difficulty thinking, (6) feelings of inadequacy, and (7) recurrent thoughts of death. In this case,



Mr. Juarez has developed depression that has lasted for more than two weeks with changes in weight and appetite, decreased interest and motivation, insomnia, decreased energy, difficulty thinking and feelings of inadequacy that have impaired his social and occupational functioning. Furthermore, Mr. Juarez's depressive symptoms are not attributable to the effects of a substance or any other medical condition. Therefore, Mr. Juarez qualifies for Major Depressive Disorder.

According to DSM-5 criteria, Mr. Juarez qualified for a diagnosis of Psychological Factors Affecting Medical Condition because there was the presence of the following medical symptoms—headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and high blood pressure—and because these medical symptoms have been exacerbated by his mental disorder. As well, these symptoms are not better accounted for by another mental disorder.

Therefore, on a psychodiagnostic basis, the most appropriate categories of mental disorder as applied to Mr. Juarez would be as follows:

| | |
|---|---|
| F32.9 | Major Depressive Disorder, Single Episode, Unspecified |
| F54 | Psychological Factors Affecting Medical Condition (stress-intensified headache, neck/shoulder/back muscle tension/pain, nausea, vomiting, shortness of breath, chest pain, palpitations, peptic acid reaction, abdominal pain/cramping, alternating constipation/diarrhea and possible stress-aggravated high blood pressure) |

## SUMMARY

Upon examination, Mr. Juarez exhibited abnormal behavior with emotional withdrawal, depressive facial expressions and tearfulness when describing the chemical exposure related medical symptoms he developed during the course of his employment at Spacex.

A few months after working at Spacex, Mr. Juarez developed symptoms of migraine headaches, dizziness, difficulty walking and sinus symptoms due to exposures to electronic materials, chemical coatings and cleaning substances there. He reported this issue to his supervisor to no avail. Mr. Juarez underwent a CT scan, which revealed he had a brain aneurysm. He underwent emergency brain surgery in Cedars-Sinai. He was discharged after three days. A few days later, Mr. Juarez had a stroke with worsened migraine headaches. Due to his worsening condition, Mr. Juarez had anxiety attacks. He was hopeless and felt like damaged equipment that could not be used.

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 12

Mr. Juarez tried to return to work; however, his supervisor said that he could not return to work due to his illness. Mr. Juarez contacted HR and submitted ADA forms. Mr. Juarez was told he would be called back, but he never received a call from them.

Mr. Juarez was provided with treatment including medication management for his brain condition under the care of the primary treating physician, Dr. Isaac Regev. For the continuing emotional complications, Mr. Juarez was referred to this office.

Upon examination, Mr. Juarez was found to be too beset by stress-aggravated medical symptoms and too depressed, anxious and overwhelmed to work. Mr. Juarez needed to work through the emotional symptoms in the further passage of time and supportive psychotherapy prior to attempting to return to any job.

Mr. Juarez was found to be temporarily totally disabled on a combined physical and psychological basis.

Mr. Juarez was observed to become emotionally unstable and disturbed at the contemplation of an immediate return to work. If he attempted to return to work, his emotional condition would deteriorate into worsened emotional dysfunction.

The events of injury arising from work were predominantly causative of injury to the psyche. It would be estimated that about 85% would be industrially-caused by the events described above with about 15% caused by the past and personal life events and other factors described below.

There would be past and personal life events and other factors to address in a comprehensive psychological evaluation. For instance, there have been legal matters to consider. In 2004, Mr. Juarez was charged with DUI. He paid a fine and performed community service. There have been no further problems with alcohol or the law. He felt he has had learned his lesson. There has been a prior work injury to consider. In 2008, Mr. Juarez injured his elbow while working for Moore Industries. There was psychological component to the injury. He consulted with a mental health specialist. He recovered. There have also been non-industrial accidents to consider. In the early 2000s, Mr. Juarez injured his shoulders and back in a vehicular accident. He received settlement of approximately $2,000. As well, in 2015, Mr. Juarez injured his back in another vehicular accident. He recovered from both injuries without emotional residuals. There have also been medical conditions to consider. In 2013, Mr. Juarez was diagnosed with CVA or stroke; in 2014, migraine headaches. These medical conditions may become considered in part as work injury stress-aggravated compensable consequences. In any event, there have been indications of emotional complications of these medical conditions in and of themselves, but not to the point of mental disorder or emotional impairment. Such factors will all be addressed in more detail relevant to the issue of apportionment to be considered when Mr. Juarez's psychological condition becomes permanent and stationary. All of the records should

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 13

be reviewed prior to a final opinion in this area. However, at present, there would appear to be a basis for 15% causation to the prior work injury and the non-industrial components of his medical conditions.

At present, it would not be possible to estimate, on a psychological basis, a return-to-work date for regular or modified work. As well, it cannot yet be determined, on a psychological basis, whether Mr. Juarez will eventually be emotionally able to engage in the occupation he performed at the time of the injury.

In addition, it would not yet be possible to estimate the residuals of permanent emotional impairment, if any.

These estimations will be provided as soon as possible, presumably when Mr. Juarez's psychological condition becomes closer to reaching permanent and stationary status.

Mr. Juarez was found to be in need of emotional treatment.

It should be noted that the California Medical Treatment Utilization Schedule Chronic Pain Treatment Guidelines Page 23 on Behavioral Interventions (CA MTUS Reg. 9792.24.2) indicates that Cognitive Behavioral Therapy (CBT) is "Recommended. The identification and reinforcement of coping skills is often more useful in the treatment of pain than ongoing medication or therapy, which could lead to psychological or physical dependence."

According to the Chronic Pain Guidelines, the following would be recommended:

- *Initial trial of 3-4 psychotherapy visits over 2 weeks.*
- *With evidence of objective functional improvement, a total of up to 6-10 visits over 5-6 weeks (individual sessions).*

According to the guidelines, therefore, there would be a request for authorization of four (4) cognitive behavior psychotherapy (CBT) sessions in the next few weeks.

The medical necessity and clinical rationale for such treatment would be set forth as follows: Without such treatment, the depression, anxiety, sleep problems, stress-intensified medical symptoms and the related functional impairment could worsen rather than improve as expected.

Overall, an attempt will be made to provide only the amount of emotional treatment essential to improving and maintaining emotional and cognitive functioning.

There will be the provision of CBT to help offset Mr. Juarez's symptoms of anxiety, panic, emotional withdrawal, isolation and depression.

432

**Ruben Juarez vs. Space Exploration Technology/Spacex**
**Page 14**

There will also be the provision of psychotropic medication evaluation and management. Prescriptions will be provided as needed through the medical staff at this office.

Adjustments in medication will be provided according to the individual patient's needs. The frequency of medication management contacts should usually be no more than once every three weeks at the beginning, and when optimal, no more than every three to four months after that.

It should also be recalled that, according to the ODG that there is a risk of weaning patients off of psychotropic medications and that medications "should not be stopped abruptly if used for psychiatric conditions...[weaning] may take as long as 3 to 6 months."

*It has been concluded that the combination of psychotropic medication and psychotherapy, particularly in the form of integrated treatment provided within a single setting, was more efficacious in leading to a better quality of life and potential increased productivity in the workplace (Langlieb AM, Kuhn JP. How much does quality mental health care profit employers? J Occup Env Med. 2005; 47(11):1099-1109.)*

*Cognitive behavioral therapy for depression is recommended based on meta-analyses that compare its use with pharmaceuticals. Cognitive behavioral therapy fared as well as antidepressant medication with severely depressed outpatients in four major comparisons. Effects may be longer lasting (80% relapse rate with antidepressants versus 25% with psychotherapy) (Paykel, 2006) (Bockting, 2006) (DeRubeis, 1999) (Goldapple, 2004). It also fared well in a meta-analysis comparing 78 clinical trials from 1977 – 1996 (Gloaguen, 1998). In another study, it was found that combined therapy (antidepressants plus psychotherapy) was found to be more effective than psychotherapy alone (Thase, 1997). A recent high quality study concluded that a substantial number of adequately treated patients did not respond to antidepressant therapy (Corey-Lisle, 2004). A recent meta-analysis concluded that psychological treatment combined with antidepressant therapy is associated with a higher improvement rate that drug treatment alone. In longer therapies, the addition of psychotherapy helps to keep patients in treatment (Pampallona, 2003). For panic disorder, cognitive behavioral therapy is more effective and more cost-effective than medication (Royal Australian, 2001). The gold standard for the evidence-based treatment of MDD is a combination of medication (antidepressants) and psychotherapy. The primary forms of psychotherapy that have been most studied through research are: Cognitive Behavioral Therapy and Interpersonal Therapy (Warren, 2005).*

*In the interim, it should be kept in mind that Evidence-Based Mental Health concluded that in patients with depression, group psychotherapy is effective for relieving symptoms and that nine (9) studies showed that group psychotherapy and individual psychotherapy did not differ in effectiveness. (Evid. Based Mental Health 2001; 4:82 doi: 10.1136/ebmh.4.3.82..."Review: group psychotherapy is effective for depression (2001) Clinical Psychological: Science and Practice 8, 98. McDermut W, Miller IW, Brown RA., The efficacy of group psychotherapy for depression: a meta-analysis and review of the empirical research..Spring;...–116 [CrossRef] [Web of Science])*

*As well, there is an abundance of evidence in the literature documenting the effectiveness of individual and group psychotherapy in chronic pain patients. Therefore, Mr. Juarez will be provided with CBT also to help in addressing his pain problems.*

*The effectiveness of individual and group psychotherapy in chronic pain patients has been firmly established (Gamsa A, Braha RE, Catchlove RF. The use of structured group therapy sessions in the treatment of chronic pain patients. Pain. 1985; 22(1):91-6.; Spence SH. Cognitive-behaviour therapy in the treatment of chronic, occupational pain of the upper limbs: a 2 yr follow-up. Behav Res Ther. 1991; 29(5):503-9.; Basler HD. Group treatment for pain and discomfort. Patient Educ Couns. 1993; 20(2-3):167-75.; Li EJ, Li-Tsang CW, Lam CS, Hui KY, Chan CC. The effect of a "training on work readiness" program for workers with musculoskeletal injuries: a randomized control trial (RCT) study. J Occup Rehabil. 2006; 16(4):529-41.; Thorn BE, Kuhajda MC. Group cognitive therapy for chronic pain. J Clin Psychol. 2006; 62(11):1355-66.)*

Juarez, Ruben
Page 14

*The appropriateness and importance of the use of individual and group psychotherapy in chronic pain patients has also been firmly established in further research. (See Gamsa A, Broha RE, Catchlove RF. The use of structured group therapy sessions in the treatment of chronic pain patients. Pain. 1985; 22(1):91-6.; Spence SH. Cognitive-behaviour therapy in the treatment of chronic, occupational pain of the upper limbs: a 2 yr follow-up. Behav Res Ther. 1991; 29(5):503-9.; Basler HD. Group treatment for pain and discomfort. Patient Educ Couns. 1993; 20(2-3):167-75.; Li EJ, Li-Tsang CW, Lam CS, Hui KY, Chan CC. The effect of a "training on work readiness" program for workers with musculoskeletal injuries: a randomized control trial (RCT) study. J Occup Rehabil. 2006; 16(4):529-41.; Thorn BE, Kuhajda MC. Group cognitive therapy for chronic pain. J Clin Psychol. 2006; 62(11):1355-66.)*

*Cognitive behavioral rehabilitation programs have been demonstrated to be an effective means of reducing psychological distress, of changing cognition, and of improving the function of patients with chronic low back pain (Rose MJ, Reilly JP, Pennie B, Bowen-Jones K, Stanley IM, Slade PD. Chronic low back pain rehabilitation programs: a study of the optimum duration of treatment and a comparison of group and individual therapy. Spine. 1997; 22(19):2246-51; discussion 2252-3.) It has also been shown that psychological interventions in combination with physiotherapy can be effective in treating fibromyalgia patients, especially if applied early (Keel PJ, Bodoky C, Gerhard U, Müller W. Comparison of integrated group therapy and group relaxation training for fibromyalgia. Clin J Pain. 1998; 14(3):232-8.)*

*Experimental subjects suffering from chronic pain and treated in a multi-modality based setting including the provision of psychotherapy reported less pain, better control over pain, more pleasurable activities and feelings, less avoidance and less catastrophizing. In addition, disability was reduced in terms of social roles, physical functions and mental performance. (Basler HD, Jäkle C, Kröner-Herwig B. Incorporation of cognitive-behavioral treatment into the medical care of chronic low back patients: a controlled randomized study in German pain treatment centers. Patient Educ Couns. 1997; 31(2):113-24.) In the rehabilitation setting, the provision of psychotherapy stable anxiety levels despite increased patient effort implied improved pain tolerance. (Singh G, Willen SN, Boswell MV, Janata JW, Chelimsky TC. The value of interdisciplinary pain management in complex regional pain syndrome type I: a prospective outcome study. Pain Physician. 2004; 7(2):203-9.) Treatment with psychotherapy has also shown to cause a decrease in the degree to which pain interferes with activity, increasing the ability to cope with pain, and allowing a decreased use of some medications and other physical treatments (Puder RS. Age analysis of cognitive-behavioral group therapy for chronic pain outpatients. Psychol Aging. 1988; 3(2):204-7.)*

Would the claims administrator please fax to this office a letter of authorization for the aforementioned psychological treatment to be initiated as soon as possible.

It would be hereby requested that the defendant authorize the aforementioned course of emotional treatment at my office.

It should be noted further that Labor Code 5402(b) immediately went into effect with the passage of the Workers' Compensation reform bill on 4/19/04. Labor Code 5402(c) requires the employer to authorize all appropriate medical care up to $10,000 until the liability for the claimed injury is accepted or rejected. As of 6/1/04, Labor Code 5814 mandates a 25% penalty on the amount of payment unreasonably delayed (10% if self-imposed). Accordingly, it would be requested that the defendant please provide immediate payment.

Would the claims adjuster please provide copies of all medical records, personnel records, investigative reports or any other relevant discovery materials. These data are essential to evaluating complex matters of causation and apportionment. It would also be appreciated if the claims adjuster would provide notification of any scheduled psyche Agreed Medical Examinations, defense QME examinations or panel QME examinations,

434



and/or any reluctance to make reimbursement for a comprehensive permanent and stationary evaluation from this office. Would the adjuster please advise this office if the applicant is not an employee, was the initial aggressor, did not timely report the injury, filed a fraudulent claim or was otherwise not legally eligible for benefits. Would the adjuster please also submit any information relevant to any important upcoming court dates, in particular any expedited hearings or Mandatory Settlement Conferences; and please provide notification of any psyche physician's depositions.

If there are any valid objections such that there would not be the authorization for the requested treatment at this office, could the adjuster please report the basis for such denial within seven days.

For further information on treatment details, please request a brief narrative report. Otherwise, there will be further reports to follow as necessary.

Thank you for your consideration in this matter.

## AFFIDAVIT OF COMPLIANCE

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, I believe it to be true.

In the preparation of this report, I was assisted by Thomas A. Curtis, M.D., who edited the first draft and provided the psychological test interpretations.

It should be noted that, aside from the clerical preparation of this report, any reviews deemed necessary and appropriate to identify and determine the relevant psychological issues in this matter and to determine the diagnoses, conclusions and recommendations contained in this report, have been performed by me.

I declare under penalty of perjury that I have not violated the provisions of California Labor Code Section 139.3.

I also declare under penalty of perjury that the attached billing for services is true and correct to the best of my knowledge.

The opportunity to provide this evaluation has been appreciated.

If there are any questions, please feel free to contact me.

435

Ruben Juarez vs. Space Exploration Technology/Spacex
Page 17

---

Signed on _____4/13/16_____ in Los Angeles County, California.

Signature: _____
Gayle K. Windman, Ph.D. (PSY 19944)

436

# EXHIBIT 41

# BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

## OF THE STATE OF CALIFORNIA

RUBEN JUAREZ,

APPLICANT,

VS.

SPACE EXPLORATION TECH. CORP.;
CHUBB GROUP OF INS. CO.,

DEFENDANTS.

CASE NO.   ADJ9801824

VOLUME I

### DEPOSITION OF RUBEN HERNANDEZ JUAREZ

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 30, 2015

2:02 P.M.

# CERTIFIED
# COPY

# PERANICH REPORTING

*Certified Shorthand Reporters*
5241 E. Santa Ana Canyon Road, Suite 100
Anaheim Hills, CA 92807
(800) 956-4784
(714) 637-3774
Fax (714) 637-3023

REPORTED BY:   **DANA M. DAVIS**

CSR NO.:   **10534**

438

BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

OF THE STATE OF CALIFORNIA

RUBEN JUAREZ,

            Applicant,

     vs.

SPACE EXPLORATION TECH.
CORP.; CHUBB GROUP OF INS.
CO.,

            Defendants.

No. ADJ9801824
VOLUME I

        DEPOSITION OF RUBEN HERNANDEZ JUAREZ, taken

on behalf of the Defendants, at 3600 Wilshire Boulevard,

Suite 2100, Los Angeles, California, at 2:02 P.M. on

Monday, March 30, 2015, before DANA M. DAVIS, CSR #10534,

RPR, a Certified Shorthand Reporter within and for the

State of California, pursuant to Notice.

                  -oOo-

2



APPEARANCES

For the Applicant:

    GRAIWER & KAPLAN, LLP
    BY:  SHERWIN CONWAY
        Attorney at Law
    3600 Wilshire Boulevard, Suite 2100
    Los Angeles, California 90010
    (213) 380-7500


For the Defendants:

    ROBIN, CARMACK and GONIA, LLP
    BY:  ROBERT M. ROBIN
        Attorney at Law
    131 North El Molino Avenue, Suite 120
    Pasadena, California 91101
    (626) 568-9800

3



1                    I N D E X

2                   VOLUME I

3

4    WITNESS                                    PAGE

5    RUBEN HERNANDEZ JUAREZ

6         Examination by Mr. Robin              5

7

8

9

10

11               E X H I B I T S

12               (None entered)

13

14

15

16

17

18

19

20

21

22

23

24

25

PERANICH REPORTING, INC.      (800) 956-4784        (714) 637-3774

441

1        LOS ANGELES, CALIFORNIA - MONDAY, MARCH 30, 2015

2                   VOLUME I

3              2:02 P.M. - 4:03 P.M.

4                  -oOo-

5

6            RUBEN HERNANDEZ JUAREZ,

7  called as a witness on behalf of the Defendants, having

8  been first duly sworn, was examined and testified as

9  follows:

10

11                EXAMINATION

12  BY MR. ROBIN:

13     Q    Would you state your name for the record,

14  please.

15     A    Pardon me?

16     Q    Your full name.

17     A    Ruben Hernandez Juarez.

18     Q    Mr. Juarez, my name is Robert Robin.  I'm an

19  attorney.  I represent Space Exploration Technologies

20  Corp. and Chubb Group of Insurance Companies in the

21  workers' comp claim you filed.  I'm going to conduct your

22  deposition.

23        Have you ever been deposed before?

24     A    Yes, I do.

25     Q    How many times?

                                                    5

assigned persons to do certain areas.  So when you're

2   still working there, you're thrown in there and do

3   whatever you have to do.

4        Q    Did you have a supervisor?

5        A    I had a manager.

6        Q    Who was that?

7        A    John Pena.

8        Q    John Pena?

9        A    Uh-huh, yes.

10       Q    What was your work schedule?  Five days a week?

11       A    No.  It varies.  But most of the time it's six

12   days a week.

13       Q    What were your earnings?

14       A    $31 an hour, I believe.

15       Q    You worked at the Hawthorne location?

16       A    Correct.

17       Q    Did your job title change at any time?

18       A    Yes.

19       Q    When was that?

20       A    Sometime, I want to say, about six, seven months

21   after I started working there.

22       Q    What was your new job title?

23       A    Technician.  According to my supervisor, I was

24   going to have the title change, but my responsibilities

25   would remain the same.

                                                    22

```
 1      Q      Your duties were the same?

 2      A      Correct.

 3      Q      Your salary was the same?

 4      A      Yes.  Not looking back --

 5             MR. CONWAY:  Wait a second.

 6             (Interruption in the proceedings.)

 7  BY MR. ROBIN:

 8      Q      Same salary, same duties, correct?

 9      A      Correct.

10      Q      And you continued working at your usual and

11  customary occupation until such time as you had some type

12  of symptoms?

13      A      I started having symptoms, I want to say, August

14  of 2013.

15      Q      What were the symptoms?

16      A      I got dizzy and felt like nauseous.  So I

17  request one of my coworkers to go out with me for a walk

18  around the building.

19      Q      Who was that?

20      A      Jose.

21      Q      Jose?

22      A      I don't remember his last name.  I'm sorry.  I

23  think he was like a lead on one of the assembly areas.

24      Q      When you say you felt dizzy, can you describe

25  the symptoms to me.
```

                                                        23

444

1    A    Passing-out like symptoms.

2    Q    You felt lightheaded?

3    A    Lightheaded and passing out.

4    Q    You were unconscious?

5    A    I was working, and I felt like I was going to

6    pass out, and I felt really dizzy.  So I requested Jose

7    to go out with me for a walk because I was feeling

8    extremely dizzy and felt like I was going to throw up.

9    Q    You took a walk around the building with Jose?

10    A    Yes.

11    Q    When you came back, how did you feel?

12    A    I still felt pretty bad, but I believe I left

13    for the day.  I don't recall.

14    Q    You think you finished your shift?

15    A    I don't think so.  I don't remember.

16    Q    What happened next as far as symptoms?

17    A    I kept feeling headaches, and sometimes when I

18    walked, I felt dizzy and nauseous.

19    Q    These headaches, what part of your head are they

20    located?

21    A    On the front area and went from the front to the

22    back.

23    Q    Both sides?

24    A    Yes.  It is similar to a sinus headache.

25    Q    How often would you have these frontal

                                                        24

1 | headaches?

2 | A    Every week or every other week.  I believe I

3 | missed quite a bit of work.

4 | Q    Did you go home early?

5 | A    Sometimes.

6 | Q    When did the headaches begin?

7 | A    Like I say, probably August, September, around

8 | there.  I don't recall the exact date.

9 | Q    Of 2014?

10 | A    2012.

11 | Q    2012 -- excuse me.  So when you had these

12 | various symptoms, did you see a doctor at that time?

13 | A    I went to urgent care.

14 | Q    Is that the first source of any kind of medical

15 | treatment or examination you had?

16 | A    I believe that was the first time I went to

17 | see --

18 | Q    Where is the urgent care?

19 | A    Facey Medical Group.

20 | Q    Located on what street?

21 | A    Sepulveda Boulevard.  I think it's Mission Hills

22 | or Granada Hills.

23 | Q    Near your home?

24 | A    Near my house, yes.  Well, because I got an

25 | anxiety attack when that happened, so I tried to drive

25

1     home really quickly to go to the doctor.

2         Q     And the first time you went there, what

3     treatment or examination did they provide to you?

4         A     I don't remember exactly, but they thought I had

5     some kind of ear infection or respiratory infection.  So

6     I believe they gave me some antibiotics.

7         Q     Did that change your condition in any way?

8         A     No.

9         Q     What next happened?

10        A     I don't quite remember every time I went there.

11    I know I went there, and they told me there was a problem

12    with my balance.

13        Q     You told them that?

14        A     No.  They told me I probably had a problem with

15    my balance because I told them I feel dizzy.  So they

16    gave me some kind of medication to help me with the

17    balance, but it didn't work.

18        Q     Then what?

19        A     Then after that, they told me I probably had a

20    problem with the ears because they control the balance.

21    So they sent me to do a study.

22        Q     What kind of study?

23        A     For ears.  I don't remember what kind of study.

24        Q     Hearing test?

25        A     Hearing test, but I don't know what they were

                                                              26

```
 1      A     Yes.

 2      Q     When did you last speak with her?

 3      A     Probably about six, seven years ago.

 4      Q     Do any of your siblings have high blood

 5  pressure?

 6      A     Not that I know of.

 7      Q     What about your parents?

 8      A     Not that I know of.

 9      Q     Any of your siblings or parents ever had an

10  aneurysm?

11      A     No.

12      Q     Your attorney had requested that we provide him

13  with copies of an MSDS, Material Safety Data information.

14      A     Correct.

15      Q     Which we have done.  Did you work with chemicals

16  of any type at SpaceX?

17      A     All the chemicals that I can remember.

18      Q     Listed where?

19      A     The MSDS.  I sent an e-mail to my HR rep

20  requesting those MSDS forms, and she told me that we were

21  going to forward a copy.

22      Q     On the list given, there is something called

23  thinner 527.  Do you know what this is?

24      A     It's a -- can be used as a cleaning agent, or

25  it's also for coating purposes.
```

                                                          49

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

448

1    Q    Did you work with this chemical?

2    A    Yes.

3    Q    When?

4    A    Through my time with SpaceX.

5    Q    What did you do with it?

6    A    You use that to soak parts to be cleaned.  You

7  use that also to flush the equipment.  You use that as a

8  part of a mixture or formula to --

9    Q    How often would you use this product?

10    A    Every day.

11    Q    I'm sorry?

12    A    On a daily basis.

13    Q    How much of this chemical would you use?  Was it

14  a liquid?

15    A    It is a liquid.

16    Q    How is it stored?  In a bottle of some sort?

17    A    It's stored in metal cans.  I think it's

18  one-gallon containers.

19    Q    You'd use very little of it?

20    A    It depends.  It depends.  If I needed to flush

21  equipment, you'd probably use 20 to 30 ounces a unit to

22  soak parts to be cleaned, 40 ounces.  It depends what you

23  were doing.

24    Q    If you would flush equipment, is this in an

25  enclosed system?  It would be pushed into tubes or pipes

50

1    or something?

2         A    You have to fill up a canister with that, and

3    then the compressor would push to clean the lines.

4         Q    What kind of lines are these?

5         A    PVC hoses.

6         Q    Is this for hydraulic?

7         A    No.  It is for coating material.

8         Q    How often would you do this?

9         A    Most every day.

10        Q    For how long?

11        A    For a couple minutes or up to a couple -- half

12   an hour or hour or so.  The only problem with that is the

13   equipment, they bypass the emergency switch.  So

14   sometimes you have to open it.  And in normal conditions,

15   it should have shut down, not allow you to work on the

16   machine.  But somebody will bypass the safety switch.

17        Q    So what does that mean?  The machine would

18   operate while --

19        A    While you open it, while it's still open, which

20   is hazardous.  But that's the way they work.

21        Q    You never got hurt or anything on a machine?

22        A    No.  I did a request to operate the equipment in

23   there, but it never went over.  I approved with my then

24   manager to look into acquiring new equipment for safety.

25        Q    Who was that?

                                                          51

450

1        A      John Pena referred me to New York.  I don't
2    remember the date.  Because this equipment, I believe,
3    doesn't have a -- doesn't have an alarm system whenever
4    the exhaust fan is not working.  The new equipment does
5    have an alarm system whenever the exhaust fan is not
6    working.  It will shut down or would not allow you to
7    operate the machine.

8        Q      Would the majority of time that you're doing
9    maintenance work using the thinner 527 be just a couple
10   or a few minutes?

11       A      For the most part, yes.

12       Q      Did you wear any type of mask or respirator or
13   anything like that?

14       A      No.

15       Q      Did you come in contact with this thinner 527?

16       A      Yes.

17       Q      How was this contact made?

18       A      Sometimes you are under -- literally you press
19   the button to flush the lines, and you stick your head to
20   make sure all the fluid is gone through it, and you get
21   an air bubble.  Then you will inhale that thinking that
22   everything is being flushed out, and you still have
23   residue inside the air lines or liquid lines.

24       Q      How often would that happen where you would
25   take -- you'd smell it or --

                                                            52

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

1    A    Every day.  It was part of the regimen.

2    Q    That would be a momentary exposure when you'd

3  smell it or possibly breathe some of it?

4    A    Yes, because you have to look inside the machine

5  to find out if all the material was bled out.  And then

6  due to the fact that -- the way this is set up, sometimes

7  you will get an air pocket.  And then you think that

8  everything is gone, and then you get the air pocket.

9  Then you get the spray of the mist, of the material, and

10  you just breathe out.

11    Q    How often would this occasional mist exposure

12  occur?

13    A    Once or twice a day you have to flush these

14  lines.

15    Q    But would that mean every time the line is

16  flushed, you get exposed to it, or would it just happen

17  occasionally?

18    A    No.  Almost every time you bleed the lines,

19  because since it's a mist, you can't really see if you're

20  really finished bleeding the machine.  So you kind of

21  have to stick your head inside the machine.

22    Q    This would happen for a moment daily?

23    A    Yeah, for a moment.  It shouldn't have to be

24  that way, but they bypass the emergency mechanism.

25    Q    Is this product, this thinner 527, flammable?

53

1      A     As far as I know it is.

2      Q     When you work on these machines, are you working

3  with gloves, hand protection?

4      A     Sometimes.  Sometimes you don't.

5      Q     It's up to you?

6      A     No, it's not up to me.  It's just the material

7  is very -- not the thinner, but the material is mixed

8  with -- it's extremely sticky.  So if you wear your

9  gloves, it will constantly break because they will stick

10  to the components or the part you are working with.

11      Q     Do you work with anything else when you're

12  working with the 527 thinner?

13      A     I was in charge of the sign-in, the tooling

14  for -- to cover the electronic devices that were to be

15  coated with this material.  So I sometimes -- most of the

16  time I have to clean it up and review how much damage

17  they had and order new ones or design new fixtures to

18  help the operators.  Whenever they have a new chemical

19  that they want to try out because they wanted to have

20  better protection for the electronic devices, they call

21  me to flush the system and put in new lines and set up

22  the machine basically.

23      Q     So they can test the new materials?

24      A     At that time I had to take the equipment apart,

25  clean it thoroughly with thinner, soak it up for a

54

453

1    couple -- up to an hour or more and then flush it with

2    the wire flush and put a new rebuild kit.

3        Q    Sort of like a carburetor on an old car?

4        A    Similar to that.  It's just that some of the

5    chemicals, they cannot be mixed because they have a

6    chemical reaction.  And you only have a certain period of

7    time to work with them before they start to dry out.  So

8    you have to take the whole spray assembly apart and put a

9    new kit, put it back together, try the new chemical, and

10   do it over again.  Pick it up or clean it up, put a new

11   kit together.  So sometimes it's kind of essential that

12   you work very fast.  Otherwise -- sometimes they used

13   two- to three-part chemicals.  They start to settle.

14   They start to cure.  So you only have a window of time of

15   about a half an hour to 40 minutes.

16       Q    Would you use this 527 -- strike that.

17            Would this 527 thinner come into your work in

18   any other manner than that which you've already

19   discussed?

20       A    Not that I can remember at this time, no.

21       Q    Did you work with a product called 63/67

22   eutectic solder wire?

23       A    I didn't work directly with the solder wire.

24   What I was in charge of was to replace the fume extractor

25   filters.  Each workstation had a filter ventilation for

55

454

1    the operators.  So whenever they're working doing

2    soldering, the fumes will not go to them.  So we had a

3    smoke system, and then I was in charge of replacing those

4    filters.

5        Q    What's involved in replacing the filters?

6        A    Opening up the -- like a backpack-size device

7    that you have to remove the cover and replace -- manually

8    replace filters and dispose them for chemical hazard.

9        Q    Did you wear gloves?

10       A    Just the regular nitrile gloves, yes.

11       Q    Nitrile gloves?

12       A    Yeah, something like that.  I don't know if they

13   were nitrile gloves or they were just latex.

14       Q    So you wouldn't be exposed to the solder wire,

15   just the cleaning fumes?

16       A    The fume filters.  It's not part of that MSDS.

17   I did some of the cleaning for the workstation which uses

18   the same type of solder, 63/67 eutectic solder.

19       Q    You'd clean workstations?

20       A    No.  It's a re-workstation.  It's like a

21   fountain, eutectic solder.

22       Q    You're talking about a fountain?

23       A    Yes.  It's a device to rework electronic

24   devices.  It's melted solder that would use a submotor to

25   propel the solder to go up like a fountain.

                                                      56

1    Q    What would you do with this device?

2    A    I didn't do it.  I did the maintenance on them.

3    Q    What does the maintenance require?

4    A    You have to remove the soldering tools, remove

5    the pump and propeller and reassemble it.

6    Q    When you did this, you wore gloves?

7    A    You had to wear high-heat gloves.

8    Q    Is the solder liquid at that point?

9    A    It's 500 Fahrenheit, yes.

10   Q    When you're working, is it still that hot?

11   A    You have to.

12   Q    You have to work at that heat level?

13   A    Yes.  Otherwise, the pump is submerged into

14   the --

15   Q    The solder?

16   A    If you let that cool down, you won't be able to

17   take it out.

18   Q    I see.  So you use these high-heat gloves,

19   correct?  You pull the pump out of the drawer?

20   A    Out of the bath.

21   Q    Out of the bath, the solder.  What do you do

22   with the pump?

23   A    Disassembled it, remove the solder doors.

24   Q    As you're disassembling, what keeps the solder

25   heated?

57

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

456

1      A    Well, you remove it from the belt.  You remove

2  the pump.  The solder still continues to be heated up by

3  electrical heaters.  The pump is just assembly of that.

4      Q    So these electrical heaters keep the solder hot

5  while you're disassembling?

6      A    The liquid, remove the pump.  You have to

7  disassemble very quickly before it cools down.

8      Q    Solder cools very quickly.

9      A    They give you enough time because it takes about

10  five to ten minutes before the pump -- whatever is

11  melted, solder melted inside the screws, it will become

12  solid again.  So you have to move fast.

13      Q    How much time do you have?

14      A    Not much time.

15      Q    30 seconds?

16      A    About a minute, minute and a half before you

17  have to take everything apart.  Then it will take a

18  couple hours to clean all the solder drawers.

19          MR. ROBIN:  Off the record.

20          (Discussion held off the record.)

21          MR. ROBIN:  Back on.

22      Q    Would you do any other work with solder?

23      A    No.  Just train the operators on how to use it.

24      Q    How to use the machine?

25      A    Correct.

                                                        58

```
 1      Q      So that's all your involvement with 63/67
 2  eutectic solder?
 3      A      Yes.
 4      Q      The next item is described as HumiSeal 1A33
 5  conformal coating.  Is that coding or coating?
 6      A      Coating.
 7      Q      With a "t."  What is this?  A liquid?
 8      A      It's similar to a nail polish.
 9      Q      Similar to nail polish?
10      A      Uh-huh, yes.
11      Q      Nail polish remover or the --
12      A      The paint.  It's similar to it on their
13  application.
14      Q      So it's some kind of a paint, correct?
15      A      It's more like a protective --
16      Q      Coating?
17      A      -- coating, yes.
18      Q      Is that a color?
19      A      Clear.
20      Q      And how do you come in contact with this
21  product?
22      A      Similar to what I described before.  I have to
23  use that on the equipment.  I do most of the prototypes
24  and programming for the machine and tooling.
25      Q      How often do you use it?
```

59

458

1      A      Every day.

2      Q      Do you wear gloves when you use this product?

3      A      You have to.

4      Q      Gloves are always worn.  Okay.

5             Is it applied to the machine?

6      A      You have to fill up the canister, mix the

7      formula of thinner, the one we talked about before and

8      this.  You have to adjust the thickness.

9      Q      For the --

10     A      For the coating.

11     Q      Viscosity?

12     A      You have to do the mixing for the viscosity.

13     And then after the viscosity is made, then you have to

14     adjust the machine to get the thickness of -- layer of

15     thickness -- the thickness of the layer that you want to

16     apply to the electronic devices.

17     Q      That would be the thickness of the coating?

18     A      Correct.  Approximately five-thousandths of an

19     inch.

20     Q      .015 inch.  Okay.

21     A      .001.

22     Q      One-thousandth.  Okay.

23            How often do you engage in this type of work?

24     A      On a daily basis, through experiment or

25     assistant operator to achieve the goal.

                                                        60

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

459

1    Q    Would your exposure be contact if it touched

2  your skin or something?

3    A    Yes.  Contact, debriding it, because when we

4  talk about one-thousandth of an inch, we're talking about

5  mistlike material, so --

6    Q    Very fine vapor?

7    A    Very fine.  So you have to kind of stick your

8  head in there and see if it's actually applied.  That's

9  why I request my management for some samples so we don't

10  have to go in there.  But they never allow me to purchase

11  a machine to check the thickness of that.  We do have

12  coupons that we spray on, and then we check the thickness

13  on the coupons.

14    Q    Coupons?

15    A    Correct.

16    Q    So there's like test materials?

17    A    Correct, since it's very critical.  Those

18  dimensions are also very critical.  I order some coupons

19  to match up so they can prevent any error in spraying

20  material.

21    Q    When you're spraying and -- the machine is

22  spraying this coating, that vapor is spraying like in

23  microns?

24    A    Correct.  Sometimes you can't even see it,

25  sometimes.

61

460

1          Q      Any other contact with this product, this

2   HumiSeal?

3          A      I was introducing the programming to use the

4   machine, to program it to do certain areas only.  So I

5   did spend quite a bit of time doing some programs on it.

6          Q      But when you're programming the machine, you're

7   not using the chemicals?

8          A      Yes, you are, because you have a dry run and a

9   wet run.  Dry run is the machine goes through the

10  exercises without applying any material, and wet run is

11  when you do the machine, the routine and spraying as

12  well.

13         Q      The dry run is to make sure the area is correct;

14  the wet is actually to use the coupons to check?

15         A      Correct.

16              MR. ROBIN:  Off the record.

17              (Discussion held off the record.)

18              MR. ROBIN:  At this point, the parties will

19  stipulate to finish the deposition of Volume II --

20  actually continue the depo to Volume II.  Volume I, we

21  will stipulate to relieve the court reporter of her

22  obligations of the transcript, waiving CCP 2025 (q) and

23  (s).  Original and one to applicant's attorney, copy to

24  myself, four-to-one condensed to me.  Any changes,

25  amendments, deletions, or corrections to the testimony of

                                                       62

461

1   the deponent shall be noticed to opposing counsel in

2   writing within 45 days.  Penalty of perjury is agreeable.

3   If the original signed copy is not available for any

4   purpose, an unsigned copy can be introduced into evidence

5   as though a signed original for all purposes.

6          So stipulated?

7          MR. CONWAY:  Yes.

8        [Deposition proceedings concluded at 4:03 P.M.]

9                     -oOo-

10

11

12      I, the undersigned, have read the foregoing

13   deposition and declare under penalty of perjury that the

14   foregoing is true and correct.

15      Executed this _____ day of ___ __ ___ ___, 20__,

16   at _____, _____ ___ __ __.

17

18

19

20

21

22

23        _____

24             RUBEN HERNANDEZ JUAREZ

25

                                                    63

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

# BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

## OF THE STATE OF CALIFORNIA

RUBEN JUAREZ,

APPLICANT,

VS.

SPACE EXPLORATION TECH. CORP.;
CHUBB GROUP OF INS. CO.,

DEFENDANTS.

CASE NO.   ADJ9801824

VOLUME II

DEPOSITION OF RUBEN JUAREZ

LOS ANGELES, CALIFORNIA

WEDNESDAY, MAY 20, 2015

10:25 A.M.

## CERTIFIED

## COPY

REPORTED BY:   CATINA PERAHIA

CSR NO.:   9731

## PERANICH REPORTING

*Certified Shorthand Reporters*

5241 E. Santa Ana Canyon Road, Suite 100
Anaheim Hills, CA 92807
(800) 956-4784
(714) 637-3774
Fax (714) 637-3023

463

```
 1            BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

 2                     FOR THE STATE OF CALIFORNIA

 3

 4
                                       )
 5    RUBEN JUAREZ,                     )
                                       )
 6                    Applicant,        )
                                       )
 7         vs.                          )   CASE NO.:  ADJ9301824
                                       )
 8    SPACE EXPLORATION TECH. CORP.;    )
      CHUBB GROUP OF INS. CO.,          )
 9                                      )
                      Defendant.        )   VOLUME II
10    _____)

11

12

13

14                  DEPOSITION OF RUBEN JUAREZ,

15    taken on behalf of the Defendant, at 3600 Wilshire

16    Boulevard, Suite 2100, Los Angeles, California, at

17    10:25 A.M., on Wednesday, May 20, 2015, before CATINA M.

18    PERAHIA, CSR 9731, a Certified Shorthand Reporter within

19    and for the State of California, pursuant to Notice.

20                             -oOo-

21

22

23

24

25
                                                              67
```

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

464



APPEARANCES OF COUNSEL:

For the Applicant:

    GRAIWER & KAPLAN
    BY:   SHERWIN CONWAY
        Attorney at Law
    3600 Wilshire Boulevard
    Suite 2100
    Los Angeles, California  90010
    (213) 380-7500

For the Defendant:

    ROBIN, CARMACK and GONIA, LLP
    BY:   ROBERT M. ROBIN
        Attorney at Law
    131 North El Molino Avenue
    Suite 120
    Pasadena, California  91101
    (626) 568-9800

68



I N D E X

WITNESS                                                    PAGE

RUBEN JUAREZ

        Examination by Mr. Robin                  70


                E X H I B I T S

                    (NONE)

69

1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 20, 2015

2              10:25 A.M. - 11:56 A.M.

3                 -oOo-

4

5               RUBEN JUAREZ,

6      having solemnly sworn to tell the truth,

7       was examined and testified as follows:

8

9              EXAMINATION

10  BY MR. ROBIN:

11     Q.   Mr. Juarez, you recall our first deposition --

12     A.   I do.

13     Q.   -- where I gave you the admonition as to the

14  procedure?  Would you like me to repeat that?

15     A.   Yes, because --

16     Q.   Okay.  I'm going to continue to ask you

17  questions about the claim you have filed for workers'

18  compensation benefits in this second volume of the

19  deposition.  To each of my questions, I would ask that

20  you give me a response loud enough for all of us to hear.

21      The reporter is taking down everything that is

22  said exactly as it is said.  All testimony is under

23  penalty of perjury.  It has the same force and effect as

24  if we were in a court of law.

25      Please wait for the end of my question, as the

                                          70

1    Q.    You applied for Social Security disability?

2    A.    SSDI, yeah.

3    Q.    When was that?

4    A.    I want to say some time in April.

5    Q.    Have you received a determination?

6    A.    No, no.  I just receive some information about

7    the process, and I receive a phone call from

8    Social Security asking me about my case and that was it.

9    Q.    So the case is pending?

10   A.    Yes.  I think they have to review it, and they

11   have to make a determination.  There were -- I was told

12   that they were going to send me some forms on the mail,

13   and I have to fill it up and send it back somewhere.  I

14   think in Utah or somewhere like that.

15   Q.    Are these medical authorizations to release

16   medical information so they --

17   A.    I don't think so.  I'm not sure.  The person

18   that I talked to -- I talked to him twice.

19   Q.    Right.

20   A.    The first time he told me he was going to send

21   me a copy of the claim itself.  And then he also told me

22   to get a copy of my State disability payment, which I

23   did, and mail it back to them.

24        And then thereafter he called me, and he left a

25   voicemail saying that I was going to receive a package of

                                                        75

1  forms, to fill it out as much as possible and then send

2  it back to them.  And that's --

3      Q.    That was it?

4      A.    That was it.

5      Q.    When last we were here in Volume I of your

6  deposition, we had discussed various chemicals that you

7  had used or been present with at the Space Ex facility.

8  We talked about Thinner 527, eutectic solder wire,

9  HumiSeal 1A33, conformal coating --

10     A.    Yes.  And by the way, on the eutectic solder,

11 it's not just a solder wire.  It's solder bars as well.

12     Q.    The same solder, just in different form?

13     A.    Different composition, yes.  I mean --

14     Q.    Different shape?

15     A.    Yes.  The formula is the same, but this one is

16 in a bar.

17     Q.    Right.

18     A.    And I also like to -- we did not have the

19 proper -- the proper container to dispose the solder that

20 it was coming out of a solder pot that we had.

21     Q.    Was that for storage?

22     A.    That's for disposal.  Under California you have

23 to have a container to dispose that because it's lead.

24 And we only had a plastic container which not adequate to

25 store.

                                                    76

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

1        And, also, for the HumiSeal I was not -- I was

2    never given the proper equipment to replace the filter

3    system on the conformal coating, which I think the

4    company should change the policy on that.

5        Q.   And I also note that -- did you use isopropyl

6    alcohol for anything?

7        A.   Actually, it was something that aggravate my

8    situation because they put a station right next to my

9    work area.  A wash area where they use alcohol to wash

10   PCB's, printed circuit board assemblies.  And they would

11   blow it right next to me.

12       Q.   Printed circuit --

13       A.   Board.

14       Q.   PCB's.

15       A.   Printed circuit board assemblies.

16       Q.   You're saying there was some type of odor;

17   correct?

18       A.   Well, it was the odor on the mist from when they

19   were using compressed air to blow that to dry them out,

20   and I was right next to the station.

21       Q.   How far away?

22       A.   About 12 inches.

23       Q.   You were 12 inches away from the wash station?

24       A.   Yes, to the wash area.

25       Q.   How often would they use this wash station?

77

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

1      A.    Every day.

2      Q.    For how long?

3      A.    Through the entire work time.

4      Q.    Were those all of the chemicals that you came in

5   any type of contact with?

6      A.    Um, as far as I can remember.  I don't know.  I

7   gave the list to the HR, human resources.

8      Q.    Okay.

9      A.    I don't know whether there are chemicals --

10     Q.    That's fine.

11     A.    Because I don't remember.  It was HumiSeal, and

12  it was two other -- two-part or three-part component,

13  alcohol, eutectic solder, and I don't remember if I

14  missed one or not.

15     Q.    I show that your occupation was designated

16  ultimately as a computer programmer; is that correct?

17     A.    Due to the fact that there were always new head

18  management, my title changed, but I was mostly doing

19  manufacture engineer work under different title.

20     Q.    What was that title?

21     A.    The first they assigned me as an equipment

22  specialist, but it didn't have any description, job

23  description.  And then after that I think they changed it

24  to a technician or something like that, but I was still

25  doing the same manufacture engineer work.

78

1        Q.    That was working with the machinery and

2   programming?

3        A.    Working with machinery, programming,

4   troubleshooting, ordering equipment.

5        Q.    When you say "troubleshooting," you get machines

6   to work; you fix problems?

7        A.    Correct.  And also working with a process, fine

8   tuning the process, ordering new equipment.

9        Q.    And the process, you're talking about the

10  manufacturing process?

11       A.    Correct.  Including design of fixtures to aide

12  the operators.

13       Q.    Were these machines C and C types?

14       A.    No, it was conformal coating equipment.

15       Q.    Conform?

16       A.    Conformal coating equipment.

17       Q.    Coating.

18       A.    And inspection.  Optical inspection equipment.

19  AOI, automatic optical inspection.  I traveled to

20  San Diego to train and also to New York.

21            I did request an upgrade for our current machine

22  because it didn't have the safety feature which it had

23  had under conformal coating, such as it didn't have the

24  alarm to know when the suction was working or not.

25       Q.    So you wanted some type of an alarm system built

79

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

000123

1    in?

2         A.    No.   To upgrade the equipment itself, because

3    the current equipment -- it was obsolete, and it didn't

4    have the alarm system to advise the operator that the

5    suction system was not working or pulling all of the

6    fumes out of it.

7         Q.    Okay.

8         A.    So I end up buying some separate standalone

9    filtration system for that area.

10        Q.    For the work area; correct?

11        A.    Yes, for the equipment and for the drying out

12   area.   They use a designated area to -- where the boards

13   were dried out from the chemicals.   So I purchased those

14   standalone system.

15        Q.    Right.

16        A.    To help out to clean the air because it was

17   pretty bad.

18        Q.    And when did you get this system?

19        A.    I don't remember the date.

20        Q.    Approximately.

21        A.    I -- no, I don't want to speculate on that.   My

22   memory is not that well.

23             I also purchased an inspection system and --

24   with that -- from England.   I also purchased a filtration

25   system for that inspection area as well.   I was trying to

                                                              80

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

473

000124

1    make things better for the operators and the inspectors

2    because the fumes can be pretty strong.

3        Q.    All right.

4        A.    And I designed some of the fixtures so we didn't

5    have to use that many chemicals.  And some did work.  I

6    was in the process of using a preform tape so they don't

7    have to use so much labor and helping out the operator

8    not being exposed to the conformal coating materials.  So

9    I was trying to make things better for the operators.

10       Q.    Okay.  Is that all of your job duties?

11       A.    No.  That was part of my job duties.  The rest

12   of it was designing, programming and equipment repair.

13   So even though my title did say something, it didn't

14   actually reflect my duties.

15       Q.    Okay.

16       A.    And I was advised by my manager that my title

17   might change but not to worry about it, that I would be

18   doing the same thing, which end up not being true.

19       Q.    Who is the manager?

20       A.    John Peana.  P-e-a-n-a.  When I tried to return

21   to work, they told me I was a technician, which was

22   ludicrous.  And they denied me to return to work because

23   they say my medical condition.

24       Q.    Are those all of your job duties?

25       A.    That I can remember.

81

# BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

# OF THE STATE OF CALIFORNIA

RUBEN JUAREZ,

APPLICANT,

VS.

SPACE EXPLORATION TECH. CORP.; CHUBB GROUP OF INS. CO.,

DEFENDANTS.

CASE NO.   ADJ9801824

VOLUME III

### DEPOSITION OF RUBEN JUAREZ

LOS ANGELES, CALIFORNIA

WEDNESDAY, OCTOBER 21, 2015

10:07 A.M.

# CERTIFIED COPY

REPORTED BY:   DIANA ALDRICH

CSR NO.:   12877

# PERANICH REPORTING

*Certified Shorthand Reporters*

5241 E. Santa Ana Canyon Road, Suite 100
Anaheim Hills, CA 92807
(800) 956-4784
(714) 637-3774
Fax (714) 637-3023

475

1        BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

2              FOR THE STATE OF CALIFORNIA

3

4

5  RUBEN JUAREZ,             )
                       )

6           Applicant,     )
                       )

7      vs.             ) No. ADJ9801824
                       )

8  SPACE EXPLORATION TECH. CORP.; )
  CHUBB GROUP OF INS. CO.,    )

9                      )
           Defendants.  ) VOLUME III

10  _____)

11

12

13

14      DEPOSITION OF RUBEN JUAREZ, taken on behalf of

15  the Defendants, at 3600 Wilshire Boulevard,

16  Suite 2100, Los Angeles, California, commencing at

17  10:07 a.m., on Wednesday, October 21, 2015, before

18  DIANA ALDRICH, CSR No. 12877, Certified Shorthand

19  Reporter within and for the State of California.

20                * * *

21

22

23

24

25

                                                118

```
 1    APPEARANCES:

 2

 3

 4    FOR THE APPLICANT:

 5            LAW OFFICES OF GRAIWER & KAPLAN
              BY:   SAMUEL SALAZAR
 6                  ATTORNEY AT LAW
              3600 Wilshire Boulevard
 7            Suite 2100
              Los Angeles, California 90010
 8            (213) 380-7500

 9

10    FOR THE DEFENDANTS:

11            LAW OFFICES OF ROBIN, CARMACK and GONIA, LLP
              BY:   ROBERT M. ROBIN
12                  ATTORNEY AT LAW
              131 North El Molino Avenue
13            Suite 120
              Pasadena, California 91101
14            (626) 568-9800

15

16

17

18

19

20

21

22

23

24

25
                                                          119
```

477



I N D E X

WITNESS:                                                    PAGE

RUBEN JUAREZ

      Examination by Mr. Robin                        121


E X H I B I T S

(None entered)


QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

(NONE)


120

PERANICH REPORTING, INC.        (800) 956-4784        (714) 637-3774

478

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 21, 2015

 2                   10:07 A.M. - 12:02 P.M.

 3                          *  *  *

 4

 5                      RUBEN JUAREZ,

 6     called as a witness on behalf of the Defendants, having

 7     been first duly sworn, was examined and testified as

 8     follows:

 9

10                       EXAMINATION

11     BY MR. ROBIN:

12        Q.    Would you state your full name for the record,

13     please.

14        A.    Ruben Hernandez Juarez.

15        Q.    Good morning, Mr. Juarez.

16        A.    Good morning.

17        Q.    I'm Robert Robin.  We've met before as you

18     recall.

19        A.    Yes, I recall.

20        Q.    I'm about to continue your deposition.  This

21     is volume three.  You've had an opportunity of meeting

22     with your attorney and preparing for this session

23     today?

24        A.    Yes.

25        Q.    About how much time did you spend?

                                                        121
```

1  he just sent me to do exercise.

2     Q.   What kind?

3     A.   He didn't say.

4     Q.   But you don't do any exercise other than this

5  occasional walking around the neighborhood, correct?

6     A.   Correct.

7     MR. ROBIN:  Shall we stipulate to relieve the

8  reporter of her obligation to file the original

9  transcript?  Original and one copy to Applicant's

10  attorney, copy to myself;

11     Any changes, amendments, deletions or

12  corrections in the testimony of the deponent shall be

13  noticed in writing within 45 days of receipt of the

14  transcript;

15     If the signed original is not available for

16  any reason, an unsigned copy can be introduced for all

17  purposes into evidence as though a fully signed

18  original.

19     Can I have a four on one page copy also?

20     So stipulated?

21     MR. SALAZAR:  So stipulated.

22     MR. ROBIN:  Start time, please?

23     THE REPORTER:  The start time is 10:07 a.m.,

24  and the stop time is 12:02 p.m.

25     (Deposition proceedings concluded at 12:02 p.m.)

174

DECLARATION UNDER PENALTY OF PERJURY

     I, the undersigned, say I have read the foregoing deposition and declare under penalty of perjury that the foregoing is true and correct.

     Executed this _____ day of _____,

2015, at _____, _____.

                                        _____
                                        RUBEN JUAREZ

175

481

REPORTER'S CERTIFICATE

1

2

3    I, DIANA ALDRICH, CSR #12877, a Certified

4    Shorthand Reporter within and for the State of

5    California, do hereby declare:

6        That pursuant to 2093(b) CCP, I administered

7    the oath to the deponent;

8        That the foregoing deposition was taken

9    before me at the time and place set forth and was

10   taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction and

12   supervision;

13       That the foregoing deposition is a full,

14   true and correct transcript of my shorthand notes so

15   taken.

16       I further declare that I am neither counsel

17   for nor related to any of the parties to said action

18   nor in any way interested in the outcome thereof.

19       I declare under penalty of perjury this 30th

20   day of October, 2015, that the foregoing is true

21   and correct.

22

23       _Diana Aldrich_
         CERTIFIED SHORTHAND REPORTER
24       FOR THE STATE OF CALIFORNIA

25

PERANICH REPORTING     (800) 956-4784     (714) 637-3774

1

CORRECTIONS PAGE

2    Page  Line  Was                              Should be

3    ___   ___   _____        _____

4    ___   ___   _____        _____

5    ___   ___   _____        _____

6    ___   ___   _____        _____

7    ___   ___   _____        _____

8    ___   ___   _____        _____

9    ___   ___   _____        _____

10   ___   ___   _____        _____

11   ___   ___   _____        _____

12   ___   ___   _____        _____

13   ___   ___   _____        _____

14   ___   ___   _____        _____

15   ___   ___   _____        _____

16   ___   ___   _____        _____

17   ___   ___   _____        _____

18   ___   ___   _____        _____

19   ___   ___   _____        _____

20   ___   ___   _____        _____

21   ___   ___   _____        _____

22   ___   ___   _____        _____

23   ___   ___   _____        _____

24         _____            _____
                 SIGNATURE                          DATE
25

**PERANICH REPORTING, INC.**          **(800) 956-4784**          **(714) 637-3774**

# EXHIBIT 42



From: **Jane Malubag** Jane.Malubag@spacex.com
Subject: RE: MSDS
Date: March 12, 2015 at 8:23 PM
To: ruben juarez rubjua70@yahoo.com
Cc: Mike Lynch Mike.Lynch@spacex.com

Hi Ruben,

I wanted to follow-up on the voice message that you left for Mike and
myself today regarding your request for the MSDS' listed below in your
e-mail.  All the documents were sent to our insurance company and will
be forwarded to your attorney.  Please contact your lawyer for a copy.

Thank you.

--
Jane Malubag


-----Original Message-----
From: Jane Malubag
Sent: Tuesday, March 03, 2015 4:14 PM
To: ruben juarez
Cc: Mike Lynch
Subject: RE: MSDS

Hi Ruben,

The records will be sent to your attorney by our insurance company.
Also, Diane Prins is no longer with SpaceX so I've copied Mike Lynch,
HR Director, to this e-mail.  Thank you.

Sincerely,
Jane Malubag

-----Original Message-----
From: ruben juarez [mailto:rubjua70@yahoo.com]
Sent: Tuesday, March 03, 2015 3:43 PM
To: Jane Malubag
Cc: Diane Prins
Subject: MSDS

Hello Jane,

I need a copy of the following MSDS, who do I need to contact to
obtain them?

1. Arathane two part mix.
2. Thinner 521.
3. 63/37 eutectic solder wire.
4. HumiSeal 1A33 conformal coating.
5. Isopropyl alcohol (IPA).



EXHIBIT 26
Ruben Juarez
03/15/2018
Elizabeth Schmidt
CSR#13598

Thank you

Regards,

Ruben Juarez

# EXHIBIT 43

**Catalona, Alex**

| | |
|---|---|
| **From:** | Teresa Li <teresa@lawofficesofteresali.com> |
| **Sent:** | Monday, March 05, 2018 11:24 AM |
| **To:** | Catalona, Alex |
| **Cc:** | Teresa Li; Milanfar, Shahrad |
| **Subject:** | Re: Juarez case - depo. notice to plaintiff Ruben Juarez |

He does not need an interpreter.
Teresa Li, Esq.
Law Offices of Teresa Li, PC
East Bay Office:
6701 Koll Center Parkway, Suite 250
Pleasanton, CA 94566
Phone: (888) 635-3259
Fax:    (888) 646-5493
Email: Teresa@LawOfficesOfTeresaLi.com
www.lawofficesofteresali.com

San Francisco Satellite Office:
315 Montgomery Street, 9th Floor
San Francisco, CA 94104
Phone: (415) 423-3377
Fax: (415) 423-3402

CONFIDENTIALITY NOTICE:    This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.

On Mar 5, 2018, at 11:22 AM, Catalona, Alex <acatalona@bkscal.com> wrote:

Teresa,  Last week Jerry emailed you an amended deposition notice with the address.

Los Angeles Marriott Burbank
2500 N. Hollywood Way, Meeting Room P125E
Burbank, CA 91505

Please confirm that Ruben Juarez does not need an interpreter for the deposition.  Thank you.
-Alex

**From:** Teresa Li [mailto:teresa@lawofficesofteresali.com]
**Sent:** Wednesday, February 28, 2018 5:11 PM
**To:** Catalona, Alex <acatalona@bkscal.com>
**Cc:** Milanfar, Shahrad <smilanfar@bkscal.com>
**Subject:** Re: Juarez case - depo. notice to plaintiff Ruben Juarez

1

488

# EXHIBIT 44

COLOR



Arathane

🔍

Search Tips

59 results, Page 1

**Arathane** 3304 IS CH (/msds/7574963/arathane-3304-is-ch)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials |
| Product code | 00054220 |
| Revision date | 2012 August 10 |
| Language | Danish |

(/view/4373370/7574963)

**Arathane** 5750 B (LV) (/msds/7815589/arathane-5750-blv)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials (Vantico AG) |
| Product code | 00055441 |
| Revision date | 2012 December 19 |
| Language | English |

(/view/3712598/7815589)

**Arathane** 5750 B (LV) (/msds/7848053/arathane-5750-blv)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | |
| Revision date | 2013 December 11 |
| Language | English |

(/view/4503497/7848053)

**Arathane** 7760 (/msds/9973867/arathane-7760)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | |

Search Results - Free SDS search        https://www.msds.com/Msds/Search?q=Arathane&start=20

Case 2:17-cv-03342-ODW-GJS  Document 40-3  Filed 08/24/18  Page 152 of 168  Page ID
#:825



Arathane

Search Tips

**59 results, Page 2**

**Arathane 3427 PO Cl** (/msds/5469346/arathane-3427-po-ci)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials (Vantico AG) |
| **Product code** | |
| **Revision date** | 2009 March 21 |
| **Language** | English |

(/view/3191868/5469346)

**Arathane CW 8690** (/msds/3555518/arathane-cw-8690)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials America Inc |
| **Product code** | |
| **Revision date** | 2004 February 17 |
| **Language** | English |

(/view/2168120/3555518)

**Arathane 5753 B(LV)** (/msds/8036441/arathane-5753-blv)

| | |
|---|---|
| **Manufacturer** | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| **Product code** | |
| **Revision date** | 2013 December 11 |
| **Language** | English |

(/view/4598496/8036441)

**Arathane 7760-1** (/msds/8034999/arathane-7760-1)

| | |
|---|---|
| **Manufacturer** | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| **Product code** | |

(/view/4559252/8034999)

Revision date    2013 December 11
Language    English

**Arathane** 3304 IS (/msds/5373878/arathane-3304-is)
Manufacturer    Huntsman Advanced Materials
Product code
Revision date    2009 March 27
Language    Danish

(/view/3146287/5373878)

**Arathane** AY 5510 (/msds/1544889/arathane-ay-5510)
Manufacturer    Ciba Specialty Chemicals Canada
Product code
Revision date    1992 May 12
Language    English

(/view/1002972/1544889)

**Arathane** AY 5500 (/msds/1545321/arathane-ay-5500)
Manufacturer    Ciba Specialty Chemicals Canada
Product code
Revision date    1992 May 12
Language    English

(/view/1003178/1545321)



**Arathane 5750 B ( LV ) (/msds/7970970/arathane-5750-b-lv)**
Manufacturer    Huntsman Petrochemical Corporation (ALL MSDS REQUEST)
Product code
Revision date    2013 December 11
Language    French

(/view/4562551/7970970)



**Arathane 5750 Part A (/msds/7970960/arathane-5750-part-a)**
Manufacturer    Huntsman Petrochemical Corporation (ALL MSDS REQUEST)
Product code
Revision date

(/view/4562541/7970960)

2013 December 11

**Language**   | French |



(/view/4576028/8046742)

### Arathane 7760 (/msds/8046742/arathane-7760)

| | |
|---|---|
| **Manufacturer** | Huntsman Petrochemical Corporation |
| **Product code** | |
| **Revision date** | 2013 December 11 |
| **Language** | | English | |

(/view/3161155/7867293)

### Arathane 3304 IS CH (/msds/7867293/arathane-3304-is-ch)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials |
| **Product code** | 00054220 |
| **Revision date** | 2012 August 10 |
| **Language** | | Italian | |

### Arathane 5750 A (/msds/6395995/arathane-5750-a)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials (Vantico AG) |
| **Product code** | |
| **Revision date** | 2010 June 09 |
| **Language** | | English | |

(/view/3712620/6395995)



(/view/5591335/9737091)

### Arathane 5750 A (/msds/9737091/arathane-5750-a)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials Americas Inc. |
| **Product code** | 00052694 |
| **Revision date** | 2013 December 11 |
| **Language** | | French | |



(/view/5591336/9737092)

### Arathane 5750 B(LV) (/msds/9737092/arathane-5750-blv)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials Americas Inc. |
| **Product code** | |
| **Revision date** | 2013 December 11 |
| **Language** | |

493
4

French

**Arathane** 7762 US (/msds/7130492/arathane-7762-us)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | 00066332 |
| Revision date | 2013 February 22 |
| Language | English |

(/view/4048750/7130492)

**Arathane** AW 8680US (/msds/7124419/arathane-aw-8680us)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials America Inc |
| Product code | |
| Revision date | 2010 August 13 |
| Language | English |

(/view/1491282/7124419)

**Arathane** 7760 (/msds/9680140/arathane-7760)

| | |
|---|---|
| Manufacturer | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| Product code | 00066724 |
| Revision date | 2013 December 11 |
| Language | English |

(/view/3950601/9680140)

**Arathane** Ay 8685 (/msds/3828217/arathane-ay-8685)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | |
| Revision date | 2004 January 21 |
| Language | English |

(/view/2322001/3828217)

**Arathane** 7762 (/msds/8519307/arathane-7762)

| | |
|---|---|
| Manufacturer | Huntsman Petrochemical Corporation |
| Product code | |
| Revision date | 2013 December 12 |
| Language | English |

(/view/1468659/8519307)

(/view/4848429/8519794)

**Arathane** 5750 B(LV) (/msds/8519794/arathane-5750-blv)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | 00055441 |
| Revision date | 2013 December 11 |
| Language | English |

Previous (/Msds/Search?q=Arathane&start=0)   1 (/Msds/Search?q=Arathane&start=0)   2 (/Msds/Search?q=Arathane&start=20)

3 (/Msds/Search?q=Arathane&start=40)   Next (/Msds/Search?q=Arathane&start=40)



(http://www.verisk3e.com)

Terms and Conditions (/Content/3E SDS Online Terms Conditions.pdf)     Compliance Solutions (http://www.verisk3e.com/solutions)
Industries (http://www.verisk3e.com/industries)     About Verisk 3E (http://www.verisk3e.com/about-verisk3E/)
News & Events (http://www.verisk3e.com/news-events)     Corporate Governance (http://www.verisk3e.com/corporate-governance)
Privacy Policy (http://www.verisk3e.com/privacy)     Contact Verisk 3E (http://www.verisk3e.com/contact-us)

©2018 Verisk 3E (http://verisk3e.com). All Rights Reserved.
Version 1.4.7.0



**VERISK ANALYTICS®**

(/view/3249566/9973867)

00066724

| | |
|---|---|
| Revision date | 2013 December 11 |
| Language | English |

**Arathane** 7762 (/msds/6764018/arathane-7762)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials America Inc |
| Product code | |
| Revision date | 2009 June 10 |
| Language | English |

(/view/3867333/6764018)

**Arathane** 4497 Po (/msds/9644398/arathane-4497-po)

| | |
|---|---|
| Manufacturer | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| Product code | |
| Revision date | 2008 February 25 |
| Language | English |

(/view/5543426/9644398)

**Arathane** AW 8680 US (/msds/7095991/arathane-aw-8680-us)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas inc. |
| Product code | |
| Revision date | 2010 August 13 |
| Language | English |

(/view/2277073/7095991)

**Arathane** 5888 PO US (/msds/10008393/arathane-5888-po-us)

| | |
|---|---|
| Manufacturer | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| Product code | |
| Revision date | 2013 October 30 |
| Language | English |

(/view/5738550/10008393)

**Arathane** 5753 A US (/msds/9664745/arathane-5753-a-us)

| | |
|---|---|
| Manufacturer | Huntsman Pigments Americas LLC |
| Product code | 00055777 |
| Revision date | |

(/view/5555805/9664745)

497
8

2013 October 03

Language  English



## Arathane 5888 IS US (/msds/10007978/arathane-5888-is-us)

(/view/5738300/10007978)

**Manufacturer**  Huntsman Petrochemical Corporation (ALL MSDS REQUEST)
**Product code**
**Revision date**  2013 October 30
**Language**  English



## Arathane 5750B (LV) (/msds/7879765/arathane-5750b-lv)

(/view/1398366/7879765)

**Manufacturer**  Huntsman Advanced Materials Americas inc.
**Product code**  FPC0078
**Revision date**  2013 December 11
**Language**  English



## Arathane 5750A (/msds/7879764/arathane-5750a)

(/view/1328677/7879764)

**Manufacturer**  Huntsman Advanced Materials Americas inc.
**Product code**  FPC0101
**Revision date**  2013 December 11
**Language**  English



## Arathane 3304 IS CH (/msds/7889205/arathane-3304-is-ch)

(/view/3235907/7889205)

**Manufacturer**  Huntsman Advanced Materials
**Product code**  00054798, 2100129
**Revision date**  2012 August 10
**Language**  Danish



## Arathane AW 5540 Us (/msds/7899881/arathane-aw-5540-us)

(/view/1503929/7899881)

**Manufacturer**  Huntsman Advanced Materials America Inc
**Product code**
**Revision date**  2013 February 22
**Language**

English

**Arathane** 5753 A (/msds/10178536/arathane-5753-a)

(/view/5850280/10178536)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | |
| Revision date | 2015 December 09 |
| Language | English |

**Arathane** 5753 B(LV) (/msds/10390104/arathane-5753-blv)

(/view/5555801/10390104)

| | |
|---|---|
| Manufacturer | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| Product code | |
| Revision date | 2016 December 16 |
| Language | French |

**Arathane** 5753TX (/msds/8359106/arathane-5753tx)

(/view/4689533/8359106)

| | |
|---|---|
| Manufacturer | Specialty Polymers & Services, Inc. / SP&S |
| Product code | |
| Revision date | 2010 September 05 |
| Language | English |

**Arathane** 3427 PO (/msds/5717946/arathane-3427-po)

(/view/3191019/5717946)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials |
| Product code | |
| Revision date | 2009 March 21 |
| Language | German |

**Arathane** 3427 PO (/msds/5717945/arathane-3427-po)

(/view/3146190/5717945)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials (Vantico AG) |
| Product code | |
| Revision date | 2009 March 27 |
| Language | Danish |

(/view/4737200/8291948)

**Arathane** 5750 LV A/B Freeze-Pak (/msds/8291948/arathane-5750-lv-a-b-freeze-pak)

| | |
|---|---|
| Manufacturer | Bacon Industries Inc. |
| Product code | |
| Revision date | 2013 July 31 |
| Language | English |

1 (/Msds/Search?q=Arathane&start=0)    2 (/Msds/Search?q=Arathane&start=20)    3 (/Msds/Search?q=Arathane&start=40)

Next (/Msds/Search?q=Arathane&start=20)



(http://www.verisk3e.com)

Terms and Conditions (/Content/3E SDS Online Terms Conditions.pdf)    Compliance Solutions (http://www.verisk3e.com/solutions)

Industries (http://www.verisk3e.com/industries)    About Verisk 3E (http://www.verisk3e.com/about-verisk3E/)

News & Events (http://www.verisk3e.com/news-events)    Corporate Governance (http://www.verisk3e.com/corporate-governance)

Privacy Policy (http://www.verisk3e.com/privacy)    Contact Verisk 3E (http://www.verisk3e.com/contact-us)

©2018 Verisk 3E (http://verisk3e.com). All Rights Reserved.
Version 1.4.7.0



VERISK ANALYTICS®



Arathane

Search Tips

**59 results, Page 3**

**Arathane** 7762-1 (/msds/8489968/arathane-7762-1)

(/view/4833035/8489968)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials Americas Inc. |
| Product code | |
| Revision date | 2013 December 12 |
| Language | English |

**Arathane** (Uralane) 7768 (/msds/4454649/arathane-uralane-7768)

(/view/2553095/4454649)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials America Inc |
| Product code | FPC3111 |
| Revision date | 2004 January 29 |
| Language | English |

**Arathane** 3304 IS CI (/msds/6359543/arathane-3304-is-ci)

(/view/3146290/6359543)

| | |
|---|---|
| Manufacturer | Huntsman Advanced Materials |
| Product code | |
| Revision date | 2009 March 22 |
| Language | English |

**Arathane** 5874 PO US (/msds/4278312/arathane-5874-po-us)

| | |
|---|---|
| Manufacturer | Huntsman International LLC |
| Product code | |

(/view/2553144/4278312)                    13483, 5874
                        **Revision date**    2004 January 29
                        **Language**    English

**Arathane** 5814 IS US (/msds/4255270/arathane-5814-is-us)
                        **Manufacturer**    Huntsman Advanced Materials Americas Inc.
                        **Product code**
(/view/2535863/4255270)    **Revision date**    2004 January 28
                        **Language**    English

**Arathane** 5750 A (/msds/8843332/arathane-5750-a)
                        **Manufacturer**    Huntsman Advanced Materials Americas Inc.
                        **Product code**    00052694
(/view/4487621/8843332)    **Revision date**    2013 December 11
                        **Language**    English

**Arathane** CY 8877 (/msds/4117343/arathane-cy-8877)
                        **Manufacturer**    Huntsman Advanced Materials Americas inc.
                        **Product code**
(/view/2474579/4117343)    **Revision date**    2004 January 29
                        **Language**    English

**Arathane** 5753 A (/msds/12376545/arathane-5753-a)
                        **Manufacturer**    Huntsman Holland BV Huntsman Polyurethanes
                        **Product code**
(/view/7758636/12376545)    **Revision date**    2017 September 12
                        **Language**    French

**Arathane** 5753 A (/msds/13133518/arathane-5753-a)
                        **Manufacturer**    Huntsman Petrochemical Corporation
                        **Product code**
(/view/8405345/13133518)    **Revision date**



2015 December 09

**Language**    French



(/view/2536306/13155561)

### Arathane 5814 PO US (/msds/13155561/arathane-5814-po-us)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials Americas Inc. |
| **Product code** | |
| **Revision date** | 2016 May 04 |
| **Language** | English |



(/view/2553610/13155778)

### Arathane 3304 IS CH (/msds/13155778/arathane-3304-is-ch)

| | |
|---|---|
| **Manufacturer** | Huntsman Petrochemical Corporation |
| **Product code** | |
| **Revision date** | 2017 January 10 |
| **Language** | English |



(/view/8447223/13205627)

### Arathane AW 8680 US (/msds/13205627/arathane-aw-8680-us)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials Americas Inc. |
| **Product code** | |
| **Revision date** | 2010 August 13 |
| **Language** | French |



(/view/1399622/8039734)

### Arathane 5753A (/msds/8039734/arathane-5753a)

| | |
|---|---|
| **Manufacturer** | Huntsman Advanced Materials Americas Inc. |
| **Product code** | |
| **Revision date** | 2013 December 11 |
| **Language** | English |



(/view/1398368/9973834)

### Arathane 5753 B(LV) (/msds/9973834/arathane-5753-blv)

| | |
|---|---|
| **Manufacturer** | Huntsman Petrochemical Corporation (ALL MSDS REQUEST) |
| **Product code** | 00056450 |
| **Revision date** | 2013 December 11 |
| **Language** | |

English



**Arathane** 5750AB(LV) Pre-mixed & Frozen (/msds/12084947/arathane-5750ablv-pre-mixed-frozen)

(/view/7608317/12084947)

| **Manufacturer** | Specialty Polymers & Services, Inc. / SP&S |
| **Product code** | |
| **Revision date** | 2017 June 14 |
| **Language** | English |



**Arathane** 5750LV A/B/ACC/COS/Tracer Freezepack (/msds/8120044/arathane-5750lv-a-b-acc-cos-tracer-freezepack)

(/view/4623141/8120044)

| **Manufacturer** | Bacon Industries Inc. |
| **Product code** | |
| **Revision date** | 2014 October 14 |
| **Language** | English |



**Arathane** 3304 IS (/msds/6702934/arathane-3304-is)

(/view/3131976/6702934)

| **Manufacturer** | 亨斯迈化工贸易 (上海) 有限公司 |
| **Product code** | |
| **Revision date** | 2009 March 24 |
| **Language** | Chinese (Simplified) |



**Arathane** 5750A or Part A (/msds/7091693/arathane-5750a-or-part-a)

(/view/4030226/7091693)

| **Manufacturer** | RAM Technical Coatings LLC |
| **Product code** | B185313, HMS 16-2105, SCD 172605, SCGMS 56021, SM80164 |
| **Revision date** | |
| **Language** | English |

**Arathane** 5750B (LV) or Part B (Type II) (/msds/7091687/arathane-5750b-lv-or-part-b-type-ii)

(/view/4030221/7091687)

| **Manufacturer** | RAM Technical Coatings LLC |
| **Product code** | |

HMS 16-2105, SCD 172605, SCGMS 56021

**Revision date**

**Language**    English

Previous (/Msds/Search?q=Arathane&start=20)    1 (/Msds/Search?q=Arathane&start=0)    2 (/Msds/Search?q=Arathane&start=20)

3 (/Msds/Search?q=Arathane&start=40)

506
17

6/27/2018, 4:26 PM



(http://www.verisk3e.com)

Terms and Conditions (/Content/3E SDS Online Terms Conditions.pdf)    Compliance Solutions (http://www.verisk3e.com/solutions)

Industries (http://www.verisk3e.com/industries)    About Verisk 3E (http://www.verisk3e.com/about-verisk3E/)

News & Events (http://www.verisk3e.com/news-events)    Corporate Governance (http://www.verisk3e.com/corporate-governance)

Privacy Policy (http://www.verisk3e.com/privacy)    Contact Verisk 3E (http://www.verisk3e.com/contact-us)

©2018 Verisk 3E (http://verisk3e.com). All Rights Reserved.
Version 1.4.7.0



**VERISK ANALYTICS®**