Shahrad Milanfar (SBN 201126)
smilanfar@bkscal.com
Alex P. Catalona (SBN 200901)
acatalona@bkscal.com
BECHERER KANNETT & SCHWEITZER
1255 Powell Street
Emeryville, CA 94608
Telephone: (510) 658-3600
Facsimile: (510) 658-1151

Attorneys for Defendant
PRECISION VALVE & AUTOMATION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN JUAREZ, an individual and ISELA HERNANDEZ, an individual,<br><br>Plaintiffs,<br><br>PRECISION VALVE & AUTOMATION, INC., a corporation and DOES 1-20,<br><br>Defendants. | CASE NO. CV17-03342-ODW (GJSX)<br>[L.A.S.C. Case No. BC650229]<br><br>**SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: October 1, 2018<br>Time: 1:30 p.m.<br>Ctrm: 5D, 5th Floor<br>Judge: Hon. Otis D. Wright II<br><br>*This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on July 16, 2018. (Catalona Dec., 9:9-17, 690-694.)<br><br>**Defendant requests oral argument on this motion for summary judgment. |

Pursuant to Local Rule 56-1 of the United States District for the Central District of California, defendant Precision Valve & Automation, Inc. ("PVA") respectfully submits the following Uncontroverted Facts and Conclusions of Law in support of its

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

Motion for Summary Judgment.

## I. STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF SUMMARY JUDGMENT BASED ON CALIFORNIA'S TWO-YEAR STATUTE OF LIMITATIONS

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| 1.  Plaintiffs reside in Granada Hills, California, in the County of Los Angeles. | 1.  Complaint, Notice of Removal and First Amended Complaint.<br><br>(Declaration of Alex P. Catalona ("Catalona Dec."), 12:22-23, 23:11-12, 57:2-4.)[1] |
| 2.  PVA is headquartered and incorporated in the State of New York. | 2.  Notice of Removal and Declaration of Jonathan Urquhart.<br><br>(Catalona Dec., 23:13-15, 24:17-19; Declaration of Jonathan Urquhart ("Urquhart Dec."), 1:4-7.) |
| 3.  The PVA 350 is a conformal coating machine manufactured by PVA which is known in the industry as a "workcell." | 3.  Urquhart Dec. and PVA manual.<br><br>(Urquhart Dec., 2:4-5, 77.) |
| 4.  PVA sold a single PVA 350 to SpaceX in 2009. | 4.  Urquhart Dec. and March, 2018 Deposition of Ruben Juarez ("Juarez Depo."), and exhibits.<br><br>(Urquhart Dec., 1:11-18, 1:25-27, 5-6, 8, 12-14, 23; Catalona Dec., 265:21-24, 266:13-18, 267:19-24, 359-61.). |
| 5.  This machine coats printed circuit boards with a thin polymeric film that "conforms" to the board's contours to protect against moisture, dust, chemicals and temperature extremes. | 5.  Urquhart Dec.<br><br>(Urquhart Dec., 1:14-17.). |
| 6.  When it was manufactured, SpaceX specified that the machine would spray Electrolube "NVOC," a 100% solids content | 6.  Urquhart Dec., and exhibits. |

---

[1] Please note that page numbers referenced in this Separate Statement were added to the bottom right corner of each witness declaration and attached exhibits pursuant to Local Rule 11-5.2.

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| material that did not contain solvent material (such as Humiseal or Arathane.) | (Urquhart Dec., 28, 30, 63-64.) |
| 7.     In any event, the PVA 350 was built with safety features to prevent users from breathing materials used inside the machine. First, the machine monitored its exhaust flow and turned off if the exhaust system was not operating. | 7.     Urquhart Dec., PVA Manual.  (Urquhart Dec., 2:24-26, 98-99.) |
| 8.     As stated in the manual provided to SpaceX in 2009, it "must exhaust at a rate of no less than 150 cubic feet per minute, otherwise a critical fault will occur shutting the motors down." | 8.     Urquhart Dec., PVA Manual and exhibits.  (Urquhart Dec., 2:23-26, 21, 98-99.) |
| 9.     Second, the machine is a closed system with a door and negative air pressure to prevent chemicals from escaping. | 9.     Urquhart Dec.  (Urquhart Dec., 2:27-28.) |
| 10.     If the door of the machine is opened, the spraying of materials will stop. | 10.     Urquhart Dec., PVA Manual and exhibits.  (Urquhart Dec., 2:28-3:1, 21, 96-97.) |
| 11.     "When the door is opened power to the motors and pneumatics is disconnected." | 11.     Urquhart Dec., PVA Manual and exhibits.  (Urquhart Dec., 2:28-3:1, 21, 96-97.) |
| 12.     Third, the machine cannot be operated until a machine safety check is performed which ensures that all safety features are working properly:  "The machine safety check ensures the workcell safety devices (emergency stop, door interlocks, light curtain, etc.) are operating properly.  During startup, the operator must enter the safety check and complete it successfully.  Otherwise the machine halts all operations." | 12.     Urquhart Dec., PVA Manual and exhibits.  (Urquhart Dec., 3:2-6, 21, 96-99.) |
| 13.     The machine's manual lists all of these features and explicitly warn users not to "disable the safety features of the machine." | 13.     PVA Manual.  (Urquhart Dec., 96.) |
| 14.     It also states:  "NOTE: The safety features should NEVER be bypassed, | 14.     PVA Manual. |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| disabled or tampered with.  Precision Valve & Automation, Inc. is not responsible for any damages incurred, mechanical or human, because of alteration or destruction of any safety features." | (Urquhart Dec., 74, 96.) |
| 15.    "Operation of your workcell involves, air pressure, electrical power and mechanical devices *and the use of Hazardous materials*....  There are no dangerous materials or chemicals used in the operation of the machine *except for the required application material*.  The application material *should include a Material Safety Data Sheet (MSDS)*, which specifies known dangers and toxicity." | 15.    PVA Manual. (Urquhart Dec., 86-87 (emphasis added).). |
| 16.    Juarez testified that when he worked at SpaceX he never looked at this manual or asked to look at this manual for the PVA 350. | 16.    Deposition of Ruben Juarez ("Juarez Depo.). (Catalona Dec., 279:16, 291:17-18, 293:4-17.) |
| 17.    SpaceX is a designer and manufacturer of advanced rockets and spacecraft. | 17.    Declaration of Gregory Maxwell. (Declaration of Gregory Maxwell ("Maxwell Dec."), 1:5-6.) |
| 18.    After purchasing the PVA 350 in 2009, SpaceX did not begin to use Humiseal and Arathane materials, which were not originally specified for the machine, until 2012 at the earliest. | 18.    Urquhart Dec., and exhibits; Declaration of David Hwang ("Hwang Dec.") and exhibits. (Urquhart Dec., 3:15-17, 28, 63, 230; Hwang Dec., 2:6-12, 35-41.) |
| 19.    When SpaceX originally began using these chemicals, numerous employees from the Avionics department were brought together to determine the appropriate formulation of Arathane and Humiseal materials for SpaceX's conformal coating applications. | 19.    Maxwell Dec. (Maxwell Dec., 2:19-28.) |
| 20.    These employees included Ruben Juarez who Avionics Department supervisor Gregory Maxwell testified hand-mixed | 20.    Maxwell Dec.; Juarez Depo. (Maxwell Dec., 2:21-23; Catalona |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| experimental and test batches of Arathane and Humiseal to make different formulations. | Dec., 246:10-12, 247:18-22, 322:1-2, 322:9-15, 329:17-330:4, 686-88.) |
| 21.    Before hand-mixing these materials, Juarez reviewed the MSDS sheets for Arathane and Humiseal to ensure they cured and "set up" properly so SpaceX's desired result was achieved. | 21.    Maxwell Dec.<br><br>(Maxwell Dec., 2:25-28.) |
| 22.    The Avionics Department also required workers who used the PVA 350, including Juarez, to follow SpaceX's "standard operating procedures" entitled "Avionics Standard Operating Procedure: Polymeric Application of Electronic Assemblies." | 22.    Hwang Dec.; Maxwell Dec., Declaration of Duc Q. Phan ("Phan Dec."); SpaceX Standard Operating Procedures.<br><br>(Hwang Dec., 1:15-26, 4, 14, 24; Maxwell Dec., 1:23-2:2, 5, 15, 25, Phan Dec., 1:14-20, 4, 14; Dec. of SpaceX records custodian, Lynette Dhillon ("Dhillon Dec."), 1:16-17, 3:11-17, 5, 15, 25.) |
| 23.    These Standard Operating Procedures ("SOPs") instructed SpaceX employees to use a facemask and operate the machine in a well-ventilated area, pursuant to instructions in MSDS sheets for the specific coating materials that were used in the machine. | 23.    Hwang Dec.; SpaceX Standard Operating Procedures.<br><br>(Hwang Dec., 1:25-26, 5, 6, 15, 16, 25, 26.) |
| 24.    These SOPs also specified that the machine's coating materials included Humiseal 1A33 conformal coating and Humiseal 521 thinner. | 24.    Hwang Dec.; SpaceX Standard Operating Procedures.<br><br>(Hwang Dec., 1:15-26, 6, 16, 26.) |
| 25.    These SOPs also instructed SpaceX employees to "[p]rogram the machine per operating instructions in the PVA Manual." | 25.    Hwang Dec.; SpaceX Standard Operating Procedures.<br><br>(Hwang Dec., 1:15-26, 9, 11, 19, 21, 29, 32.) |
| 26.    SpaceX maintained copies of all manufacturer operating instructions and specifications for its purchased equipment including the PVA 350. | 26.    Hwang Dec.<br><br>(Hwang Dec., 1:15-17.) |
| 27.    Ruben Juarez worked as a programmer at SpaceX from January, 2012 | 27.    Juarez Depo.; job offer letter with acceptance; Workers' |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| to the end of March, 2014. | Compensation ("Comp.") Claim.<br><br>(Catalona Dec., 261:21-24, 301:17-22, 303:25-304:8, 307:14-19, 317:7-9, 355, 357.) |
| 28.    During this entire period, his job duties never changed. | 28.    Juarez Depo.; Deposition of Ruben Juarez in Workers' Compensation Action ("Juarez Workers' Comp. Depo.").<br><br>(Catalona Dec., 256:23-24, 443:22-444:9.) |
| 29.    Juarez testified that his job was to program the PVA 350, for which he was its "main support." | 29.    Juarez Depo.<br><br>(Catalona Dec., 257:25-258:6, 263:1-5.) |
| 30.    Plaintiffs also admitted in their complaint that "[d]uring Plaintiff Ruben Juarez's time at Space X, Plaintiff Ruben Juarez was *in charge of* programming the PVA 350 to spray Arathane 5750A, Arathane 5750B, Arathane 5750 A/B, and Humiseal thinner." | 30.    First Amended Complaint ("FAC.")<br><br>(Catalona Dec, 59:5-8 (emphasis added).) |
| 31.    This required Juarez to spend 60% of his time inside the conformal coating room which housed the machine. | 31.    Juarez Depo.<br><br>(Catalona Dec., 258:12-259:4, 261:21-24, 264:1-9.) |
| 32.    He testified that he was actually required to work *inside the machine* itself to verify the appropriate thickness of the coatings sprayed on SpaceX components. | 32.    Juarez Depo.<br><br>(Catalona Dec., 258:12-259:4, 261:25-262:25, 449:24-450:24, 451:17-23, 452:2-10, 460:6-13, 461:1-12.) |
| 33.    Throughout his time with SpaceX, he worked with one of the conformal coating materials, Humiseal thinner 521, on a daily basis. | 33.    Juarez Depo.<br><br>(Catalona Dec., 336:3-8, 336:17-19, 385, 448:12-449:12.) |
| 34.    Later, he also programmed other machines called "SMT" or "pick and place" machines, but he did not know when this work began during his more than two years | 34.    Juarez Depo.<br><br>(Catalona Dec., 320:4-7, 320:19-321:7, |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| at SpaceX. | 321:16-25.) |
| 35.    Mr. Juarez testified that within "two weeks" after starting at SpaceX, he began to be exposed to "toxic chemicals" when he started programming the PVA 350. | 35.    Juarez Depo. <br><br> (Catalona Dec., 261:21-263:14, 317:7-318:10.) |
| 36.    Then, in August or September of 2012, he started getting migraine headaches, dizziness, sinus symptoms and difficulty walking. | 36.    Juarez Depo.; Windman Report; Juarez Workers' Comp. Depo. <br><br> (Catalona Dec., 316:3-4, 318:20-22, 402, 446:6-10, 471:4-14.) |
| 37.    In the complaint, plaintiffs allege that starting in June, 2012, Juarez had "over 9 hospitalizations" and "at least 21 visits to urgent care/emergency room for symptoms associated with toxic chemical exposure." | 37.    FAC. <br><br> (Catalona Dec., 62:3-6.) |
| 38.    He told neurologist Isaac Regev, M.D., that "almost from the beginning he noted frequent headaches at work which he felt was associated with exposure to various chemicals." | 38.    Regev Report. <br><br> (Catalona Dec., 368.) |
| 39.    He made similar statements to psychologist Gayle K. Windman, Ph.D.:  "*A few months after he began working at SpaceX,* Mr. Juarez developed symptoms of migraine headaches, dizziness, difficulty walking and sinus symptoms due to exposure to electronic materials such as tin and lead; *chemical coatings such as Arathane and HumiSeal*; and cleaning substances such as thinners and isopropyl alcohol.  *He reported this issue to his supervisor to no avail.*" | 39.    Windman Report. <br><br> (Catalona Dec., 402 (emphasis added).) |
| 40.    In particular, he was upset that the safety features of the PVA 350 were being bypassed which he determined was "hazardous": <br><br> So sometimes you have to open it.  And in normal conditions, it should have shut down, not allow you to work on the machine.  But somebody will *bypass the* | 40.    Workers' Comp. Depo. <br><br> (Catalona Dec., 450:14-20, 452:22-24 (emphasis added).) |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| *safety switch.*<br><br>Q. So what does that mean?  The machine would operate while –<br><br>A.  While you open it, while it's still open, *which is hazardous*.  But that's the way they work | |
| 41.    He also told his toxicologist that "my employer bypass the safety switch" on this equipment. | 41.    Medical Intake Form; Juarez Workers' Comp. Depo.<br><br>(Catalona Dec., 384, 450:14-20, 452:22-24.) |
| 42.    After reporting this issue to his employer, he also asked SpaceX to "upgrade" the PVA 350 which he felt should "have the alarm to know when the suction was working or not" which was necessary "to advise the operator that the suction system was not working or pulling all of the fumes out of it." | 42.    Juarez Workers' Comp. Depo.<br><br>(Catalona Dec., 472:13-473:6.) |
| 43.    As far as he knew, SpaceX never addressed any of his concerns. | 43.    Juarez Depo.; Juarez Workers' Comp. Depo.<br><br>(Catalona Dec., 334:18-335:14, 450:23.) |
| 44.    Eventually, he purchased a "separate standalone filtration system" for the conformal coating area "because the fumes can be pretty strong." | 44.    Juarez Depo.; Juarez Workers' Comp. Depo.<br><br>(Catalona Dec., 254:20-255:3, 472:13-473:6, 473:20-474:2.) |
| 45.    Humiseal thinner, which he reportedly handled on a daily basis, was both a cleaning agent and a conformal coating material. | 45.    Juarez Depo.; Juarez Workers' Comp. Depo.<br><br>(Catalona Dec., 270:20-25, 312:10-22, 448:12-449:12, 449:24-450:16.) |
| 46.    On a medical-intake form, he stated that he worked with the Arathane and Humiseal products for 4-5 hours every day, which caused headaches, dizziness, nausea, | 46.    Juarez Depo.; Medical Intake Form.<br><br>(Catalona Dec., 309:24-310:1, 310:8-21, 312:10-22, 313:24-314:8, 385-386, |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| eye irritation and tiredness. | 398.) |
| 47.     Then in January, 2013, he was diagnosed with a brain aneurysm and had brain surgery. | 47.     Juarez Depo.; History and Physical by Michael Alyesh, M.D. (Catalona Dec., 304:19-305:4, 316:1-2, 318:23-25, 363.) |
| 48.     Due to his illness and surgery, Ruben Juarez missed 33.6 weeks of work in 2013 and did not return to work after taking a third medical leave on March 26, 2014. | 48.     SpaceX employment records; FAC. (Dhillon Dec., 36-37; Catalona Dec., 62:16-17.) |
| 49.     Plaintiff filed his workers' compensation action on September 24, 2014, claiming his headaches and aneurysm were caused by "repetitive and continuous exposure" to toxic substances. | 49.     Workers' Comp. Claim. (Catalona Dec., 357.) |
| 50.     On February 3, 2015, he told Neurologist Isaac Regev, M.D. that "almost from the beginning he noted frequent headaches at work and he believed they were associated with chemicals used to clean electrical parts." | 50.     Juarez Depo.; Regev Report. (Catalona Dec., 337:20, 370.) |
| 51.     He admitted at his deposition that by this time he suspected his headaches and other symptoms were caused by "toxic exposure." | 51.     Juarez Depo.; Regev Report. (Catalona Dec., 337:20, 338:15-19, 370.) |
| 52.     The cleaning agents to which he alleged exposure in the workers' compensation action included Humiseal thinner 521 which he used to "soak parts to be cleaned" and to "flush equipment." | 52.     Workers' Comp. Depo.; March 3, 2015 Email. (Catalona Dec., 449:5-8, 449:19-23, 485-486.) |
| 53.     He also used Humiseal thinner 521 as a conformal coating material in the PVA 350. | 53.     Juarez Depo.; Workers' Comp. Depo. (Catalona Dec., 270:20-25, 312:10-22, 448:12-25, 450:6-16.) |
| 54.     Humiseal thinner 521 was the only "thinner" Juarez used at SpaceX. | 54.     Juarez Depo.; Regev Report; March 3, 2015 Email. |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| | (Catalona Dec., 270:20-25, 312:10-22, 336:3-8, 336:17-19, 385, 485-486.) |
| 55.    Humiseal thinner 521 is also the only thinner plaintiffs allege Juarez used in the PVA 350 in this case. | 55.    FAC.<br><br>(Catalona Dec., 60:23-26.) |
| 56.    In his February 3, 2015 report, Dr. Regev recommended Juarez should be "seen by a toxicologist with the MSDS and working environment analysis." | 56.    Juarez Depo.; Regev Report.<br><br>(Catalona Dec., 337:20, 338:17-19, 370.) |
| 57.    On March 3, 2015, Juarez emailed Jane Malubag in SpaceX's human resources department to get copies of the MSDS sheets for "1.  Arathane two part mix.  2.  Thinner 521.  3.  63/67 Eutectic solder wire.<br>4.  Humiseal 1A33 conformal coating.<br>5.  Isopropyl alcohol (IPA)." | 57.    March 3, 2015 Email.<br><br>(Catalona Dec., 485-486.) |
| 58.    These MSDS sheets were then provided to Ruben Juarez's workers' compensation attorneys. | 58.    Catalona Dec.; FAC; Responses to Interrogatories 13-14 and Document Requests 13-14; Juarez Workers' Comp. Depo.; MSDS Sheets.<br><br>(Catalona Dec., 7:24-9:5, 63:1-4, 132:23-133:13, 186:12-26, 448:12-21, 618-683.) |
| 59.    Copies of the MSDS sheets plaintiff received are attached to this motion as Exhibits 48 through 55. | 59.    Catalona Dec.; FAC; Responses to Interrogatories 13-14 and Document Requests 13-14; MSDS sheets.<br><br>(Catalona Dec., 7:24-9:5, 63:1-4, 132:23-133:13, 186:12-26, 618-683.) |
| 60.    Plaintiffs allege that it was not until then that Juarez "first suspected that the PVA 350 might have caused his injuries." | 60.    FAC.<br><br>(Catalona Dec., 63:1-4.) |
| 61.    In their original complaint filed in the state court action, plaintiffs alleged that "[p]laintiff RUBEN JUAREZ did not suspect that *the chemicals* may have caused his injuries until March of 2015 when he, for the first time, received the MSDS *of the* | 61.    Complaint.<br><br>(Catalona Dec., 15:14-15 (emphasis added).) |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| *chemicals.*" | |
| 62.    The MSDS sheets for all chemicals used in the conformal coating rooms, including Humiseal and Arathane, were accessible on the computer Juarez used at his workstation and in a three-ring binder kept 3-4 feet from the PVA 350. | 62.    Maxwell Dec.; Phan Dec.; Hwang Dec.<br><br>(Maxwell Dec., 1:27-2:19, 3:16-21; Phan Dec., 2:1-5; Hwang Dec., 1:27-2:4.) |
| 63.    SpaceX complied with its own internal rules which required MSDS sheets to "be readily accessible to employees in their work area during all work shifts." | 63.    Maxwell Dec.; Phan Dec.; Hwang Dec.; SpaceX Hazard Communication Training Course.<br><br>(Maxwell Dec., 1:27-2:19, 3:16-21, 58-59; Phan Dec., 2:1-5; Hwang Dec., 1:27-2:4; Dhillon Dec., 61-62.) |
| 64.    The MSDS sheets were also accessible on at least 14 to 18 different computers located inside and outside the conformal coating rooms where Mr. Juarez worked. | 64.    Maxwell Dec.<br><br>(Maxwell Dec., 2:4-8.) |
| 65.    Juarez consulted the MSDS sheets for Humiseal and Arathane to create experimental and test batches of these materials when SpaceX created the formula it started using in PVA's machine in 2012. | 65.    Maxwell Dec.; Urquhart Dec.; Hwang Dec., PVA Business Records; NVOC Specification; March, 2012 emails.<br><br>(Maxwell Dec., 2:23-28; Urquhart Dec., 2:15-17, 28, 63, 230; Hwang Dec., 2:5-12, 35-41.) |
| 66.    On January 20th, 2012, Juarez successfully completed SpaceX's training course entitled "Hazard Communication" during which he was taught that SpaceX's MSDS sheets were "readily accessible to employees in their work area during all work shifts" and were also "always available in our online archive as well as in the big blue MSDS books in the kitchen area." | 66.    SpaceX Hazard Communication Training Course.<br><br>(Dhillon Dec., 3:1-5, 61-62; Maxwell Dec., 58-59, Phan Dec., 47-48.) |
| 67.    Throughout this time period up until the complaint was filed, MSDS sheets, including for Arathane and Humiseal products, could be downloaded from multiple websites online. | 67.    Catalona Dec.; Webpages.<br><br>(Catalona Dec., 6:27-7:23 490, 492, 493, 495, 498, 500, 503, 505, 565, 571, 584, 603-610, 612-617.) |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

-11-

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 68.     In spite of all this, Juarez testified that he could not remember ever seeing the MSDS sheets, or asking to see the MSDS sheets, when he worked at SpaceX. | 68.     Juarez Depo.<br><br>(Catalona Dec., 288:22-23, 289:13-18, 290:5-7.) |
| 69.     In interrogatories, PVA asked plaintiffs to "DESCRIBE in detail everything YOU did to determine what caused [plaintiffs'] injuries which are alleged in the COMPLAINT . . . including but not limited to any investigation, research, internet research, questions, and communications." | 69.     Interrogatory No. 13 to plaintiff Juarez; Interrogatory No. 5 to plaintiff Hernandez.<br><br>(Catalona Dec., 123:5-9, 141:5-9.) |
| 70.     As used in the interrogatory, the term "YOU" was defined as plaintiffs Ruben Juarez and Isela Hernandez, and "anyone acting on [their] behalf, including, but not limited to, attorneys, investigators, insurers, and any other agents." | 70.     Definition of "YOU" used in interrogatories to plaintiff Juarez and plaintiff Hernandez.<br><br>(Catalona Dec., 121:9-11, 140:8-10.) |
| 71.     In response to these interrogatories, plaintiffs admitted that the only investigation they did was: "going to see his doctors." | 71.     Response to Interrogatory No. 13 by plaintiff Juarez; Response to Interrogatory No. 5 by plaintiff Hernandez.<br><br>(Catalona Dec., 133:1, 148:11-14.) |
| 72.     PVA also asked plaintiff Isela Hernandez to identify the injuries she suffered which are the basis for her loss of consortium claim including "the date(s) the injury took place." | 72.     Interrogatory No. 4 to plaintiff Hernandez.<br><br>(Catalona Dec., 140:25-141:3.) |
| 73.     In response, plaintiff Hernandez stated that her "loss of love, care [and] companionship" was "derivative" of her husband's claim; she could not otherwise say when her particular injuries took place. | 73.     Response to Interrogatory No. 4 by plaintiff Hernandez.<br><br>(Catalona Dec., 147:26-148:6.) |
| 74.     PVA also asked plaintiffs to list all "EVIDENCE" which "establishes or in any way relates to whether plaintiffs' lawsuit is barred by the two-year statute of limitations." | 74.     Interrogatory Nos. 14, 16 to plaintiff Juarez; Interrogatory Nos. 6-7 to plaintiff Hernandez.<br><br>(Catalona Dec., 123:11-13, 141:11-13, 155:3-5, 165:3-5.) |
| 75.     "EVIDENCE" was defined as "any | 75.     Definition of "EVIDENCE" |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| facts, witnesses (including contact information), statements, video, pictures, photos, recordings, documents, writings, depositions, transcripts, interviews, data, compilations, reports, productions and any other evidence of any kind whatsoever." | used in interrogatories to plaintiff Juarez and plaintiff Hernandez.<br><br>(Catalona Dec., 121:1-4, 140:1-4, 154:24-28, 164:24-28.) |
| 76.    In response, plaintiffs identified only "[p]laintiff's medical records, the MSDS of the pertinent chemicals, and the email from Plaintiff to his HR, asking for a disclosure of the MSDS" as well Mr. Juarez's two days of deposition testimony with exhibits in this case, and PVA's document production. | 76.    Plaintiff Juarez's Responses to Interrogatory Nos. 14 and 16; Plaintiff Hernandez's Responses to Interrogatory Nos. 6-7.<br><br>(Catalona Dec., 133:9-13, 148:20-149:1, 160:11-17, 170:11-17.) |
| 77.    Plaintiff Juarez asserted legal objections to the above interrogatories based on the attorney-client privilege and work product doctrine, but the only evidence withheld on this or any other ground was plaintiffs' attorney's personal "notes from speaking with the clients and witnesses." | 77.    Plaintiffs' responses to PVA's Interrogatories; Plaintiffs' Privilege Log; June 24, 2018 email from Teresa Li.<br><br>(Catalona Dec., 132:27-28, 133:9-10, 148:20-22, 160:11-12, 170:11-12, 233, 235-237.) |
| 78.    On February 28, 2017, plaintiffs filed their state court action that PVA removed to this Court. | 78.    Complaint.<br><br>(Catalona Dec., 12:2-8.) |
| 79.    In the operative complaint, plaintiffs allege that the PVA 350 caused Juarez to be exposed to Arathane and Humiseal because it did not "sound an alarm" or provide a warning "when the ventilation/exhaust is not in operation," and that defendant PVA "trained" Juarez "to stick his head into the spraying chamber of the conformal coating machine." | 79.    FAC.<br><br>(Catalona Dec., 58:22-25, 59:9-12.) |
| 80.    Other than undisclosed communications with his attorneys, Juarez testified at his deposition that he had no information to explain why he waited until February 27, 2017 to file his lawsuit in this case. | 80.    Juarez Depo.<br><br>(Catalona Dec., 301:8-13.) |
| 81.    There is no evidence that Juarez's doctors assured him chemical exposure *was* | 81.    FAC; Responses To |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| *not* the cause of his injuries which would have been impossible because, as he admitted, none of his doctors were ever informed he was "working with chemicals." | Interrogatories.<br><br>(Catalona Dec., 62:20-23, 133:5-13, 148:16-149:1, 160:7-17, 170:7-17.) |

## II.   CONCLUSION OF LAW

1.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).

2.     Where the plaintiff bears the burden of proof at trial, the moving defendant has no initial evidentiary burden and must only, through argument, establish an absence of evidence in the record to support the plaintiff's case.  *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

3.     Where the moving defendant meets that initial burden, the burden then shifts to the plaintiff to provide "significant probative evidence" to establish the existence of a genuine issue of material fact for trial.  *In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 at 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

4.     "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

5.     California has a two year limitations period in both the statute governing toxic exposure suits, Cal. Code of Civil Procedure ("C.C.P.") section 340.8, and the general product liability statute, C.C.P. section 335.1.

6.     Under section 340.8, toxic exposure suits must be filed within "two years from the date of the injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later."  (C.C.P. § 340.8(a).)  Under the general product liability statute, section 335.1, plaintiffs must file suit within "two years" after plaintiffs have reason to suspect that a type of wrongdoing has injured them.

7.     Section 335.1 arguably applies to this case because PVA did not sell the allegedly "toxic substances" but a machine that plaintiff's employer used with those substances.  There is no case which decides this issue but it "makes no difference," *Nelson v. Indevus Pharmaceuticals, Inc.*, 142 Cal.App.4th 1202, 1209, fn. 7 (2006), because "the analysis is the same under either two-year limitations period." *Riggs v. 7-H Tech. Serv. Group, Inc.*, 2006 WL 1720432, *3 (Cal. Ct. App. 2006.); *Viramontes v. Pfizer, Inc.*, 2015 9319497, *6, fn. 8 (Cal. Ct. App. 2015) (accord); *Meadows v. Laci Le Beau Corp.*, 2009 WL 2875344, *4 (Cal.Ct.App. 2009) (accord).

8.     This deadline is subject to California's "delayed discovery" rule, *Gonzales v. Texaco, Inc.,* 2007 WL 4044319, *7 (Cal. Ct. App. 2007) ("Section 340.8(a) codified the discovery rule"), which is an "exception" to the affirmative defense of the statute of limitations.  *Grisham v. Phillip Morris U.S.A., Inc.*, 40 Cal.4th 623, 634 (2007); *NBCUniversal Media, LLC. v. Superior Court*, 225 Cal.App.4th 1222, 1232 (2014).

9.     Because it is an exception, it is plaintiffs' burden to establish the delayed discovery rule applies. *NBCUniversal, supra,* 225 Cal.App.4th at 1232 (holding plaintiffs "have the burden of demonstrating their entitlement to delayed accrual of their causes of action.")  "[T]he language of section 340.8 is *not intended to create a special discovery rule of accrual* for claims predicated on exposure to hazardous substances but rather to clarify that California's traditional discovery rule applies to such claims." *Tsaturyan v. Glaxosmithkline, LLC*, 2018 WL 1789379, *6, fn. 9 (Cal. Ct. App. 2018) (emphasis added; quoting *Alexander v. Exxon Mobil,* 219 Cal.App.4th 1236, 1252 (2013)); *See also Rosas v. BASF Corporation,* 236 Cal.App.4th 1378, 1390

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

(2015) ("The Legislature passed section 340.8 to codify for toxic torts the delayed discovery rule.")

10. Pursuant to the delayed discovery rule, a cause of action will not accrue until the plaintiff "has 'notice or information of circumstances to put a reasonable person on inquiry'; he need not know the 'specific 'facts' necessary to establish' the cause of action." *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 398 (1999).

11. A plaintiff's actual (or purported) ignorance of his claims is irrelevant so long as "sufficient facts" are known which would "put a *reasonable person* on inquiry notice." C.C.P. § 340.8 (emphasis added). "Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation." *McCoy v. Gustafson*, 180 Cal.App.4th 56, 108 (2009); *Treatt USA v. Superior Court*, 2015 WL 5895495, *8 (Cal. Ct. App. 2015) (holding cause of action accrues "even if the plaintiff himself is subjectively oblivious.")

12. A cause of action accrues for purposes of the running of the statute of limitations when the plaintiff "'suspects ... that someone has done something wrong' to him." *Norgart, supra,* at 397 (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988); *see also Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 808-809 (2005) (holding "a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury.")

13. By requiring knowledge that a wrongful act was committed by "another," section 340.8 also codified the longstanding rule that a cause of action accrues even when the identity of the defendant is unknown: "[T]he plaintiff may discover, or have reason to discover, the cause of action even if he does not suspect, or have reason to suspect, the identity of the defendant . . . because the identity of the defendant is not an element of any cause of action." *Norgart, supra,* 21 Cal.4th at 399 (relying on C.C.P. § 474 which requires plaintiffs to sue unknown defendants as "Does.")

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

-16-

14.     Even if an injured plaintiff's doctors' conclusions are "ambiguous" regarding the cause of his injuries, and insufficient to "arouse a reasonable person's suspicion[,] the fact that [the plaintiff] filed a workers' compensation claim . . . *based on exposure to toxic chemicals at work is definitive proof* that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before his civil complaint was filed." *Rivas v. Safety Kleen Corp.,* 98 Cal.App.4th 218, 228-229 (2002) (emphasis added).

15.     There is "no authority for the proposition that a cause of action cannot accrue until a plaintiff can attach a medical diagnosis, whether correct or incorrect, to her condition, even though plaintiff suffers harm and is aware of its negligent cause." *Miller v. Lakeside Village Condominium Assn*., 1 Cal.App.4th 1611, 1625 (1991).

16.     Here, the evidence shows that plaintiff Juarez admitted that in January or February of 2012, two weeks after starting at SpaceX, he was exposed to toxic materials from PVA's machine.  Then, a few months later he developed migraine headaches, dizziness, difficulty walking and sinus symptoms which he personally attributed to exposure to chemical coating materials Arathane and Humiseal.  Then, starting in June, 2012, he allegedly had over 9 hospitalizations and at least 21 visits to urgent care/emergency room for symptoms associated with toxic chemical exposure. He reported these issues to SpaceX who he felt should not have bypassed the machine's safety mechanisms and should have required an alarm system to prevent workers from using it without adequate ventilation.  He even purchased an air filtration system to reduce the exposure to these fumes by SpaceX employees. Plaintiffs' lawsuit therefore accrued no later than October, 2012, which is the very latest he could have first suspected someone "had done something wrong" to cause his injuries.  *Norgart, supra,* 21 Cal.4th at 406 (quoting *Jolly, supra,* 44 Cal.3d at 1110); *Treatt USA v. Superior Court,* 2015 WL 5895495, *8 (Cal. Ct. App. 2015) (holding "that no later than April 2009 . . . Linares was or reasonably should have been aware he had sustained appreciable lung injury caused, *at least in part, by occupational*

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

*exposure to toxins*, and that a reasonable person in Linares' position would suspect or should have suspected wrongdoing.  Thus, the two-year limitation period expired before the action was filed on June 20, 2012." (emphasis added).)

17.    Plaintiff Juarez not only suspected but genuinely believed the PVA 350 was responsible for his injuries because it did not have "an alarm" and there was nothing "to advise the operator that the suction system was not working or pulling all of the fumes out of it," which is the same factual theory his attorneys alleged against PVA in their complaint.

18.    Moreover, Juarez stopped working at SpaceX in March, 2014 due to his headaches and related symptoms, and filed his workers' compensation action for "exposure to toxic chemicals" in September, 2014—which under California law "constituted further 'definitive proof that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before [he filed] his civil complaint.'"  *Treatt USA, Inc., supra,* at *9 fn. 10 (quoting *Rivas, infra,* 98 Cal.App.4th at 229.)

19.    The undisputed evidence also proves that plaintiffs did nothing to investigate the cause of their injuries, even after Juarez expressed his concerns about Humiseal, Arathane and the PVA 350 to his employer in 2012 and after filing his workers' compensation action for toxic chemical exposure in September, 2014.

20.    By definition, plaintiffs' actions fail to establish the "diligence" necessary to avoid the statute of limitations.  "This duty to be diligent in discovering facts that would delay accrual of a cause of action ensures that plaintiffs who do 'wait for the facts' will be *unable to successfully avoid summary judgment against them on statute of limitations grounds*."  *Heimuli v. Lilja,* 2012 WL 2520907, *6 (Cal. Ct. App. 2012) (emphasis added; citation omitted).

21.    The fact that in March, 2015 SpaceX produced MSDS sheets to Juarez's attorneys is irrelevant, because plaintiffs are not permitted to "wait for facts to find them" and "sit on their rights."  *Ultimax Cement Mfg. Corp. v. Quikrete Companies, Inc.,* 2009 WL 4307082, *4 (Cal. Ct. App. 2009) (quoting *Jolly v. Eli Lilly & Co.* 44

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

Cal.3d 1103, 1111 (1988).)

22.     The MSDS sheets were always available to plaintiff Juarez either from SpaceX's online database on plaintiff's computer, or in the three-ring binder nearby.

23.     There was also nothing to prevent him or his attorneys from obtaining them once he left SpaceX, or simply downloading them from the internet.

24.     Plaintiffs' reliance on the MSDS sheets fails because plaintiffs are not only held to their "actual knowledge," but to any "sources" of knowledge that are reasonably available.  *Jolly, supra,* 44 Cal.3d 1103 at 1109; *Treatt USA, Inc., supra*, at *12 (accord).

25.     Plaintiff Juarez's purported failure to remember seeing the MSDS sheets at SpaceX does not create a dispute of material fact.

26.     Considering they were kept on his work computer and in a binder nearby, and that Juarez actually used them as part of his job, and because he passed a "Hazard Communication" course which taught him that this same MSDS sheets were "readily accessible to employees in their work area," the Court is free to disregard plaintiffs' version of events which "no reasonable jury could believe" because it is "utterly discredited by the record."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

27.     Even if this story is considered for the sake of argument, it does not create a dispute of material fact because Juarez never actually disputed the MSDS sheets were available to him at SpaceX.  He only testified that he could not *remember seeing them* and the fact that they were nonetheless available remains undisputed: "In sum, Linares does not actually claim he never received or understood the communications he received from anyone from National Jewish [Hospital], *only that he 'does not recall' doing so*.  But Linares's lack of recollection does not constitute affirmative evidence raising a triable issue *concerning Treatt's evidence* that he did receive and understand the communications."  *Treatt USA, Inc., supra,* 2015 WL 5895495, *12 (emphasis added); *see also Jolly, supra,* 44 Cal.3d at 1109 (imputing knowledge reasonably discoverable from available "sources.")

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

28.     Plaintiff Isela Hernandez's claim for loss of consortium fails because it is directly dependent upon plaintiff Juarez's claims for negligence and product liability, and thus "stands or falls with" those claims. *Leonard v. John Crane, Inc.* 206 Cal.App.4th 1274 1288 (2012); *Meighan v. Shore* 34 Cal.App.4th 1025, 1034-35 (1995) ("Thus, an unsuccessful personal injury suit by the physically injured spouse acts as an estoppel that bars the spouse who would claim damages for loss of consortium."); *see also Pineda v. Golden Valley Health Centers*, 2012 WL 2617589, *3 (E.D. Cal. 2012) (accord); *Treatt USA, Inc., supra,* *8, fn. 9 (accord).

29.     But even if Ms. Hernandez's claim is analyzed on its own terms, it is still barred because a loss of consortium is legally presumed to accrue on "the date of injury which gives rise to the loss of consortium." *Viramontes v. Pfizer, Inc.*, 2015 WL 9319497, *11 (E.D. Cal. 2015.)  Plaintiff Hernandez's claim is thus equally untimely because it is legally presumed to have accrued when plaintiff Juarez's injuries developed by September, 2012 at the latest, and plaintiff Hernandez could provide no evidence that her injuries began at any other time.

30.     Because plaintiffs' claims accrued by October, 2012, they were required to file suit by October, 2014 at the latest.  Plaintiffs' lawsuit was not filed until February 27, 2017 and is therefore barred by California's two-year statute of limitations as a matter of law.  (C.C.P. § 340.8(a); C.C.P. § 335.1.)

31.     Plaintiff Juarez also filed his workers' compensation action for workplace exposure to chemicals on September 24, 2014, which is *"*definitive proof that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before his civil complaint was filed." *Rivas, supra,* 98 Cal.App.4th at 229.

32.     Therefore under either scenario, both plaintiffs were also required to file their complaint before September 25, 2016.  Because their lawsuit was not filed until February 27, 2017, it is unquestionably barred by California's two-year statute of limitations as a matter of law.  (C.C.P. § 340.8(a); C.C.P. § 335.1.)

## III.     STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

## PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO WARN CLAIMS

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 1.      Plaintiffs reside in Granada Hills, California, in the County of Los Angeles. | 1.      Complaint, Notice of Removal and First Amended Complaint.<br><br>(Catalona Dec., 12:22-23, 23:11-12, 57:2-4.) |
| 2.      PVA is headquartered and incorporated in the State of New York. | 2.      Notice of Removal and Declaration of Jonathan Urquhart.<br><br>(Catalona Dec. 23:13-15, 24:17-19; Declaration of Jonathan Urquhart ("Urquhart Dec."), 1:4-7.) |
| 3.      The PVA 350 is a conformal coating machine manufactured by PVA which is known in the industry as a "workcell." | 3.      Urquhart Dec. and PVA manual.<br><br>(Urquhart Dec., 2:4-5, 77.) |
| 4.      PVA sold a single PVA 350 to SpaceX in 2009. | 4.      Urquhart Dec. and March, 2018 Deposition of Ruben Juarez ("Juarez Depo."), and exhibits.<br><br>(Urquhart Dec., 1:11-18, 1:25-27, 5-6, 8, 12-14, 23; Catalona Dec., 265:21-24, 266:13-18, 267:19-24, 359-61.). |
| 5.      This machine coats printed circuit boards with a thin polymeric film that "conforms" to the board's contours to protect against moisture, dust, chemicals and temperature extremes. | 5.      Urquhart Dec.<br><br>(Urquhart Dec., 1:14-17.). |
| 6.      When it was manufactured, SpaceX specified that the machine would spray Electrolube "NVOC," a 100% solids content material that did not contain solvent material (such as Humiseal or Arathane.) | 6.      Urquhart Dec., and exhibits.<br><br>(Urquhart Dec., 28, 30, 63-64.) |
| 7.      In any event, the PVA 350 was built with safety features to prevent users from breathing materials used inside the machine. First, the machine monitored its exhaust flow and turned off if the exhaust system was not operating. | 7.      Urquhart Dec., PVA Manual.<br><br>(Urquhart Dec., 2:24-26, 98-99.) |
| 8.      As stated in the manual provided to | 8.      Urquhart Dec., PVA Manual and |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| SpaceX in 2009, it "must exhaust at a rate of no less than 150 cubic feet per minute, otherwise a critical fault will occur shutting the motors down." | exhibits.<br><br>(Urquhart Dec., 2:23-26, 21, 98-99.) |
| 9.   Second, the machine is a closed system with a door and negative air pressure to prevent chemicals from escaping. | 9.   Urquhart Dec.<br><br>(Urquhart Dec., 2:27-28.) |
| 10.   If the door of the machine is opened, the spraying of materials will stop. | 10.   Urquhart Dec., PVA Manual and exhibits.<br><br>(Urquhart Dec., 2:28-3:1, 21, 96-97.) |
| 11.   "When the door is opened power to the motors and pneumatics is disconnected." | 11.   Urquhart Dec., PVA Manual and exhibits.<br><br>(Urquhart Dec., 2:28-3:1, 21, 96-97.) |
| 12.   Third, the machine cannot be operated until a machine safety check is performed which ensures that all safety features are working properly:  "The machine safety check ensures the workcell safety devices (emergency stop, door interlocks, light curtain, etc.) are operating properly.  During startup, the operator must enter the safety check and complete it successfully.  Otherwise the machine halts all operations." | 12.   Urquhart Dec., PVA Manual and exhibits.<br><br>(Urquhart Dec., 3:2-6, 21, 96-99.) |
| 13.   The machine's manual lists all of these features and explicitly warn users not to "disable the safety features of the machine." | 13.   PVA Manual.<br><br>(Urquhart Dec., 96.) |
| 14.   It also states:  "NOTE: The safety features should NEVER be bypassed, disabled or tampered with.  Precision Valve & Automation, Inc. is not responsible for any damages incurred, mechanical or human, because of alteration or destruction of any safety features." | 14.   PVA Manual.<br><br>(Urquhart Dec., 74, 96.) |
| 15.   "Operation of your workcell involves, air pressure, electrical power and mechanical devices *and the use of Hazardous materials*....  There are no dangerous materials or chemicals used in the operation | 15.   PVA Manual.<br><br>(Urquhart Dec., 86-87 (emphasis added).). |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| of the machine *except for the required application material*.  The application material *should include a Material Safety Data Sheet (MSDS)*, which specifies known dangers and toxicity." | |
| 16.     Juarez testified that when he worked at SpaceX he never looked at this manual or asked to look at this manual for the PVA 350. | 16.     Deposition of Ruben Juarez ("Juarez Depo.).  (Catalona Dec., 279:16, 291:17-18, 293:4-17.) |
| 17.     SpaceX is a designer and manufacturer of advanced rockets and spacecraft. | 17.     Declaration of Gregory Maxwell.  (Declaration of Gregory Maxwell ("Maxwell Dec."), 1:5-6.) |
| 18.     After purchasing the PVA 350 in 2009, SpaceX did not begin to use Humiseal and Arathane materials, which were not originally specified for the machine, until 2012 at the earliest. | 18.     Urquhart Dec., and exhibits; Declaration of David Hwang ("Hwang Dec.") and exhibits.  (Urquhart Dec., 3:15-17, 28, 63, 230; Hwang Dec., 2:6-12, 35-41.) |
| 19.     When SpaceX originally began using these chemicals, numerous employees from the Avionics department were brought together to determine the appropriate formulation of Arathane and Humiseal materials for SpaceX's conformal coating applications. | 19.     Maxwell Dec.  (Maxwell Dec., 2:19-28.) |
| 20.     These employees included Ruben Juarez who Avionics Department supervisor Gregory Maxwell testified hand-mixed experimental and test batches of Arathane and Humiseal to make different formulations. | 20.     Maxwell Dec.; Juarez Depo.  (Maxwell Dec., 2:21-23; Catalona Dec., 246:10-12, 247:18-22, 322:1-2, 322:9-15, 329:17-330:4, 686-88.) |
| 21.     Before hand-mixing these materials, Juarez reviewed the MSDS sheets for Arathane and Humiseal to ensure they cured and "set up" properly so SpaceX's desired result was achieved. | 21.     Maxwell Dec.  (Maxwell Dec., 2:25-28.) |
| 22.     The Avionics Department also | 22.     Hwang Dec.; Maxwell Dec., |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| required workers who used the PVA 350, including Juarez, to follow SpaceX's "standard operating procedures" entitled "Avionics Standard Operating Procedure: Polymeric Application of Electronic Assemblies." | Declaration of Duc Q. Phan ("Phan Dec."); SpaceX Standard Operating Procedures. <br><br> (Hwang Dec., 1:15-26, 4, 14, 24; Maxwell Dec., 1:23-2:2, 5, 15, 25, Phan Dec., 1:14-20, 4, 14; Dec. of SpaceX records custodian, Lynette Dhillon ("Dhillon Dec."), 1:16-17, 3:11-17, 5, 15, 25.) |
| 23.   These Standard Operating Procedures ("SOPs") instructed SpaceX employees to use a facemask and operate the machine in a well-ventilated area, pursuant to instructions in MSDS sheets for the specific coating materials that were used in the machine. | 23.   Hwang Dec.; SpaceX Standard Operating Procedures. <br><br> (Hwang Dec., 1:25-26, 5, 6, 15, 16, 25, 26.) |
| 24.   These SOPs also specified that the machine's coating materials included Humiseal 1A33 conformal coating and Humiseal 521 thinner. | 24.   Hwang Dec.; SpaceX Standard Operating Procedures. <br><br> (Hwang Dec., 1:15-26, 6, 16, 26.) |
| 25.   These SOPs also instructed SpaceX employees to "[p]rogram the machine per operating instructions in the PVA Manual." | 25.   Hwang Dec.; SpaceX Standard Operating Procedures. <br><br> (Hwang Dec., 1:15-26, 9, 11, 19, 21, 29, 32.) |
| 26.   SpaceX maintained copies of all manufacturer operating instructions and specifications for its purchased equipment including the PVA 350. | 26.   Hwang Dec. <br><br> (Hwang Dec., 1:15-17.) |
| 27.   Ruben Juarez worked as a programmer at SpaceX from January, 2012 to the end of March, 2014. | 27.   Juarez Depo.; job offer letter with acceptance; Workers' Compensation ("Comp.") Claim. <br><br> (Catalona Dec., 261:21-24, 301:17-22, 303:25-304:8, 307:14-19, 317:7-9, 355, 357.) |
| 28.   During this entire period, his job duties never changed. | 28.   Juarez Depo.; Deposition of Ruben Juarez in Workers' Compensation Action ("Juarez Workers' Comp. Depo."). |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

-24-

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| | (Catalona Dec., 256:23-24, 443:22-444:9.) |
| 29.    Juarez testified that his job was to program the PVA 350, for which he was its "main support." | 29.    Juarez Depo.<br><br>(Catalona Dec., 257:25-258:6, 263:1-5.) |
| 30.    Plaintiffs also admitted in their complaint that "[d]uring Plaintiff Ruben Juarez's time at Space X, Plaintiff Ruben Juarez was *in charge of* programming the PVA 350 to spray Arathane 5750A, Arathane 5750B, Arathane 5750 A/B, and Humiseal thinner." | 30.    First Amended Complaint ("FAC.")<br><br>(Catalona Dec, 59:5-8 (emphasis added).) |

| **Uncontroverted Facts** | **Supporting Evidence** |
|---|---|
| 62.    The MSDS sheets for all chemicals used in the conformal coating rooms, including Humiseal and Arathane, were accessible on the computer Juarez used at his workstation and in a three-ring binder kept 3-4 feet from the PVA 350. | 62.    Maxwell Dec.; Phan Dec.; Hwang Dec.<br><br>(Maxwell Dec., 1:27-2:19, 3:16-21; Phan Dec., 2:1-5; Hwang Dec., 1:27-2:4.) |
| 63.    SpaceX complied with its own internal rules which required MSDS sheets to "be readily accessible to employees in their work area during all work shifts." | 63.    Maxwell Dec.; Phan Dec.; Hwang Dec.; SpaceX Hazard Communication Training Course.<br><br>(Maxwell Dec., 1:27-2:19, 3:16-21, 58-59; Phan Dec., 2:1-5; Hwang Dec., 1:27-2:4; Dhillon Dec., 61-62.) |
| 64.    The MSDS sheets were also accessible on at least 14 to 18 different computers located inside and outside the conformal coating rooms where Mr. Juarez worked. | 64.    Maxwell Dec.<br><br>(Maxwell Dec., 2:4-8.) |
| 65.    Juarez consulted the MSDS sheets for Humiseal and Arathane to create experimental and test batches of these materials when SpaceX created the formula it started using in PVA's machine in 2012. | 65.    Maxwell Dec.; Urquhart Dec.; Hwang Dec., PVA Business Records; NVOC Specification; March, 2012 emails.<br><br>(Maxwell Dec., 2:23-28; Urquhart Dec., 2:15-17, 28, 63, 230; Hwang |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | Dec., 2:5-12, 35-41.) |
| 66.    On January 20th, 2012, Juarez successfully completed SpaceX's training course entitled "Hazard Communication" during which he was taught that SpaceX's MSDS sheets were "readily accessible to employees in their work area during all work shifts" and were also "always available in our online archive as well as in the big blue MSDS books in the kitchen area." | 66.    SpaceX Hazard Communication Training Course.<br><br>(Dhillon Dec., 3:1-5, 61-62; Maxwell Dec., 58-59, Phan Dec., 47-48.) |
| 67.    Throughout this time period up until the complaint was filed, MSDS sheets, including for Arathane and Humiseal products, could be downloaded from multiple websites online. | 67.    Catalona Dec.; Webpages.<br><br>(Catalona Dec., 6:27-7:23 490, 492, 493, 495, 498, 500, 503, 505, 565, 571, 584, 603-610, 612-617.) |
| 68.    In spite of all this, Juarez testified that he could not remember ever seeing the MSDS sheets, or asking to see the MSDS sheets, when he worked at SpaceX. | 68.    Juarez Depo.<br><br>(Catalona Dec., 288:22-23, 289:13-18, 290:5-7.) |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 79.    In the operative complaint, plaintiffs allege that the PVA 350 caused Juarez to be exposed to Arathane and Humiseal because it did not "sound an alarm" or provide a warning "when the ventilation/exhaust is not in operation," and that defendant PVA "trained" Juarez "to stick his head into the spraying chamber of the conformal coating machine." | 79.FAC.<br><br>(Catalona Dec., 58:22-25, 59:9-12.) |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 82.    Plaintiffs allege the PVA 350 contained "no warning anywhere" about the fact that the machine was "designed to continue to spray chemicals even when the ventilation/exhaust is not in operation." | 82.    FAC.<br><br>(Catalona Dec., 58:22-25, 63:15-25, 64:1-2, 64:15-21.) |

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

## IV.   **CONCLUSION OF LAW**

1.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

2.     Where the plaintiff bears the burden of proof at trial, the moving defendant has no initial evidentiary burden and must only, through argument, establish an absence of evidence in the record to support the plaintiff's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

3.     Where the moving defendant meets that initial burden, the burden then shifts to the plaintiff to provide "significant probative evidence" to establish the existence of a genuine issue of material fact for trial. *In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 at 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

4.     "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

5.     Plaintiffs' failure to warn claims fail as a matter of law because PVA unquestionably provided warnings with its machine, and also because its warnings could not have caused plaintiffs' injuries as a matter of law because they were never read.

6.     The undisputed evidence proves that the PVA 350 contained safety features that prevented chemicals from being sprayed when its exhaust system was not in operation.

7.     This evidence also shows that PVA's manual explicitly warned users (1) never to bypass, disable or tamper with this feature and (2) that while the materials

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

used in the machine could be hazardous, those materials came with MSDS sheets that specified known dangers and toxicity.

8.      The fact that PVA's warnings, which were available, were "not on the product" itself is irrelevant. *Temple v. Velcro USA, Inc.*, 148 Cal.App.3d 1090, 1094-1095 (1983).

9.      Summary judgment must be granted on plaintiffs' failure to warn claims because the undisputed evidence negates the precise factual theory alleged in the complaint.

10.     These claims also fail as a matter of law because Juarez never read the PVA manual which was available and which his employer explicitly instructed him to use to program PVA's machine. "There is no causation when the person to whom the warning is directed did not read the warning." *Contois v. Aluminum Precision Products, Inc.*, 2008 WL 5065108, *4 (Cal. Ct. App. 2008); *Ramirez v. Plough, Inc.*, 6 Cal.4th 539, 556 (1993) (unless the warnings are read, there can be "no conceivable causal connection between the representations or omissions that accompanied the product and plaintiff's injury"); *Hart v. Robert Bosch Tool Corp.*, 2010 WL 3566715, *5 (Cal. Ct. App. 2010) (accord); *Motus v. Pfizer Inc.*, 358 F.3d 659 (9th Cir. (Cal.) 2004)) (holding "the adequacy of Pfizer's warnings is irrelevant" unless they were read.)

11.     Plaintiffs' failure to warn claims therefore fail for two reasons: (1) the undisputed evidence negates plaintiffs' legal theory alleged in the complaint, and (2) plaintiffs cannot establish the legal element of causation or that PVA's warnings were inadequate because they admittedly were never read.

12.     The MSDS sheets, provided by the third party suppliers of Arathane and Humiseal materials, also negate plaintiffs' failure to warn claims because they contained admittedly adequate warnings regarding the toxic nature of those substances, and were at all times reasonably accessible on Mr. Juarez's computer and the three ring binders in his department. *Johnson v. American Standard, Inc.*, 43

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

Cal.4th 56, 61-62 (2008) (HVAC worker's failure to warn claims against air conditioner manufacturer defeated by warnings contained in available MSDS sheets for third party supplier's refrigerant, "R-22," used in defendant's machine.)

## V.   STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' STRICT PRODUCT LIABILITY CAUSE OF ACTION

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 1.      Plaintiffs reside in Granada Hills, California, in the County of Los Angeles. | 1.      Complaint, Notice of Removal and First Amended Complaint.<br><br>(Catalona Dec., 12:22-23, 23:11-12, 57:2-4.) |
| 2.      PVA is headquartered and incorporated in the State of New York. | 2.      Notice of Removal and Declaration of Jonathan Urquhart.<br><br>(Catalona Dec., 23:13-15, 24:17-19; Declaration of Jonathan Urquhart ("Urquhart Dec."), 1:4-7.) |
| 3.      The PVA 350 is a conformal coating machine manufactured by PVA which is known in the industry as a "workcell." | 3.      Urquhart Dec. and PVA manual.<br><br>(Urquhart Dec., 2:4-5, 77.) |
| 4.      PVA sold a single PVA 350 to SpaceX in 2009. | 4.      Urquhart Dec. and March, 2018 Deposition of Ruben Juarez ("Juarez Depo."), and exhibits.<br><br>(Urquhart Dec., 1:11-18, 1:25-27, 5-6, 8, 12-14, 23; Catalona Dec., 265:21-24, 266:13-18, 267:19-24, 359-61.).) |
| 5.      This machine coats printed circuit boards with a thin polymeric film that "conforms" to the board's contours to protect against moisture, dust, chemicals and temperature extremes. | 5.      Urquhart Dec.<br><br>(Urquhart Dec., 1:14-17.). |
| 6.      When it was manufactured, SpaceX specified that the machine would spray Electrolube "NVOC," a 100% solids content material that did not contain solvent material (such as Humiseal or Arathane.) | 6.      Urquhart Dec., and exhibits.<br><br>(Urquhart Dec., 28, 30, 63-64.) |

Becherer<br>Kannett &<br>Schweitzer<br><br>1255 Powell St.<br>Emeryville, CA<br>94608<br>510-658-3600

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 17.    SpaceX is a designer and manufacturer of advanced rockets and spacecraft. | 17.    Declaration of Gregory Maxwell.<br><br>(Declaration of Gregory Maxwell ("Maxwell Dec."), 1:5-6.) |
| 18.    After purchasing the PVA 350 in 2009, SpaceX did not begin to use Humiseal and Arathane materials, which were not originally specified for the machine, until 2012 at the earliest. | 18.    Urquhart Dec., and exhibits; Declaration of David Hwang ("Hwang Dec.") and exhibits.<br><br>(Urquhart Dec., 3:15-17, 28, 63, 230; Hwang Dec., 2:6-12, 35-41.) |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 83.    The MSDS sheets for Arathane and Humiseal materials referenced and incorporated into plaintiffs' allegations in the complaint show that these chemicals were manufactured and supplied by third parties. | 83.    FAC;<br><br>(Catalona Dec., 60:4-26; 628, 644, 646, 659, 666, 668, 673.) |

## VI.    CONCLUSION OF LAW

1.    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

2.    Where the plaintiff bears the burden of proof at trial, the moving defendant has no initial evidentiary burden and must only, through argument, establish an absence of evidence in the record to support the plaintiff's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

3.    Where the moving defendant meets that initial burden, the burden then shifts to the plaintiff to provide "significant probative evidence" to establish the existence of a genuine issue of material fact for trial. *In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 at 249-50, 106 S. Ct.

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

2505, 91 L. Ed. 2d 202 (1986).

4.  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

5.  Under California law, a product manufacturer may be held strictly liable for an injury producing material used in conjunction with its product that it neither manufactured, sold nor supplied, but only if the two products must "necessarily" be used "together."  *O'Neil v. Crane Co.*, 53 Cal.4th 335, 361 (2012); *Shields v. Hennessy Industries,* 205 Cal.App.4th 782, 798 (2012) (accord).

6.  Strict liability is prohibited even when it is "foreseeable that the products will be used together," unless such use is actually necessary.  *O'Neil, supra,* 53 Cal.4th at 361 (also holding that the lower court had "extend[ed] *Tellez-Cordova* [*v. Campbell–Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577], beyond its unique factual context" which "could easily lead to absurd results.  It would require match manufacturers to warn about the dangers of igniting dynamite, for example.").

7.  Here, PVA did not manufacturer, sell or supply the chemicals SpaceX used in its machine which were manufactured by third parties.

8.  Nor is there any dispute that these materials were required to be used in PVA's machine.  Indeed, SpaceX originally specified that different materials were to be used in the machine.

9.  Partial summary judgment must also be granted on plaintiffs' strict product liability claim because it is undisputed that PVA did not manufacture, sell, supply or specify the Arathane and Humiseal materials which were not necessarily

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

1    required to be used with PVA's machine.  *O'Neil, supra,* 53 Cal.4th at 361.

2

3    DATED: August 24, 2018                BECHERER KANNETT & SCHWEITZER

4

5                                    By:    /s/     Alex P. Catalona
6                                           Alex P. Catalona
                                            Attorneys for Defendant
7                                           PRECISION VALVE & AUTOMATION, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Becherer
Kannett &
Schweitzer

1255 Powell St.
Emeryville, CA
94608
510-658-3600

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF
DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 27, 2018, a true and correct copy of **SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT** has been served via ECF upon all counsel of record in the Court's electronic filing system.

By:    /s/ Jerry Dumlao

**Becherer
Kannett &
Schweitzer**

1255 Powell St.
Emeryville, CA
94608
510-658-3600