1  **BALABAN & SPIELBERGER, LLP**
2  11999 San Vicente Blvd., Suite 345
   Los Angeles, CA 90049
3  Tel: (424) 832-7677 / Fax: (424) 832-7702
   Daniel K. Balaban, SBN 243652
4  Andrew J. Spielberger, SBN 120231
5  Vanessa L. Loftus-Brewer, SBN 265213

6  **LAW OFFICES OF TERESA LI, PC**
7  315 Montgomery Street, 9th Floor
   San Francisco, California 94104
8  Tel: (415) 423-3377 / Fax: (888) 646-5493
9  Teresa Li, SBN 278779

10 Attorneys for <u>Plaintiffs</u>

11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15 RUBEN JUAREZ, an individual and      **CASE NO. 2:17-cv-03342**
   ISELA HERNANDEZ, an individual
16                                       **PLAINTIFFS' OPPOSITION TO**
17                          Plaintiffs,  **DEFENDANT PRECISION VALVE**
                v.                       **& AUTOMATION, INC.'S MOTION**
18                                       **FOR SUMMARY JUDGMENT**
19
20 PRECISION VALVE &                     [Filed Concurrently with Plaintiff's Response
   AUTOMATION, Inc., a corporation       to Defendant's Statement of Uncontroverted
21 and DOES 1-20                         Facts; Plaintiff's Objections To Documents
                                         Referenced In Defendant's Motion For
22                          Defendants.  Summary Judgment; Declarations of Glen
                                         Stevick; Ruben Juarez; Christopher Mendoza,
23                                       Manuel Gutierrez; and Vanessa L. Loftus-
24                                       Brewer]

25                                       Date: October 1, 2018
                                         Time: 1:30 p.m.
26                                       Ctrm: 5D, 5th Floor
27                                       Judge: Hon. Otis D. Wright II

28

1
2

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................. 1

    1.   Issues of Fact Exist As To When Plaintiff Should Have Discovered That His Injury Had a Wrongful Cause; and ................... 1

    2.   Filing A Workers Compensation Claim Does Not Equate To A Claimant Claiming That His/Her Injury Was Due To The Fault of Anyone; and ................................................................................ 1

    3.   The Reason Plaintiff Filed His Workers Compensation Claim Had Nothing To Do With the PVA 350 or Any Suspicion About The PVA 350; and ......................................................... 1

    4.   Discovery Conducted *During* The Workers Compensation Action Provided Plaintiff With a Basis To Suspect His Injury Might Have Been Caused By Chemicals From the PVA 350;and .......................................................................................... 1

    5.   Medical Causation Does Not Equate To Knowledge Of Wrongful Conduct ...................................................................... 1

II.  BRIEF FACTUAL BACKGROUND ................................................... 2

   A.  THE PRODUCT ............................................................................ 2

   B.  INTERACTIONS BETWEEN SPACE X, PLAINTIFF, PVA INC. AND PVA 350 ......................................................................... 4

III. LEGAL STANDARD ......................................................................... 7

IV.  THE STATUTE OF LIMITATIONS: PLAINTIFFS TIMELY FILED THEIR COMPLAINT ............................................................... 8

   A.  Issues of Fact Exist As To When Plaintiffs Should Have Discovered That Their Injury Had A Wrongful Cause. ................. 8

   B.  Filing A Workers Compensation Claim Does Not Equate To A Claimant Claiming That His/Her Injury Was Due To The Fault of Anyone. ................................................................................... 9

   C.  The Reason Plaintiff Filed His Workers Compensation Claim Had Nothing To Do With the PVA 350 Or Any Suspicion About The PVA 350 .................................................................... 11

   D.  Discovery Conducted *During* The Workers Compensation Action Provided Plaintiff With A Basis To Suspect His Injury Might Have Been Caused By Chemicals From The PVA 350 ..................................... 12

   E.  Medical Causation Does Not Equate To Knowledge Of Wrongul Conduct ............................................................................... 15

i

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

F. DEFENDANT'S CASES ARE NOT CONTROLLING. ..........................16

V. THE PVA 350 IS A DEFECTIVE PRODUCT ................................19

A. DEFENDANT'S PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFFS' FAILURE TO WARN CLAIM...........19

B. NEGLIGENT FAILURE TO WARN........................................21

C. STRICT LIABILITY FAILURE TO WARN............................21

D. DEFENDANT'S MOTION FOR A PARTIAL SUMMARY JUDGMENT FOR A STRICT PRODUCT LIABILITY ACTION SHOULD BE DENIED.........................................................23

E. CONSUMER EXPECTATION TEST .......................................23

F. RISK BENEFIT TEST..........................................................24

VI. CONCLUSION ..........................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................... 11

*Navajo Nation v. U.S. Forest Service*
    535 F. 3d 1058 (2008) .................................................................. 24

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ...................................................... 11

**California Cases**

*Wright v. Stang Manufacturing Co.* (1997)
    54 Cal. App. 4th 1218.......................................................24, 26, 27

*Alexander v. Exxon Mobil*,
    219 Cal. App. 4th 1236 (2013) .................................................. 23

*Barker v. Lull Engineering* (1978)
    20 Cal.3d 413..................................................................... 5, 27

*Buckner v. Milwaukee Electric Tool Corp.* (2013)
    222 Cal.App.4th 522.................................................................. 26

*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001)
    24 Cal.4th 800........................................................................... 14

*Chavez v. Clock Inc.* (2012)
    207 Cal. App. 4th 1283............................................................. 25

*Contois v. Aluminum Precision Products Inc.*,
    2008 WL 5065108 (Cal. Ct. App. 2008) ............................... 24

*DeLeon v. Commercial Manufacturing and Supply Co.* (1983)
    148 Cal.App.3d 336.................................................................. 26

*Fox v. Ethicon Endo-Surgery, Inc.* (2005)
    35 Cal. 4th 797.........................................................12, 15, 16, 17

iii

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

*Gonzales v. Carmenita Ford Truck Sales Inc*. (1987)
  192 Cal. App. 3d 1143.................................................................23, 24, 26

*Gonzales v. Texaco*
  2007 4044319 (Cal. Ct. App. 2007) ...................................................... 20

*Gonzalez v. Workers Compensation Appeals Board* (1996)
  46 Cal.App.4th 1584 ............................................................................ 14

*Hart v. Robert Bosch Tool Corp.*
  2010 WL 3566715 (Cal. Ct. App. 2010) .............................................. 24

*Heimuli v. Lilja*,
  2012 WL 25208907 (Cal. Ct. App. 2012) ............................................ 22

*Jackson v. Deft, Inc.* (1990)
  223 Cal.App.3d 1305.................................................................24, 25, 27

*Johnson v America Standard Inc.*
  43 Cal. 4th 56 (2008) ........................................................................... 29

*Jolly v. Eli Lilly & Co.*,
  44 Cal. 3d 1103 (1988) ......................................................................... 20

*McCabe v, American Honda Motor Co.* (2002)
  100 Cal. App. 4th 1115 ......................................................................... 28

*McCoy v. Gustafson*,
  180 Cal. App. 4th 56 (2009) ................................................................. 21

*Midgley v. S.S. Kresge Co.* (1976)
  55 Cal. App. 3d 67 ................................................................................ 26

*Miller v. Lakeside Village Condominium Assn.*,
  1 Cal. App. 4th 1611 (1991) ................................................................. 22

*Nazir v. United Airlines* (2009)
  178 Cal.App.4th 243 ............................................................................. 11

*NBC Universal Medial LLC v. Superior Court*,
  225 Cal. App. 4th 1222 (2014) ............................................................. 20

*Nelson v. Indevus Pharmaceuticals, Inc.* (2006)
  142 Cal.App.4th 1202 ........................................................................... 12

iv

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

*Nguyen v. Western Digital Corp.*,
    229 Cal. App. 4th 1522 (2014)................................................................23

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999)..........................................................................22

*Pannu v. Land Rover North America, Inc.* (2011)
    191 Cal.App.4th 1298...........................................................................28

*Perez v. VAS S.p.A.* (2010)
    188 Cal.App.4th 658.............................................................................29

*Putensen v. Clay Adams, Inc.* (1970)
    12 Cal. App. 3d 1062...........................................................................23

*Ramirez v. Plough Inc.*
    6 Cal. 4th 539 (1993)............................................................................24

*Reynolds v. Natural Gas Equipment, Inc.* (1960)
    184 Cal.App.2d 724..............................................................................25

*Rivas v. Safety-Kleen Corp.*,
    98 Cal. App. 4th 218 (2002)................................................................21

*Rosas v. BASF Corp.*,
    236 Cal. App. 4th 1378 (2015)............................................................22

*Shields v. Hennessy Industries Inc.*
    205 Cal. App. 4th 782 (2012)..............................................................29

*Stevens v. Workers Compensation Appeals Board* (2015)
    241 Cal.App.4th 1074..........................................................................14

*Taylor v. Elliott Turbomachinery Co., Inc.* (2009)
    171 Cal.App.4th 564............................................................................25

*Tellez-Cordova v. Campbell-Hausfeld* (2004)
    129 Cal. App. 4th 577..........................................................................29

*Temple v. Velcro USA Inc.*
    148 Cal.App. 3d 1090 (1983)..............................................................24

*Treatt USA v. Superior Court*
    2015 WL 5895495 (Cal. Ct. App. 2015).............................................21

v

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

*Tsaturyan v. GlaxoSmithKline LLC,*
    2018 WL 1789379 (Cal. Ct. App. 2018) .............................................. 23

*Webb v. Special Elec. Co. Inc.* (2016)
    63 Cal.4th 167 ...................................................................................... 29

*Williams v. Beechnut Nutrition Corp.* (1986)
    185 Cal. App. 3d 135 ........................................................................... 25

## Other Authorities

*Aguilar v. Atlantic Richfield Co., supra,* at 850 ...................................... 11

CACI 1204 .................................................................................................. 28

CACI 1205 .................................................................................................. 26

CACI 1245 .................................................................................................... 6

Fed.R.Civ.P. 56(c)(2) ................................................................................. 11

vi

# I.     **INTRODUCTION**

Defendant Precision Valve & Automation Inc.'s (hereinafter "PVA") Motion for Summary Judgment must be denied because Plaintiffs produce evidence demonstrating there are issues of fact, which must be determined by a jury-and not by the Court on Summary Judgment. Plaintiffs' claims cannot be dismissed on Summary Judgment pursuant to the Statute of Limitations defense for the following reasons:

1.   Issues of Fact Exist As To When Plaintiff Should Have Discovered That His Injury Had A Wrongful Cause; and

2.   Filing A Workers Compensation Claim Does Not Equate To A Claimant Claiming That His/Her Injury Was Due To The Fault of Anyone; and

3.   The Reason Plaintiff Filed His Workers Compensation Claim Had Nothing To Do With the PVA 350 Or Any Suspicion About The PVA 350; and

4.   Discovery Conducted *During* The Workers Compensation Action Provided Plaintiff With A Basis To Suspect His Injury Might Have Been Caused By Chemicals From The PVA 350; and

5.   Medical Causation Does Not Equate To Knowledge Of Wrongful Conduct.

Plaintiffs' claims cannot be dismissed on Summary Judgment pursuant to Defendants' allegation that there is no evidence of a product defect for the following reasons:

1.   Inadequate Warnings on the PVA 350 and a failure to properly train users on the use and dangers of the PVA 350 provide sufficient evidence to proceed with a Failure to Warn claim; and

2.   Evidence produced by Plaintiff shows that the PVA 350 is a defective product because it fails the Consumer Expectations Test as well as the Risk/Benefit Analysis under *Barker v. Lull Engineering* (1978) 20 Cal.3d 413.**.**

1

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

## II.   BRIEF FACTUAL BACKGROUND

### A.  THE PRODUCT

The subject machine, a PVA 350, was manufactured, designed, and sold by PVA Inc.  [PUF 152] The purpose of the subject machine was to safely coat circuit boards with a layer of coating material after which the circuit boards were to be placed inside rockets. [PUF 153] The PVA 350 is a selective conformal coating machine. The PVA 350 is known as a selective conformal coating machine, which means a user can program the equipment to skip or avoid designated areas.  [PUF 127] PVA 350 is not a "work cell." [PUF 124] The PVA 350 is a standalone device, which is a mechanism or system that can perform its function without the need of another device, computer, or connection.  In contrast, a work cell is a term used in the manufacturing industry for an arrangement of resources in manufacturing to improve quality, speed, and the costs of the processes.  [PUF 125]

Each PVA model machine is different, and the PVA 350 machine does not contain vital safety features for its intended purposes as on other models including a conveyor belt, a heighted above-board clearance inside the machine, an exhaust blower (also known as a PVA Blower), flow monitoring, additional chemical supply heads, and an external on board computer and each safety measure was readily available at the time the PVA 350 was manufactured.  [PUF 155]

Based on the statements of Ruben Juarez, he was trained by PVA Inc. to put his head inside the PVA 350 machine without a ventilation mask. [PUF 157]  The PVA manual does not warn individuals working the PVA machines to wear facemasks with ventilators. [PUF 158] Further, based on the dimensions of the machine, the use of the PVA 350 machine with a ventilation face mask is not feasible. [PUF 159] After installing the machine, PVA Inc. continued to service the machine, make modifications to the machine, and assist Space X to make modifications to the machine. [PUF 161] PVA Inc. did not ensure the safety of end

2

users. [PUF 162]  Indeed PVA Inc., through its continued support and maintenance of the machine, knew of Space X's use of toxic sealants in the conformal coating process. [PUF 163]  It is the custom and practice for manufactures to anticipate a reasonable degree of misuse and take this into account in designing their product. *See* CACI 1245.  As such, PVA Inc. has a duty to protect end users from anticipatable misuse. [PUF 164]

The PVA 350 is defective in design because PVA Inc. should have taken steps during the manufacturing and design process to mitigate the risk of harmful exposure by foreseeable use of the end users including the various available coating chemicals.  This could have been easily done by: (i) altering the design of the PVA 350 so that the interior can be monitored with cameras and/or mirrors so that the end user need not place their head within the confined space; (ii) equipping the PVA 350 with interlocks that prevent the operation of the PVA 350 unless the ventilation system is operating. (Air flow sensors are commonly used to ensure ventilation systems are operating); (iii) equipping the PVA 350 with interlocks that prevent opening the PVA 350 until the ventilation system has cleared the interior airspace of the PVA 350 of harmful vapors.  This is commonly done with timers and/or chemical sensors; and, (iv) eliminating possible overriding systems of bypass/interlocks at the PVA 350. [PUF 168]

PVA Inc. likewise failed to provide proper warnings to its end users as to the use of toxic materials and proper ventilation/protection. [PUF 169] Specifically, the PVA 350 failed to have an adequate warning because PVA Inc. failed to take steps to warn its customers and end users that the PVA 350 machine could leak toxic chemicals or exposure could occur while using the PVA 350. [PUF 170]

PVA Inc. knew how Space X was utilizing the machine and the chemicals utilized during the conformal coating process, but PVA Inc. failed to provide sufficient safety features or warn of the danger and thus the PVA 350 caused

3

dangerous and possibly life-threatening exposure and injures. [PUF 174] PVA Inc. should have never sold this PVA 350 to Space X because it was involved in the avionics industry which often requires the use of dangerous chemicals in the coating process, but PVA Inc. sold and maintained this machine while in the service of Space X with the knowledge that the end users could easily be injured. [PUF 175]

It was clearly foreseeable that end users such as those in the Avionics industry would utilize the PVA 350 with dangerous chemicals utilized in the conformal coating process, and PVA Inc. was aware of the specific chemicals being utilized by Space X as stated in the emails/Declarations. [PUF 180]  There should have been a **stamp on the PVA 350** as well as a **hardcopy set of instructions** in the box specifically warning customers not to use the PVA 350 with dangerous chemicals commonly utilized in the avionics conformal coating process, or PVA should have provided sufficient safety measures to ensure its safe operating conditions under these circumstances. [PUF 181]

## B.  INTERACTIONS BETWEEN SPACE X, PLAINTIFF, PVA INC. AND PVA 350

PVA Inc. manufactured, designed, and sold the PVA 350 to Space X in 2009. [PUF 84]  Ruben Juarez worked at Space X from January 2012 to May or June 2014 as a programmer. [PUF 89]  While working at Space X, Ruben Juarez started to experience various health problems including headaches.  [PUF 92]  A physician initially suspected Mr. Juarez had vertigo and later suspected his aneurysm was the cause of his condition.  [PUF 94]  Only after a successful surgery am 2013 and subsequent checkups did Mr. Juarez realize that he had recovered from the aneurysm. [PUF 95]  But because Mr. Juarez' symptoms persisted, he realized the aneurysm was not causing his symptoms.  [PUF 96]  As no one else at work was sick, Mr. Juarez thought his symptoms were caused by his aneurysm or because he

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

was just unusually sensitive to the chemicals in the nearby chemical baths. [PUF 97, 111]

Mr. Juarez' Workers Compensation Claim was filed due to "repetitive and continuous exposure to electronics parts cleaning (the chemical bath down the hall) & Lead SO (the filters with the lead wiring). [PUF 98] At this time, Mr. Juarez guessed that the cause of his injuries was lead solder wires and unknown chemicals used in the chemical cleaning baths at the Space X facility—items and areas completely unconnected to the PVA 350. [PUF 99] At the time Mr. Juarez filed his Workers Compensation Claim, there were no physicians who suggested Plaintiff examine all the chemicals utilized at Space X—there were no physicians telling Plaintiff to avoid anything or any place at work—there was no one informing Plaintiff that the PVA 350 was not working properly or that it was dangerous to program the PVA 350—Plaintiff did NOT see any MSDS sheets or Manual associated with the PVA 350—nor did Plaintiff see any Standard Operating Procedures issued by his employer regarding the use of MSDS sheets and/or the use of the PVA 350. [PUF 100]

During the work up of Mr. Juarez' Workers Compensation claim, he was sent to see Dr. Regev. [PUF 101] Dr. Regev suggested that Mr. Juarez obtain the MSDS sheets for the lead solder wire and chemical cleaning baths. [PUF 102] During this appointment, Dr. Regev never indicated Mr. Juarez thought any of the chemicals he was working with were dangerous, and Dr. Regev did not tell Mr. Juarez to stay away from any chemicals. [PUF 104]

Pursuant to Dr. Regev's request (i.e. *following the doctors advice*), Plaintiff requested the MSDS sheets and made an appointment with a toxicologist. [PUF 106] Also, Mr. Juarez called Space X and requested a list of chemicals associated with the chemical bath and the filters with the lead wires, but Space X did not provide Mr. Juarez with a list so Mr. Juarez called Francisco (a co-worker at Space

5

X) in early March of 2015 and Francisco ended up giving Mr. Juarez not only the list of chemicals involved in the cleaning baths and lead wire, but also the names of the chemicals that Mr. Juarez worked with when programming PVA 350.  [PUF 107]

Mr. Juarez emailed Space X on March 3, 2015 asking for the MSDS sheets that Francisco indicated that Mr. Juarez worked with, and on March 3, 2015, Jane Malubag with Space X did not send Mr. Juarez the MSDS sheets but indicated Space X's insurance would send them to Mr. Juarez' workers' compensation attorneys, and on March 12, 2015 she indicated that the MSDS sheets were forwarded to Mr. Juarez' attorney and insurance company.  [PUF 108] After receipt of the MSDS sheets, Mr. Juarez saw a toxicologist on March 25, 2015, Mr. Zlotolow M.D., and provided Dr. Zlotolow with the MSDS sheets for review.  [PUF 109]  It was at the appointments with the toxicologist, starting in March of 2015 tht Plaintiff was first told his reactive airways disease and rhinitis were probably caused by industrial exposure on the job. [PUF 110]   Only after Mr. Juarez reviewed the MSDS sheets did Mr. Juarez realize that the solder wire was actually lead-free and the chemical used in the chemical baths was only isopropyl alcohol. [PUF 112] Plaintiff was deposed on three occasions during the Workers Compensation Action—on March 30, 2015 and May 20, 2015 and October 21, 2015.  [PUF 113] During these depositions, counsel for Space X continued to ask questions to Plaintiff about the PVA 350—the manner in which Plaintiff operated the PVA 350—the training Plaintiff received about the PVA 350 and about any warnings associated with the PVA 350.  It was this series of questions which led Plaintiff to investigate the safety of the PVA 350 and which triggered Plaintiffs actual suspicion that his injury was might have been caused by defects associated with the PVA 350.  [PUF 114]

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

For years, Mr. Juarez worked with the PVA 350 without any suspicion that Space X or PVA Inc. were doing anything wrong and he was never provided the manual. [PUF 130, 134 134] A new chemical, which Mr. Juarez later found out was a toxic chemical, Arathane, was introduced at Space X with the assistance of PVA Inc. and  David Hwang replaced the original chemical, which Mr. Juarez later found out was Humiseal. [PUF 139] Mr. Juarez had no formal or informal chemistry training so he was not allowed to mix these chemical compounds and he was unaware of toxicity of the chemicals.  [PUF 135, 144]

## III.  LEGAL STANDARD

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.   A court does not make credibility determinations or weigh conflicting evidence but rather draws all inferences in the light most favorable to the nonmoving party.  *Ibid*.; see also *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  There is a triable issue of fact if the evidence would allow a reasonable trier of fact to find any material fact in favor of plaintiff. *Aguilar v. Atlantic Richfield Co., supra,* at 850. A Court must view the evidence in the light most favorable to plaintiff and strictly scrutinize defendant's evidence. *Nazir v. United Airlines* (2009) 178 Cal.App.4th 243. The Court may not grant summary judgment based on inferences if contradicted by other inferences which raises a triable issue as to any material fact. *Aguilar (supra)* at 856.  In the

7

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

instant matter, Plaintiff produces evidence which raises triable issues of fact on the statute of limitations defense and in regard to the defectiveness of the PVA 350.

## IV.    THE STATUTE OF LIMITATIONS: PLAINTIFFS TIMELY FILED THEIR COMPLAINT

### A.    Issues of Fact Exist As To When Plaintiffs Should Have Discovered That Their Injury Had A Wrongful Cause.

As to the Statute of Limitations argument put forth by PVA, the California Supreme Court in *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797 clearly states the delayed disocovery rule and a Plaintiff's obligations as follows: "The Legislature, in codifying the discovery rule, has also required plaintiffs to pursue their claims diligently by making accrual of a cause of action contingent on when a party discovered or should have discovered that his or her injury ***had a wrongful cause.***" *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797, 808. [Emphasis added]    Furthermore, "[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by the tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim.") *Fox* (supra) @ 813. In *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202, the court addressed the delayed discovery rule and the issue of raised suspicions. The *Nelson* court held, "Our ***Supreme Court has never held that under the discovery rule, the suspicion necessary to trigger the statute may be imputed to a plaintiff***, and we do not believe that to be the law." *Nelson (supra)* at 1206. [Emphasis added].

Thus, California law is quite clear that the mere fact of knowledge of an injury does not result in an accrual of a cause of action.  A plaintiff must have either discovered that the injury had a wrongful cause or that the plaintiff should have discovered that his injury had a wrongful cause.

8

In this case, it is undisputed that Plaintiff was aware of an injury (headaches, dizziness and migranes in 2012 and an aneurysm in 2013) more than two years before he filed his Complaint on 2/28/17.  But the instant motion must be denied because there are **issues of fact as to when Plaintiff discovered or should have discovered that his injury was caused by a wrongful act**—i.e. a defective product manufactured by PVA.  Specifically, despite the fact that Plaintiff was displaying symptoms as early as 2012, there are no medical records which pre-date Plaintiffs Workers Compensation Claim (filed 9/24/14) which state (in any manner) that Mr. Juarez suspected his injuries were caused by the wrongful act of anyone[1]. There are no medical records which pre-date Plaintiffs Workers Compensation Claim in which a doctor advised Plaintiff to stay away from any place, product or chemical.  [PUF 120]  Plaintiff vehemently denies that he ever saw the MSDS sheets for his workplace prior to March 2015 and vehemently denies that he ever saw the PVA 350 Manual or the Space X Standard Operating Procedure Manuals. [PUF 91, 92 100]

### B. Filing A Workers Compensation Claim Does Not Equate To A Claimant Claiming That His/Her Injury Was Due To The Fault of Anyone.

On 9/24/14, Plaintiffs filed a Workers Compensation Claim with his employer (Space X) because Plaintiff felt he was getting sick at work due to the existence of filters with lead wires at the Space X worksite and due to the existence of a chemical

---

[1] In fact, Plaintiff hoped his headaches and dizziness were going to resolve after his aneurysm surgery in 2013—i.e he did not think his headaches and dizziness would remain due to some ongoing chemical exposure. [Juarez Declaration @ Para. 3] Furthermore, to Plaintiffs knowledge, no one else at work was experiencing similar symptoms so Plaintiff did not suspect anyone had done anything wrong which caused harm to plaintiff. Plaintiff, at that time, merely thought he had his own unique medical condition. [Juarez Declaration @ Para. 3]

9

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

cleaning bath that was located next to Mr. Juarez' work station.  [PUF 121, 122]
The filters with lead wires and the cleaning baths were constructed and integrated
into the Space X work place (as opposed to the many independent machines [such as
the PVA 350] that were manufactured by third parties and purchased by Space X for
use in the Space X building).  [PUF 98, 104, 111]

As *California is a "no-fault" state* which allows employees to file Workers
Compensation actions against their employer based on the mere fact that a worker
got sick at work, the *filing of a Workers Compensation claim is not definitive
proof that a claimant suspects his injury was due to the wrong or fault of another*.
*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811;
*Stevens v. Workers Compensation Appeals Board* (2015)  241 Cal.App.4th 1074,
1087; *Gonzalez v. Workers Compensation Appeals Board* (1996) 46 Cal.App.4th
1584.  ("The state Constitution gives the Legislature plenary power…to create…and
enforce a complete system of workers compensation…Acting under this power, the
Legislature enacted the workers compensation law to govern compensation to
California workers who are injured in the course of their employment…The
underlying premise behind this statutorily created system…is the compensation
bargain…under which the employer assumes liability for industrial personal injury
or death *without regard to fault* in exchange for limitations on the amount of that
liability.  The employee is afforded relatively swift and certain payment of benefits
to cure or relieve the effects of industrial injury without having to prove fault…").
[Emphasis added] *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24
Cal.4th 800, 811; *Stevens v. Workers Compensation Appeals Board* (2015)  241
Cal.App.4th 1074, 1087; *Gonzalez v. Workers Compensation Appeals Board* (1996)
46 Cal.App.4th 1584.

Thus, the mere filing of Plaintiff's Workers Compensation Claim on 9/24/14
does not equate to any admission that Plaintiff suspected his injury was caused by

10

the wrongful conduct of his employer or any third party.  In fact, Plaintiff's conduct in filing his Workers Compensation Claim is exactly what the State of California encourages citizens to do if they get injured at work—file a Workers Compensation Claim for quick relief.

## C. The Reason Plaintiff Filed His Workers Compensation Claim Had Nothing To Do With the PVA 350 Or Any Suspicion About The PVA 350

"[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." *Fox v. Ethicon Endo-Surgery* (supra) @ 813.

As the Workers Compensation Claim Form shows, and as the testimonial evidence submitted by Plaintiff shows, the Workers Compensation Claim was filed due to "repetitive and continuous exposure to electronics parts cleaning (the chemical bath down the hall) & Lead SO (the filters with the lead wiring). [PUF 98] This evidence shows that Plaintiff did not have an actual suspicion when he filed his Workers Compensation Claim that the PVA 350 was actually causing plaintiffs injury and it shows that (prior to filing his Workers Compensation Claim) Plaintiff never thought or alleged that there was something wrong with the PVA 350 which caused Plaintiff injury.  [PUF] Just because Plaintiff suspected that the chemical bath implemented by his employer (Space X) and/or the lead wiring (also implemented by Space X) might have been causing him injury does not equate to Plaintiff being aware of facts that demonstrated that the PVA 350 was the cause of injury due to PVA doing something wrong with its product.  [PUF 113, 114]

There simply was nothing on Plaintiffs' "radar screen" at the time he filed his Workers Compensation Claim that would have provided Plaintiff with facts to cause him to investigate the PVA 350—i.e. there were no physicians who suggested

11

Plaintiff examine all the chemicals utilized at Space X—there were no physicians telling Plaintiff to avoid anything or any place at work—there was no one informing Plaintiff that the PVA 350 was not working properly or that it was dangerous to program the PVA 350—Plaintiff did NOT see any MSDS sheets or Manual associated with the PVA 350—nor did Plaintiff see any Standard Operating Procedures issued by his employer regarding the use of MSDS sheets and/or the use of the PVA 350[2]. [PUF 99]

## D. Discovery Conducted *During* The Workers Compensation Action Provided Plaintiff With A Basis To Suspect His Injury Might Have Been Caused By Chemicals From The PVA 350

As PVA lacks any evidence of Plaintiffs actual suspicion (more than two years before the filing of the Complaint on 2/28/17) that Plaintiffs' injuries were caused by a wrong commited by PVA, the California Supreme Court in *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797 provides California Plaintiffs with their legal obligations when a Plaintiff should have discovered that his or her injury had a wrongful cause.

"In other words, Plaintiffs are required to ***conduct a reasonable investigation*** after becoming aware of an injury, and are ***charged with knowedge*** of the information that would have been ***revealed by such a [reasonable] investigation***." *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797, 808.  [Emphasis added]

_____

[2] There is a multitude of independent "stand alone" devices located at the Space X work site. [PUF 124-126]  It is a question of fact to be determined by a jury as to whether a person "in plaintiffs' shoes" should have investigated ***every machine and device at Space X*** based upon Plaintiffs knowledge of the fact that he was experiencing headache and dizziness symptoms and he was around many different types of machines and devices at his work place.

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

The issue of "what constitutes a reasonable investigation" and "what a reasonable investigation would have revealed"—as well as to when Plaintiffs should have discovered their injuries were caused by a wrong—is generally a question of fact for a jury to determine. *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797.

In this case, the evidence shows that up to the time of filing his Workers Compensation Claim, Plaintiff had been seen by multiple physicians and none of them told Plaintiff his injuries were caused, or might have been caused, by chemicals at his workplace and that he should avoid those chemicals.  [PUF  93, 99, 100]

But during the discovery phase in the Workers Compensation claim, Plaintiff went to see Dr. Isaac Regev. [PUF 99, 100] In the "DISCUSSION" portion of the Regev Medical Records, Dr. Regev confirms Plaintiffs History by noting that: "The patient relates of frequent headaches at work and he believed they were associated with chemicals to clean electrical parts [the chemical baths down the hall]. He also believes he was exposed to lead [the filters with the lead wiring in the building]. [PUF 104] But Dr. Regev did not stop there.  Dr. Regev then advised that Plaintiff see a toxicologist and obtain the MSDS sheets from Space X so a toxicologist could review said sheets and advise Plaintiff.  [PUF 105-109]  "I suggest the patient be seen by a toxicologist with the MSDS and working environment analysis." [PUF 104]

Under *Fox* (supra), Dr. Regev's advice now triggered Plaintiff to commence a reasonable investigation to obtain the MSDS sheets from his employer and to take them to a toxicologist[3].  This is EXACTLY WHAT PLAINTIFF DID.  Promptly

_____

[3] Prior to seeing Dr. Regev, there was no physician who advised Plaintiff to investigate the chemicals in the chemical baths and lead wires. Thus, prior to seeing Dr. Regev, Plaintiff's

13

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

after seeing Dr. Regev, Plaintiff contacted Space X and asked for the MSDS sheets from his working environment.   [PUF 106] Unfortunately, the administrative personnel at Space X did not promptly respond to Plaintiffs request for the MSDS sheets. [PUF 106] So, Plaintiff then contacted his co-worker (Francisco) who mixed the chemicals at Space X and asked Francisco to get Plaintiff the MSDS Sheets from Space X.   [PUF 106] Instead of sending Plaintiff the MSDS sheets, Francisco told Plaintiff over the phone the products and MSDS sheets to ask for from Space X. [PUF 106] This all took time.  On March 3, 2015, Plaintiff sent an email to Space X asking for the MSDS sheets that Francisco told Plaintiff to ask for.  Space X did not, however, send the MSDS sheets directly to Plaintiff but instead sent them to Workers Compensation Counsel for Plaintiff.  [PUF 107]  Finally, Plaintiff obtained the MSDS sheets in time for his first appointment with the toxicologist (Dr. Ronald Zlotolow) on March 25, 2015.  [PUF 108] It was at this appointment, that Plaintiff was first told his reactive airways disease and rhinitis were probably caused by industrial exposure on the job [PUF 109].  Thus, the reasonable results of Plaintiffs' investigation into any causal connection between his workplace on some of his symptoms occurred—AT THE EARLIEST ON MARCH 25, 2015[4].   [PUF 108] Thus, Plaintiff timely filed his Complaint on 2/28/17—less than two years after the

---

"reasonable investigation" based on his fact of injury resulted in Plaintiff being told he had symptoms but no physician connected the symptoms to any chemical exposure at work.  [PUF] The "reasonable investigation" broadened when Dr. Regev told Plaintiff to get the MSDS Sheets and see a toxicologist. [PUF 105-106]

[4] Issues of fact exist as to whether the reasonable results of the reasonable investigation would be found by the jury to be 3/3/15 (when Plaintiff asks for the MSDS sheets from Space X) or on the date after 3/3/15 (when Plaintiff or his attorney actually received the MSDS Sheets) or on 3/25/15 (when Plaintiff reviewed the MSDS sheets with Dr. Zlotolow).  [PUF 105-109] All of these dates make the two year period for the Statute of Limitations as the Complaint was filed on 2/28/17.

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

product of his reasonable investigation occurred in March of 2015. [PUF 106-109, 182]

### E. Medical Causation Does Not Equate To Knowledge Of Wrongul Conduct

All of the aforementioned evidence from the MSDS Sheets and from the medical records just speaks to Plaintiffs subjective (or legally imposed objective) knowledge about a potential causal connection between some chemicals at work and some of Plaintiffs symptoms. But said medical causation evidence does not equate to Plaintiffs knowledge or suspicion that there was something wrong with the PVA 350—i.e. that it was defective in any manner. Just because a chemical might be listed as an agent that can cause harm to a human being does not mean that said chemical is reaching said human being due to someone's wrongful conduct. For the cause of action to truly accrue, plaintiff had to be aware of some facts which would have led him to believe/suspect that the causative chemicals were reaching plaintiff due to something being wrong with the PVS 350 device.[5] As it turns out, that suspicion arose during the discovery process in the Workers Compensation Action.

Plaintiff was deposed on three occasions during the Workers Compensation Action—on March 30, 2015 and May 20, 2015 and October 21, 2015. [PUF 113] During these depositions, counsel for Space X continued to ask questions to Plaintiff about the PVA 350—the manner in which Plaintiff operated the PVA 350—the training Plaintiff received about the PVA 350 and about any warnings associated with the PVA 350. [PUF 113] It was this series of questions which led Plantiff to investigate the safety of the PVA 350 and which triggered Plaintiffs actual suspicion that his injury was might have been caused by defects associated with the PVA 350.

_____

[5] The PVA 350 device was not the only "stand alone device" provided by a third party to Space X which is used at the huge Space X facility. [PUF

15

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

[PUF 114]  This element of a cause of action—suspicion of a wrong—did not arise until the earliest deposition on 3/30/15---less than two years before the Complaint was filed on 2/28/17.  [PUF 114, 182]

As shown above, there are questions of fact as to when Plaintiffs causes of action accrued as to Plaintiffs claims against PVA. There certainly is evidence that would support a reasonably jury finding that said cause of action accrued in March of 2015.  [PUF 114]   Therefore, since Plaintiff filed his Complaint in February 2017, Plaintiff timely filed his Complaint against PVA and the instant motion must be denied on that basis.

## F.  DEFENDANT'S CASES ARE NOT CONTROLLING.

Defendant's motion cites a series of cases interpreting the delayed discovery rule, which are similarly distinguishable.  Specifically, Defendant cites *Gonzales v. Texaco* 2007 4044319, *7 (Cal. Ct. App. 2007), which is dissimilar to the facts asserted by Mr. Juarez because in *Gonzales* the plaintiff was told by a doctor her cervical cancer was caused by Texaco's oil extraction activities; no similar conveyance was made to Mr. Juarez until March of 2015.  [PUF]

Defendant has failed to met its burden of showing a prima facie case showing nonexistence of any triable issue of material fact because only then does the burden shift to opposing party to show a trial issue of material fact.  *See NBC Universal Medial LLC v. Superior Court,* 225 Cal. App. 4th 1222, 1232 (2014).  Defendant fails to met its burden because defendant may not rewrite the First Amended Complaint, which clearly alleges Plaintiff did not have a reasonable suspicion until the MSDS sheets were provided by Space X in 2015 within the two year statute of limitations period.  As stated in *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1112 (1988), "plaintiffs who file suit as soon as they have reason to believe that they are entitled to recourse will not be precluded" and upon receipt of the MSDS sheets and seeing a toxicologist Mr. Juarez had a reasonable suspicion of a wrongdoing as

16

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

stated in the First Amended Complaint, but he did not know about the defects in the PVA 350 until the Worker's Compensation depositions.  [PUF 113, 114]

Mr. Juarez was not put on notice of the toxicity of the chemicals he was working with, which distinguishes the line of chemical cases and notice cases cited by the defendant.  [PUF 135, 144]  In *McCoy v. Gustafson*, 180 Cal. App. 4th 56, 109 (2009), the court indicated the Plaintiffs had a duty to investigate after the Plaintiffs received specific notice of the condition of the soil in a purchase agreement and thus had notice (unlike Mr. Juarez who did not receive the MSDS sheets until these were provided by Space X in March 2015).  [PUF 109]  Similarly, defendant also cites the unreported opinion of *Treatt USA v. Superior Court* 2015 WL 5895495 (Cal. Ct. App. 2015) where the plaintiff sued the chemical manufactures and suppliers of toxic food flavoring chemical, and the plaintiff was specifically diagnosed with a disease related to the chemicals, which is dissimilar to Mr. Juarez's cause of action which is asserted against a product manufacturer not the chemical manufacturer. Upon Mr. Juarez discovering the toxicity of the chemicals utilized with the PVA Inc. after receiving the MSDS sheets, being interrogatored about the PVA 350 during his Workers' Compensation depositions, and filed an action and the discovery process has revealed the PVA 350 was defective and PVA Inc. was negligent.  [PUF 90-92, 113, 114]  As such, this case and the Defendant's line of chemical cases are specifically inapplicable.

Along this same rationale, *Rivas v. Safety-Kleen Corp.*, 98 Cal. App. 4th 218 (2002) is similarly distinguishable because in *Rivas* the Plaintiff sued a chemical manufacturer, the doctor asked for a list of chemicals, and the doctor specifically told the Plaintiff to stay away from a specific chemical and the Plaintiff failed to act diligently.  This is completely different from the actions of Mr. Juarez who upon request by a doctor diligently sought out the MSDS sheets, received the MSDS sheets in March 2015, and saw a toxicologist in March of 2015 thereby starting the

17

process of uncovering facts of the defective product and timely filing his action within 2 years of obtaining said causation facts.  [PUF 106-112]  Along this similar rational both *Norgart v. Upjohn Co.,* 21 Cal. 4th 383 (1999) and *Miller v. Lakeside Village Condominium Assn.*, 1 Cal. App. 4th 1611, (1991) are inapposite because, in both cases, the Plaintiffs were aware of the toxicity and the cause of their injuries unlike Mr. Juarez' product defect and negligence actions, which is one step removed because the defects in the product were not uncovered until after the MSDS sheets were uncovered in March of 2015 and Plaintiff sat for his worker's compensation damages.  [PUF 106-112]

Although *Rosas v. BASF Corp.*, 236 Cal. App. 4th 1378, 1399 (2015) is a case where the Plaintiff is suing the manufacturers and sellers of chemicals, the case does indicate: ***"[a] rule of law that places on any sick individual the burden of sharing with his or her doctor any suspicion, whether well formed or not, is not yet embodied in California law, and we are not willing to go that far.  Instead, we hold that when a reasonable person would not necessarily suspect wrongdoing, it is not a plaintiff's burden to begin an investigation until the objective facts establish a reason to investigate***."  Simply put, when Mr. Juarez' doctor requested the MSDS sheets, Mr. Juarez provided these sheets upon receipt and met with a toxicologist.  However, the failure of his doctors to request that information earlier does not create a lack of diligence on the behalf of Mr. Juarez.  Plaintiff acted upon receipt of the MSDS sheets to meet with the toxicologist and filed his claim within the two year statute of limitation.  [PUF 106-113]

Defendant's reliance on the unreported case of *Heimuli v. Lilja*, 2012 WL 25208907 *6 (Cal. Ct. App. 2012) by arguing that Plaintiff was not diligent and that the advice of attorneys does not toll the statute of limitations is inapplicable because Plaintiff herein filed his Complaint within two years of  meeting  with the toxicologist with the MSDS sheets on March 25, 2015.  [PUF 182]

18

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

Additionally, Mr. Juarez is not suing his employer and thus the string of cases such as *Nguyen v. Western Digital Corp*., 229 Cal. App. 4th 1522, 1529 (2014) where the subsequent toxic exposure action is asserted against the employers is inapplicable.  Plaintiff herein is suing a third party: PVA for a defective stand alone machine that was in a large work space at Space X amongst a multitude of other stand alone machines.  Similarly, Mr. Juarez is not seeking to toll the statute of limitations based on English not being his first language as set forth in *Tsaturyan v. GlaxoSmithKline LLC,* 2018 WL 1789379 * 6, (Cal. Ct. App. 2018).  Further, the cases that find the tolling ceased at the notice of a "environmental concerns" are dissimilar because the Plaintiffs in those cases were provided with notice of the hazard in the development and purchase of land whereas Plaintiff herein was not pvoided with notice of any hazard before Plaintiff obtained the MSDS sheets.  *See Alexander v. Exxon Mobil,* 219 Cal. App. 4th 1236 (2013).

**V.     THE PVA 350 IS A DEFECTIVE PRODUCT**

**A.   DEFENDANT'S PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFFS' FAILURE TO WARN CLAIM**

***Plaintiffs' evidence supporting Plaintiffs' failure to warn claim is set forth in the declaration of Glen Stevick.  [PUF 169-171, 180-181***] A manufacturer "has a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the manufacturer has reason to believe that they will not realize its dangerous condition." *Putensen v. Clay Adams, Inc.* (1970) 12 Cal. App. 3d 1062, 1076-1077. The duty to warn is not limited to unreasonably dangerous products.  Rather, directions or warnings are in order where reasonably required to prevent the use of a product from becoming unreasonably dangerous*. Gonzales v. Carmenita Ford Truck Sales Inc*. (1987) 192 Cal. App. 3d 1143, 1151. It is the lack of such a warning which renders a product

19

unreasonably dangerous and therefore defective. *Id.* "[T]he law…requires a **manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse."** *Wright v. Stang Manufacturing Co*. (1997) 54 Cal. App. 4th 1218, 1235. [T]he extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact. *See Id.* In most cases, **the adequacy of a warning is a question of fact for the jury.** S*ee Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1320.; See CACI Jury Instruction 1205. ***The PVA 350 is defective as set forth in the declaration of Glen Stevick. [PUF 169-171, 180-181]***

Defendant's line of cases are inapplicable.  First, *Temple v. Velcro USA Inc.* 148 Cal.App. 3d 1090 (1983), is inapplicable because the PVA 350 did not have a clear warning and only warned of the hazard of voltage unlike the warning in *Temple* that provided an extensive and detailed warning.   Second, *Contois v. Aluminum Precision Products Inc.,* 2008 WL 5065108, * 4 (Cal. Ct. App. 2008) is inapplicable PVA Inc. did have an inadequate warning on the machine and the company inadequately trained Mr. Juarez on how to utilize the machine without providing a sufficient warning unlike the Plaintiff in *Contois* who did not read any warnings.  [PUF 85-87, 132, 156] Third, Mr. Juarez is not alleging a failure to warn because the warning was not written in a foreign language and thus *Ramirez v. Plough Inc.* 6 Cal. 4th 539, 544 (1993) and *Hart v. Robert Bosch Tool Corp*. 2010 WL 3566715, * 5(Cal. Ct. App. 2010) are inapplicable.  Fourth, Plaintiff pled facts sufficient to show the statute of limitations tolled in the First Amended Complaint so *Navajo Nation v. U.S. Forest Service* 535 F. 3d 1058 (2008) is similarly inapplicable. [PUF 169-171, 180-181]

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

## B.  NEGLIGENT FAILURE TO WARN

A manufacturer/seller of a product is under a duty to exercise reasonable care in its design so that it can be safely used as intended by its buyer/consumer, and this duty extends to all persons within the range of the potential danger.  *See  Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal. App. 3d 135, 141. "[W]here an article is either inherently dangerous or reasonably certain to place life and limb in peril when negligently made, a manufacturer owes a duty of care to those who are the ultimate users." *Reynolds v. Natural Gas Equipment, Inc.* (1960) 184 Cal.App.2d 724, 736. "***This duty requires reasonable care to be exercised in assembling component parts and inspecting and testing them before the product leaves the plant***." *Id.* Negligence law in a failure-to-warn case requires a Plaintiff prove that distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about.  *Chavez v. Clock Inc.* (2012) 207 Cal. App. 4th 1283, 1305.  ***As set forth in the declaration of Glen Stevick, PVA Inc. negligently failed to warn. [PUF 172-181]***

## C.  STRICT LIABILITY FAILURE TO WARN

In most cases, ***the adequacy of a warning is a question of fact for the jury.*** S*ee Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1320.; See CACI Jury Instruction 1205. "Our law recognizes that even '"a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes 'defective' simply by the absence of a warning." *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 577. Thus, manufacturers have a duty to warn consumers about the hazards inherent in their products. *Id.* The purpose of requiring adequate warnings is to inform consumers about a product's hazards and faults of which they are unaware, so that the consumer may then either refrain from using the product altogether or avoid the danger by careful use." *Id.*

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

A duty to warn or disclose danger arises when an article is or should be known to be dangerous for its intended use, either inherently or because of defects." *See DeLeon v. Commercial Manufacturing and Supply Co.* (1983) 148 Cal.App.3d 336, 343. "[T]he duty to warn is not conditioned upon [actual or constructive] knowledge [of a danger] where the defectiveness of a product depends ***on the adequacy of instructions furnished by the supplier which are essential to the assembly and use of its product***." *Midgley v. S.S. Kresge Co.* (1976) 55 Cal. App. 3d 67, 74. [T]he warning requirement is not limited to unreasonably or unavoidably dangerous products. *Gonzales v. Carmenita Ford Truck Sales Inc.* (1987) 192 Cal. App. 3d 1143, 1151. Rather, ***directions or warnings are in order where reasonably required*** *to prevent the use of a product from becoming unreasonably dangerous*. *Id.*

"[T]he law now requires a ***manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse.*"* Wright v. Stang Manufacturing Co.* (1997) 54 Cal. App. 4th 1218, 1235. [T]he extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact. *See Id.*

California law [CACI 1205] shows: "Two types of warnings may be given. If the product's dangers may be avoided or mitigated by proper use of the product, the manufacturer may be required adequately to instruct the consumer as to how the product should be used." *Buckner v. Milwaukee Electric Tool Corp.* (2013) 222 Cal.App.4th 522, 532.    The other type of warning to be given is to warn about the foreseeable risks and hazards in use of the product.   *DeLeon v. Commercial Manufacturing and Supply Co.* (1983) 148 Cal.App.3d 336. Additionally, "[T]he law now requires the manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions

22

to minimize the harm that may result from misuse and abuse…the extent to which designers and manufacturers are required to anticipate safety neglect presents an issue of fact…a manufacturer owes a foreseeable user of its product a duty to warn of risks of using the product.   *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218.   The adequacy of a warning is a question of fact for the jury. *Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305.   **As set forth in the declaration of Glen Stevick, the evidence cited herein there is a failure to warn.  [PUF 169-171, 180-181]**

### D. DEFENDANT'S MOTION FOR A PARTIAL SUMMARY JUDGMENT FOR A STRICT PRODUCT LIABILITY ACTION SHOULD BE DENIED.

Defendant's motion for summary judgment for strict liability should be denied because the product was defective, PVA Inc. continued to service and modify the equipment, and the misuse of the machine was foreseeable.  [PUF 132, 165, 168, 176]  In the seminal case of *Barker v. Lull Engineering* (1978) 20 Cal. 3d. 413, the California Supreme Court established two alternative tests for determining whether a product was defectively designed including the Consumer Expectation Test and the Risk/Benefit Test.

### E. CONSUMER EXPECTATION TEST

A product may be found defective in design if the plaintiff demonstrates that the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Barker v. Lull Engineering (1978)* 20 Cal. 3d 413, 429. The consumer expectation test recognizes that "implicit in a product's presence on the market is a representation that it is fit to do safely the job for which it was intended. The consumer expectation test recognizes that "implicit in a product's presence on the market is a representation that it is fit to do

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE & AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT

safely the job for which it was intended. If the facts permit an inference that the product at issue is one about which consumers may for minimum safety assumptions in the context of a particular accident, then it is enough for a plaintiff, proceeding under the consumer expectation test, to show the circumstances of the accident and the objective features of the product where relevant to an evaluation of its safety, leaving it to the fact finder to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1309 citing *McCabe v, American Honda Motor Co.* (2002) 100 Cal. App. 4th 1115, 1120-1121. Specialized groups of consumers have also been afforded protections under the consumer expectation test. When assessing what a reasonable consumer expectation is in a specialized group of users this is appropriate to consider expert testimony. *McCabe v, American Honda Motor Co.* (2002) 100 Cal. App. 4th 1115, 1120. ***As set forth in the declaration of Glen Stevick, the PVA 350 fails the consumer expectation test. [PUF 164]***

## F.   RISK BENEFIT TEST

CACI 1204 provides the elements of the Risk/Benefit Test.[6] To make a prima facie case, the plaintiff has the initial burden of producing evidence that he or she was injured while the product was being used in an intended or reasonably foreseeable manner. If this prima facie burden is met, the burden of proof shifts to

---

[6] Plaintiffs must prove 1. Defendants manufactured/distributed/sold the product; 2. Plaintiff was harmed; and 3.  That the product design was a substantial factor in causing harm to Plaintiff. If Plaintiffs are successful in proving these three elements, the burden switches to Defendant to prove that the benefits of the product's design outweigh the risks of the design.  In deciding whether the benefits outweigh the risks, the jury will consider the following: (a) the gravity of the potential harm resulting from the use of the product, (b) the likelihood of an alternative safer design at the time of manufacture, (c) the feasibility of an alternative safer design at the time of manufacture, (d) the cost of an alternative design, (e) the disadvantages of an alternative design, and (f) other relevant factors.  See CACI 1204

24

the defendant to prove that the plaintiff's injury resulted from a misuse of the product. *See Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 678.

Additionally, the line of cases cited by the defendant are factually distinguishable.  In *Johnson v America Standard Inc*. 43 Cal. 4th 56, 61-62 (2008), the Plaintiff indicated he had reviewed the MSDS sheets unlike Mr. Juarez, who did not get the MSDS sheets until after Space X sent the MSDS sheets in March of 2015.  [PUF 106-113]  The defects in the PVA 350 created the danger so *Shields v. Hennessy Industries Inc.* 205 Cal. App. 4th 782 (2012) is inapplicable.   "Under the component parts doctrine, the supplier of a product component is not liable for injuries caused by the finished product unless: (1) ***the component itself was defective and caused injury*** or (2) the supplier participated in integrating the component into a product, the integration caused the product to be defective, and that defect caused injury." *Webb v. Special Elec. Co. Inc.* (2016) 63 Cal.4th 167, 183. *Tellez-Cordova v. Campbell-Hausfeld* (2004) 129 Cal. App. 4th 577.  Here, ***PVA Inc. created the defective PVA 350 and fails the Risk Benefit Test as set forth in the declaration of Glen Stevick.  [PUF154-176, 180]***

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, PVA's Motion For Summary Judgment should be denied.

 DATED: SEPTEMBER  10, 2018          **BALABAN & SPIELBERGER, LLP**


<u>/s/ Vanessa L. Loftus-Brewer</u>
Daniel K. Balaban, Esq.
Andrew J. Spielberger, Esq.
Vanessa L. Loftus-Brewer
Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANT PRECISION VALVE &
AUTOMATION, INC.'S MOTION FOR SUMMARY JUDGMENT