# EXHIBIT 2

EXHIBIT 2                    19

# BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

# OF THE STATE OF CALIFORNIA

RUBEN JUAREZ,

APPLICANT,

VS.

SPACE EXPLORATION TECH. CORP.;
CHUBB GROUP OF INS. CO.,

DEFENDANTS.

CASE NO.   ADJ9801824

VOLUME II

DEPOSITION OF RUBEN JUAREZ

LOS ANGELES, CALIFORNIA

WEDNESDAY, MAY 20, 2015

10:25 A.M.



EXHIBIT 17
Ruben Juarez
03/08/2018

Elizabeth Schmidt
CSR#13598

# CERTIFIED

# COPY

REPORTED BY:   **CATINA PERAHIA**

CSR NO.:   **9731**

## PERANICH REPORTING

*Certified Shorthand Reporters*
5241 E. Santa Ana Canyon Road, Suite 100
Anaheim Hills, CA 92807
(800) 956-4784
(714) 637-3774
Fax (714) 637-3023

EXHIBIT 2                                          20



```
 1              BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

 2                     FOR THE STATE OF CALIFORNIA

 3

 4                                  )
 5   RUBEN JUAREZ,                  )
                                    )
 6              Applicant,          )
                                    )
 7      vs.                         )   CASE NO.:  ADJ9801824
                                    )
 8   SPACE EXPLORATION TECH. CORP.; )
     CHUBB GROUP OF INS. CO.,       )
 9                                  )
                Defendant.          )      VOLUME II
10   _____)

11

12

13

14              DEPOSITION OF RUBEN JUAREZ,

15   taken on behalf of the Defendant, at 3600 Wilshire

16   Boulevard, Suite 2100, Los Angeles, California, at

17   10:25 A.M., on Wednesday, May 20, 2015, before CATINA M.

18   PERAHIA, CSR #9731, a Certified Shorthand Reporter within

19   and for the State of California, pursuant to Notice.

20                          -oOo-

21

22

23

24

25
                                                            67
```

1    APPEARANCES OF COUNSEL:

2

3        For the Applicant:

4            GRAIWER & KAPLAN
             BY:   SHERWIN CONWAY
5                  Attorney at Law
             3600 Wilshire Boulevard
6            Suite 2100
             Los Angeles, California   90010
7            (213) 380-7500

8

9        For the Defendant:

10           ROBIN, CARMACK and GONIA, LLP
             BY:   ROBERT M. ROBIN
                   Attorney at Law
11           131 North El Molino Avenue
             Suite 120
12           Pasadena, California   91101
             (626) 568-9800

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    68

EXHIBIT 2                          22

1
                    I N D E X

2
WITNESS                                PAGE

3
RUBEN JUAREZ

4
                 Examination by Mr. Robin      70

5

6

7

8

9
                   E X H I B I T S

10
                      (NONE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          69

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 20, 2015

2                  10:25 A.M. - 11:56 A.M.

3                          -oOo-

4

5                      RUBEN JUAREZ,

6          having solemnly sworn to tell the truth,

7             was examined and testified as follows:

8

9                        EXAMINATION

10   BY MR. ROBIN:

11        Q.   Mr. Juarez, you recall our first deposition --

12        A.   I do.

13        Q.   -- where I gave you the admonition as to the

14   procedure?  Would you like me to repeat that?

15        A.   Yes, because --

16        Q.   Okay.  I'm going to continue to ask you

17   questions about the claim you have filed for workers'

18   compensation benefits in this second volume of the

19   deposition.  To each of my questions, I would ask that

20   you give me a response loud enough for all of us to hear.

21             The reporter is taking down everything that is

22   said exactly as it is said.  All testimony is under

23   penalty of perjury.  It has the same force and effect as

24   if we were in a court of law.

25             Please wait for the end of my question, as the

                                                              70

EXHIBIT 2                      24

1    end of my question may affect your answer.  And it avoids

2    both of us speaking at the same time, which is very

3    difficult for the reporter to take down in her

4    transcription.

5         Following the deposition the reporter's notes

6    will be transcribed into a typewritten booklet called a

7    deposition booklet which you have here as Volume I.  That

8    verbatim transcript will be submitted to you again in the

9    future for Volume II to review and sign.

10        At that time you will have the opportunity to

11   make any changes you may deem necessary in your

12   testimony.  But I should indicate to you that I or any

13   other attorney associated in this matter will have the

14   right to comment on the extent of those changes, if any,

15   and they could prove adverse to your credibility.  So I

16   would ask for your best testimony at this time.

17        If you do not understand part or all of my

18   question, please ask me for clarification, as I will

19   assume, if you do answer it, you understood the question.

20        The reporter can take down spoken testimony

21   only.  She cannot take down responses such as a nod of

22   the head, a shrug of the shoulders or utterances such as

23   "uh-huh" or "huh-uh."

24        If you need a break at any time, simply let us

25   know.  We can take a break.

71

```
 1              Do you have any questions before we begin?

 2        A.    No.

 3        Q.    Okay.  Have you taken any medications in the

 4   last 24 hours that would in any way affect your ability

 5   to participate in this deposition?

 6        A.    I have took some medications.

 7        Q.    What have you taken?

 8        A.    Pain medication.

 9        Q.    Such as?

10        A.    Percocet.

11        Q.    All right.

12        A.    And Xanax.

13        Q.    Anything else?

14        A.    Well, my normal medication which is Depakote.

15        Q.    I'm sorry?

16        A.    Depakote.  Nortriptyline, Wellbutrin, Topamax.

17   I think that's all.

18        Q.    The Percocet is for pain?

19        A.    Yes, pain medication.

20        Q.    What part of your body does it affect?

21        A.    The brain.

22        Q.    Is this for like headaches?

23        A.    Yes.

24        Q.    Xanax?

25        A.    For anxiety.
```

                                                          72

1        Q.    Depakote?

2        A.    The rest of it -- Depakote is for prevention of

3   migraines.

4        Q.    Nortriptyline?

5        A.    For prevention medication for migraines.

6        Q.    Wellbutrin?

7        A.    For depression.

8        Q.    And Topamax?

9        A.    For prevention of migraine.

10       Q.    Do any of these medications or all of these

11  medications in combination affect your ability to

12  participate in the depo to accurately remember?

13       A.    Not that I can think of, no.  I might have a

14  little bit of problem remembering things, but that's --

15       Q.    Do you still reside at 16527 Jersey Street,

16  Granada Hills, California 91344?

17       A.    Correct.

18       Q.    Are you working now?

19       A.    No.

20       Q.    Do you have a current source of income?

21       A.    This time, no.  I was waiting for my

22  Social Security.

23       Q.    Are you getting State disability?

24       A.    It ended.

25       Q.    When was that?

73

1      A.    Some time in March.  End of March.

2      Q.    Of this year?

3      A.    Yes.  And I'm waiting for the -- the insurance

4   from the company, from Space Ex.

5      Q.    You receive --

6      A.    Long-term disability insurance.

7      Q.    You received short-term disability initially;

8   correct?

9      A.    I did.

10     Q.    And when did that end?

11     A.    That I don't remember.

12     Q.    You've applied for long-term disability through

13  Space Ex?

14     A.    Recently.

15     Q.    And has a decision been made in respect to that

16  claim?

17     A.    I e-mailed the person who handles my case to see

18  they would do it, but I e-mailed because I don't see

19  anything on their website as far as when are they going

20  to start paying me.

21     Q.    So you have no current income at present?

22     A.    Not at this point.

23     Q.    How long has it been since you have had no

24  income?

25     A.    A month and a half or so.

74

1       Q.   You applied for Social Security disability?

2       A.   SSDI, yeah.

3       Q.   When was that?

4       A.   I want to say some time in April.

5       Q.   Have you received a determination?

6       A.   No, no.  I just receive some information about

7   the process, and I receive a phone call from

8   Social Security asking me about my case and that was it.

9       Q.   So the case is pending?

10      A.   Yes.  I think they have to review it, and they

11  have to make a determination.  There were -- I was told

12  that they were going to send me some forms on the mail,

13  and I have to fill it up and send it back somewhere.  I

14  think in Utah or somewhere like that.

15      Q.   Are these medical authorizations to release

16  medical information so they --

17      A.   I don't think so.  I'm not sure.  The person

18  that I talked to -- I talked to him twice.

19      Q.   Right.

20      A.   The first time he told me he was going to send

21  me a copy of the claim itself.  And then he also told me

22  to get a copy of my State disability payment, which I

23  did, and mail it back to them.

24           And then thereafter he called me, and he left a

25  voicemail saying that I was going to receive a package of

                                                         75

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

EXHIBIT 2                    29

1    forms, to fill it out as much as possible and then send

2    it back to them.  And that's --

3        Q.   That was it?

4        A.   That was it.

5        Q.   When last we were here in Volume I of your

6    deposition, we had discussed various chemicals that you

7    had used or been present with at the Space Ex facility.

8    We talked about Thinner 527, eutectic solder wire,

9    HumiSeal 1A33, conformal coating --

10       A.   Yes.  And by the way, on the eutectic solder,

11   it's not just a solder wire.  It's solder bars as well.

12       Q.   The same solder, just in different form?

13       A.   Different composition, yes.  I mean --

14       Q.   Different shape?

15       A.   Yes.  The formula is the same, but this one is

16   in a bar.

17       Q.   Right.

18       A.   And I also like to -- we did not have the

19   proper -- the proper container to dispose the solder that

20   it was coming out of a solder pot that we had.

21       Q.   Was that for storage?

22       A.   That's for disposal.  Under California you have

23   to have a container to dispose that because it's lead.

24   And we only had a plastic container which not adequate to

25   store.

                                                        76

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

EXHIBIT 2                         30

1          And, also, for the HumiSeal I was not -- I was

2     never given the proper equipment to replace the filler

3     system on the conformal coating, which I think the

4     company should change the policy on that.

5          Q.   And I also note that -- did you use isopropyl

6     alcohol for anything?

7          A.   Actually, it was something that aggravate my

8     situation because they put a station right next to my

9     work area.   A wash area where they use alcohol to wash

10    PCB's, printed circuit board assemblies.   And they would

11    blow it right next to me.

12         Q.   Printed circuit --

13         A.   Board.

14         Q.   PCB's.

15         A.   Printed circuit board assemblies.

16         Q.   You're saying there was some type of odor;

17    correct?

18         A.   Well, it was the odor on the mist from when they

19    were using compressed air to blow that to dry them out,

20    and I was right next to the station.

21         Q.   How far away?

22         A.   About 12 inches.

23         Q.   You were 12 inches away from the wash station?

24         A.   Yes, to the wash area.

25         Q.   How often would they use this wash station?

77

1          A.    Every day.

2          Q.    For how long?

3          A.    Through the entire work time.

4          Q.    Were those all of the chemicals that you came in

5    any type of contact with?

6          A.    Um, as far as I can remember.  I don't know.  I

7    gave the list to the HR, human resources.

8          Q.    Okay.

9          A.    I don't know whether there are chemicals --

10         Q.    That's fine.

11         A.    Because I don't remember.  It was HumiSeal, and

12   it was two other -- two-part or three-part component,

13   alcohol, eutectic solder, and I don't remember if I

14   missed one or not.

15         Q.    I show that your occupation was designated

16   ultimately as a computer programmer; is that correct?

17         A.    Due to the fact that there were always new head

18   management, my title changed, but I was mostly doing

19   manufacture engineer work under different title.

20         Q.    What was that title?

21         A.    The first they assigned me as an equipment

22   specialist, but it didn't have any description, job

23   description.  And then after that I think they changed it

24   to a technician or something like that, but I was still

25   doing the same manufacture engineer work.

                                                    78

1    Q.   That was working with the machinery and

2  programming?

3    A.   Working with machinery, programming,

4  troubleshooting, ordering equipment.

5    Q.   When you say "troubleshooting," you get machines

6  to work; you fix problems?

7    A.   Correct.  And also working with a process, fine

8  tuning the process, ordering new equipment.

9    Q.   And the process, you're talking about the

10  manufacturing process?

11    A.   Correct.  Including design of fixtures to aide

12  the operators.

13    Q.   Were these machines C and C types?

14    A.   No, it was conformal coating equipment.

15    Q.   Conform?

16    A.   Conformal coating equipment.

17    Q.   Coating.

18    A.   And inspection.  Optical inspection equipment.

19  AOI, automatic optical inspection.  I traveled to

20  San Diego to train and also to New York.

21         I did request an upgrade for our current machine

22  because it didn't have the safety feature which it had

23  had under conformal coating, such as it didn't have the

24  alarm to know when the suction was working or not.

25    Q.   So you wanted some type of an alarm system built

79

1    in?

2       A.    No.    To upgrade the equipment itself, because

3    the current equipment -- it was obsolete, and it didn't

4    have the alarm system to advise the operator that the

5    suction system was not working or pulling all of the

6    fumes out of it.

7       Q.    Okay.

8       A.    So I end up buying some separate standalone

9    filtration system for that area.

10      Q.    For the work area; correct?

11      A.    Yes, for the equipment and for the drying out

12   area.  They use a designated area to -- where the boards

13   were dried out from the chemicals.  So 1 purchased those

14   standalone system.

15      Q.    Right.

16      A.    To help out to clean the air because it was

17   pretty bad.

18      Q.    And when did you get this system?

19      A.    I don't remember the date.

20      Q.    Approximately.

21      A.    I -- no, I don't want to speculate on that.  My

22   memory is not that well.

23            I also purchased an inspection system and --

24   with that -- from England.  I also purchased a filtration

25   system for that inspection area as well.  I was trying to

                                                          80

1   make things better for the operators and the inspectors

2   because the fumes can be pretty strong.

3       Q.   All right.

4       A.   And I designed some of the fixtures so we didn't

5   have to use that many chemicals.  And some did work.  I

6   was in the process of using a preform tape so they don't

7   have to use so much labor and helping out the operator

8   not being exposed to the conformal coating materials.  So

9   I was trying to make things better for the operators.

10      Q.   Okay.  Is that all of your job duties?

11      A.   No.  That was part of my job duties.  The rest

12  of it was designing, programming and equipment repair.

13  So even though my title did say something, it didn't

14  actually reflect my duties.

15      Q.   Okay.

16      A.   And I was advised by my manager that my title

17  might change but not to worry about it, that I would be

18  doing the same thing, which end up not being true.

19      Q.   Who is the manager?

20      A.   John Peana.  P-e-a-n-a.  When I tried to return

21  to work, they told me I was a technician, which was

22  ludicrous.  And they denied me to return to work because

23  they say my medical condition.

24      Q.   Are those all of your job duties?

25      A.   That I can remember.

81

1     Q.  Okay.  Good.

2     A.  I mean, I was like a wild card trying to work

3  everywhere.

4     Q.  You had many skills.

5     A.  Yeah, many hats.

6     Q.  Are you under current medical treatment now?

7     A.  Yes.

8     Q.  And which doctors are you seeing?

9     A.  Dr. Ronald Andiman.

10     MR. ROBIN:  A-n-d-i-m-a-n.

11     THE REPORTER:  Thank you.

12  BY MR. ROBIN:

13     Q.  He's an orthopedist?

14     A.  No, a neurologist.

15     Q.  And what treatment does he provide to you?

16     A.  Medication for prevention -- oh, I forgot to

17  tell you that I also get shots of Botox.

18     Q.  Botox?

19     A.  Yes.  Sorry about that.

20     Q.  What is this for?

21     A.  For the headaches.  I believe I mentioned that

22  previously.  I'm not sure.  I don't remember.

23     Q.  Who gives you this Botox injection?

24     A.  Dr. Andiman.

25     Q.  Where do they inject the Botox?

82

PERANICH REPORTING   (714) 637-3774   (800) 956-4784

EXHIBIT 2                                    36

1    Angiogram is the study, the test.  The aneurysm, that's

2    the condition.

3              MR. ROBIN:  Okay.  I don't think I have anything

4    further.

5              MR. CONWAY:  I have no questions.

6              MR. ROBIN:  Shall we stipulate to waive the

7    reporter's obligation to file the original transcript

8    waiving CCP 2025(q) and (s).  Original and one copy to

9    Applicant's attorney, copy to myself, four on one

10   condensed, please.

11             Any changes, amendments, deletions, corrections

12   shall be noticed to deposing counsel in writing within

13   45 days of receipt of the transcript.  If the original

14   signed is not available for any reason, an unsigned copy

15   can be introduced into evidence as though a fully signed

16   original for all purposes.

17             So stipulated?

18             MR. CONWAY:  Yes.

19             (Deposition proceedings were concluded

20             at 11:56 A.M.)

21                        -oOo-

22

23

24

25

                                                    113

```
 1              I, the undersigned, say I have read the

 2    foregoing deposition and declare under penalty of perjury

 3    that the foregoing is true and correct.

 4              Executed this ____ day of _____, 2015, at

 5    _____, _____.

 6

 7                         _____

 8                              RUBEN JUAREZ

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                      114
```

1

STATE OF CALIFORNIA  )      ss.

2                        )

3

4          I, Catina M. Perahia, CSR No. 9731, a Certified

5    Shorthand Reporter within and for the State of

6    California, do hereby declare:

7          That pursuant to 2093 (b) C.C.P., I administered

8    the oath to the deponent;

9          That the foregoing deposition was taken before

10   me at the time and place set forth and was taken down by

11   me in shorthand and thereafter transcribed under my

12   direction and supervision;

13         That the foregoing deposition is a full, true

14   and correct transcript of my shorthand notes so taken.

15         I further declare that I am neither counsel for,

16   nor related to, any party to said action, nor in any way

17   interested in the outcome thereof.

18         I declare under penalty of perjury this 25th day

19   of _May_ , 2015, that the foregoing is true and

20   correct.

21

22         _____
           CERTIFIED SHORTHAND REPORTER

23         FOR THE STATE OF CALIFORNIA

24

25

115